```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   PACT XXP TECHNOLOGIES, AG   *    Civil Docket No.
                                 *    2:07-CV-563
 4   VS.                         *    Marshall, Texas
                                 *
 5                               *    May 14, 2012
     XILINX, INC. & AVNET, INC.  *    8:14 A.M.
 6
                    TRANSCRIPT OF JURY TRIAL
 7         BEFORE THE HONORABLE JUDGE ROY S. PAYNE
                UNITED STATES MAGISTRATE JUDGE
 8   APPEARANCES:

 9   FOR THE PLAINTIFFS:        MR. JOSEPH S. GRINSTEIN
                                MR. JOHN P. LAHAD
10                              Susman Godfrey
                                1000 Louisiana Street
11                              Suite 5100
                                Houston, TX    77002
12
                                MR. LINDSEY N. GODFREY
13                              Susman Godfrey
                                1201 Third Avenue
14                              Suite 3800
                                Seattle, WA    98101
15
                                MR. MICHAEL F. HEIM
16                              MR. LESLIE V. PAYNE
                                MR. RUSSELL A. CHORUSH
17                              MR. ERIC J. ENGER
                                MR. NATHAN J. DAVIS
18                              Heim Payne & Chorush
                                600 Travis Street
19                              Suite 6710
                                Houston, TX    77002
20
     APPEARANCES CONTINUED ON NEXT PAGE:
21

22   COURT REPORTERS:          MS. SUSAN SIMMONS, CSR
                               MS. SHELLY HOLMES, CSR
23                             Official Court Reporters
                               100 East Houston, Suite 125
24                             Marshall, TX    75670
                               903/935-3868
25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE PLAINTIFFS:          MR. OTIS W. CARROLL
                             MR. COLLIN M. MALONEY
                             Ireland Carroll & Kelley
                             6101 South Broadway
                             Suite 500
                             Tyler, TX   75703

                             MR. ROBERT M. PARKER
                             MR. CHRISTOPHER BUNT
                             MR. CHARLES AINSWORTH
                             Parker Bunt & Ainsworth
                             100 East Ferguson
                             Suite 1114
                             Tyler, TX   75702

FOR THE DEFENDANTS:          MR. SAMUEL F. BAXTER
                             McKool Smith
                             104 East Houston
                             Suite 300
                             Marshall, TX   75670

                             MR. JASON CASSADY
                             MS. ADA BROWN
                             McKool Smith
                             300 Crescent Court
                             Suite 1500
                             Dallas, TX   75201

                             MR. GREGORY S. AROVAS
                             Kirkland & Ellis
                             601 Lexington Avenue
                             New York, New York   10022

                             MR. MARC H. COHEN
                             Kirkland & Ellis
                             950 Page Mill Road
                             Palo Alto, CA   94304

                             MR. ADAM R. ALPER
                             Kirkland & Ellis
                             555 California Street
                             27th Floor
                             San Francisco, CA   94104

1
P R O C E E D I N G S
2

3              (Jury out.)

4              LAW CLERK:  All rise.

5              THE COURT:  Good morning.  Please be

6 seated.

7              For the record, we're here this morning

8 for the trial of PACT XPP Technologies versus Xilinx, Et

9 Al., which is Case No. 2:07-563.

10              It's my understanding that there are some

11 issues that counsel would like to address before we

12 bring the jury in.

13              So if counsel would make their

14 introductions, we'll address those issues.

15              MR. GRINSTEIN:  Your Honor, Joe

16 Grinstein representing the Plaintiff PACT.  I've got my

17 team with me here today.

18              THE COURT:  All right.  Thank you, Mr.

19 Grinstein.

20              MR. BAXTER:  Morning, Your Honor, Sam

21 Baxter, and we're ready, Your Honor.

22              THE COURT:  All right.  Mr. Grinstein, do

23 you want to start?  Do you have issues that the Court

24 needs to address?

25              MR. GRINSTEIN:  Yes, Your Honor.  Again,

1   Joe Grinstein representing the Plaintiff, PACT.  I've

2   got the first issue and the issue relates to Defendants'

3   opening demonstratives.  And I have to say actually this

4   is a pretty serious issue if not, you know, I don't like

5   the looks of the demonstrative, it's not -- you know,

6   it's not the right color.

7                    I think we're going to have a very

8   serious Markman 02 issue in this case.  And it's

9   suggested to me by the Defendants' demonstratives -- can

10  I have the ELMO, please?  Your Honor, there's a series

11  of demonstratives that the Defendants have proposed to

12  show to the jury this morning.  I'm showing you one of

13  them.  This particular one discusses the re-examination

14  of the PACT '181 patent.

15                   THE COURT:  Mr. Grinstein, before we get

16  too far into that, can you tell me, do you have other

17  issues?  I'd like to get an idea --

18                   MR. GRINSTEIN:  Oh, I'm sorry.

19                   THE COURT:   -- of what all we have so

20  that I can make sure we reach what we need to reach.

21                   MR. GRINSTEIN:  With respect to

22  objections to their demonstratives, my only issue is

23  this 02 issue.  I think we have a couple of issues with

24  document objections and deposition objections.  I think

25  they're relatively quick.

1          THE COURT:  Are those issues that you

2   expect to be material this morning?

3          MR. GRINSTEIN:  No.  I expect them to be

4   material this afternoon, Your Honor.

5          THE COURT:  Okay.  And is that it from

6   Plaintiff's side?

7          MR. GRINSTEIN:  Yes, Your Honor.

8          THE COURT:  Okay.  Mr. Baxter, you have

9   other issues that you wanted to raise before we bring in

10  the jury this morning?

11         MR. BAXTER:  Yes, Your Honor, there is

12  still I think the Court has had under consideration what

13  has been marked as DX 912, which is the e-mail from Mr.

14  Vorbach and one of his engineers that the Court had

15  carried along.  It was the e-mail, Your Honor, in which

16  they said that the --

17         THE COURT:  Can you hear all right?  Do

18  we need to -- if you could either raise that mic up so

19  that you get mic'd better we'll make a better record.

20         Thank you.

21         MR. BAXTER:  All right.  Thank you, Your

22  Honor.  That was the e-mail, Your Honor, in June of '05

23  which Mr. Marcus Weinhardt sent an e-mail to Mr. Vorbach

24  about the DSP48 which had come out and he said that he

25  looked at it, it didn't have anything to do with XPP.

1              THE COURT:  All right.

2              MR. BAXTER:  There was a document

3  attached to that e-mail, Your Honor. The document's in,

4  which is the manual for the DSP48.  That's in.  It was

5  the e-mail that the Court still has under consideration.

6              THE COURT:  Any other matters that the

7  defense wanted to raise?

8              MR. BAXTER:  That's -- that's all, Your

9  Honor, except for the depositions and -- and a few, I

10 think, exhibit --

11             THE COURT:  Okay.  Good.  Thank you.

12             MR. GRINSTEIN:  Oh, Your Honor, I'm -- I

13 don't have complete control of the issues as well as I'd

14 like this morning.  We also have a couple of questions

15 to ask about the proper scope of testimony with respect

16 to Your Honor's rulings yesterday on Motions in Limine

17 Number 12 and 13.  We want to make sure we don't step

18 somewhere where we're not supposed to step.

19             THE COURT:  All right.  And do you expect

20 that to be an issue that will come up in the morning

21 session?

22             MR. GRINSTEIN:  I would like to be

23 careful.  I don't want to go somewhere where I'm not

24 supposed to go on opening --

25             THE COURT:  All right.

1            MR. GRINSTEIN:   -- so I think those I

2  probably should be careful about, Your Honor.

3            THE COURT:  All right.  Well, let's drop

4  back, then, to the demonstrative that you were starting

5  to address.

6            MR. GRINSTEIN:   Your Honor, one of the

7  demonstratives that the Defendants intend to put before

8  the jury is this demonstrative that discusses what was

9  said in the re-examination of one of PACT's patents.

10  And the obvious point behind this demonstrative is to

11  argue to the jury what the claims of PACT's patents

12  mean.

13            In fact, there are several demonstratives

14  just like this one, there's a demonstrative right here

15  that discusses the summary of the patent; demonstrative

16  right here that talks about the abstract of the patent.

17  The re-examination file history is potentially relevant

18  to three possible issues, Your Honor.

19            Issue No. 1 is if there was a prosecution

20  history, estoppel issue or a DOE issue, then statements

21  from the re-examination file history would be proper.

22  That's not the case here.  DOE has been limined out.

23  Second re-examination is relevant to prior art, what was

24  before the Patent Office on the prior art, what wasn't,

25  what the Patent Office decided.  That's not the issue

1  right here.  This is not discussing prior art.

2              The third relevance of re-examination

3  history is to use that history to define what the claims

4  mean, and that is exactly what the Defendants mean to do

5  with this particular exhibit.

6              What they are talking about is trying to

7  define what the bus system in our patents mean, what the

8  bus interface, what bus system control, all of these

9  things that are underlined they intend to argue to the

10 jury, Your Honor -- Ladies and Gentlemen of the Jury,

11 PACT's patents cover an invention which means this and

12 you can see what that invention means by looking at the

13 re-examination file history.

14             That's the exact same thing that they do

15 with these other exhibits, the summary, the abstract.

16 They're arguing claim meaning, and that is not a proper

17 issue for the jury under Markman and it's not a proper

18 issue for the jury under 02.

19             It is error to allow the Defendants to

20 get before the jury and argue to the jury that the

21 claims mean anything other than what the claim language

22 says and what Your Honor's definitions of those claim

23 language is.  They can't get up here and argue I know

24 what the claim language says, but Ladies and Gentlemen

25 of the Jury, look at this stuff and that will help you

1  understand what the definitions and constructions are.

2  That can't be a proper use of this type of evidence.

3              Now, I'm not saying that there isn't a

4  proper use for some reason for the re-examination; in

5  fact, it's very relevant to prior art.  I'm not saying

6  that looking at the patents and the abstracts and

7  drawings aren't relevant to some potential issues in

8  this case, but they are certainly not relevant to

9  rearguing claim meaning to the jury.  That is a province

10 exclusively of this Court, not of Defendants' counsel.

11             THE COURT:  All right.  Mr. Baxter?

12             MR. BAXTER:  I guess this will be the

13 first patent case I've ever seen, Judge, where they say

14 we're going to put the patent in evidence but you can't

15 show the jury anything from the patent, which is what

16 their argument really is.  We're not rearguing the claim

17 language, what we're trying to do, Your Honor, you know

18 all the slides they have with the fences, we're just

19 trying to find those fences for the jury.  And we're

20 trying to tell the jury, look, here's what they told the

21 Patent Office and here's what they told the world the

22 patent is about.

23             In the re-exam, it's why we believe, in

24 fact, the re-exam was granted and then why it was issued

25 over our opposition is that they put language in there

1   that moved the fences in a narrow way.  And so it's not

2   rearguing the claim language at all, Your Honor, it's

3   simply saying this is what they told the Patent Office

4   their patent was about.

5              And certainly we get to show the jury the

6   abstract and the summary of the invention that the

7   inventors swore was true when he filed his invention and

8   that's all we're using it for.

9              THE COURT:  And are you going to be

10  arguing to the jury that the interpretation of the

11  claims should be based on what you're pointing out to

12  them?

13             MR. BAXTER:  No, Your Honor, I'm simply

14  going to argue to the jury that they told the Patent

15  Office and told the world when they filed their patent

16  that as far as their bus system control is -- is in the

17  Patent Office -- in the patent in the Patent Office, it

18  didn't have to have any programming by the programmer,

19  is what they told the Patent Office.  And -- and

20  that's -- doesn't contradict anything in the Court's

21  claim construction.

22             THE COURT:  All right.  Mr. Grinstein?

23             MR. GRINSTEIN:  Your Honor, I feel like

24  I could package up Mr. Baxter's argument and send it

25  straight to the Federal Circuit and that would be a

1  point of reversible error.  I mean, Mr. Baxter just said

2  that he wants to argue the re-examination file history,

3  he wants to argue the abstract of the patent to, quote,

4  find the fences for the jury.  It is not his job to find

5  the fences for the jury, Your Honor, it is your job to

6  find the fences for the jury.

7            Judge Everingham already found the fences

8  for the jury, Your Honor continues to -- to play that

9  role.  But to get up here and use the re-examination and

10  say, you know, PACT claimed that its invention was X, Y

11  or Z, so therefore you the jury shouldn't find

12  infringement because look, PACT claimed it was X, Y or

13  Z, that is purely rearguing Markman.  I -- I wouldn't

14  know how to describe it more cleanly than rearguing

15  Markman.

16            The only thing that defines the invention

17  are the claims of that patent and this Court's claim

18  constructions.  And to get up here and argue that, well,

19  PACT can't get up here, is estopped from claiming

20  otherwise or PACT made inconsistent statements, those

21  were all arguments for Markman.  That time has come and

22  passed, and we cannot have a jury trial here where both

23  sides are getting up and rearguing what the claims mean.

24            THE COURT:  All right.  With respect to

25  your next objection that you wanted to raise for this

1  morning, let's go ahead and get them all in.

2             MR. GRINSTEIN:  Your Honor, Mr. Lahad is

3  going to handle this.  This is the exhibit issues.  We

4  have one particular issue with a slide which we've

5  worked out with counsel, so Mr. Lahad will go next.

6             THE COURT:  All right.

7             MR. LAHAD:   Good morning, Your Honor,

8  John Lahad for the Plaintiff PACT.  I believe the

9  Defendants have some deposition designation objections,

10  but I'd like to bring up a couple of points or seek some

11  clarification on two points from Your Honor's limine

12  rulings --

13             THE COURT:  All right.

14             MR. LAHAD:   -- yesterday.  Again, I

15  just -- they're fairly clear, but I want to be extra

16  clear.  In docket 357, which is the order on the

17  parties' motions in limine with respect to Defendants'

18  Motion in Limine No. 1, the Court said -- it granted as

19  modified the motion and said no reference shall be made

20  to the specific amount of revenue or profit earned from

21  the accused products or in total.  Your Honor, we have

22  no intention of mentioning billions or millions of total

23  revenues or profits.

24             My main concern is average selling price,

25  and the use of average selling price was discussed

heavily throughout the briefing on Defendants' motion to

strike our damages expert, Mr. Nawrocki.  In the order

on that motion, the Court denied the motion and said

that the entire market value rule was not applied and so

I'd -- I'd just like to get some clarification on where

the Court stands on average selling price as it relates

to --

THE COURT:  Average selling price of?

MR. LAHAD:   -- the accused products.

THE COURT:  You're talking specifically

about the Defendants' chip; is that what we're

discussing here?

MR. LAHAD:  Yes, sir.

THE COURT:  And what -- what evidence do

you want to offer on that?

MR. LAHAD:  Simply the average selling

price of the accused products, Your Honor.

THE COURT:  Which is what?

MR. LAHAD:  Which is approximately $211.

I'll add that Defendants' expert similarly uses the

average selling price of the accused products, albeit on

a --

MR. CASSADY:  I tried to search -- search

what it is, Your Honor.  We're not going to have any

objections to the reference of the average selling price

1  as long as it doesn't go further than that.  I just

2  don't want somebody bringing up they sold this many

3  million chips next to $230 times equals this many

4  billions, that's what I don't want.

5              THE COURT:  All right.  Does that provide

6  the extra clarification, Mr. Lahad?

7              MR. LAHAD:  Yes, it does, Your Honor.

8              THE COURT:  Okay.  Good.

9              MR. LAHAD:  My second question relates to

10 the Court's ruling on Defendants' Motion in Limine 12,

11 which was -- dealt with the RocketChip's acquisition and

12 I understand that the acquisition price requires leave

13 from the Court.

14              The second part of that order, and I'm

15 looking at docket 358, the second part of that order

16 references projected revenues from the RocketChip's

17 acquisition, and I'm not trying to parse the language of

18 the order too much, but I'm wondering if the Court is

19 making any kind of distinction between revenues and

20 profitability projections -- revenue projections and

21 profitability projections?

22              It doesn't mention it in the order.  I

23 know it was in the briefing and so it's clear from the

24 order that, you know, revenues or projected revenues

25 from the RocketChip's acquisition, you know, as the

1  Court said if that revenue projection is incremental

2  revenue related to the alleged infringement, then the

3  Court is inclined to admit the evidence.  The -- the

4  order is silent on profitability and profitability

5  projections.

6              THE COURT:  And what -- specifically what

7  evidence with respect to profitability projections are

8  you seeking to use?

9              MR. LAHAD:  That it's simply a

10 percentage, Your Honor, by incorporating this acquired

11 technology Xilinx expected profitability to increase by

12 such and such percent, and I won't be arguing by 300

13 million or 400 million or any of the large numbers that

14 Defendants are concerned about.

15             THE COURT:  All right.

16             MR. LAHAD:  I don't know if Mr. Cassady

17 can short circuit this one as well.

18             MR. CASSADY:  Not this time, Your Honor.

19             THE COURT:  Frankly I don't think that

20 what he's describing runs afoul of what our concern was.

21 So I -- if -- if your evidence is going to be within

22 what you described now --

23             MR. LAHAD:  Yes.

24             THE COURT:   -- that's not a problem

25 under our ruling.

```
 1                    MR. LAHAD:   Thank you, sir.  That's all
 2   I have.
 3                    THE COURT:  All right.
 4                    MR. CASSADY:   Your Honor, just -- just
 5   so I understand and make clear, we're talking about just
 6   percentages, right, not dollar figures?
 7                    MR. LAHAD:   That -- I don't plan to use
 8   dollar figures, Your Honor.
 9                    THE COURT:  All right.  Any other issues
10   for the Plaintiff before we start?
11                    MR. GRINSTEIN:  No, Your Honor.
12                    THE COURT:  All right.  Mr. Baxter, did
13   you have other issues that you wanted to raise before
14   the morning session?
15                    MR. AROVAS:   Your Honor, maybe I can get
16   up and just raise the -- the issues.  I think there
17   are -- is one open issue on the question of deposition
18   designations.  There are also some objections to
19   witnesses -- I'm sorry, documents that will be used with
20   one of the expert witnesses potentially in the
21   afternoon.  I'm not sure if you want to address all
22   those this morning.
23                    THE COURT:  If you want to you -- you can
24   go ahead and get them out on the table, so to speak, but
25   I don't know that we need to address them before we
```

1  start this morning, but what -- what are --

2                    MR. AROVAS:  Okay.

3                    THE COURT:    -- the issues?

4                    MR. AROVAS:  So I'll just get them on the

5  record.  So --

6                    THE COURT:  Okay.

7                    MR. AROVAS:    -- with regard to the

8  Plaintiff's technical expert witness, Dr. Tredennick

9  there are a number of documents we will be objecting to

10 as not in the expert report.  And as I understand the

11 issue, just to encapsulate it for Your Honor, is that

12 there were a number of schematics that based on the

13 production date, I think, were produced after the scope

14 of the -- after the expert reports were filed.

15                   No supplemental expert report was done

16 and we just don't want to be in a position learning

17 about documents that an expert is going to use for the

18 first time on the stand and so we think there should be

19 a clean rule in the case documents that are in a -- a

20 witness' expert report as long as pre-admitted can be

21 used.  Documents that are not in an expert witness'

22 report shouldn't be used and that's how I understand the

23 issue.

24                   THE COURT:  Well, no exhibit should be

25 used that have not been tendered to the other side.  Are

1  you -- have you been tendered exhibits that you're

2  objecting to on that basis?

3             MR. AROVAS:  Yeah, we have the exhibits,

4  they're just not in the witness' expert report.

5             THE COURT:  And did you raise those

6  objections earlier in the process?

7             MR. AROVAS:  Well, we just found out last

8  night that these -- that these documents were going to

9  be used with this expert witness.  So the --

10            THE COURT:  Well, I'm not sure what you

11 mean by found out they're going to be used.  Were they

12 on the exhibit list?

13            MR. AROVAS:  They're documents that are

14 on the exhibit list, yes.

15            THE COURT:  And was an objection made?

16            MR. AROVAS:  No, there's no objection to

17 the documents being used in the case.  For example, they

18 could -- they're -- they're -- by the way, they're

19 Xilinx's documents, so they could cross examine our

20 witnesses on them and there's no objection to them cross

21 examining our witnesses on those documents.

22            The issue we have is the night before

23 witnesses go on the stand, each side tenders or -- or

24 gives a list of the exhibits they plan to use with each

25 witness.  So this was the first time we learned that the

1  expert is going to give expert opinions on these

2  particular documents.

3            THE COURT:  So you had no notice, you're

4  saying, that this expert had considered these documents?

5            MR. AROVAS:  Exactly, Your Honor, or

6  would use them as the basis for his opinion.

7            THE COURT:  All right.  Let me hear from

8  the Plaintiff, then, on that.

9            MR. GRINSTEIN:   Your Honor, these

10 documents relate to the expert report of Dr. Nick

11 Tredennick, our infringement expert.  In his expert

12 report he said Xilinx has not produced to me specific

13 schematics as of the time of my report; therefore, I

14 reserve the right to rely upon those schematics and look

15 at them after Xilinx produces them, but you put me in

16 the position of me filing a report and not being able to

17 discuss them.

18            So we plainly put them on notice that we

19 were interested in these schematics, that Dr. Tredennick

20 would review them and they took his deposition after he

21 issued his report.  So I don't see what the notice,

22 particular notice issue --

23            THE COURT:  All right.

24            MR. GRINSTEIN:  -- here is.

25            THE COURT:  Let me just make sure I

1  understand.  Are you saying he reviewed those schematics

2  before his deposition?

3                    MR. GRINSTEIN:  I believe that's the

4  case, yes.

5                    THE COURT:  All right.  And did he

6  testify in his deposition about them?

7                    MR. GRINSTEIN:  I don't think that's the

8  case.  I don't think he was asked about them.

9                    THE COURT:  Did he ever -- did he or you

10  ever issue any supplemental report or other notice that

11  he had after his report --

12                    MR. GRINSTEIN:  No, Your Honor --

13                    THE COURT:   -- examined those?

14                    MR. GRINSTEIN:   -- we did not.  The only

15  notice that we issued was in the report saying when they

16  produced them, I am going to consider them.  And, I

17  mean, this -- Your Honor, this is four schematics out of

18  hundreds.  They knew that we wanted them.  I mean,

19  there's -- I -- I guess we should have filed a

20  supplemental report.  On the other hand, we told them

21  that we wanted these things and some of the blame is

22  with them for not producing them before the report.

23                    THE COURT:  I understand that, but I

24  think it's pretty basic that if your expert examines

25  additional materials after that affect his opinions, he

1  has to supplement his report.  If he had testified about

2  that at the deposition, then I -- I might say no harm,

3  no foul.  But if they didn't have any notice that they

4  needed to examine him about those schematics at his

5  deposition, then, I mean, that's the purpose of the

6  reporting rule.

7          MR. GRINSTEIN:  I -- I understand, Your

8  Honor.  Respect the ruling.  I just push back a little

9  and said we did give them notice that he would be

10  looking at them.

11          THE COURT:  That he was going to?

12          MR. GRINSTEIN:  He was going to look at

13  them.  It was their fault for not producing them before

14  his report.

15          THE COURT:  I understand that, but I -- I

16  think that we do have to observe that line, that the

17  expert needs to provide notice about what he's

18  considering, and if he hadn't done that, then he won't

19  be allowed to testify about those documents.

20          MR. GRINSTEIN:  Yes, sir.

21          THE COURT:  What else?

22          MR. AROVAS:  The -- the second issue,

23  Your Honor, relates to deposition designations, and in

24  the Court's pre-trial proceedings, we had times that the

25  parties were supposed to exchange deposition

1   designations, counters, counter counters, that whole

2   process so that the parties had adequate time to prepare

3   their cases based on what was going to potentially come

4   into evidence and prepare counters and package

5   everything up for the jury.

6            In the most recent exchange of what was

7   supposed to be the cut down list of deposition

8   designations to actually be used in the case, PACT has

9   now gone beyond their original deposition designations,

10  done some entirely new designations that were never

11  identified in -- in advance of the pre-trial process.

12  And obviously that puts us in the position just days

13  before trial now trying to deal with new deposition

14  testimony and, you know, issues that could be raised by

15  that.

16           So the objection is to PACT adding to the

17  deposition designations that it exchanged in the

18  pre-trial process.

19           THE COURT:  And these are same witnesses,

20  just additional passages?

21           MR. AROVAS:  That's -- that's right, Your

22  Honor.

23           THE COURT:  All right.  And who can speak

24  to that for the Plaintiff?  Mr. Lahad?

25           MR. LAHAD:  Yes.  Thank you, Judge.

1              First of all, I think that this -- this

2 issue applies only to a single deponent, and that's Mr.

3 Wittig.  I think we've reached agreement on the other

4 deponents.  Ostensibly Defendants want to marry us to

5 our July 2011 designations.  That was about a year ago.

6 A lot has happened in this case.  And as I understand

7 their argument, it's -- it's one of notice.

8              A year ago when we did a -- initially

9 exchanged deposition designations, I'll admit that this

10 witness' designations were a little different, didn't

11 include the ones at issue today.  But at the same time,

12 if they're trying to ascribe a certain level of holiness

13 or sanctity to these July 2011 designations --

14              THE COURT:  When did you first give them

15 notice of the additional designation?

16              MR. LAHAD:  Yesterday.  Two days ago.

17              THE COURT:  And how much additional

18 language are we talking about?

19              MR. LAHAD:  I think it's a handful of

20 pages, two or three pages worth.

21              THE COURT:  And what's the reason for

22 adding those two or three pages?

23              MR. LAHAD:  I think just the -- the

24 contours of the case changed somewhat, and you know, in

25 the -- in the past year the scope of the case as far as

1   patents at issue, as far as accused products at issue.

2               THE COURT:  Unless you have some argument

3   of some extraordinary need for this, I -- I think that

4   yesterday's too late to add designations.  If you want

5   to give me a copy of them, I'll look at them and see

6   if -- if you think you can show some good cause for the

7   lateness of it, but --

8               MR. LAHAD:  I'll be happy to do that,

9   sir.

10              THE COURT:  All right.  That's fine.  I

11  assume that is --

12              MR. LAHAD:  That shouldn't affect

13  anything this morning, Your Honor.

14              THE COURT:  Okay.  Well then, I'm going

15  to take the matter regarding the demonstrative exhibit

16  under advisement, and I'll be back in a few minutes and

17  let you know.

18              We are planning to bring the jury in and

19  out of the courtroom through that side door.  We've

20  moved the tables to try and accommodate that.  It's much

21  more convenient for the jury.  I know it's going to be a

22  slight inconvenience to your side, but if you can just

23  be aware that we want to keep a path open through there,

24  I'd appreciate it.  And if you -- if you could refrain

25  from tripping them, that'll -- that'll also help out

1  long-term.  So we'll take a recess at this time.

2                     LAW CLERK:  All rise.

3                     (Recess.)

4                     (Jury out.)

5                     LAW CLERK:  All rise.

6                     THE COURT:  Thank you.  Please be seated.

7  Before we bring in the jury, I want to address the items

8  that remain from this morning's discussion.  With

9  respect to DX 912, I've had a chance to look at that

10 again, and that will be excluded at this time, unless

11 the defense believes that Mr. Vorbach opens the door to

12 that, in which case you can approach and we'll discuss

13 it at that time.

14                     For the record, I think that his belief

15 as to whether infringement has occurred is of

16 questionable relevance, but if that matter is explored,

17 then it may be proper as to that.

18                     With respect to the use of the

19 demonstratives, I do believe that the proper argument

20 about the meaning of the claim terms is their plain and

21 ordinary meaning, other than the construction that's

22 been given by the Court.  I don't believe that

23 prosecution history can be allowed to vary that meaning,

24 other than through the claim construction process.  So

25 the Defendant -- the Plaintiff's objection to the use of

1   those demonstratives during opening statement is

2   sustained.

3                    And with that, we'll bring in the jury.

4   I have probably 20 minutes of preliminary instructions

5   to give them, and then we'll turn to the opening

6   statements.  And I would like to hand out the juror

7   notebooks during the preliminary instructions, so if

8   those are ready, I'd ask that we get those to Ms.

9   Lockhart.

10                   MR. AROVAS:   Your Honor, could I just

11  ask for one clarification on this issue with regard to

12  some of the opening demonstratives?

13                   THE COURT:  Okay.

14                   MR. AROVAS:  And the reason I'm asking is

15  because, you know, obviously like -- like many patent

16  cases, there will be a number of witnesses talking about

17  the background of the invention, where it came from, the

18  problem, the solution, that sort of thing.  Obviously,

19  the specification is the background, it's the written

20  description of what they did.

21                   We do believe that everything in there is

22  entirely consistent with the ordinary meaning of the

23  terms, whether in the claim construction or not in the

24  claim construction, and have no intent to contradict the

25  claim construction at all.  However, this issue will

1  come up again later with the witnesses.  Obviously, both

2  inventors are going to be testifying.  I can say for

3  sure at least one is going to testify about the problem

4  he had to solve and how he came up with that solution,

5  his ideas, and I just want to make sure that this ruling

6  is not more expansive than just any suggestion of

7  contradiction of the claim construction or the

8  prosecution history itself.

9        THE COURT:  I'm not worried about it.

10  Its use during the questioning of the witnesses, I think

11  we can handle that pretty easily at that time.  I

12  understand that you're going to be addressing that

13  through your experts, and we -- you know, that's

14  expected, but I am concerned about introducing it in

15  opening statements in that manner.

16        MR. AROVAS:  Okay.  Now, that's the --

17  the prosecution history.  Is the -- with regard to the

18  specification, can the specification be used in opening

19  statement to give a background for the invention, say

20  here is the problem they were trying to solve and here's

21  their idea about solving it?

22        Obviously, the claim construction will be

23  used independently and say this is -- and it's our

24  position, we think it's a great claim construction and

25  we're going to embrace it and do not intend in any way

1  to contradict it.

2           THE COURT:  Well, that -- I don't have an

3  objection that I'm aware of to that use of the

4  specification.

5           Mr. Grinstein?

6           MR. GRINSTEIN:  I want to be clear, Your

7  Honor, when I mention the prosecution history I then

8  flip forward to the abstract, their abstract of the

9  patent slide, and said that they were doing the exact

10  same thing.

11           I mean, I know that the specification has

12  usefulness in the trial, but the usefulness of it in

13  citing to spec cites and saying this is what the

14  invention means and jury when you're considering what

15  the invention means, you should consider these spec

16  cites, that's a Markman issue, it is not a -- it's not a

17  jury issue.  So they're -- what I -- I fear is going to

18  happen is they'll try to slide in claim construction by

19  this argument of background.

20           I know what these claim terms mean, I

21  know what this means, but trust me, the real thing he

22  was trying to solve was, you know, making a green car

23  and this is not a green car case.

24           THE COURT:  I think they have to be able

25  to talk about the specifications.  I'm not going to --

1  the slides that you showed me were about the re-exam

2  history and that's what I was addressing.

3                   MR. GRINSTEIN:  Thank you, Your Honor.

4  And before we start openings, I've got a very mundane

5  issue.  Your Honor's rule about counsel's activities, is

6  it the standard an arm's length away from the podium?  I

7  don't want to run afoul of, you know --

8                   THE COURT:  If you're big enough here you

9  can get to the jury box from -- in an arm's length.  So

10 what I would ask you to do is to not get closer to the

11 jury than the podium is, all right?

12                  MR. GRINSTEIN:  Halfway line there.

13                  THE COURT:  And I don't care if you

14 wander --

15                  MR. GRINSTEIN:  Won't cross it.

16                  THE COURT:   -- all the way back to the

17 wall in the other direction, but if you -- if you would

18 not -- I really think the jury would object to your

19 invading their space anyway.  It's not just my rule.  I

20 think they want you to stay, you know, that far away.

21                  MR. GRINSTEIN:   I understand, Your

22 Honor.

23                  THE COURT:  Not you specifically.

24                  MR. GRINSTEIN:  No offense taken.

25                  THE COURT:  All right.  In that case,

1  we'll bring in the jury.  Please rise.

2                  (Jury in.)

3                  THE COURT:  Good morning.  Please be

4  seated.

5                  Ladies and Gentlemen, I want to welcome

6  you back this morning.  I want to thank you for being

7  here on time.  We're going to try to keep the case

8  running on time so that we can stick to the schedule

9  that I told you about during the jury selection two

10 weeks ago.  I do have some preliminary instructions that

11 I want to give you this morning before we start with the

12 opening statements from the lawyers and get on to the

13 evidence.

14                 You have now been sworn as the jurors in

15 this case, and as the jury, you will decide all of the

16 facts in the case.  I will, as the Judge, give you

17 instructions on the law, decide any questions of law

18 that come up during the trial, and -- and handle matters

19 of procedure, and at the end of the evidence, I'll give

20 you detailed instructions about the law that you're to

21 apply in deciding the case, and I'll give you a list of

22 questions that you're to answer.  Your answers to the

23 questions will need to be unanimous.

24                 I want to tell you a little bit about

25 what this case is about.  This case involves a dispute

relating to two U.S. patents.  Before summarizing the

positions of the parties and the issues involved, I want

to take a minute to explain again for you what a patent

is and how it is obtained.  Patents are granted by the

U.S. Patent and Trademark Office, which is referred to

often as the PTO.

A valid U.S. patent gives the

patentholder the right for up to 20 years from the date

the patent application was filed to prevent others from

making, using, offering to sell, or selling the patented

invention within the United States or from importing it

into the United States without the patentholder's

permission.

A violation of the patentholder's right

is called infringement.  The patentholder may try to

enforce a patent against persons believed to be

infringers by a lawsuit filed in federal court.

The process of obtaining a patent is

called patent prosecution.  To obtain a patent, you must

first file an application with the PTO, which is an

agency of the federal government that employs trained

examiners who review applications for patents.  The

application includes what is called the specification,

which contains a written description of the claimed

invention, telling what the invention is, how it works,

1  how to make it, and how to use it.

2           The specification concludes with one or

3  more numbered sentences and these are what you'll hear

4  about as the patent claims.  And I'll show you in a few

5  minutes the patents involved in this case and the claims

6  involved.  Once a patent is granted by the PTO, the

7  numbered claims define the boundaries of its protection

8  and give notice to the public of what those boundaries

9  are.

10          After the applicant files the

11 application, an examiner reviews the application to

12 determine whether or not the claims are patentable and

13 whether they're appropriate for patent protection and

14 whether or not the specification adequately describes

15 the invention that's claimed.

16          In examining a patent application, the

17 examiner reviews certain information about the state of

18 the technology at the time the application was filed.

19 The PTO searches for and reviews information that is

20 already publicly available or that is submitted by the

21 applicant.  This information is called the prior art.

22 The examiner reviews this prior art to determine whether

23 or not the invention is truly an advance over the state

24 of the art at the time.  Prior art is defined by law,

25 and I'll -- I'll give you specific instructions as to

what constitutes prior art.  However, in general, prior

art includes public information that existed before the

claimed invention was made or more than one year before

the application was filed.  A patent lists the prior art

that the examiner considered, and this is -- this list

is called the cited references.

After the prior art search and

examination of the application, the examiner informs the

applicant in writing of what the examiner has found and

whether the examiner considers any claim to be

patentable and thus would be an allowed claim.  This

writing from the examiner is called an office action.

If the examiner rejects the claims, the

applicant has an opportunity to respond to the examiner

and to try and persuade the examiner to allow the claims

or to change the claims or submit new claims.  This

process may go back and forth for some time until the

examiner is satisfied that the application meets the

requirements for a patent and the application issues as

a patent or that the application should be rejected and

no patent should issue.

Sometimes patents are issued after

appeals within the PTO or even to a Court.  The papers

generated during these communications between the

examiner and the applicant are called the prosecution

1  history.

2          After a patent has been issued, third

3  parties, who are people other than the applicant, may

4  ask the PTO to reconsider the issuance of a patent.

5  This process is referred to as re-examination.  A third

6  party initiates the re-examination process by filing a

7  re-examination request at the PTO, which can include

8  submitting new prior art.  If the PTO agrees with the

9  requester that there's a substantial new question of

10  patentability, the PTO will re-examine the patent.

11          The re-examination process proceeds in

12  much the same way as the original prosecution.  The PTO

13  issues office actions that set forth its analysis and

14  conclusions, and the patent owner is allowed to respond,

15  amend claims, or add new claims.  If the PTO agrees that

16  the claims are patentable, it issues an official

17  re-examination certificate.

18          The fact that the PTO grants a patent

19  does not necessarily mean that any invention claimed in

20  the patent, in fact, deserves the protection of a

21  patent.  While the issued patent is presumed valid, a

22  person accused of infringement has the right to argue

23  here in federal court that a claimed invention in the

24  patent is invalid because it does not meet the

25  requirements for a patent.

```
 1              It's your job to consider the evidence

 2  presented by the parties at this trial and determine

 3  independently whether or not the patent is invalid.

 4              To help you follow the evidence, I'll

 5  give you a summary of the positions of the parties.  The

 6  parties in this case are PACT XPP Technologies, AG,

 7  which the parties and I will refer to as PACT, P-A-C-T,

 8  and Xilinx, Inc., and Avnet, Inc., which the parties and

 9  I will refer to as Xilinx.

10              The case involves U.S. Patent Nos.

11  6,119,181 and 6,338,106, and you don't have to try and

12  learn all those numbers.  Those patents were obtained by

13  Martin Vorbach and Robert Munch and transferred by them

14  to PACT.  For your convenience, the parties and I will

15  refer to these patents by their last three numbers,

16  namely, as the '181 patent and the '106 patent.

17              PACT filed suit in this Court seeking

18  money damages from Xilinx for allegedly infringing the

19  '181 and '106 patents by making, using, selling, or

20  offering for sale in the United States products that

21  PACT argues are covered by four claims of the '181

22  patent, and I'll point those out to you in a moment.

23  Those are claims number 1, 3, 17 and 30.  You don't have

24  to remember those numbers now.  And by one claim of the

25  '106 patent, which is Claim 8.
```

1          PACT also argues that Xilinx has actively
2  induced infringement of these claims by other people.
3  Xilinx denied -- denies that it has infringed these
4  claims and Xilinx also argues that these claims are
5  invalid.
6          I will instruct you later as to the ways
7  in which a patent may be invalid, but in general, a
8  patent is invalid if it is not new or is obvious in view
9  of the prior art at the relevant time.  A patent is also
10 invalid if its specification is not detailed enough to
11 demonstrate that the applicant actually possessed the
12 invention as broadly as claimed in the numbered claims
13 of the issued patent.
14         Your job will be to decide whether or not
15 those claims, Claims 1, 3, 17, and 30 of the '181 patent
16 and Claim 8 of the '106 patent have been infringed and
17 whether or not those claims are invalid.
18         If you decide that any claim of the '181
19 patent or the '106 patent has been infringed and is not
20 invalid, you'll need to consider whether PACT has an
21 obligation to notify Xilinx of the alleged infringement,
22 and I'll tell you more about that, and to decide any
23 money damages to be awarded to PACT to compensate it for
24 the infringement.
25         You'll also need to make a finding as to

whether or not the infringement was willful.  If you

decide that any infringement was willful, that should

not affect any damage award you give.  I'll take

willfulness into account later if you find that it

exists.

I have already for the Court determined

the meaning of the claims of the two patents that are at

issue.  You'll be given a document in a moment that

reflects those -- those constructions, those meanings

that I have determined.

For any claim term which I've not

provided you with a definition in this document, then

you should simply apply the ordinary meaning to that

term.  You are to follow my definitions of the terms

throughout the case.  However, my interpretation of the

language of these claims should not be taken by you as

an indication that I have any view one way or the other

regarding issues of infringement and invalidity.  Those

issues are for you to decide.  And I will provide you

with more detailed instructions on the meaning of these

claims at the end of the trial before you begin your

deliberations.

In deciding the issues that are before

you, you'll be asked to consider specific legal rules,

and I'll give you an overview of those rules now and

1  then much more detailed instructions later.

2           The first issue you'll be asked to decide

3  is whether Xilinx has infringed the claims of the '181

4  patent or the '106 patent.  Infringement is assessed on

5  a claim-by-claim basis, and there are, as I've told you,

6  five claims between the two patents at issue here.

7           Therefore, you may find that there is

8  infringement as to one claim but not infringement as to

9  another.

10           There are a few different ways that a

11  patent may be infringed, and I'll give you more details,

12  but generally, Xilinx may infringe either of these

13  patents by making, using, selling, or offering for sale

14  in the United States or importing into the United States

15  a product that meets all of the requirements of one of

16  the numbered claims.  Xilinx may also indirectly

17  infringe these patents by inducing another person or

18  company to infringe them.

19           Another issue you'll be asked to decide

20  is whether either of these patents is invalid.  A patent

21  may be invalid for a number of different reasons

22  including because its claims -- it claims subject matter

23  that is not new or is obvious.  For a claim to be

24  invalid because its not new, Xilinx must show by clear

25  and convincing evidence that all of the elements of a

1 claim are present in a single previous device that was

2 publicly used or sold or sufficiently described in a

3 single previous printed publication or patent.  And,

4 again, those are what we call prior art.  If a claim is

5 not new, it is said to be anticipated.

6            Another way that a claim may be invalid

7 is that it may have been obvious.  Even though every

8 element of a claim is not shown or sufficiently

9 described in a single piece of prior art, the claim may

10 still be invalid if it would have been obvious to a

11 person of ordinary skill in the field of technology of

12 the patent back at the relevant time.

13            You'll need to consider a number of

14 questions in deciding whether the inventions claimed in

15 the '181 patent or the '106 patent are obvious.  And

16 I'll provide you more detailed instructions at the end

17 of the case.

18            A patent may also be invalid if its

19 description in the specification does not meet certain

20 requirements.  To be valid, a patent must meet the

21 written description requirement.  In order to meet this

22 written description requirement, the description of the

23 invention in the specification portion of the patent

24 must be detailed enough to demonstrate that the

25 applicant actually possessed the invention as broadly as

1   claimed in those numbered claims of the issued patent.

2                   If you decide that any claim of the '181

3   patent or the '106 patent has been infringed and is not

4   invalid, you'll need to decide any money damages to be

5   awarded to PACT to compensate it for the infringement.

6   A damages award should be no less than what PACT would

7   have received if it had been paid a reasonable royalty.

8                   I'll instruct you later on the meaning of

9   a reasonable royalty, but the damages you will award are

10  meant to compensate PACT and not to punish Xilinx.  You

11  may not include in your award any additional amount as a

12  fine or penalty above what is necessary to compensate

13  PACT for the infringement.  I'll give you more detailed

14  instructions on calculations at the end.

15                  Now, you're going to be hearing a number

16  of witnesses in this case, and I want you to keep an

17  open mind while you're listening to the evidence and not

18  decide any facts until you've heard all of the evidence.

19                  While the witnesses are testifying,

20  remember that you will be the ones who have to decide

21  the believability of the witnesses.

22                  So while they're testifying, you should

23  be asking yourself does the witness impress you as

24  truthful?  Does he or she have a reason not to tell the

25  truth?  Does he or she have any personal interest in the

outcome of the case?  Does the witness seem to have a

good memory?  Did he have the opportunity and ability to

observe accurately the things testified about?  Did the

witness appear to understand the questions clearly and

answer them directly?  And, of course, does the witness'

testimony differ from that of other witnesses?

These are the sorts of things you should

be thinking about while you're listening to each of the

witnesses.  You'll need to pay close attention to the

testimony because you'll have to rely on your memory.

The court reporter here is taking down

what is said, but that transcript will not be ready in

time for your deliberations.  It's prepared in the event

that there's an appeal to some higher court that has to

review this.  So you'll each have to rely upon your

memories.

In a moment, you're going to be given a

notebook.  One of the things in the back of that

notebook are blank pages that you can use to take notes.

I see that you have steno pads now.  It's up to each of

you to decide whether or not you want to take notes and

how detailed you want your notes to be.  But remember

that those notes are for your own personal use.  You

have to rely on your own memory of the evidence.  You

should not abandon your recollection because somebody

else's notes indicate something different.  The notes are to refresh your recollection and -- and that's the reason for which you should be keeping them.

I'm going to ask our courtroom deputy, Jan, if she'll hand out these juror notebooks for each of you.  In those notebooks you'll see that you each have a copy of the two patents that we've talked about, the '181 and the '106, and I want you in a moment to turn to those and I'll show you something.

COURTROOM DEPUTY:  They're all numbered.

THE COURT:  You want to help her?  Yeah.

They are numbered 1 through 8 because y'all are known as Jurors 1 through 8.

You'll see when you open it that the first tab is patent number '181, and you'll see at the -- that we have highlighted the last three numbers at the top right-hand corner up there, that that's where the '181 comes from.

If you turn in that document, you'll see that toward the back, there are numbers at the top of the pages starting with 1, 2, that are numbering the columns, and if you turn to the page that has the 12 at the top of the column and you go about halfway down that column, a little past halfway down, you'll see that it says what is claimed is, and the No. 1 there should be

highlighted because that's Claim No. 1 that we talked

about.  And then you'll see also No. 3 is highlighted,

and that's Claim 3.  No. 17 is highlighted, that's on

another page, if you turn over on Column 15, you'll see

the No. 17 highlighted.  And finally, the No. 30, which

is over on Column 18 is highlighted.  And I'm not going

to tell you more about those now, but I just want you to

know that's where you can find those numbered claims.

          Then if you'll flip to the next tab,

you'll see at the top we've highlighted the number '106.

That's the second tab in your notebook, and that's

patent '106, and the claims in it are back toward the

back of that.  Let me see, we get to -- there we go.  On

the -- where it has Column 15 up at the top of the

second to the last page of that hand out, you'll see the

claims start toward the bottom of Column 15, and Claim

No. 8 is highlighted because that's the claim from that

patent that is at issue in this case.

          If you'll then flip to the next tab,

which says claim constructions, you'll see just one page

and that's the page that has the claim terms listed.

Those are words that are found in those numbered claims

that we've told you before, and then over under

construction in that column, that's the definition that

the Court has given you to work with as for those terms.

1        And you're going to be hearing a lot more

2 about that from the witnesses, but I just want you to

3 know where you can find those.  And you can keep your

4 notes in the back of that notebook if you want so that

5 everything will be together for you.

6        And if you would just put those up for a

7 second, I know that you'll have lots of opportunity to

8 look through those, but I just want to now give you my

9 final instructions before the opening statements begin.

10       Each side will make an opening statement

11 in a moment.  You need to understand that an opening

12 statement is not evidence.  What the lawyers tell you is

13 not evidence, it's simply their explanation of what they

14 expect the evidence will show you.  The evidence is the

15 sworn testimony of the witnesses together with the

16 exhibits that are admitted into evidence for your

17 consideration.

18       There are two standards of proof that

19 you'll be asked to apply to the evidence depending on

20 the issue you're deciding.  On some issues, you decide

21 whether certain facts have been proven by a

22 preponderance of the evidence.  That's the normal burden

23 in a civil case.  A preponderance of the evidence means

24 that the fact to be proven has to be shown to be more

25 likely true than not true.  In other words, that the

1 evidence in favor of the fact being true is sufficient

2 to tip the scale even if slightly in favor of it, more

3 probably than not.

4         On certain issues in this case that I'll

5 identify for you, you'll be applying a higher standard,

6 and in that case, you'll be deciding whether a fact has

7 been proven by clear and convincing evidence; that is,

8 in those matters the question will be whether you've

9 been left with a clear conviction that the fact has been

10 proven.  These standards are different from what you've

11 heard about in criminal cases where there has to be

12 proof beyond a reasonable doubt.  That's a very high

13 standard, and we use that in criminal cases deciding

14 whether a person should be imprisoned or subjected to

15 other penalty.

16         If you put all these different standards

17 of proof on a scale, preponderance of the evidence would

18 be at the lower end where the proof need only be enough

19 to tip slightly in favor of the party who has the burden

20 of proving the fact.  And then all the way at the other

21 end, at the highest end, would be proof beyond a

22 reasonable doubt, which is in criminal cases.  And then

23 on those issues where you have to determine by clear and

24 convincing evidence, that would be somewhere in between

25 those two standards.

1              After you've heard the opening

2    statements, the Plaintiff, PACT, will present its

3    evidence about whether some of the numbered claims of

4    the patent have been and continue to be infringed by

5    Xilinx and whether that infringement has been and

6    continues to be willful.

7              To prove infringement of any claim, PACT

8    must persuade you by the preponderance of the evidence

9    that it's more likely than not that Xilinx has infringed

10   that numbered claim.  To persuade you that any

11   infringement was willful, PACT must prove that the

12   infringement was willful by clear and convincing

13   evidence, the higher standard we discussed.

14             PACT will also present its evidence in

15   support of damages.  PACT will then present its evidence

16   that the claims of the '181 patent and the 10 -- I'm

17   sorry, Xilinx, the Defendant, will then present its

18   evidence that the claims of the two patents are not

19   infringed and are invalid.

20             To prove invalidity of any numbered

21   claim, Xilinx must persuade you by that higher standard

22   that we discussed, clear and convincing evidence, that

23   the claim is invalid.  In addition to presenting its

24   evidence about invalidity, Xilinx will also put on

25   evidence responding to PACT's proof of infringement and

1   willfulness.  Xilinx will also put on evidence

2   responding to PACT's evidence about damages.

3                PACT will then be given an opportunity to

4   put on any additional evidence responding to Xilinx's

5   evidence; that's what's known as rebuttal evidence.

6                After all the evidence has been

7   presented, I will give you the final instructions on the

8   case.  The lawyers will then present their closing

9   arguments.  And you will then have the case and retire

10  to deliberate your verdict.

11               At this time, I'd ask you to give your

12  attention to counsel, and we'll start off with PACT as

13  they present their opening statement.

14               MR. GRINSTEIN:  Thank you, Your Honor.

15               Good morning, Ladies and Gentlemen of the

16  Jury.  My name is Joe Grinstein and I represent the

17  Plaintiff in this case, which is a company called PACT.

18               And with us in Court today, we've got two

19  witnesses who will be testifying to you during the

20  course of this trial from PACT.  We have Mr. Martin

21  Vorbach, who is the lead inventor on the PACT patents

22  and we also have Mr. Peter Weber who is the Chairman of

23  the Board of PACT.

24               Now, as you all heard, this case is a

25  business dispute about patent infringement.  My client,

1   PACT, developed and owns these two patents, and it's our

2   contention that the Defendants, Xilinx and Avnet, are

3   infringing on these two patents by making, using,

4   selling products that are covered by the claims in these

5   two patents.

6            Before I go any further, though, I'd like

7   to say a couple of words about the patent system in the

8   United States.  Now, our Founding Fathers thought that

9   patents were so important, they established the patent

10  system in the United States Constitution.  It's right

11  there in Article 1, Section 8.  And the idea behind the

12  patent system was to encourage scientists from all over

13  the world to come here to the United States to publicly

14  disclose their inventions.

15           The idea was if folks came here and

16  disclosed their inventions, that American scientists

17  could be inspired by those inventions, could learn from

18  them, could improve upon them.  Now, in exchange for

19  publicly disclosing your invention, the United States

20  government issues to you a patent.  And you can see what

21  a patent gives to you on the very first page of the

22  patent.  It's right there on the first page.  If you are

23  granted a patent, you are given the right to exclude

24  others from making, using, or selling anything that is

25  covered by your patent.  So that's how patent rights

1  work.

2          You can kind of think like a patent as a

3  deed to property.  You know, every property has its

4  boundaries.  And for a patent, the boundaries are in the

5  claims.  The claims define where your intellectual

6  property starts and stops.  And if you have a piece of

7  property like that, say you have a property like that

8  and maybe your property has some oil on it, an oil

9  company can't just come on to your property and start

10  drilling without your permission.  That would be

11  trespassing.  Patent rights are much the same way.

12          If you own a piece of intellectual

13  property, someone can't come in and start using your

14  patented inventions without your permission.  That would

15  be trespassing.  And that's what we've got here.

16          This is a case of patent infringement

17  because the Plaintiff, PACT, is going to prove to you in

18  this case that the Defendants, Xilinx and Avnet, are

19  trespassing on PACT's patented inventions.  Although I

20  will tell you, I think during the course of this case,

21  you're also going to come to understand that this case

22  is about something more important than simple

23  trespassing.

24          This case is about doing the right thing

25  because the evidence is going to show that for the last

1  decade, the Defendant, Xilinx, has known about PACT's

2  patents and has known that it needed to use PACT's

3  patents in its products.  But Xilinx has consistently

4  refused to do the right thing by PACT.

5           As far back as 2003, Xilinx was saying

6  these sort of things about PACT's patents.  These

7  internal Xilinx documents says PACT seems like a strong

8  patent portfolio, and then Xilinx listed out the patents

9  that it thought were so strong, and look right there

10  you've got the '106 and the '181 patents, the two

11  patents in this case.

12           Other things that the Defendant Xilinx

13  said back in 2003, PACT has a large patent portfolio

14  which we should probably research and keep an eye on.

15           PACT, they are well positioned from a

16  patent point of view, they have a strong patent

17  portfolio.  Those are the things that the Defendant said

18  before this lawsuit was filed.

19           And so after saying all those great

20  things about PACT's patent, did Defendants come to PACT

21  and ask for PACT's permission to use PACT's patents?

22  Did they do the right thing?  The answer to that is no.

23  In fact, the Defendants came up with plan after plan to

24  avoid doing the right thing.

25           The Defendants first plan was to pretend

1   to be interested in a business deal with PACT, that way

2   Xilinx could extract more and more information out of

3   PACT without actually ever giving any business to PACT.

4   And Xilinx's hope was that PACT would eventually go

5   bankrupt and when that happened, Xilinx could swoop in,

6   buy up PACT's patents on the cheap and not have to pay a

7   fair price for them.  Unfortunately for Xilinx that

8   first plan didn't work out.  PACT didn't go bankrupt.

9   PACT survived long enough to file this lawsuit.  So

10   after that occurred, Xilinx came up with a second plan.

11                  After its bankruptcy plan failed and

12   after this lawsuit was filed, Xilinx ran to the Patent

13   Office and argued to the Patent Office that you know

14   what, PACT doesn't deserve these '181 and '106 patents.

15   You should take the patents away from PACT.

16                  That's a process called putting the

17   patents into re-examination.  And in this re-examination

18   process, Xilinx argued to the Patent Office that PACT

19   hadn't come up with anything new.  In fact, Xilinx

20   argued that it was Xilinx that came up with PACT's

21   inventions before PACT.

22                  But just like that bankruptcy thing,

23   Xilinx's re-examination plan also failed, because just

24   last year, the Patent Office rejected Xilinx's

25   re-examination petitions, and it re-affirmed that PACT

has good, valid patents.  And that brings us to today,
because this trial is going to be Xilinx's third attempt
not to do the right thing.

First, it wanted PACT to go bankrupt, but
that didn't happen.

Second, it wanted the Patent Office to
take away PACT's patents, but that didn't happen.

And, third, it's going to ask you, the
Ladies and Gentlemen of the Jury, to find that PACT's
patents are not infringed or that they're invalid, but
PACT thinks that shouldn't happen either, because for
this particular incidence, the third time is not the
charm for Xilinx.

Because Xilinx won't do it on its own,
PACT is going to ask you the Ladies and Gentlemen of the
Jury to finally hold it accountable for its trespassing
on PACT's property.

So let me tell you a few things about
PACT.  PACT is a company from Germany.  And it was
founded in 1996 by Mr. Martin Vorbach.  Now, Mr. Vorbach
was something of a computer whiz kid when he was a
little kid.  He started running the computers in his
dad's construction business when he was just nine years
old.  He built his first computer from scratch when he
was 15, and he got his first computer patent when he was

1  23 years old.

2                 As he sits here today, Mr. Vorbach holds

3  60 United States patents, although this case, as you've

4  heard, is about just two of them, the '181 and the '106.

5                 Now, while Mr. Vorbach was in college, he

6  got interested in a field of computers called

7  configurable computing, and so he founded PACT to

8  develop products in that field of configurable

9  computing.  The other co-founder of PACT was a man named

10 Robert Munch, and Mr. Munch is listed as the second

11 inventor on all of PACT's patents.  And that's how PACT

12 came to own Mr. Vorbach and Mr. Munch's patents in this

13 case.

14                 So let me tell you now a little bit about

15 the technology in this case, and the easiest way I could

16 come up with a way to tell you about the technology and

17 explain it is to make an analogy to kids' toys.

18                 Let's say you've got a little boy, and if

19 your little boy is anything like my little boy, Max,

20 your little boy loves knights and castles.  And so for

21 Christmas one year, you could go out and buy your little

22 boy a toy castle.  And you know what, that toy castle

23 would be really good at doing one thing.  It would be

24 really good at being a toy castle.

25                 Computer chips are much the same way.

1    You can buy a computer chip that's really good at

2    processing video, or you can buy a computer chip that's

3    really good at running complex calculations.  But

4    there's a problem.  What happens if, as it inevitably

5    will happened with a little boy, your little boy wakes

6    up one day and he decides he's not into knights and

7    castles anymore.  Now he wants to be a fireman.

8                   Well, now you're going to have to go out

9    and buy your little boy a firetruck, and it's the same

10   problem with computer chips.  You have a computer chip

11   that processes video, and now all of a sudden you want

12   to do complex calculations, you're out of luck and you

13   wasted all that money on the first chip when what you

14   really want is a second chip.

15                  Now, I will say there's one way you could

16   have fixed your boy's problem.  You could have just

17   bought your boy some LEGOs.  Then while your boy was

18   interested in knights and castles, he could have built

19   himself a castle.  When he got interested in fire

20   stations, he could have built himself a firetruck, so on

21   and so forth.  That's the beauty of LEGOs.

22                  Configurable computer chips are much the

23   same way.  You can take a configurable computer chip and

24   rearrange its parts and build a chip that's good at

25   processing video.  And then if your needs change, you

1  can rearrange the parts again and build a chip that does

2  complex calculations.

3              Now, there are a variety of different

4  configurable computer chips out there, but this case is

5  going to focus on one kind of chip in particular.  That

6  chip -- oh, I should also say that the parts of the

7  computer chip that you can arrange and rearrange are

8  called cells.

9              Now, the one particular kind of chip that

10  this case is going to focus on is called a

11  field-programmable gate array.  And because that word is

12  a mouthful, most people usually just abbreviate it FPGA.

13              Now, the Defendant Xilinx is the world's

14  largest maker of FPGA chips.  The other Defendant,

15  Avnet, is the distributor of Xilinx's FPGA chips.  It's

16  kind of the middleman between Xilinx and Xilinx's

17  customers.  And for that reason, you all are going to

18  hear a lot less about Avnet during the course of this

19  trial.  Most of the focus and attention is going to be

20  on Xilinx.

21              So let's talk about Mr. Vorbach's

22  invention particularly.  Now, PACT did not invent

23  configurable computer chips, and PACT did not invent

24  FPGAs.  In fact, Xilinx was the one who developed the

25  first commercial FPGA back in the 1980s, and since then,

1  it has come up with a variety of really innovative FPGA

2  features, just not the features that are in this case.

3                    What happened was back in 1995,

4  Mr. Vorbach realized that old-style FPGA chips had a

5  problem, and his inventions relate to critical ways to

6  solve that problem.  That's why his patents are known as

7  improvement patents.  They took a problem -- they took

8  an existing product, like an FPGA, and made significant

9  improvements on it.

10                    So what was the problem that Mr. Vorbach

11  saw?

12                    Well, like I said, in a configurable

13  computer chip, you can rearrange the parts of the chip

14  to build any kind of computer structure that you want,

15  but sometimes that's actually not a good thing.

16                    Sometimes there are structures on a

17  computer chip you actually want to leave alone.  And one

18  of those structures is known as the bus interface.

19  So what's a bus interface?

20                    Well, let me tell you what a bus is, and

21  then I can tell you what a bus interface is.

22                    Computer chips need to be able to

23  communicate.  They need to be able to communicate inside

24  the chip, and they need to be able to communicate with

25  the outside world.  And computer chips do this

1  communication over what is known as a bus.  A bus is

2  like a communication pathway.

3          Now, this makes for pretty easy analogy

4  actually, because you can think of a bus like a city bus

5  system.  A city bus system transports folks around a

6  town, just like the bus on a computer chip transports

7  data around the chip and off the chip.

8          Now, PACT's inventions relate to a

9  critical piece of circuitry called the bus interface.

10 This is the circuitry inside the computer chip that

11 controls the various buses and makes sure they're all

12 speaking the same language.

13         Now, this is a really critical part of a

14 computer chip.  Without it, your computer chip couldn't

15 talk with the outside world, with other devices.

16         Now, what Mr. Vorbach realized is that

17 you can rearrange and build up any kind of computer

18 structure you want on your computer chip, and so every

19 time you fired up your FPGA and configured it, you could

20 put it on that bus interface.  But that's not actually

21 very efficient.

22         Think about it this way:  Let's go back

23 to the LEGO example.  Let's say whatever your boy likes

24 to build, if it's a fire station, a house, whatever it

25 is, he always needs a roof.  Now, your boy, when he

1  builds that roof, he can build it out of individual LEGO

2  blocks.  He can put all the LEGO blocks together and do

3  that, but that would take him a long time.

4          It would be more efficient and he would

5  build that roof a lot quicker, if his LEGO set came with

6  some prebuilt roof pieces.  Then he could arrange those

7  roof pieces, put them on to his creation, configure them

8  around a little bit, and he would have a roof.  That

9  would have saved him a lot of time.

10          PACT's inventions are very similar to

11 that.  PACT's innovation was to introduce into these

12 configurable computer chips something known as a

13 permanent bus interface, and the idea was that when

14 somebody used one of these chips, they would not have to

15 build that bus interface up out of cells each time.

16 They would not have to build it out of the LEGOs.

17          Instead, it would be a permanent

18 interface that was there.  Although it's important not

19 to get confused on this point, what makes PACT's

20 interface permanent is the fact that you don't have to

21 build it up out of LEGOs each time.  You don't have to

22 rebuild it out of cells.

23          That doesn't mean you never touch it.  It

24 doesn't mean you never program it.  That's all that it

25 means; it's not built out of LEGOs.

1          Now, PACT's permanent bus interface was a

2   huge improvement over the configurable chips that came

3   before PACT for four big reasons.

4          Reason Number 1, by having a permanent

5   bus interface on the computer chip, you save a lot of

6   space on your LEGO board.  And by doing that, you can

7   use the LEGOs to build up the structures that you're

8   really interested in.

9          Number 2, you save a lot of building

10  time.  By having that bus interface implemented

11  permanently, your computer programmers don't have to

12  build up that interface each time they want to configure

13  their LEGOs.

14          Number three, a permanent bus interface

15  is a lot faster than a bus interface that's not

16  permanent.

17          And, number four, permanent bus interface

18  uses less power, which is always a good thing in the

19  computer chip world.

20          So what did PACT do with those

21  inventions?

22          Well, PACT decided to design a chip, and

23  so it created a chip design, which is kind of like the

24  blueprints for a computer chip.  And using those

25  blueprints for the computer chip, PACT went out and

1  marketed those blueprints and those designs to folks in

2  the industry.

3              So how does this relate to the

4  Defendants?  How do all these inventions relate to the

5  Defendants?

6              Well, the evidence is going to show that

7  starting in 2002, Xilinx began infringing upon PACT's

8  permanent bus interface invention by introducing a

9  feature into its products called RocketIO, and Xilinx

10  was really proud of RocketIO.  It touted RocketIO in all

11  its marketing materials.

12              It said its rocket science and, in fact,

13  the main RocketIO was supposed to tell folks just how

14  fast your FPGA chip would be if it had a permanent

15  interface like PACT's interface, like a rocket in PACT's

16  technology that makes that rocket go.

17              Now, over the years, Xilinx introduced

18  some additional infringing features that infringed

19  PACT's patents even more.  Those are called embedded

20  EMAC and integrated PCIe endpoint.  We'll explain all of

21  those to you in more detail as the case goes on.

22              So like I said, PACT took its inventions

23  and created a chip design, kind of like a blueprint for

24  chips.  And into those blueprints, PACT put the

25  inventions of these patents.  But PACT also put a ton of

additional PACT technology into those blueprints,
because PACT was designing an entire chip.  It was not
just designing a -- a bus interface.  It was an entire
chip.

So what did PACT do with these blueprints
with these chip designs?

Well, PACT went out into the market and
marketed its chip design to folks in the industry who
built chips or used chips.  And some of the folks PACT
approached liked PACT's chip design; some of them
didn't.  An example of someone who liked PACT's chip
design was a firm called EADS Astrium.  They are folks
in Europe who build satellites and rockets for the
European equivalent of NASA.  And Astrium licensed
PACT's chip design so that it could send designed chips
into space on satellites.

At the same time, there were also folks
who didn't like PACT's chip design, and you know what,
they were pretty candid about saying it, although that
brings us to a critical issue in this case.

This case is a case of patent
infringement.  It is not a case of design infringement.
So your job in this case is not going to be to compare
PACT's chip design to Xilinx's chip design.  In fact,
that wouldn't make any sense anyway, because there's a

1  lot more in PACT's chip design than just these patented

2  inventions.

3              Your job in this case is going to be to

4  compare Xilinx's products to PACT's patents.  And so as

5  a result, whether or not PACT had a good business or

6  whether or not PACT had a good chip design is absolutely

7  irrelevant to the issue of whether or not it's got a

8  good patent.

9              And you know what, you don't have to take

10 my word for that.  Xilinx itself says the same thing.

11             This is an e-mail from Ivo Bolsens, one

12 of Xilinx's executives, and he's here talking about

13 PACT.

14             And what does he say?  You know what, I

15 wouldn't bet my dollars on PACT.  I wouldn't invest in

16 them.  I'm not so sure about their business, about their

17 chip design, but I would be interested in their patents.

18 He's saying it right there.

19             There's a difference between a business

20 and a design and patents, and Xilinx recognized it.

21 So having recognized that, did Xilinx do the right

22 thing?  Did Xilinx come to PACT and say:  You know what,

23 we like your patents.  We're kind of iffy on your chip

24 design, so can we have permission to use your patents in

25 our products?

1              No.   That's not what Xilinx did.   Xilinx

2  came up with a different plan.   Xilinx's plan was to

3  lead PACT on and extract as much information as it

4  could, but never actually do a business deal with PACT.

5  And Xilinx hoped by doing that, it could drive PACT

6  bankrupt.   And then when PACT went out of business,

7  Xilinx could swoop in and buy up PACT's patents on the

8  cheap.

9              And you know what, it's not just me

10  saying that either.   That plan is candidly laid out in

11  Xilinx's own e-mails.   These are the sort of things that

12  Xilinx said in its own e-mails.   PACT, on the verge of

13  going out of business, we may want to buy their patents

14  or have someone else buy them.

15              PACT, when the company comes available

16  for sale, I recommend taking a look at their patent

17  portfolio.   We might want to put in a low offer to get

18  access to the patents, if they turn out to be valuable.

19  In fact, Xilinx was gleefully waiting for the day that

20  PACT went bankrupt.

21              Here's another e-mail from someone within

22  Xilinx talking about PACT, saying:   You know what,

23  PACT's financials look really weak.   They have 15 folks,

24  and they both -- they just fired both their CEOs.

25  And what does this person say?   He says sarcastically:

1  Nice, stable company.  And just to emphasize the

2  sarcasm, he puts down a little smiley face right there.

3            I tell you what, Ladies and Gentlemen of

4  the Jury, it was not all smiles for Xilinx, because PACT

5  didn't go bankrupt.  PACT survived long enough to force

6  Xilinx to pay fair compensation for PACT's patents.

7  And what should that fair compensation be?

8            Well, that's one of the issues you're

9  going to have to decide in this case.  And to go back to

10 our oil analogy, say the oil company asks you for

11 permission to come on to your land, like a good oil

12 company should.  If it does that, it has to pay you what

13 is known as a royalty.

14           Patent law has the same concept.  If

15 someone infringes on your patent, they have to pay you

16 what is known as a reasonable royalty.  And to assist

17 you in figuring out what that royalty should be in this

18 case, we'll present to you the testimony of Mr. Jim

19 Nawrocki.  He is an accountant and an expert in patent

20 damages.

21           Mr. Nawrocki, can you please stand up.

22           Mr. Nawrocki undertook an extensive

23 investigation of the Defendants' sales in this case.

24 And he found that Xilinx has sold 7 million chips that

25 infringe upon PACT's patents.  He then figured out how

much of the selling price of each of those chips ought

to be attributed to PACT's technology.  And he concludes

that PACT is owed a royalty of $4.50 a chip for each of

those chips, for total damages of $30.8 million.

Now, other than damages, there are going

to be two other hotly contested issues in this case.

The first hotly contested issue in this

case is going to be infringement.  It's the question of

whether or not Xilinx does what is in PACT's patents.

And as you might remember from jury instructions or jury

selection a couple weeks ago, it is PACT's burden to

prove infringement to you.  And it has to do that by

what is known as a preponderance of the evidence.

So if you think of the scales of justice,

the evidence has to tip slightly in favor of PACT on the

issue of infringement.  And to help you on this

particular issue, we are going to present to you the

testimony of Dr. Nick Tredennick.

Dr. Tredennick, please stand up.

Dr. Tredennick is one of the world's

leading experts on FPGAs.  He has a Ph.D. in electrical

engineering, and he is world-renowned as a FPGA expert.

In fact, he has been called a true industry pioneer in

the configurable chip industry.

And do you know who called him that?

1          Xilinx called him that.  Xilinx issued a

2  press release in 2002 and called our expert a true

3  industry pioneer.  What Dr. Tredennick is going to do is

4  tell you about the investigation of Xilinx's products

5  that he undertook.  He looked at those products, and he

6  compared those products to the individual words in

7  PACT's patent claims.  And he's going to show you how

8  Xilinx infringes.

9          Now, on the subject of infringement, I

10  want to mention two more things.

11          Number one, infringement is not the same

12  thing as copying.  To prove infringement, PACT does not

13  have to show you that Xilinx literally took out PACT's

14  patent and copied PACT's inventions out of it.  In fact,

15  you can be guilty of patent infringement even if you

16  never knew about the patent you were infringing.

17          I mean, think about it.  If you had a

18  piece of property and someone came on to your property,

19  they would be guilty of trespassing even if they never

20  saw your no-trespassing sign.  That being said, that's

21  not the case here.

22          What the evidence will show here is that

23  Xilinx came on to PACT's property.  Xilinx saw PACT's

24  no-trespassing sign, but instead of immediately leaving,

25  Xilinx stayed on that property and kept infringing.

1 That is not accidental patent infringement.  That is

2 willful patent infringement.

3             The second thing I want to say to you on

4 the issue of infringement is that there is one and only

5 one place you should look in the patents to determine

6 whether there has been infringement.  That is the claims

7 of the patents, these numbered photographs at the very

8 end of the patent.

9             Remember what the Court just told you ten

10 minutes ago in its preliminary instructions.  The Court

11 said that the claims define the boundaries of its patent

12 protection.  And then the Court told you the first issue

13 you're going to be asked to decide in this case is

14 whether Xilinx has infringed the claims of the '181

15 patent or the '106 patent.

16             Infringement is assessed on a

17 claim-by-claim basis.  So that means the one and only

18 one place that you all should look when considering the

19 issue of infringement is in the claims of the patents

20 and any definitions of those claims that the Court may

21 provide to you.

22             So during the course of this case,

23 someone may get up to you and say:  You know what,

24 PACT's invention is this, or someone might get up to you

25 and tell you PACT's invention is that.  But all of that

1   will not matter on the issue of infringement, unless

2   those folks are using the language of the claims, unless

3   they are talking about this claims.

4              Likewise, someone during the course of

5   this case may get up and talk to you and say:  You know

6   what, the abstract of the patent says this.  Or they may

7   get up to you and say:  You know what, the drawings of

8   the patents say that.  But, again, you cannot infringe

9   the abstract of a patent.  You cannot infringe the

10  drawings of a patent.

11             The only thing you can infringe are the

12  claims of the patent.  Let me give you an example of

13  this.  During jury selection two weeks ago, Mr. Baxter,

14  representing the Defendants, argued to you that what

15  PACT's invention was, was to quote the patent, an

16  interface that took no computer programmer intervention.

17  That's what he said.

18             And then he said:  You know what,

19  Xilinx's products have computer programmer intervention;

20  therefore, we don't infringe.

21             But you know what, that phrase, no

22  computer programmer intervention, that doesn't appear

23  anywhere in the claims of the patents or in the

24  definitions of the patents.  In fact, that phrase

25  doesn't actually appear in the patents at all.

1                Mr. Baxter was paraphrasing the patent.

2  He wasn't quoting it.  In any event, unless the phrase,

3  no computer programmer intervention, appears in the

4  claims of the patent or in the definitions of those

5  claims, and it doesn't, any argument that Xilinx wants

6  to make to you about whether its products have

7  intervention or whether they don't have intervention has

8  no relevance to infringement.

9                Let me give you another example.  During

10 voir dire or during jury selection -- if my clicker --

11 oh, I was clicking the wrong thing and I was hitting you

12 with the laser.  Sorry about that.

13                During jury selection a couple weeks ago,

14 Mr. Baxter also told you that you know what, PACT's

15 inventions has this bus system on it, and you can't

16 program it.  You don't touch that bus system at all.

17 And he said:  You know what, we don't infringe because

18 we've got a bus system that you can program.

19                But Mr. Baxter, when he made that

20 argument to you, didn't actually show you the claims of

21 any of PACT's patents, and there's a good reason for

22 that.  That's because the claims of PACT's patents say

23 the exact opposite thing.

24                This is Claim 30 of PACT's '181 patent

25 and Claim 30 right here (indicates) is talking about

1   this interface unit that I discussed with you earlier.

2                       And what does it say about the interface

3   unit?

4                       It says that the interface unit can be

5   configured.  That means that interface unit can be

6   programmed; it can be touched.  So it's absolutely not

7   true that PACT's patents are some patent that has a bus

8   system that you can't program and you can't touch,

9   because Claim 30 of the '181 patent says the exact

10  opposite.

11                      That's why you should not listen to what

12  people tell you what are in the patents.  You should

13  insist on seeing what's actually in the claims of the

14  patents.

15                      Now, the second of the two issues I want

16  to talk to you about, which will probably be a big issue

17  in the case, is the issue of invalidity.  What Xilinx is

18  going to argue to you is, you know what, even if we do

19  infringe PACT's patents, that's okay because PACT's

20  patents are invalid and never should have been granted

21  in the first place.

22                      It's kind of like I didn't steal your

23  lawn mower, but even if I did steal your lawn mower it

24  was broken when I took it.

25                      And what Xilinx is going to come and

argue to you is and say:  The Patent Office messed up.

It should have never issued these patents to PACT,

because other folks had developed these inventions first

in what's known as the prior art.

And on this particular issue, it's

important to remember that there's something called the

presumption of validity.  And because of that

presumption of validity, in order for Xilinx to

invalidate these patents, Xilinx has to come and present

to you clear and convincing evidence that the Patent

Office made big errors and messed up and should have

never issued these patents.

Now, I do not know what precisely will be

Xilinx's invalidity arguments.  I suspect what Xilinx is

going to argue is that Xilinx came up with PACT's

inventions before PACT did, which is somewhat

interesting, because they're also going to be arguing to

you that Xilinx doesn't do what PACT does, even though

Xilinx came up with PACT's inventions before PACT did.

In any event, Xilinx is going to argue to

you, I think, that it had two products called the

XC 4000 and XC 6200, and both of these products had

PACT's inventions in them before PACT filed for its

patents.

It's going to be really hard for Xilinx

1  to make that argument to you.  Really hard for two

2  reasons.  The first reason are all those e-mails that I

3  showed you where Xilinx kept saying that PACT has great

4  patents; we should buy them up as soon as PACT goes

5  bankrupt.

6          But if it's really true that Xilinx had

7  invented this stuff before PACT did, then why didn't

8  somebody in those e-mails chime in and say:  You know

9  what, PACT's patents are terrible.  We shouldn't buy

10 these patents.  We don't want these patents.  We

11 invented this stuff with the 4000 and the 6200.

12         But you're not going to see any e-mails

13 in this case that say anything like that.

14         The second big problem for Defendants on

15 invalidity is going to be an even bigger problem for

16 them, because like I mentioned to you, after PACT filed

17 this lawsuit, Defendants ran to the Patent Office and

18 tried to get the Patent Office to take away PACT's

19 patents.  It's a process called putting the patents into

20 re-examination.

21         During that process, Xilinx argued to the

22 Patent Office that PACT hadn't come up with anything new

23 and PACT didn't deserve its patents.  And, in fact, that

24 XC 4000 and XC 6200 were before the Patent Office during

25 the re-examination.  The Patent Office looked at those

things and considered them and still concluded that
PACT's patents were good, valid patents and that PACT
was first with these inventions and not Xilinx.

So now what the Defendants are going to
come up to you and do is try to get you to second-guess
the Patent Office.  And like I said, I'm not sure what
their invalidity arguments are going to be, but I can
tell you that any piece of prior art that they're going
to show you during the course of this trial, the Patent
Office looked at and concluded last year does not
invalidate the patents.

So Xilinx is going to ask you to
second-guess the Patent Office right there, after the
Patent Office has already blessed these two patents
twice.

THE COURT:  You've got about four
minutes, Mr. Grinstein.

MR. GRINSTEIN:  Xilinx took its shot at
trying to short-circuit this case at the Patent Office,
and Xilinx lost.

So, Ladies and Gentlemen of the Jury,
thank you for your time, and thank you for your
attention today.  And certainly, I know on behalf of
both parties, thank you for your jury service.

I know what I just said was a lot to take

1  in in 40 minutes, but at the end of the day, I think

2  you'll find that this case is actually pretty simple.

3          On the one hand, you've got PACT who came

4  up with revolutionary technology; it was a significant

5  improvement over configurable chips and whose patents

6  have been approved by the Patent Office not once but

7  twice.

8          On the other hand, you've got Xilinx who

9  has consistently refused to do the right thing by PACT.

10          First, Xilinx wanted PACT to go bankrupt,

11 but that didn't happen.  Second, Xilinx wanted the

12 Patent Office to take away PACT's patents, but that

13 didn't happen.  And now for a third shot, Xilinx is

14 going to want to argue to you that it does not willfully

15 infringe PACT's valid patents.

16          But as PACT sees it, the third time is

17 not the charm for Xilinx, and just like in baseball, it

18 ought to be three strikes and you're out.

19          Thank you.

20          THE COURT:  Thank you, Mr. Grinstein.

21          MR. BAXTER:  Ready, Your Honor?

22          THE COURT:  For the Defense, yes.

23          MR. BAXTER:  Thank you, Your Honor.  May

24 it please the Court.

25          Ladies and Gentlemen of the Jury, we left

1  you two weeks ago with two burning questions.  Number

2  one, was my friend, Mr. Carroll, here going to make the

3  jury.  I told you he would.

4              Did you make the jury?

5              MR. CARROLL:  The case settled.

6              MR. BAXTER:  Didn't make it.

7              Number two, does Xilinx infringe the PACT

8  patents?  And I told you then, and the evidence in this

9  case, is going to prove to you that we absolutely do

10  not.

11             Now, I think what we ought to do is go

12  back and look at where the computer industry was, not

13  when PACT came along, but long before that, even before

14  Xilinx came along.

15             And what we had was a situation, as we

16  talked in voir dire, where chip companies were making

17  chips called ASIC chips, and they were very specific

18  chips, and they did one thing and they tried to do it

19  very well.  But they were hard-wired, and they were

20  fixed.

21             And there were a couple of problems, it

22  turns out, with the ASICs.  Number one, they were very

23  expensive.

24             Number two, if you made a mistake, you

25  got to eat a whole boatload of chips, because they were

1  not valuable to you.

2  And, number three, if you found out there

3  was a better way to do something, once again, you were

4  in trouble, because what you had was a boatload of chips

5  that now you wanted to change and you had to start all

6  over.  You had to get your engineer to design the

7  change.  You had to get them to the foundry.  They had

8  to mask them.  They had to produce them, and they had to

9  get them to you.  And then you needed to convince

10  customers they ought to buy a new chip.

11  Well, there was another system that was

12  in computers that was important, and that was called the

13  bus system.  And you heard a little bit about the bus

14  system.  And this case is going to turn out to be about

15  the bus system.  We're going to talk about that in a

16  minute, but here's how the old bus systems worked.

17  You had a chip with a permanent bus

18  control, and it set up something called the bus system

19  protocol.  And the bus system protocol was a way in

20  which the chips had to agree that in this case, they

21  both spoke English.  And you couldn't have a chip in

22  which one of them spoke English and the other spoke

23  French, and it didn't understand English, because those

24  chips were not going to communicate.

25  But those were hard-wired.  They were

1  fixed.  And they were permanent, which meant, once

2  again, that if a bus system came along and you thought

3  it was better than the one you had, you couldn't change

4  it.  You had to go buy new chips.

5              And that was sort of the state of the art

6  until 1982.  And for a moment when I was listening to

7  Counsel, I was afraid that he was going to claim that

8  Mr. Vorbach and PACT invented FPGAs.  Of course, that

9  didn't happen.  Mr. Vorbach wasn't around in '82, but

10 there was a gentlemen by the name of Ross Freeman.

11             And he was a computer chip engineer, and

12 he realized the problem that people were having with

13 ASICs and with bus control systems.  And he said

14 wouldn't it be good, if we had a chip that you could

15 change that wasn't fixed, that you could program?

16             And so he sat down and he designed a

17 chip, the first commercial chip of something called a

18 field-programmable gate array.  Now, the reason it's

19 called field programmable is that when you design the

20 chips, you make it for sale to a very sophisticated

21 customer that's going to have its computer chip

22 engineers program the chip.

23             When they get it and it comes out of the

24 box, it won't work.  It takes the company and their

25 computer chip engineers to tell it what it wants to do,

1   and it will do amazing things.  It will do a large

2   number of things, but out of the box, it won't do

3   anything.

4               Now, they got smaller.  They got all the

5   pins on the side.  It's eventually called gate array,

6   because if you look on the inside of those, you would

7   find all those cells, and they're all wired together.

8   And they have something called CLBs inside, and that is

9   the gate array that's inside.  And we're going to hear a

10  lot about CLBs in this case and they're logic blocks.

11  But they're the ones that are configurable; hence,

12  they're called CLBs.  And those CLBs, when they arrive

13  at the customer, the customer can then tell the CLBs:

14  Here's what we want you to do.  And in this case, we

15  want -- let's see the next slide just a minute.

16              There's -- there's the customer, and he

17  tells the program chips with the configuration file how

18  we want you to work.  And in the field, that chip will

19  do amazing things.

20              Let's see the next slide.

21              Now, here's the great thing about the

22  chip, is that the chip designer -- this is the customer

23  now.  Say it's Cisco, and you want that chip to go into

24  a router in order to route e-mail messages or whatever

25  it is.

1          The chip designer can start and he can

2    start designing that chip, and he realizes that maybe

3    that triangular wheel isn't going to work very well.  So

4    what he can do is he can change it, and he can make it a

5    different type of wheel, one that will work.  He can

6    then change it to something entirely different.

7          Let's suppose Cisco wants a different

8    kind of router.  Instead of having a car router, it

9    wants a truck router.  You can wipe it out and you can

10   start it over, and you can make it the kind of router

11   you want.  And that is the beauty of the chip.

12         And one of the things that Mr. Freeman

13   said is that we're going to have building blocks, and

14   we're going to use building blocks inside of those chips

15   in order to build the sort of thing we want the chip to

16   do.  And when we send them out, it can go to a

17   television and be a television FPGA, or it can go to a

18   satellite or it can go into an airplane or it can be

19   used in the computer in your automobile for the fuel

20   injection system, whatever it is.  That's how our chip

21   works.

22         The FPGA, the field-programmable gate

23   array, it was a revolution in the computer industry.  In

24   fact, if you look at one of the computer publications

25   that writes about very sophisticated computers, they

1   have the 25 microchips that shocked the world.  And one

2   of those 25, of course, is the Xilinx field-programmable

3   gate array.

4            For his work -- Mr. Freeman's now dead --

5   but for his work, he was placed in the Inventors Hall of

6   Fame right after Alexander Graham Bell and before Samuel

7   F.B. Morse.  Mr. Freeman is one of those distinguished

8   inventors that helped change the computer industry and

9   thus changed our world, and it's because he had the idea

10  of having building blocks inside of a chip that you

11  could change, that you could make do whatever it is you

12  want it to do throughout the chip.

13           Now, here's the question for us, is it

14  always required to program the CLBs in the chips?

15           And the answer is, no matter which chip

16  you started with, with the Freeman patent back in 1984

17  going through -- we went through 2010, but if you went

18  through today, every one of our chips, when it gets to

19  the customer, must be programmed so the chip will do

20  what that business needs it to do.

21           And because our chips have been so

22  reliable and because they are the standard in the

23  industry, they're used for our aircraft, our fighter

24  aircraft.  They're used in most medical devices that

25  take a computer.  Your television that you watched this

morning before you came to court has got one in it, and the car that you've got has one in it.

Xilinx has been an innovator in the field.  They own 2500 patents.  They are the leading FPGA-maker in the world today, and they have the cutting-edge technology.

Now, let's talk just a moment about PACT and who they are and where they came from and what they did.

PACT was started by Mr. Vorbach and Mr. Munch, and they're the co-inventors of the two patents.  Mr. Vorbach you've seen; he's the Plaintiff or represents the Plaintiff in this case.  You haven't seen Mr. Munch yet, and there will be an interesting story associated with Mr. Munch.

And that is, Mr. Munch was in Germany and he was contacted by PACT's lawyers, had a brief conversation, and you never heard from him again.  When we found out about Mr. Munch, we eventually contacted him, and we talked to him about his invention.  He's going to come, when it's our turn to put on our evidence, and explain to you exactly what they invented.

Mr. Munch and Mr. Vorbach, of course, knew about Freeman.  They even cited Freeman in their patent applications, but here I think we might

1  divulge -- diverge and talk about what these chips --

2  our chips and what they tried to invent really was

3  about.  And it's something you didn't hear from Counsel.

4  And that is, when they were starting to make designs for

5  their chip, they said:  We understand about FPGAs.

6  That's a really great idea, but we're going to make a

7  better one.

8              At that time, it didn't have anything to

9  do about any bus control system.  It was how can we make

10  a better FPGA.  And in my limited understanding, here's

11  what they said:  We're going to add complexity to the

12  chip.  We, in effect, are going to put a little

13  mini-microprocessor in the chip, and we're going to have

14  it do things differently than the way Xilinx FPGA chips

15  work.  Differently.

16              And here's the best analogy that I can

17  understand and -- and maybe get across to you, and my

18  colleagues over here will cringe every time I do it

19  because they say, Baxter, you have a simple

20  understanding.  But that's all I've got.  But here it

21  is:

22              If you have a truck that's going to go

23  from Dallas to Marshall using the Xilinx chips, you can

24  program the truck to go from Dallas to Marshall and you

25  can say, start on Interstate 30, get on 80, go to 20,

1  get off at 43, turn left on Washington, and go to the

2  Square.

3              But once you tell it that, the truck's

4  going to do exactly that.  It's not going to vary from

5  its route.  That's how you programmed it.  That's what

6  it's going to do.

7              But the PACT people said:  We've got a

8  different idea.  We're going to tell that truck to go

9  from Dallas to Marshall, but if there is some condition

10 that changes, we're going to stop the truck, halt the

11 truck, reprogram it a way to go, and tell it to go

12 differently so it may cut across in Canton and get on 80

13 and go to Marshall from there.

14             Now, that was what their idea really was

15 about.  And when they came and talked to Xilinx, that's

16 really what they talked to us about.

17             Here's the problem they had right

18 upfront, and you're going to hear Mr. Munch explain

19 this.  Once you add that complexity to your chips -- and

20 by the way, it turns out that the chips didn't work.

21 But once you add that complexity to your chip, now you

22 need to get that information off the chip.

23             You now have a bus control system and a

24 bus control system that you need to be simple.  You

25 don't need it to be complex.  You don't need to program

1  that bus control system.  You want it permanent; you

2  want it fixed; and you don't want to change it.  You

3  don't want to program it.

4           And you will hear Mr. Munch say they had

5  long conversations, he and Mr. Vorbach, about that.

6           Now, Mr. Munch was the real brains behind

7  the software, and he was the one saying it's very

8  complex; it's very hard to write the code; it's very

9  hard to get the chip to do what we want it to do;

10  therefore, at least in the bus control area, let's dummy

11  it down and make it simple and make it fixed and make it

12  permanent, and we don't program that.

13           And that's what they agreed to do, and

14  that's what they got a patent on.  And you're going to

15  hear Mr. Munch explain all that to you about how that

16  was his idea.  Mr. Vorbach agreed, and that's how they

17  tried to design their chips.

18           Now, you heard a little bit about the

19  patent, and you've got the patent in your notebooks

20  there.  If you get a chance, open that up just a moment.

21  See if you can find the '181 patent.

22           And I heard something very amazing today

23  from Counsel, and that is, it's the first time I've ever

24  heard anyone say:  Just look at the back of the patent

25  and don't read anything else.

```
 1                    But I want you to start at the front of
 2   the patent where Mr. Munch and Mr. Vorbach, who swore
 3   under oath to the Patent Office about their '181 bus
 4   patent, what that patent consisted of, and it's right
 5   there in the abstract.
 6                    And it says:  A uniform bus system is
 7   provided which operates without any special
 8   considerations by a programmer.  The bus system control
 9   is predefined; it's fixed; it's permanent; and does not
10   require any influence by the programmer.  And that was
11   their idea.  And they were upfront to the Patent Office
12   that said we're going to make it fixed; we're going to
13   make it permanent; and we're not going to have the
14   programmer influence it any way whatsoever.
15                    If you go further in the patent, you'll
16   find a section called the summary of the invention that
17   Mr. Munch and Mr. Vorbach swore to.  And here's what it
18   said:  The present invention provides a uniform bus
19   system, which operates without any special consideration
20   by the programmer.  The present invention includes a
21   permanent implementation of the bus control system.  And
22   you're going to hear a lot about the word permanent.
23                    And Judge Payne and the Court has issued
24   a claim construction that's also in your notebook.  And
25   I'm going to talk about that in just a second.  But
```

1   let's see if Judge Payne didn't tell you and tell us

2   that the bus control system has to be permanent, which

3   is exactly what Mr. Munch and Mr. Vorbach in the

4   Munch/Vorbach patents said.

5                   Go back just one second.

6                   And at the bottom of that summary, it

7   says:  The bus control system is predefined and does not

8   require any influence by the programmer.  That's the

9   '181.

10                  The '106, here's the abstract.  If you've

11  got your '106 patent, it's right at the front.  It's

12  what they tell the public their patent is all about.

13  A general bus system is provided which combines a number

14  of internal lines and leads them to a bundle through the

15  terminals.  The bus system control is predefined and

16  does not require any influence by the programmer.

17                  That's the '106.

18                  Let's see the next one.

19                  They told the Patent Office and they told

20  us and they told you in this summary, and you can find

21  it in the patent.  It's -- it's after the drawings and

22  it's right at the first of the words:  A uniform bus

23  system operates without any special consideration by a

24  programmer.  A permanent implementation of the bus

25  system control is provided.  The bus system control is

1 predefined and does not require any influence by the

2 programmer.

3 　　　　　Now, Judge Payne is going to tell you

4 what some of the words mean, and I'm here to tell you

5 that one of the things he's going to tell you is, it's

6 got to be permanent, because that's what the inventors

7 told the Patent Office their bus control system was

8 going to be.  It was going to be permanent.

9 　　　　　Now, here is a sample claim from the

10 '181, and we're going to talk about an interface unit.

11 And the interface unit is coupled throughout plurality

12 of individual lines, and it forms the bus system.

13 　　　　　Go to the next slide for me.

14 　　　　　Now, this is right from Judge Payne's

15 claim construction, and he defines a couple things for

16 you.  There's some more words in there, but he tells you

17 that the bus system is used to communicate information

18 according to a bus protocol.  And a bus protocol, we'll

19 remember, is I speak English; you speak English; no, you

20 want to speak French?  Okay, I'll need a different

21 protocol in order to speak French.

22 　　　　　But more importantly, remember that claim

23 had an interface unit in it, and he tells you what that

24 interface unit has to be, and it is a unit providing

25 permanent implementation of a bus control -- bus system

1  control for communicating across a shared boundary; that

2  is, up against another chip or an external device.

3             Now, it's permanent control of the whole

4  system, not just one little bitty part of it, not one

5  little tiny block in a scheme of blocks that is like

6  this (indicates).  It's the whole thing.  That's what

7  they got their patent on.  That was the solution to

8  their problem, that their chip was too complex.  And

9  that's how they solved it.  And that's what the patent

10 is.

11            And Judge Payne has told you that it's

12 permanent, and I think we'll hear a lot about whether or

13 not the Xilinx chips and the bus control system -- or

14 the bus system control -- I always say it backwards --

15 is permanent or not.

16            Now, what else happened to PACT?

17            Well, PACT takes its patents and its

18 ideas and its schematics and it goes out into the

19 marketplace.  They contact us.  We didn't contact them.

20 They contacted over 60 companies, and no one -- no one

21 would invest in the company, would buy their patents, or

22 would take a license from them on their new chip idea.

23 And the reason is it didn't work.  It was too complex,

24 and they couldn't make it work.

25            They had all kinds of problems.  They had

1    design problems.  They had manufacturing problems.  They

2    had administrative problems.  They simply,

3    unfortunately, for them failed in the marketplace.

4              Now, they had a business plan in 2001,

5    and here's what they told people that wanted to invest.

6    It's what I told you a while ago.  It was a unique

7    combination of revolutionary technologies and a new way

8    of computing.  Now, think about this just for a moment.

9    If Xilinx was using their technology, why in the world

10   would they tell us they had a new way and a new way of

11   computing and a new way to make FPGAs.

12             Not just once but over five or six years,

13   they kept coming back and we kept telling them no.  We

14   kept telling them we're not interested.  We don't think

15   your technology is going to work.  We are not interested

16   in changing the way we do things, because what they kept

17   telling us is, it was new; it was new in two respects.

18             Number one, that microprocessor that sat

19   on top of their gate array was going to be able to stop

20   the operation, halt it, reprogram the chip, and do it a

21   different way.  And we said that's too complicated.  We

22   don't want to do that.  Our customers don't want to do

23   that.  That basically is called coarse grain array, and

24   we didn't want to do it.

25             Now, I'm not just kidding about how they

1  pursued us.  Really starting in 2002, there were

2  meetings with Mr. Bolsens.  You saw some of his e-mails,

3  and you're going to get a chance to see Mr. Bolsens and

4  judge his credibility for yourself.

5            THE COURT:  Mr. Baxter, if you'd speak a

6  little closer to the mic, I think we'll be able to pick

7  you up better.  Thank you.

8            MR. BAXTER:  Is that better?

9            THE COURT:  That's better.

10           MR. BAXTER:  You're going to see

11 Mr. Bolsens, and I think what you're going to find,

12 after you see Mr. Bolsens, after you see Ivo, is that

13 he's an honest man.  He wouldn't steal anybody's

14 technology.  He's a scientist.  He is simply interested

15 in doing the right thing, and that's what he did.

16           And one of the things he did is that he,

17 in all fairness, looked at PACT's technology to see if

18 they were interested, to see if they had something

19 better, because if it were better, they wanted to take a

20 look at it and maybe do it.  But it wasn't.

21           And for all of these meetings, all the

22 e-mails, all the in-person meetings, when you look at

23 documents, I'll promise you this:  They were about

24 whether or not you were going to put that microprocessor

25 on top of those chips, and you were going to have some

1  sort of halt/reprogram/start again chip.

2            The bus system wasn't even discussed.

3  That's how proud they were of the bus system.  That's

4  not what they were trying to sell Xilinx.  They were

5  trying to sell them new technology.  Being fixed and

6  permanent was old technology, and they knew, had to know

7  that Xilinx did it differently.

8            Now, think about this:  If you're going

9  to go to a company and tell them I'm going to sell you

10 something new, you've got to know how they do something.

11 And they did, in fact, know how we ran our chips.

12            To top it all off, there's no secret how

13 we do it.  All of our manuals that explain how things

14 work are on the Internet.  You simply go to Xilinx and

15 go to the right website and our manuals pop up, and they

16 had instructions.

17            One of the board members instructed

18 Mr. Vorbach personally to take a look at all of the

19 Xilinx materials, and they kept up with us, and they

20 knew what we were doing.

21            Now, they had all these meetings, and we

22 kept saying, no, we're not interested in your chips.

23 And they kept coming back and kept coming back and kept

24 coming back until finally we very directly said we

25 simply are not interested in investing money, buying

1  your patents, buying your chips, or licensing your

2  technology, because we don't think it's a good fit for

3  Xilinx.

4          Now, one of the things that they didn't

5  tell us is that they had had their chips evaluated by an

6  expert independent lab, and they found out -- that is,

7  PACT found out -- they forgot to tell us -- next

8  slide -- that their chips just didn't work very well.

9  And in comparison to everybody else's chips, they

10  failed.

11          It was so bad that Mr. Vorbach wrote a

12  letter to the board that said this:  The chip's

13  specifications did not fit any customer requirements,

14  not even Siemens.  And we're going to hear a lot about

15  how they tried to get Siemens interested.

16          Go back.

17          It did not support sequential processing,

18  external DSPs were required, which did not even

19  interface and integrate well.  The interface structure

20  was proprietary, the protocols complicated and badly

21  defined.  No standard bus structure was implemented.

22  With the given specification, the chip was absolutely

23  useless for any product, not even for prototyping.

24          And even after he wrote this and even

25  after they got reports from Siemens and BDTI that their

1   chips didn't work and didn't perform well, they still

2   came back and tried to sell our (sic) chips and told us

3   they were high performance and we needed them.

4                 Wasn't true.  If you look at those

5   documents, if you get a chance to see those documents,

6   see if there's anything about a bus control system,

7   because that's not what they were talking about.

8                 Mr. Weber that you saw out here had to

9   write the investors that he had been disappointed and

10  they had been a failure.

11                Mr. Diaz.

12                And, finally, Mr. Schwarz at Xilinx had

13  to tell Mr. Weber in 2006 that their proposed solution

14  is too risky, and there's just no synergy with Xilinx.

15  And we once and for all said we simply are not going to

16  do business with you, which we had told them two times

17  before, and then they sued us.

18                Now, I told you we didn't infringe, and

19  the testimony is going to be this:  You heard about the

20  RocketIO.  Now, here's what's going to be interesting

21  about the RocketIO.  Xilinx got the technology for the

22  RocketIO in 2000.  They hadn't even heard of PACT.  They

23  determined they were going to put this technology in

24  their chip, and the RocketIO, in order for it to work,

25  has to be programmed by the customer.

1        You heard about the ethernet MAC cores

2   and the PCI Express cores.  They all have to be

3   programmed by the customer in order to get them to work.

4   And this is the bus system control.  It's not permanent;

5   it's flexible.  There are over dozens upon dozens of bus

6   system controls and bus systems.  Companies use

7   different ones depending on what their needs are and

8   what they like.

9        Our chip will do them all.  Their chip

10  was fixed and permanent and would not do that.  Our

11  chips have to be programmed.  That's not the way their

12  patent worked.  It wasn't their idea.  They had the

13  opposite idea.  They were going to be fixed and they

14  were going to be permanent.

15       If you look at -- at our documents, this

16  says they're highly configurable, and you've got to

17  program all the RocketIO.

18       Let me see the next slide.

19       Here's just an example of how many CLBs

20  it takes.  It takes more than 370 to program the ether

21  (sic) MAC; almost 200 to do the PCI Express; and 430 to

22  do something called OBSAI.  Those logic blocks have to

23  be programmed by the customer.  That's not true in the

24  patent.

25       Now, I told you the RocketIO was in June

of 2000.  We put it out in 2002.  And in all the meetings, in all of the conversations we had with all of our stuff on the internet with our engineers talking to their engineers, not one time, not once did they ever say to us:  Oh, gosh, your RocketIO has already got our patent in it.  Let's talk about that.

Those words never fell from their lips. Now, don't you know that if they really thought their patent covered the RocketIO, they might have just mentioned it to us one day, sent us an e-mail, when their engineers are talking, saying, gosh, you've already got our technology.

That's untrue.  They didn't do that, not one single time.  And that pretty much tells the tale right there.

Now, you heard about what I'm going to now call the conspiracy theory.  Oh, Xilinx had a plan. They conspired to get PACT's chips.  The truth is that from 2001, Mr. Bolsens, Ivo, has probably talked to over 400 companies, startup companies that come to him with new ideas.  A very few we've liked; most we have not. There was a list of competitors for Xilinx.  PACT is on there.  It was No. 245.  It was not a significant competitor, because they didn't make any chips.  They've never sold any chips.  You heard them talk about how

1  there was this company that was interested in their

2  chips in Europe, put satellites up.

3              Well, it will be interesting to see how

4  many of their chips are actually in a satellite, because

5  I think the answer is none of them are.  They simply

6  haven't been able to get them to work, and, therefore,

7  no one's ever paid them any royalty for using their

8  chips.

9              And, finally, I want us to see -- when

10 you see they have a strong patent portfolio, Mr. Bolsens

11 is going to testify about that.  At the time someone

12 wrote that, they hadn't even looked at the patents.

13 They just knew they had numbers.

14             But here's the key to that.  This is from

15 Mr. Bolsens in 2005 talking about PACT:  They are,

16 however, well-positioned from a patent point of view.

17 If you believe that coarse grain arrays will prevail in

18 the future, they have a strong patent portfolio of 60

19 patents filed and 30 approved in this field.

20             Now, here's what you need to keep in

21 mind, the critical words there are course grain array.

22 And the course grain array is their initial concept of

23 being able to have a FPGA that you can, in midstream, in

24 doing whatever it is the manufacturer or the customer

25 wants it to do, it stops, it halts, and it reprograms

1 itself and rewires itself.  That's called course grain

2 array.

3                And that really was their idea, and they

4 have patents on that.  But, Ladies and Gentlemen, it

5 didn't have anything to do with a bus system.  It didn't

6 have anything to do with a bus system that was permanent

7 and fixed.  Coarse grain array is something entirely

8 different.

9                And that's why Mr. Bolsens and the

10 engineers at Xilinx were even looking at their patents,

11 because there was a possibility that course grain array

12 could work; and if so, they'd be interested in PACT, but

13 if it didn't work and no one uses it in the way that

14 PACT has its patents, no one, then those patents were

15 not of interest to us.

16                We weren't planning on their bankruptcy.

17 We weren't planning on their demise.  We knew they were

18 a small startup company that had horrible internal

19 problems.  You're going to see some documents about

20 that, some from Mr. Vorbach himself, that they were not

21 well-organized, and they were not a success.

22                At the end of the day, if you look at the

23 patent as a whole, look at the claims, and look at what

24 Judge Payne tells you that those claims mean, he told

25 you that the bus system control has to be permanent,

1 just like they said so in the beginning of their patent.

2 I didn't make that up.  I didn't try to mislead you.

3 But when you read the claims, you have to read them in

4 the light of what Judge Payne has told you the words

5 mean, and what he's told you is it's got to be

6 permanent.

7                    Ours, Ladies and Gentlemen, are not

8 permanent.  We don't just have one sort of bus control

9 system on our chips.  We can have dozens, because you

10 can program it to do whatever you want it to do, and

11 that is not true with PACT's patents.  That's not true

12 with their idea.  That's not how they solve their

13 problem.  And it's why we don't infringe.

14                    Now, one more word:  Damages.  Remember I

15 told you in voir dire that I was going to put on a

16 damage expert, Ms. Woodford.  You're going to like her.

17 She's very knowledgeable, and she's going to give you

18 some information about damages.  But because I put

19 Ms. Woodford on and because she gives a damage number in

20 no way -- no way means that we agree we ought to pay a

21 penny.

22                    THE COURT:  You've got four minutes,

23 Mr. Baxter.

24                    MR. BAXTER:  Thank you, Your Honor.

25                    Because we do not -- we do not infringe

1   their patent.  The only way that you ever have to pay

2   any monies is if you infringe the patent.  And so she's

3   going to give you a way to analyze damages, but I

4   believe that when Judge Payne gives a charge, as he

5   will, and gives you a verdict form that he will tell you

6   that unless you find infringement, you never get to

7   damages.

8             And because I believe so strongly that

9   you will find that we do not infringe their patents, you

10  will not ever have to worry about damages, but I just

11  wanted to make sure that you understood that I've got

12  to, under the law, talk about this thing that

13  Mr. Carroll last week or two weeks ago called the

14  play-like negotiations.  It's called the Georgia-Pacific

15  Factors, and it's called a hypothetical negotiation, one

16  that didn't take place.

17            And so we have to answer that, and we've

18  got to give you a way of looking at those factors to

19  arrive at a number that is -- would make some sense.

20  But I do not agree that we infringe the patents.  The

21  evidence will show that we don't, and as a result of

22  that, when we get to damages, you will know that we're

23  doing it because we have to, but not because we ever

24  agree that we infringe the patents.

25            Xilinx is a company that has been built

1  on integrity.  We are the leader in the field.  We are

2  innovative.  From the very get-go, when Mr. Freeman had

3  his idea of how to make these chips that change the way

4  people think about computer chips, from his patent

5  forward, we have always done it the same way.

6              We've tried to get better at it, but

7  we've always done it the same way.  We've always had

8  building blocks that build upon one upon another that

9  you have to program in order to get them to work.

10             If they had a chip and you could get it

11  and you wanted to put it in your television, you could

12  take their chip and plug it in, and at least as far as

13  the bus system control is concerned, once you powered it

14  on, it was working and it was fixed and it was

15  permanent.

16             If you took our chip and plugged it into

17  the same television and turned on the power, it would

18  set there like my child and homework, and do nothing.

19  It won't work.  The bus system control will not work

20  until someone programs that chip to make it work.

21             You have to tell it what you want it to

22  do.  You have to tell it what language to speak.  You

23  have to tell it what its parameters are.  You've got to

24  tell it how fast to go.  But it won't work out of the

25  box, and theirs will, and that's the critical

1  difference.

2            So at the end of the day, after you hear

3  all the testimony, I think you're going to find, number

4  one, that we do not infringe the patent; and, number

5  two, we were honest with PACT.  We told them that we

6  were not interested in their technology, not once, not

7  twice, but three times.  And they kept coming back with

8  different ideas.

9            But when they came back to us, what they

10 really were talking about were the -- was the

11 programmable portion of the chips.

12            THE COURT:  Thank you, Mr. Baxter.

13            MR. BAXTER:  There wasn't any

14 conversation about the bus, and you'll find that true.

15            Thank you, Your Honor.  I appreciate it.

16            THE COURT:  All right.

17            MR. BAXTER:  Ladies and Gentlemen, we

18 look forward to bringing this case to you.

19            THE COURT:  Ladies and Gentlemen, we're

20 going to take the morning recess now.  We're a little

21 bit off schedule, but I wanted to finish up the opening

22 statements.  We'll take a 15-minute recess, and then

23 we'll go for about an hour and take the lunch recess at

24 that time.

25            Let's rise.

```
 1                    LAW CLERK:  All rise.

 2                    (Jury out.)

 3                    THE COURT:  We'll be in recess for 15

 4  minutes.

 5                    (Recess.)

 6                    (Jury in.)

 7                    COURTROOM DEPUTY:  All rise for the jury.

 8                    THE COURT:  Thank you.  Please be seated.

 9                    Mr. Grinstein, you may call your first

10  witness.

11                    MR. GRINSTEIN:  Thank you, Your Honor.

12  And just for the record, I will invoke the Rule at this

13  point.

14                    THE COURT:  All right.  Do you have

15  witnesses present in the courtroom, other than the one

16  who is about to testify and other than the experts?

17                    MR. GRINSTEIN:  No, Your Honor.

18                    THE COURT:  Mr. Baxter, does the --

19                    MR. BAXTER:  No.  We have experts here,

20  Your Honor, and the client representative, Mr.

21  Trimberger, who to my discredit I didn't introduce to

22  the jury but he's here.

23                    THE COURT:  All right.  And he'll be your

24  representative --

25                    MR. BAXTER:  Yes, sir.
```

```
 1                    THE COURT:   -- so there's no witnesses
 2   to be sequestered.  If the Rule's been invoked, however,
 3   both sides will be responsible for making sure that they
 4   don't have nonexpert witnesses who come into the
 5   courtroom during any of the proceedings.  If the Rule is
 6   violated, there will be problems regarding those
 7   witnesses testifying, so that each side better watch
 8   over that.
 9                    You may proceed.
10                    MR. GRINSTEIN:  Your Honor, for our first
11   witness the Plaintiff, PACT, calls Martin Vorbach.
12                    THE COURT:  All right.  Mr. Vorbach, you
13   may come up to the stand and be sworn.
14                    (Witness sworn.)
15                    THE COURT:  Thank you.  Please have a
16   seat.  If you would pull that microphone a little bit to
17   you as you sit down --
18                    THE WITNESS:  Okay.
19                    THE COURT:   -- that'll help.  Thank you.
20            MARTIN VORBACH, PLAINTIFF'S WITNESS, SWORN
21                        DIRECT EXAMINATION
22   BY MR. GRINSTEIN:
23       Q.   Could you please state your name for the jury?
24       A.   I am Martin Vorbach.
25       Q.   And Mr. Vorbach, where do you live?
```

1    A.   I have two places of living.  I live in
2  Lingenfeld, Germany and have another place in Cupertino,
3  this is in California in the Silicon Valley.
4    Q.   Are you married, Mr. Vorbach?
5    A.   Yes, I'm married with my wife Suzanna.
6    Q.   Any kids?
7    A.   I have two kids, two sons, Adrian and Julian.
8    Q.   And what is your relationship to the Plaintiff
9  in this case, PACT?
10    A.   I am the founder of PACT and the -- the CTO,
11  the Chief Technology Officer of the company.
12    Q.   Okay.  And as you heard in the opening
13  statement, this case is about the '181 and the '106
14  patents.  What do have to do with those two patents?
15    A.   I'm the lead inventor of both patents.
16    Q.   All right.  Let's talk -- begin our
17  conversation by talking a little bit about your
18  background.  Where did you grow up?
19    A.   I grew up in a small town in South Germany in
20  Heidenheim.
21    Q.   And when did you first realize that you were
22  interested in technical or mechanical, that sort of
23  thing?
24    A.   When I was a kid I used to disassemble every
25  electronic or mechanical component in our house, so it

1  was a nightmare for -- for my parents, that as soon

2  as -- as I got older, with a screwdriver I would

3  disassemble something.  And after a while they thought,

4  okay, let's give the kid something which was broken so

5  that he don't create any mess.  And they gave me, for

6  instance, a broken calculator and I disassembled it, I

7  tried to assemble it again, and I can say it started

8  really with this broken calculator, I put it together

9  and it worked, so --

10      Q.   How old were you at this time?

11      A.   -- this is how it happened.  I was 6, 7, that

12  age.

13      Q.   And did you continue to have an interest in

14  technical things when you were that young?

15      A.   Yes, absolutely.  After that I -- I started to

16  go to the local TV shop and ask them for broken TVs, and

17  I took them with me, and tinkered around with them just

18  to see whether I can fix them or -- I mean, in the

19  beginning I just wanted to have an idea how these things

20  worked.  And later on I figured out, okay, quite of --

21  some of them I can fix and I looked for -- for the spare

22  parts and fixed them, and yeah, this is how -- how it

23  began.

24      Q.   How old were you when you were fixing TVs?

25      A.   7, 8.

1    Q.   And did there come a time in which you got

2  interested in computers?

3    A.   Yes.  In 1979, my dad's construction company

4  bought some of the very early computers, and the funny

5  thing was at -- at first, how shall I say -- how shall I

6  say, the -- the concept was lock the door where the

7  computers are and never let the kid into the computer

8  room.  He will disassemble the computers.

9         Now, some days in the late, late '79, they had

10  a problem with that computer, it's a specific one.  And

11  ultimately they asked me, look at -- look at computer.

12  Can you figure out what it is?  Now, this was something

13  completely new for me.  I had never touched software or

14  the programming level of that computer and it took me

15  about one to two days to go through manuals and -- and

16  just think through it, and ultimately I fixed the

17  problem with this computer.

18    Q.   How old were you then?

19    A.   9.

20    Q.   And what did you come to think about the

21  computers in your dad's construction business?

22    A.   They were way too slow.  I mean, as of today

23  you can buy dishwashers which have much more computing

24  performance just to figure out how to wash the dishes

25  than those computers back then.

1      Q.    So what did you do?

2      A.    Ultimately I asked my father for permission to

3  build my own computer system.  Maybe I should say that

4  before I did that, I was maintaining those computers

5  already for some time and I started writing software for

6  the company the -- the people there came to me and said

7  well, could you write a piece of software for this or

8  that.  So I got some experience, and yeah, ultimately I

9  asked my dad do you allow me to buy a faster computer

10 for the company.

11     Q.    Were you going to buy a computer or build it?

12     A.    No, the idea, the concept was that I -- I made

13 a schematics, a plan how to build a computer, then I

14 made a design of the printed circuit boards, this is

15 these boards which you see in all the electronic

16 components or electronic devices and I went to a shop

17 and bought the integrated circuits, all those little

18 tiny things which are on those boards and soldered it

19 together.

20     Q.    How old were you when you finished this

21 computer?

22     A.    15.

23     Q.    And after you'd finished your -- the first

24 iteration of the computer, I guess, did you continue to

25 tinker on it?

1     A.   Yes, absolutely.  The point is the

2  computations in constructions are very complicated,

3  particularly if you have large buildings.  You have to

4  ensure that the building is stable and does not

5  disintegrate, so those are complex calculations and I

6  figured out that even this new computer was too slow and

7  ultimately I had the idea to put multiple, many of those

8  boards together and form a parallel computer to enhance

9  the processing speed.

10     Q.   What is a parallel computer?

11     A.   You can think of a parallel computer like that

12  it is performing many tasks at the same time.  So it's

13  not limited to just doing one task, one program, one

14  kind of mathematical calculation, but it can do multiple

15  at the same time.

16     Q.   And what grade were you on when you were

17  working on this parallel computer?

18     A.   I was in high school.

19     Q.   Okay.  What did you do after high school?

20     A.   I went to the German Army.

21     Q.   Was that a volunteer, mandatory, how did that

22  work back then?

23     A.   It was mandatory at that time.

24     Q.   And what was your job in the Army?

25     A.   I was a radio operator then.

1    Q.    When did you complete your military service?

2    A.    This was in 1990 -- 1990.

3    Q.    What did you do after that?

4    A.    I went to the University of Karlsruhe to study

5    computer science.

6    Q.    Where is the Karlsruhe?

7    A.    This is in the southwest part of Germany.

8    Q.    Okay.  Now, you -- do you remember me in

9    opening discussing these things called configurable

10   chips, do you remember that?

11   A.    Yes, I do.

12   Q.    Now, were these configurable chips things you

13   were discussing or studying at the University of

14   Karlsruhe?

15   A.    No, back at that time, configurable chips were

16   not -- they're known in the industry and -- and

17   universities didn't talk about them.  So the studies or

18   the classes I took were about PCs, about personal

19   computers like an IBM desktop computer.

20   Q.    So how did you first learn about these

21   configurable chip things?

22   A.    Well, I was using, you can say, the

23   predecessors of those chips, the so-called PLDs,

24   Programmable Logic Devices, for the computers I had

25   built for my father's company.

1    Q.   Did you also hear me in opening refer to these

2  things called FPGAs?

3    A.   Yes.

4    Q.   When did you first use an FPGA?

5    A.   This was in 1995.

6    Q.   Okay.  Let's -- skipping ahead a little bit, I

7  want to stay in your college years, and we -- we talked

8  a minute ago about this computer that you built for your

9  dad when you were 15 years old.  Did you continue to

10  work on it while you were in college?

11    A.   Yes, I did.  At that time, a new technology

12  came to the market, which was called transputers.  They

13  were parallel processor -- processors which made

14  implementing parallel computer systems easier than the

15  old technology.

16    Q.   And did working with these transputers spark

17  any ideas in your head?

18    A.   Yes, it did.  Transputers were still similar

19  to my old concept means, parallelizing compete shops,

20  which means if you think of a company, you go to one

21  employee and say you do -- you do this; you go to

22  another employee and say you do that.  So you -- you

23  parallelize on a shop-level basis.

24         Now, the idea which, how shall I say, sparked

25  in my mind, was that I can get a better efficiency out

of my system if I do not parallelize only on a shop

basis but also, let's say, on a microbasis, means you

can imagine that one single person is able to staple

paper, read paper, and print paper at the same time.

This is called instruction level parallelism which means

handling multiple instructions at the same time.

Q.   And what did you do with your new ideas about

instruction-level parallelism?

A.   I wrote a patent about it, which I filed in

Germany in 1993.

Q.   And did the German Patent Office grant you

that patent?

A.   Yes, it did.

Q.   How old were you at the time?

A.   When they granted it?

Q.   Yes.

A.   I filed it when I was 23.  I think they

granted it when I was 25.

Q.   Now, is that one of the two patents that's in

this lawsuit today?

A.   No, it relates to different aspect of our

technology.

Q.   All right.  I want to talk to you about the

patents that are in this lawsuit today.  You understand

those are the '106 and '181 patents?

1      A.   Yes.

2      Q.   Are you the only inventor on those patents?

3      A.   No, I invented those patents together with Mr.

4  Robert Munch.

5      Q.   Now, this Robert Munch, when did you meet him?

6      A.   I met him at the University in Karlsruhe.

7      Q.   Was he a professor, student, what was he?

8      A.   He was a student.  We had the same classes

9  together and this is where I met him.

10     Q.   And at that time did you-all agree to work

11 together?

12     A.   Yes.  We decided to found a company which

13 would do business in the construction area with my

14 knowledge, also the medical area, and I would -- I

15 wanted to continue the research on those transputers on

16 those parallel processing technologies.

17     Q.   What did you name this new company?

18     A.   We gave it an acronym it was SCRIP, which

19 would be SCRAP in English.

20     Q.   SCRAP is not a really good name for a computer

21 company in the construction business, is it?

22     A.   No, absolutely not, but you've got toward the

23 German centric at that point in time and didn't think

24 about the -- the English word, the English translation.

25     Q.   So what sort of things did SCRAP -- what sort

1    of industries did SCRAP end up working in?

2        A.    Well, as that we work -- we were working in

3    the construction industry, so we were providing software

4    to construction companies.  We were writing software for

5    the medical industries, industries for doctors.  This,

6    by the way, how I met my wife, she's a nurse by

7    education and well our most famous customer was

8    certainly Porsche, the car company, they used our

9    computer systems for information terminals at trade

10   shows.

11       Q.    Now, you said that you were working with SCRAP

12   with Mr. Munch; is that correct?

13       A.    Yes.

14       Q.    How did you divide up job responsibilities at

15   SCRAP between the two of you?

16       A.    Okay.  Mr. Munch was a very good programmer,

17   so we said -- or we decided that he will do the software

18   tasks.  I on the other hand, I mean, I was writing

19   software since I was 9 year old, so I was a bit tired of

20   it and wanted to focus on the hardware development.

21       Q.    Can you just explain to us what's -- what's

22   hardware?

23       A.    Okay.  If you go to a computer store and you

24   buy this metal box which you carry home, this is the

25   hardware, the computer system, this metal box you carry

1  home is the hardware.  Now, if you compare it to

2  software, software would be if you put a DVD in the

3  drive and you load software like a word processor, then

4  this is the software means the -- the thing which tells

5  the computer what to do.

6      Q.   Now, what was it like working with Mr. Munch

7  back at SCRAP?

8      A.   It was a bit rocky, honestly.  So we got some

9  issues, and split up for a while.

10     Q.   Did you get back together?

11     A.   Yes.  After about a year we sorted those

12  issues out and we started working together again.

13     Q.   All right.  Now, while you were at SCRAP, were

14  you still in college?

15     A.   Yes.

16     Q.   Did you finish your college degree?

17     A.   No, I did not.  At some point in time I had to

18  make the decision do I want to focus on the business and

19  the company or do I want to spend the time for my

20  studies.  It was an either/or, either/or decision and I

21  decided for the company.

22     Q.   So what happened to SCRAP?

23     A.   One of our sales guys figured out about this

24  patent I had for instruction of parallelism processing,

25  and he was pushing us to implement it.  We figured out

1  that this required so much money we couldn't use the

2  income which the company generated, so we -- so we

3  decided to go out and look for investors.

4     Q.   And did you find that money?

5     A.   Yes, we did.

6     Q.   After you got those investments, did you form

7  a new company?

8     A.   We formed a new company.  This is called PACT.

9     Q.   What does PACT stand for?

10     A.   Processing Array Computer Technology.

11     Q.   So did you pay attention to the English that

12  time?

13     A.   This time, yes.

14     Q.   When did you form PACT?

15     A.   This was 1996.

16     Q.   And is the PACT back from 1996 the same PACT

17  that's the Plaintiff in this lawsuit?

18     A.   Yes, essentially it is.  We went through

19  through -- through a few name changes, mainly we changed

20  the extension of PACT when it means -- it was first PACT

21  Technologies, GmbH, then it became PACT XPP

22  Technologies, so this -- words changed.  Also we changed

23  the form, the legal form, from a German GmbH to an AG.

24  An AG is similar to a U.S. Inc., but essentially it's

25  the same company.

1    Q.   Do you still work for PACT today?

2    A.   Yes, I do.

3    Q.   Full time or part time?

4    A.   Part time.

5    Q.   What do you do with the rest of your time?

6    A.   I am forming right now another company which,

7  again, is focusing on computer technology but a

8  different technology.

9    Q.   Do you draw a salary from PACT?

10   A.   I do.

11   Q.   I want to show you DX 915.  I think you've got

12 two binders up there in front of you?

13   A.   No.

14   Q.   Don't have the binders.

15            MR. GRINSTEIN:  Your Honor, may I

16 approach?

17            THE COURT:  Yes.

18   Q.   (By Mr. Grinstein)  There are your binders.

19   A.   Thank you.

20   Q.   I think this exhibit is going to be in binder

21 No. 2.  You could also look up at the screen on it.

22   A.   Okay.

23   Q.   Okay.  Can you -- can you tell us what DX 915

24 is?

25   A.   This is an English translation of my current

1  contract with PACT.

2     Q.    And when did you enter into your current

3  contract with PACT?

4     A.    This was in February 2011.

5     Q.    Okay.  And under this contract with PACT, are

6  you entitled to any of PACT's income?

7     A.    Yes, I am.

8     Q.    How does that work?

9     A.    I get a percentage on PACT's income.  This is

10  8 percent on all -- all income above $6 million and the

11  percentage increases as the income of PACT increases.

12     Q.    What qualifies as income?

13     A.    Sales of products, licensing of designs,

14  licensing of patents, sales of patents, this lawsuit,

15  for instance, just every kind of income.

16     Q.    All right.

17           MR. GRINSTEIN:    Take that down with you.

18     Q.    (By Mr. Grinstein)  I want to change subjects

19  now and talk to you about the technology in this case.

20           Now, did you hear me in the opening statement

21  refer to this bus interface technology?

22     A.    Yes.

23     Q.    Okay.  Now, I want to be really careful here.

24  The Court has defined some of the terms for the jury and

25  I do not mean for you to be redefining what the patents

1  mean or what the terms mean.  I just want you to explain

2  when you were developing these inventions, what did you

3  understand a bus interface to be?

4      A.   Okay.  In very broadly spoken, it's the means

5  to move data between inside a chip and the outside

6  world.

7      Q.   And just so we're all on the same page, what's

8  a chip?

9      A.   A chip is -- is -- how shall I say, it's an

10  electronic component inside a computer, for instance --

11  for instance, or inside a mobile phone which moves,

12  stores, processes data.  So it's -- you can say the

13  brain inside your computer system or inside your TV,

14  your electronic -- your electronic devices.

15      Q.   What year did you come up with the ideas that

16  led you to file for the patents that are in this

17  lawsuit?

18      A.   This was when I designed the emulator in 1995.

19      Q.   Okay.  Let me show you Demonstrative 1.  Hold

20  it up right there and then I'll put it under the ELMO so

21  everyone can see it a little easier.  What is

22  Demonstrative 1?

23      A.   This is the emulator I designed in 1995.

24      Q.   What is an emulator?

25      A.   Okay.  If you design chips, the chip design is

1  very expensive.  It costs a lot of money.  It's similar

2  to designing an airplane or designing a car.  So before

3  you really built the first, let's say, airplane or car,

4  you want to simulate that it really works.  It's -- it's

5  similar with chips.  You want to simulate whether your

6  chip design works and this is what, for what we are

7  using in the electronic world, emulators just to

8  simulate our design, our concept.

9      Q.   Well, I guess one thing I don't understand,

10  Mr. Vorbach, is computer chips I've seen are really

11  small and this thing looks pretty big.  So why the

12  difference?

13      A.   Okay.  You can say it's the other way around

14  compared to airplanes.  If you simulate the airplane,

15  your computer is pretty small and the airplane is pretty

16  big.  Now, in our world, the emulator is pretty big and

17  the final chip is rather small.  So it's the similar

18  relationship.

19      Q.   Let's take a look and see if we have something

20  that can explain that.  Right now I want to show you

21  Demonstrative No. 2.  And can you tell us what

22  Demonstrative No. 2 is?

23      A.   Yes, this is a so-called wafer.  On this wafer

24  disk are -- on this particular one are 65 of our XPP 128

25  chips.

```
 1        Q.    So these are PACT chips on this wafer?

 2        A.    Yes, those are ours.

 3        Q.    And just in terms of raw materials and money

 4   and everything, how much did it cost PACT to generate

 5   this wafer?

 6        A.    At that time, approximately $750,000.

 7        Q.    Is that the reason why you simulate a chip

 8   design on an emulator like that?

 9        A.    Yes.  Absolutely, yes.

10        Q.    All right.  I want to go back and talk to you

11   a little bit more about this emulator board.  Now I'm

12   going to flip it over.  And if I can figure out how to

13   zoom, I'm going to zoom up, turn that around.  There we

14   go.

15             Right there I see some writing on -- on the

16   emulator board -- and maybe I'll zoom a little bit more

17   so it's easier for folks to see.  That writing says

18   SCRAP 1995 M. Vorbach; can you explain what we're

19   looking at right there?

20        A.    Yes.  This means I have designed this board in

21   1995 while I was working inside the company SCRAP.

22        Q.    That's your name on there?

23        A.    Yes.

24        Q.    Is Mr. Munch's name on there?

25        A.    No.
```

Q.   Now, I'm going to flip this emulator board
over again, and on this board, I see these four big
chips right there.  And we'll take it out a little, zoom
it out a little bit.  I see these four big chips right
here.

A.   Yes.

Q.   What are those?

A.   Those are Altera FPGAs.

Q.   Who is Altera?

A.   Altera is the second larger maker of FPGA
devices in the market.

Q.   Okay.  Why did you put FPGA chips on your
emulator board?

A.   Well, FPGA chips comprise configurable logic,
so you have small cells in them which you can -- can
configure to perform -- to perform any function which
you like them to perform.  So if you implement a piece
of hardware, the ideal platform to use as you can make
them behave like the design you want actually to build.

Q.   And so what did you do with this emulator
board after you built it?

A.   The concept was to -- yeah, to configure the
FPGAs to behave like my instruction level parallelism
processor.

Q.   Okay.  Tell the jury what it was that sparked

 1   the idea in your head that led to the inventions in this

 2   case.

 3        A.   Okay.  Can I have a laser pointer?

 4        Q.   Is there a laser pointer up there?

 5             MR. GRINSTEIN:  Sorry.  May I approach

 6   again, Your Honor?

 7             THE COURT:  Yes.

 8        A.   You can see here that several chips, those --

 9   those are, by the way, chips, are surrounding those four

10   FPGAs.  We have a bank of chips here, we have another

11   bank of chips here, third one here, and another one

12   which looks differently here.  Also you can see that

13   this chip bank again looks different from those two and

14   you can see that here is a further chip which says video

15   on it.

16             So the issue I had with this board was that I

17   had to build interfaces, means I have to enable this

18   FPGAs to talk with all those surrounding chips.  And I

19   figured out that instead of, how shall I say, focusing

20   on my design on the thing I really wanted to build, I

21   had -- I had to base even months, not only week, but

22   months of work, of design work, to implement the

23   interfaces to talk to these surrounding devices.

24        Q.   (By Mr. Grinstein)  Did you like doing that?

25        A.   Not -- not at all.  I mean, it was a waste of

1  time for me.

2      Q.   Did configuring those interfaces also cause

3  you space problems on those chips?

4      A.   Yes, absolutely.  The space, I mean, I wanted

5  to use the space inside these devices for my design for

6  the thing I wanted to build.  But instead of -- of

7  having or using the space for my design, I had to waste

8  the space, or a significant amount of the space, such to

9  integrate the interface for talking to the surrounding

10  units on the board.

11      Q.   And what did doing all that integrating do to

12  the speed and the power on this thing?

13      A.   Well, a significant issue, for instance, I had

14  here with the video interface, you know, video is a lot

15  of information, so to produce a picture, to produce a

16  movie, you know how much data today is on a Blu-ray or

17  on a DVD.  So you have to transport a large amount of

18  data between your processor and this thing which brings

19  the picture to your screen.  So I had significant speed

20  issues here, and this was the first problem.

21          The second problem was that I had or I saw

22  that I waste a lot of power, I used a lot of energy just

23  to provide the power, the -- the -- yeah, the energy to

24  the units managing the interface or being the interface.

25      Q.   So did all those ideas or all those issues

1  spark any kind of idea in your head?

2      A.   Yes, I -- I had the idea it would be much

3  nicer if I had permanent interfacing circuitry on this

4  board, which would be there.  I would not have to take

5  care about that -- that interfacing circuitry.  It's

6  there.  It doesn't waste my time.  It doesn't waste

7  space and energy on the system.  Also the idea was if I

8  have an optimized interfacing circuitry, it is

9  optimized, it is -- it is permanent.  It's made for this

10  purpose.  So I can optimize the power dissipation and

11  the speed significantly compared to a -- to a -- to a

12  implementation where I have hundreds or thousands of

13  logic cells which consume much more power which are much

14  slower simply as it is larger, the signals require more

15  time to travel through this large area.

16          It's like drive in a car.  If you go to a city

17  close by, it's quick.  If you drive from here to Dallas,

18  it takes you a long time.  It is -- it is similar there.

19  So I had a significant improvement in time as I was

20  optimized.  I had a significant improvement in power

21  dissipation as that was optimized.

22      Q.   So just so we're clear, what do you mean by

23  permanent?

24      A.   Permanent means that a predefined interface

25  was sitting there, which was built for the purpose of

interfacing.  Now, it could, for instance, interface to

these devices or it could interface to those, to this or

this, which means think of -- of it as -- as a

translator.  Imagine you are going to Germany or Japan.

Now this would mean that -- or you may want to learn the

language so that you can communicate with the people

there.

Now, if you sit down, learn the language, it

takes you months, years maybe to learn this language.

On the other hand, you could say, well, I get a

translator for me, a dedicated permanent translator

which is with me, and use this person to translate from

English to German or to Japan -- to Japanese.  On the

other hand, you could tell your translator which

language the translator shows me.  Means in that case,

here I would tell this translator speak to these

particular chips.  You see they look different than

those chips or this chip or this interface block here.

So the idea was having a translator there but

being able to tell the translator speak the language

those chips are talking or speak the video language for

this chip.  Speak the memory or the -- the -- yeah, the

language for this chip or speak this -- this language

for this interfacing unit on the left corner.

Q.    So just so your analogy is clear, in your

1   analogy, what is the translator?

2       A.   The translator would be my permanent bus

3   interface.

4       Q.   And in your analogy do you ever give

5   instructions to your translator or do you just take your

6   translator out of the box and forget about him?

7       A.   No, I would have to tell the translator, do

8   you speak this language, do you speak the -- the video

9   language or do you speak, for instance, this language or

10  there which, again, looks completely different.

11      Q.   Do you have to teach your translator those

12  languages?

13      A.   No, I program it and tell him to speak --

14  speak this language.

15      Q.   Now, did you write down any of your ideas for

16  this permanent bus interface invention?

17      A.   Yes.  At the time I was -- I was designing

18  this board, I made -- I made drawings.  I made -- I made

19  schematics and drew diagrams for it.

20      Q.   Let's take a look at Plaintiff's Exhibit 89,

21  and you might want to look in your book on this one.

22  It's in your book on this one, Mr. Vorbach.  It should

23  be in the first book.

24      A.   Okay.  89?

25      Q.   89.

1     A.    Okay.  I've got it.

2     Q.    Can you tell us what Plaintiff's Exhibit 89

3 is?

4     A.    Those are some of the drawings I made in

5 the -- yeah, you can say in the early days when we were

6 doing the conception of our technology.

7     Q.    Turn with me to the page that's labeled 704.

8     A.    7 -- I'm there.

9     Q.    What's this drawing?

10     A.    This is -- this drawing shows the interfacing

11 circuitry.  You can see here we have here configurable

12 components.  In our technology, we call them PAE.  So

13 this is the configurable part of the -- of the chip of

14 the design.

15     We then have lines going from the configurable

16 components to this block called IORT.  Now, those --

17 those lines are many wiring which carry electrical or

18 electronic signals.

19     Here the IORTs, these are particularly the

20 parts I'm talking about.  You can see here four of them.

21 Here's one; here; here's another one; and here's yet

22 another one (indicates).  And those IORTs are getting

23 the internal lines.  They are combining the lines and

24 forming a bus system, which is then in communication

25 which -- with the external units.

1          You can see here ex RAM.  This means external

2  read access memory.  RAM is a term in our industry.

3      Q.   So just so we're clear, these IORTs, what do

4  those have to do with your invention?

5      A.   Those IORTs are the permanent bus interfaces

6  on the chip.

7      Q.   All right.  Up there in the right-hand corner,

8  I see a little indication.

9              MR. GRINSTEIN:  Matt has helped blow it

10 up for us.

11     Q.   (By Mr. Grinstein) Can you tell us what that

12 indicates?

13     A.   Yes.  This means -- M.V., which I wrote the

14 drawing, Martin Vorbach.  And this date is actually the

15 German writing of a date.  In Germany, you have the day

16 first, then the month, and then the year.  So this was

17 done June 29th, 1995.

18     Q.   That's the date of this particular drawing?

19     A.   Yes.

20     Q.   And M.V., who does that M.V. stand for?

21     A.   It's me, Martin Vorbach.

22     Q.   Is Robert Munch on this drawing?

23     A.   No.

24     Q.   Now, did you actually ever implement the

25 concepts in this drawing in anything?

1        A.    Yeah.   First of all, we used it on this

2   emulator board to interface with the surrounding -- with

3   the devices surrounding the FPGAs.

4        Q.    Can you explain?

5        A.    Yeah.   I -- I configured this -- you can say

6   this interfacing units together with the PAEs with our

7   configurable technology inside the FPGAs to simulate, or

8   as we say, to emulate our design.   So it was inside the

9   FPGAs.

10       Q.    And, Mr. Vorbach, I think it might be a little

11  bit better if you came forward a little bit.

12       A.    Oh, I'm sorry.   Yeah.

13       Q.    There you go.

14             Now, other than work on this emulator board,

15  what did you do with your new ideas about this permanent

16  bus interface circuitry?

17       A.    We filed a patent in Germany.

18       Q.    And when did you do that?

19       A.    This was 1996.

20       Q.    Were you the only inventor listed on that

21  patent?

22       A.    No.   We also listed Robert Munch.

23       Q.    Who was listed first?

24       A.    It's me.

25       Q.    Why?

1       A.   Well, first of all, the clear definition

2  inside SCRAP was I'm the hardware guy.  I'm doing the

3  hardware work.  Robert Munch was doing the software

4  work.  So naturally, it was my work.  As you also can

5  see on the emulator board, I did it, so I was listed

6  first.

7       Q.   Just to be clear, when you filed this patent

8  application, was it SCRAP or was it PACT?  It was 1996?

9       A.   1996 was already PACT.

10      Q.   So you -- the decision was made to list you as

11  the first inventor; is that right?

12      A.   Yes.

13      Q.   Did Mr. Munch argue about that?

14      A.   No.  It was clear that -- that this was a

15  hardware task, that I made this invention.  This was my

16  job.

17      Q.   Well, can you describe Mr. Munch's role in

18  these inventions?

19      A.   Yes.  He took, how shall I say, the

20  preconfigured board, so to say, and then put his

21  software on the boards, which means we had two levels of

22  programming.  First was just to make the board look like

23  we wanted it to look to simulate our design, and then he

24  later claim and he worked with the design, programmed

25  it, and tested software, tested algorithms on that

design.

Q.   So do you dispute that he's a co-inventor?

A.   No.  Absolutely not, no.

Q.   Now, did you eventually apply for some United States patents on these particular inventions?

A.   Yes, we did.  In 1997.

Q.   Let's run through those patents very quickly. I want you to look at Plaintiff's Exhibit 4.  You've got a copy.  I've got the original of Plaintiff's Exhibit 4 right here.

Do you see Plaintiff's Exhibit 4?

A.   Yes.

Q.   And what is Plaintiff's Exhibit 4?

A.   This is the original United States patent, which we got issued.

Q.   And why does it have this fancy ribbon thing on the front?

A.   This says that this is the original patent, which is USPTO, the U.S. Patent Office, has issued to us.

Q.   Okay.  Can you turn to the second page of PX 4, and I just want to discuss with you some of the things that are said on this particular page.

First of all, when did you apply for this patent in the United States?

1      A.   We applied for it in -- on October 8th, 1997.

2      Q.   Was it related to any previous patent

3  applications?

4      A.   Yes, it was.  You can see two lines below, it

5  first says foreign patent -- foreign application

6  priority date.  And there it says December 20, 1996,

7  Germany, and the application number was 196 54 595.

8      Q.   Is that the German patent that you just

9  discussed, the patent application you just discussed?

10     A.   Yes.  Exactly.  This is the patent we filed in

11  Germany.

12     Q.   Was there any difference between the patent

13  application that you filed in Germany and the patent

14  application that you filed in the United States that led

15  to this patent?

16     A.   No, only the -- the language is different.  It

17  has been translated to English.

18     Q.   Okay.  When did the United States Patent

19  Office issue this patent?

20     A.   This one got issued September 12th in 2000.

21     Q.   Now, we mentioned that you applied for the

22  German patent in December 1996, so is that when you

23  conceived of the inventions in this patent?

24     A.   No, actually not.  This was when we built

25  this, this emulator board in 1995.

1    Q.   How would you describe the inventions in this

2  patent?

3    A.   I would look to the claims.

4    Q.   Okay.  So if you flip to the back of the

5  patent, last couple pages, this area right here

6  (indicates), are you saying that that is what describes

7  your inventions?

8    A.   Yes, those are the claims.  This is the

9  definition, the description of our inventions.  Yes.

10    Q.   Do you and Mr. Munch still own this patent?

11    A.   No.  We assigned it to PACT.

12    Q.   Let me show you Plaintiff's Exhibit 781 (sic).

13         MR. GRINSTEIN:  Maybe if you go three

14  pages in, please, Mr. Boles.

15                   Next page.

16    Q.   (By Mr. Grinstein) If you want to look at it

17  on the screen, it might be a little easier.

18         What is Plaintiff's Exhibit 781 (sic)?

19    A.   This is the assignment -- this is the

20  assignment document where we assigned the patent to the

21  company, PACT.

22    Q.   And I see one of the parties is PACT GmbH.

23  Did that eventually become PACT in this case?

24    A.   Yes, exactly.

25    Q.   So does the Plaintiff PACT in this case own

1  the '181 patent?

2       A.   Absolutely.  Yes.

3       Q.   Let's switch patents.  I want to talk about PX

4  5, this guy.

5            And if we look at the second page of PX 5,

6  tell us which patent PX 5 is.

7       A.   PX is a continuation -- it's -- it's the '106

8  patent.

9       Q.   Okay.  And is PX 5 related to any previous

10 patent applications or patents?

11      A.   Yes.  It's a continuation of the '181 patent.

12 You can see that in Line 63.

13      Q.   Right there (indicates)?

14      A.   Yes.  Here it says continuation of application

15 number, and it's filed on October 8th, 1997, now, patent

16 6,119,181.

17      Q.   Okay.  And when did you file for this

18 particular application?

19      A.   We filed this June 18th, 1999.

20      Q.   And it was issued when?

21      A.   January 8th, 2002.

22      Q.   Just so that we have everything complete, can

23 you look at Plaintiff's Exhibit 781 (sic) and --

24            MR. GRINSTEIN:   781 (sic), please.

25      Q.   (By Mr. Grinstein) What is Plaintiff's Exhibit

1  781?

2      A.   This is the assignment document where I --

3      Q.   I'm sorry.  It was 780.  My mistake.  780.

4      A.   Okay.  This is the assignment document where I

5  and Robert Munch assigned the '106 patent to PACT.

6      Q.   Okay.  So does the Plaintiff in this case,

7  PACT, own the '106 patent?

8      A.   Yes.  Absolutely.

9      Q.   And, again, how would you describe the

10  inventions in the '106 patent?

11      A.   I would, again, look to the claims.

12      Q.   Now, internally within PACT, did PACT have a

13  way of referring to the '181 and the '106 patents?

14      A.   Yes.  We called that the PACT 03 patent

15  family.

16      Q.   Can you explain that?

17      A.   We have a lot of patents inside PACT, and

18  some, how shall I say, are similar or based on a similar

19  specification, a similar content.  And we grouped those

20  together.  And in the PACT 03 family, we have the '106,

21  the '181, and others.  I think three, four, five more.

22      Q.   All right.  So if folks see during this case

23  documents that mention PACT 03, are you talking about

24  the '181 and the '106 patents?

25      A.   We are talking mainly about the whole family,

1  the content of the family.

2      Q.   Are there more than just the '181 and the '106

3  in the PACT 03 family?

4      A.   Yes.  I think there are three, four, five more

5  in this family.

6      Q.   Let's turn our attention away from the patents

7  and talk to you a little bit more about the history of

8  PACT.

9      A.   Okay.

10      Q.   Now, I think you mentioned earlier that PACT

11  was formed in '96, after you got some investments; is

12  that right?

13      A.   Yes.

14      Q.   At some point in time, did you go out and look

15  for more investments for PACT?

16      A.   Yes.  Once we had the design working on this

17  emulator board, we went out to look for more money in

18  order to implement the first chips.

19      Q.   Did you get more money?

20      A.   Yes, we did.

21      Q.   And what did you do with it?

22      A.   We actually implemented these chips.  You

23  showed the wafer, so this is what we did with the money.

24      Q.   All right.  Let me show you Demonstrative 3,

25  and can you explain for us what Demonstrative 3 depicts.

1      A.   Yes.   This says it's the first generation of

2  our technology, which we call the XPP 1 design, which

3  means the XPP 1 first technology.   And based on this

4  technology, we built a chip which was called the

5  XPP 128.

6      Q.   Now, just to be clear, was -- this XPP 128

7  chip, did it just have a bus interface and nothing else

8  in it?

9      A.   No.   Certainly, we had other components in it,

10  our reconfigurable elements.

11      Q.   Okay.   When did you finish the design on the

12  XPP 128 chip?

13      A.   This was -- I remember this well -- December

14  31st, 1999.

15      Q.   Trying to get it in before the end of the 20th

16  century?

17      A.   Yes.

18      Q.   Okay.   After you finished the design, what did

19  you do next?

20      A.   We went to Fab.   Fab is a company which builds

21  those wafers, which actually manufactures the chips, and

22  started with the manufacturing of those wafers.

23      Q.   And so is that what we're looking at in

24  Demonstrative No. 2?

25      A.   Yes.   Exactly.

1    Q.   This is a wafer of what?

2    A.   Of the XPP 128 chip.

3    Q.   Where was this wafer made?

4    A.   In Korea.

5    Q.   And so if I wanted to use the chips on this

6  wafer, could I take this wafer and plug it in a computer

7  and start using it?

8    A.   No.  This wouldn't work.  You have at first to

9  saw the chips out of that wafer.  You see, there are

10  many rectangles on it, so such 1-by-1-inch rectangle is

11  a chip.

12         You saw them out of the wafers, so you get the

13  bare chips, the raw chips, and then you put those chips

14  into a package.  And this packaged device is what you

15  can put into a computer.

16    Q.   I've got one more toy to show you.

17  Demonstrative No. 4.

18              MR. GRINSTEIN:  We're going to put

19  this -- can I have the ELMO, please?

20              Thank you.

21    Q.   (By Mr. Grinstein) What is Demonstrative 4?

22    A.   This is the XPP 128 chip.  If you would break

23  this package, you would find such -- such a chip inside

24  it.

25    Q.   Now, was -- this chip I'm holding in my hand

1  right now, was this ready to be sold as a commercial

2  product?

3      A.   No.

4      Q.   Why not?

5      A.   The pads inside the chip were not

6  production-ready.

7      Q.   What's a pad?

8      A.   A pad, you can understand it as surge

9  protectors, protector for chips.

10     Q.   Okay.  So even though the pads on this thing

11 were not production-ready, could you test it?

12     A.   Yes.  You could perfectly test it under the

13 laboratory conditions, or if you are very careful how to

14 handle the chip.  So what you are doing --

15     Q.   Not a good idea?

16     A.   -- throwing it around, would kill it.

17     Q.   I'm sorry.

18          So what did you do with these chips which you

19 handled more carefully than I'm handling your chip now?

20     A.   We put them on a -- on a demonstrator board

21 and demonstrated them in October 2000 on the

22 Microprocessor Forum in San Jose.

23     Q.   San Jose where?

24     A.   California.

25     Q.   What was the Microprocessor Forum?

```
 1        A.    The Microprocessor Forum was, you can say,
 2   kind of prestigious gathering of electronic engineers,
 3   so all big semiconductor companies like to show their
 4   newest designs there.  IBM was there, Intel, Texas
 5   Instruments, all the big guys.
 6        Q.    And is that why you went?
 7        A.    Yes, absolutely.  Yes.
 8        Q.    Okay.  Let's take a look at Plaintiff's
 9   Exhibit 15.
10        A.    15.
11        Q.    Can you tell us what Plaintiff's Exhibit 15
12   is?
13        A.    Yes.  This is an article which was written
14   about our technology.  It says PACT debuts -- debut,
15   sorry -- I'm not sure how it is pronounced -- Extreme
16   Processor.  And this was written around the same time.
17   I think it was exactly -- it was exactly the same date
18   when we showed -- when we presented our XPP 128 design.
19        Q.    And the first paragraph in this article from
20   Microprocessor Report says:  Combine the
21   reconfigurability of an SRAM-based FPGA with a large
22   array of ALUs and you get potential for tremendous
23   flexibility and performance.  PACT's new Extreme
24   Processor Platform delivers that combination along with
25   some serious questions.
```

1          Do you see that?

2      A.   Yes.

3      Q.   Was that typical of the feedback that PACT got

4  about this XPP 128 chip?

5      A.   Yeah, this was very typical.  People liked,

6  how shall I say, the new design, the new technology.

7  They liked the high performance which we could deliver,

8  but they were in doubt whether we are too far ahead of

9  the market and whether there was any market for this

10  device.

11      Q.   Did PACT receive other good press about its

12  technology?

13      A.   Yes, we did.

14      Q.   Let's take a look at PX 753, please.  You can

15  look up at the screen, if that's a little bit easier for

16  you, Mr. Vorbach.

17      A.   Yeah, that's easier.

18      Q.   What is PX 753?

19      A.   This is an article about nominees named for an

20  award called Most Important Products and Technologies in

21  2002.

22      Q.   And on the second page of PX 753, does it

23  discuss PACT?

24      A.   Yes.  It says PACT's XPP is designed to

25  support multiple parallel threads among its 128 on-chip

1   processing element.

2      Q.   So is PACT being nominated for this award?

3      A.   Yes, we were.

4      Q.   Let's take a look at PX 452.  This is this

5   Microprocessor Report again.

6      A.   Okay.

7      Q.   Is this a really popular magazine in the

8   microchip industry?

9      A.   In the microprocessor world, it was.

10     Q.   Okay.  What's PX 452?

11     A.   This is an article about -- about

12   high-performance processor devices.

13     Q.   Turn with me to Page 4 of that article.  And

14   right there, can you read that paragraph that starts

15   after MPR analysts make their choice, read the first

16   opinions.

17     A.   NEC's DRP and PACT's XPU 128 lead all the

18   others in architectural performance by delivering 512

19   byte-operations per cycle.

20     Q.   Is that a good thing?

21     A.   That's a great thing.

22     Q.   Let me show you another exhibit, DX 582.

23          MR. GRINSTEIN:  Can we take a look at

24   DX 582?

25     Q.   (By Mr. Grinstein) And DX 582 appears to be an

1  e-mail from a Mark Seager around September 2000.

2       Do you see that?

3       A.   Yes.  Yes.

4       Q.   Were you a recipient of this e-mail?

5       A.   Yes, I was.

6       Q.   Who was Mark Seager?

7       A.   He was with Lawrence Livermore National

8  Laboratories located in Livermore, California.

9       Q.   That's what that llni.gov (sic) address means?

10      A.   Yes.

11      Q.   What is Lawrence Livermore National

12 Laboratories?

13      A.   It's a U.S. government institution.  They

14 have -- yeah, you can say they have the most advanced

15 and fastest supercomputers in the world there.

16      Q.   And what did Mr. Seager have to say about

17 PACT's technology?

18      A.   You have -- you have very good technology.

19      Q.   Said you have good technology?

20      A.   Yes.

21      Q.   It doesn't say very.  Let's not add that in.

22 The -- how did it make you feel when Mr. Seager told you

23 you have good technology?

24      A.   I was happy about it.  I was proud of it.  I

25 mean, it's -- it's a big thing.  The Lawrence Livermore

1  Laboratories are, how shall I say, very respected in --

2  in the world.  They are simply the -- the most advanced

3  supercomputer center in the world.

4       Q.   Well, all this sounds great.  Did -- I take

5  it, then, that no one ever criticized PACT's technology

6  and everyone thought it was great?

7       A.   No.  We also received other articles.  I mean,

8  there are always guys on the other side, too.

9       Q.   All right.  Let's go back to the time of that

10  2000 Microprocessor Forum.

11            Now, this chip right here, this XPP 128, was

12  PACT actually selling this at the forum?

13       A.   No.  As I said, they were not

14  production-ready.

15       Q.   Did it eventually offer to sell it to anyone?

16       A.   No.

17       Q.   Did you ever manufacturer a commercial version

18  of this chip.

19       A.   No, we never did.

20       Q.   So this thing was a failure, right?

21       A.   I wouldn't say so, no.

22       Q.   Well, why not?

23       A.   Well, right after the Microprocessor Forum, it

24  was approached by EADS Astrium.  This is a European

25  company making satellites and rockets for EADS.  EADS is

1   the European you can say counter part to the U.S. NASA.

2       Q.    And what did EADS Astrium want with you?

3       A.    They wanted to use the XPP 128 on their

4   satellites.  The problem they have there is you have

5   very little power there on the satellites.  Power

6   dissipation is an issue, and also you require very high

7   performance on the satellites.  I mean, it's more

8   performance you can put on the satellite.  It's more the

9   satellite can do means you have less satellite launches,

10  which saves you a lot of money.

11      Q.    So did EADS Astrium get anything from PACT?

12      A.    Yes.  They acquired a license from us for the

13  second generation of our design, the XPP II design, and

14  then upgraded the license to the third generation, XPP

15  III.

16      Q.    And so are XPP 128 or XPP chips in satellites

17  today?

18      A.    The last I heard is that they are launching

19  the satellites or the first satellites this year.

20      Q.    And will it actually be a PACT chip that gets

21  launched or PACT design?

22      A.    It's a PACT design.  They are using our

23  design, our technology, and are implementing their own

24  chips for space applications.

25      Q.    If someone were to say in opening that PACT

1  had never licensed its technology and every single

2  person they approached rejected it, would that be true?

3      A.   No, definitely not.

4      Q.   How long -- so how long has PACT's

5  relationship with Astrium lasted?

6      A.   It's still ongoing.

7      Q.   All right.  One more time pulling us back to

8  the Microprocessor Forum in the year 2000, what was

9  Mr. Munch's relationship with PACT at that time?

10     A.   This was about the time that we parted ways.

11     Q.   Why?

12     A.   Robert Munch felt he has no -- there is no

13 place for him at PACT anymore, and he wanted to go his

14 own way.

15     Q.   Are you mad at him for leaving?

16     A.   No, absolutely not.  This was his personal

17 decision, and I respect that.

18     Q.   What was PACT's next project after the XPP 128

19 design?

20     A.   PACT started to implement or work on the

21 XPP II architecture and implemented the XPP 64 chip.

22              MR. GRINSTEIN:  Can we look at

23 Demonstrative 5, please.

24     Q.   (By Mr. Grinstein) What does Demonstrative 5

25 depict?

1     A.   Yes.  Here you can see it's the second

2  generation of our technology.  We called it XPP II, the

3  technology by itself, and produced the XPP 64 chip.

4     Q.   And were you personally involved in the design

5  of the XPP 64 chip?

6     A.   No, I was not.

7     Q.   Well, do you know if PACT ever produced any

8  working XPP 64 chips?

9     A.   Yes.  We produced working samples of the

10  XPP 64 chip.

11     Q.   What did PACT do with them?

12     A.   Pardon?

13     Q.   What did PACT do with them?

14     A.   Those chips were targeting the European

15  telecommunication market.  Back in the early 2000s, all

16  the big telecom players were located in Europe, so the

17  chip design was specified together with Siemens,

18  focusing their base stations, their -- how should I

19  explain the base stations -- their antennas, which

20  interface with your -- with your mobile phone.

21     Q.   Where was the -- where were the XPP 64 chips

22  made?

23     A.   In Grenoble, France.

24     Q.   Did you ever sell any XPP 64 chips in the

25  United States?

 1     A.   No.  We did not.  This was completely European

 2  industry.

 3     Q.   So I guess you never offered to sell it in the

 4  United States?

 5     A.   No, we did not.

 6     Q.   So you said you were not involved in the

 7  XPP 64 design.

 8          What were you doing during the time of that

 9  design work?

10     A.   I moved already ahead to the XPP III

11  technology.

12              MR. GRINSTEIN:  Can I take a look at

13  Demonstrative 6, please.

14     Q.   (By Mr. Grinstein) What does Demonstrative 6

15  depict?

16     A.   This shows the third generation of our

17  technology, which we called XPP III.

18     Q.   And I see that there's not a chip associated

19  with your third design, although there is one with your

20  first two.  Why is that?

21     A.   We did not build an XPP III chip.

22     Q.   So I take it from that, did you ever sell an

23  XPP III chip in the United States?

24     A.   Without having one, this wouldn't work, no.

25  We'd never -- we never sold one.

1    Q.   Did you have a chip that you could offer to

2  sell in the United States?

3    A.   We never -- we never designed one, no.

4    Q.   Let me ask two concluding questions on this

5  point.

6         Did PACT at any time ever make, sell, or offer

7  to sell in the United States a product that was an

8  embodiment of the inventions of the '181 patent?

9    A.   No.  Absolutely not, no.

10   Q.   Did PACT ever make, sell, or offer to sell in

11 the United States a product that was an embodiment of

12 the inventions in the '106 patent?

13   A.   Also clearly, no.

14   Q.   All right.  I want to change focus right now

15 and talk about Xilinx.

16            THE COURT:  Would this be a good time to

17 break for lunch?

18            MR. GRINSTEIN:  I think it would be a

19 great time, Your Honor.

20            THE COURT:  All right.  Then we're going

21 to break for lunch until 1:15.  I'd ask the jury to be

22 back in the jury room at that time, and we'll start back

23 up promptly.

24            Thank you.

25            LAW CLERK:  All rise.

```
 1                    (Jury out.)

 2                    THE COURT:  Thank you.  Please be seated.

 3                    Before the rest of us break for lunch, I

 4   just wanted to find out where we stand with respect to

 5   the issue regarding the deposition designation.  Is that

 6   still a live issue?  If not, I'd like to figure out a

 7   time to resolve it.

 8                    MR. GRINSTEIN:  I think Your Honor's

 9   ruling with respect to the untimely designations

10   resolved the issue.

11                    Is that correct?

12                    THE COURT:  All right.

13                    MR. GRINSTEIN:  That is an issue off the

14   table.

15                    THE COURT:  Then we'll return at 1:15.

16   Thank you.

17                    LAW CLERK:  All rise.

18                    (Lunch recess.)

19                    * * * * * * * * * * * * * * * * * * * * * * * * *

20

21

22

23

24

25
```

1                        CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes

5    of the proceedings in the above-entitled matter to the

6    best of my ability.

7

8

9

10   /s/_____              _____
     SHELLY HOLMES, CSR                   Date
11   Official Court Reporter
     State of Texas No.:  7804
12   Expiration Date  12/31/12

13

14   /s/_____            _____
     SUSAN SIMMONS, CSR                   Date
15   Official Court Reporter
     State of Texas No.:  267
16   Expiration Date  12/31/12

17

18

19

20

21

22

23

24

25