```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   PACT XXP TECHNOLOGIES, AG   *    Civil Docket No.
                                 *    2:07-CV-563
 4   VS.                         *    Marshall, Texas
                                 *
 5                               *    May 14, 2012
     XILINX, INC. & AVNET, INC.  *    1:15 P.M.
 6
                     TRANSCRIPT OF JURY TRIAL
 7       BEFORE THE HONORABLE JUDGE ROY S. PAYNE
                UNITED STATES MAGISTRATE JUDGE
 8   APPEARANCES:

 9   FOR THE PLAINTIFFS:       MR. JOSEPH S. GRINSTEIN
                               MR. JOHN P. LAHAD
10                             Susman Godfrey
                               1000 Louisiana Street
11                             Suite 5100
                               Houston, TX   77002
12
                               MS. LINDSEY N. GODFREY
13                             Susman Godfrey
                               1201 Third Avenue
14                             Suite 3800
                               Seattle, WA   98101
15
                               MR. MICHAEL F. HEIM
16                             MR. LESLIE V. PAYNE
                               MR. RUSSELL A. CHORUSH
17                             MR. ERIC J. ENGER
                               MR. NATHAN J. DAVIS
18                             Heim Payne & Chorush
                               600 Travis Street
19                             Suite 6710
                               Houston, TX   77002
20
     APPEARANCES CONTINUED ON NEXT PAGE:
21

22   COURT REPORTERS:          MS. SUSAN SIMMONS, CSR
                               MS. SHELLY HOLMES, CSR
23                             Official Court Reporters
                               100 East Houston, Suite 125
24                             Marshall, TX   75670
                               903/935-3868
25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE PLAINTIFFS:          MR. OTIS W. CARROLL
                             MR. COLLIN M. MALONEY
                             Ireland Carroll & Kelley
                             6101 South Broadway
                             Suite 500
                             Tyler, TX    75703

                             MR. ROBERT M. PARKER
                             MR. CHRISTOPHER BUNT
                             MR. CHARLES AINSWORTH
                             Parker Bunt & Ainsworth
                             100 East Ferguson
                             Suite 1114
                             Tyler, TX    75702

FOR THE DEFENDANTS:          MR. SAMUEL F. BAXTER
                             McKool Smith
                             104 East Houston
                             Suite 300
                             Marshall, TX    75670

                             MR. JASON CASSADY
                             MS. ADA BROWN
                             McKool Smith
                             300 Crescent Court
                             Suite 1500
                             Dallas, TX    75201

                             MR. GREGORY S. AROVAS
                             Kirkland & Ellis
                             601 Lexington Avenue
                             New York, New York    10022

                             MR. MARC H. COHEN
                             Kirkland & Ellis
                             950 Page Mill Road
                             Palo Alto, CA    94304

                             MR. ADAM R. ALPER
                             Kirkland & Ellis
                             555 California Street
                             27th Floor
                             San Francisco, CA    94104

1                    P R O C E E D I N G S

2

3              LAW CLERK:  All rise.

4              (Jury in.)

5              THE COURT:  Thank you.  Please be seated.

6   MARTIN VORBACH, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

7              DIRECT EXAMINATION (CONTINUED)

8   BY MR. GRINSTEIN:

9      Q.   Mr. Vorbach, when we --

10             MR. GRINSTEIN:  Or, Your Honor, may I

11  proceed?

12             THE COURT:  Yes, go ahead.

13     Q.   (By Mr. Grinstein) Mr. Vorbach, when we broke,

14  I was just about to ask you really interesting questions

15  about Xilinx, so let me do that now.  Did you ever go to

16  meet with Xilinx to discuss PACT's technology?

17     A.   Yes, multiple times.

18     Q.   Why?

19     A.   Well, Xilinx is the largest maker of

20  field-programmable gate array devices, so we thought it

21  would benefit us if they would adopt our technology and

22  we had a proof of concept in the market which we could

23  show to other customers.

24     Q.   When you were ever going to talk to Xilinx,

25  did you mention PACT's patents?

1      A.    Absolutely, yes.

2      Q.    Why did you think to do that?

3      A.    Well, first of all, it is normal in the

4  semiconductor industry that companies have patents.

5  Xilinx also have quite large patent portfolio, and we

6  thought they would respect our patents.  On the other

7  hand, we also thought this would give the company

8  credibility -- credibility if we can show our patents.

9      Q.    Did you ever tell Xilinx about specific patent

10  numbers?

11      A.    Yes, we did.

12      Q.    Let's see an example of that.

13              MR. GRINSTEIN:  Exhibit PX 674, please.

14      Q.    (By Mr. Grinstein)  Can you tell us what PX

15  674 is?

16      A.    This is a presentation we gave to Xilinx.

17      Q.    And now, the date on this particular document

18  says November 17th, 2009.  Is that date accurate?

19      A.    No.  This is actually the date when the

20  document was printed.  Actually, the presentation was in

21  March 2005, and both the parties agreed that this is the

22  correct date, March 2005.

23              MR. GRINSTEIN:  Can we go to the last

24  page of this particular exhibit?

25      Q.    (By Mr. Grinstein)  And, again, is this a

1    document that you provided to Xilinx?

2        A.    Yes.

3        Q.    Okay.  What do we see on the last page of this

4    particular exhibit?

5        A.    This is -- this is a list of granted patents,

6    of granted PACT patents you can see in -- on the

7    left-hand side there's our PACT 03 family mentioned.

8        Q.    Is -- are any of the patents in this lawsuit

9    mentioned on this document?

10        A.    Yes, you can see right in the middle of this

11    table, there is the 6,338,106, our '106 patent.

12        Q.    Over the years -- thanks.  Over the years how

13    many different meetings did you attend with Xilinx?

14        A.    I would say at least 10.

15        Q.    How many different folks from Xilinx did you

16    meet with in those meetings?

17        A.    15, maybe 20, maybe even a bit more, about --

18    about 15 to 20 would be the range.

19        Q.    Do you think Xilinx was taking your technology

20    seriously?

21        A.    Yes, as they would not have met with us so

22    many times.

23        Q.    I mean, did they treat you just like number

24    285 out of 400 folks they met with?

25        A.    I didn't feel that, no.

1     Q.   In those 10 meetings meeting with 15 to 20

2  different folks at Xilinx, did anyone at Xilinx ever

3  tell you PACT's patents are bad?

4     A.   No, never.  Not at all.

5     Q.   In those 10 meetings with Xilinx meeting with

6  15 to 20 different people, did anyone at Xilinx ever

7  tell you we invented PACT's inventions before PACT did?

8     A.   No, never.

9     Q.   I want to talk to you about the history of

10  some of these meetings, then.  When was the first time

11  you met with folks at Xilinx?

12     A.   This was in 2001.

13     Q.   Who do you remember meeting back then?

14     A.   This was Mr. Chris Dick and I remember at

15  least one other person.  It may have been Mr. John

16  Weiskittel.

17     Q.   Did anything come of that meeting?

18     A.   No.

19     Q.   Let's move forward to 2002 and I'm going to

20  show you exhibit DX 1410.  Can you tell me what DX 1410

21  is?

22     A.   This is one of -- one of our presentations to

23  Xilinx.

24     Q.   Turn to the second page of the presentation.

25  There's a date down there at the bottom of the page, do

1  you see that date?

2      A.   Yes.

3      Q.   What's the date?

4      A.   It's July -- it's July 27th, 2002.

5      Q.   Is that the date that you gave your 2002

6  presentation to Xilinx?

7      A.   No, it's actually not.

8      Q.   Why -- how do you know -- well, first of all,

9  when did you give this presentation to Xilinx?

10     A.   This was September 24th, 2002.

11     Q.   How do you know that?

12     A.   I know that from -- from two perspectives or

13 based on two kind of material.  First the file name of

14 this file has the name -- has the date of the

15 presentation coded into the file name.  This is the

16 typical way how I handled file names, so based on that

17 we know the file name is Xilinx 020924, which gives us

18 the date of the presentation.  Also we have e-mail

19 traffic between PACT and Xilinx which clearly says that

20 the meeting was September 24th.

21     Q.   Okay.  You know, I want to turn to Page 62 of

22 this particular presentation.  Do you see Page 62?

23     A.   Yes, I do.

24     Q.   Is this one of the pages that you showed to

25 Xilinx?

1       A.   We did, yes.

2       Q.   The I/O element that this page is discussing,

3  how does that relate to the inventions in this case?

4       A.   This is one embodiment of our inventions.

5       Q.   Is -- what -- what part of a computer chip

6  does I/O refer to?

7       A.   Input/output.

8       Q.   Okay.  Let's go back to Plaintiff's Exhibit

9  89, Page 704, 10704, and this was the drawing that we

10 talked about before lunch, right --

11      A.   Yes -- no.

12      Q.   -- or when we get there.  This was the drawing

13 that we talked about before lunch?

14      A.   Yes.

15      Q.   And which part of the drawing did you say

16 related to the bus interface in your patents?

17      A.   You see here the IORT and --

18      Q.   I -- the IORT?

19      A.   Yes.

20      Q.   That's all I need to hear.  Now, let's go back

21 to page -- to DX 1410.

22           MR. GRINSTEIN:  Page 62, again, please.

23      Q.   (By Mr. Grinstein)  So are you discussing the

24 bus right here?

25      A.   Yes, it's also named I/O, which means

1   input/output, and this element is our bus interface.

2       Q.   So if it was suggested by somebody in opening

3   argument that PACT never discussed its bus technology

4   with Xilinx; is that true?

5       A.   This is absolutely wrong.  Exactly this

6   document shows that we discussed the bus interface with

7   Xilinx.

8       Q.   Tell me what this page is telling Xilinx about

9   your bus technology.

10      A.   It -- it says that we can at least operate in

11  two different modes.  The first mode which is called

12  port mode, in this port mode the bus interface is

13  configured or you can say programmed to operate as two

14  32 bit streaming channels and you can reprogram that

15  unit that it operates in RAM mode.  In this mode you

16  have a different set up.  We work as one 32 bit RAM

17  interface that we have address and data.

18      Q.   I don't understand, did you just say that your

19  bus can be programmed?

20      A.   Yes, sure.

21      Q.   I thought I heard in opening argument that

22  PACT's technology was some sort of bus system that could

23  never be touched and never be programmed.  What does

24  this page say about that?

25      A.   This page clearly says that we are

programmable and can operate in at least those two

modes.

Q.   I heard in opening argument that PACT's

technology was about some bus system that you could

unpackage from the box, you wouldn't have to touch, and

you could use it immediately.  What does that say about

whether you can unpackage PACT's bus technology from the

box and use it immediately?

A.   This wouldn't work.  You at least have to set

up these modes.  Also you see here in the -- in that

area where our internal interconnections are.  You see

the switches here so you have to program those switches

in order to connect it to your system.

Q.   Did anything come of your meeting with Xilinx

in 2002?

A.   Yes.  We had a follow-up meeting in 2003.

Q.   Did you do any business deal with Xilinx in

2002?

A.   No, we did not.

MR. GRINSTEIN:  Let's take a look at PX

198.  And I want to look about -- actually, can we look

at the bottom part of 198, please?

Q.   (By Mr. Grinstein)  This is an e-mail string

and the first e-mail I see, who wrote the first e-mail

in this string that's being blown up?

1      A.    It's me -- I wrote an e-mail to -- no -- yes,

2  I wrote an e-mail to Ivo Bolsens.

3      Q.    And what do you write in the first sentence?

4      A.    We met about a year ago and discussed about

5  PACT's reconfigurable XPP technology.

6      Q.    Which meeting are you referring to in that

7  e-mail?

8      A.    That 2002 meeting, the meeting in September

9  2002.

10      Q.    What were you asking Dr. Bolsens in this

11  e-mail to do?

12      A.    I -- I asked him for another meeting.

13      Q.    Okay.

14             MR. GRINSTEIN:  Now, if we can look at

15  the top of the presentation.

16      Q.    (By Mr. Grinstein)  This is another e-mail in

17  the same chain; is that right?

18      A.    Yes, it is.

19      Q.    Okay.  And did you write this particular

20  e-mail?

21      A.    I did.

22      Q.    Now, at the last paragraph I see -- what do

23  you write in that first sentence?

24      A.    I have -- I have attached a PowerPoint

25  presentation about the advantages of our architecture,

 1  some of the bullets are converted to paragraph by the

 2  PDF converter, sorry.  Please feel free to --

 3      Q.    You're good.

 4      A.    Okay.

 5            MR. GRINSTEIN:  Can I look at PX 327?

 6      Q.    (By Mr. Grinstein)  What is PX 327?

 7      A.    This is the presentation I did attach to this

 8  e-mail.

 9      Q.    Did you actually have a meeting with Xilinx in

10  response to the e-mail you sent to Dr. Bolsens?

11      A.    Yes, we had.

12      Q.    Do you remember who you met with?

13      A.    I remember at least two people, Dan Gibbons

14  and a lady named Sholeh Diba, but there were many others

15  in that meeting.

16      Q.    What was discussed?

17      A.    We discussed all internal details of the

18  technology.

19      Q.    Okay.  What came of your conversations with

20  Xilinx in 2003?

21      A.    Nothing.

22      Q.    When was the next series of meetings that you

23  had?

24      A.    This was 2005.

25      Q.    How did you come to be meeting with Xilinx in

1  2005?

2      A.   We had a discussion with a company called

3  Intervest.  Intervest is a venture capital company

4  providing capital to -- to small, young companies and

5  one of their partners, his name is Flip Giancos, he's

6  also on the board of Xilinx.  He asked us to go back to

7  Xilinx and present our technology there again.

8      Q.   Did you want to?

9      A.   No, not at all.

10     Q.   Why not?

11     A.   I mean, we had this experience from 2001 and

12 we had this experience from 2003, so I had not much

13 interest in going back to Xilinx.

14     Q.   Did you do it anyway?

15     A.   He was pushing us quite hard, and we were

16 looking for the investment from Intervest, so we did it,

17 yes.

18     Q.   Who did you meet with in this 2005 meeting?

19     A.   This was Ivo Bolsens again.

20     Q.   How did that meeting go?

21     A.   Very well.  I thought he was really interested

22 in our technology.

23     Q.   Did Xilinx ask you to send over any data or

24 anything like that after that meeting?

25     A.   Yes.  They asked us for technology data and

1   also for benchmarks on various algorithms, among others

2   MPEG and H2264, which means video algorithms.

3        Q.    Was that data that you released publicly?

4        A.    No, this was confidential data.

5        Q.    What did you do to protect it?

6        A.    We signed an NDA.

7        Q.    And tell us what is an NDA.

8        A.    An NDA is a nondisclosure agreement.  This is

9   an agreement where both parties agree to keep the other

10  parties' documents confidential, not show them to

11  anybody else and do not make use of the other parties'

12  information.

13              MR. GRINSTEIN:  Let's look at Plaintiff's

14  Exhibit 117, please.

15       Q.    (By Mr. Grinstein)  Can you tell us what

16  Plaintiff's Exhibit 117 is?

17       A.    This is this NDA, this nondisclosure

18  agreement.

19              MR. GRINSEIN:  Okay.  If we can go to the

20  last page of that, Mr. Boles.

21       Q.    (By Mr. Grinstein)  Mr. Vorbach, can you tell

22  us who signed this NDA?

23       A.    The left-hand side signature is mine.  On the

24  right-hand side you see Dr. Ivo Bolsens' signature for

25  Xilinx.

1    Q.    What month and year was this signed?

2    A.    This was March 2005.

3              MR. GRINSTEIN:  Now, let's take a look at

4    Plaintiff's Exhibit 512.

5    Q.    (By Mr. Grinstein)  And Mr. Vorbach, can you

6    tell us what Exhibit 512 is?

7    A.    We sent more information to Ivo Bolsens -- no,

8    sorry, to Dave Parlour, yeah.

9    Q.    Is this the e-mail in which you sent over the

10   information that they've been requesting?

11   A.    Yes, I think -- yes, it clearly says MPEG-4

12   application details, so this was the presentation where

13   we sent them details of our video codes.

14   Q.    I'm going to ask you to take a look at two of

15   the exhibits at the same time, Exhibit 513 and 514.  Are

16   these the -- is this the data that you sent over after

17   Exhibit 512?

18   A.    Yes, it is.

19   Q.    And again, was this data confidential PACT

20   data?

21   A.    Absolutely, yes.

22   Q.    Now, did you continue to meet with folks at

23   Xilinx after sending this data over?

24   A.    Yes.  We were introduced by Xilinx to their

25   DSP group.

1    Q.   Who do you remember meeting from their DSP

2  group?

3    A.   At least Mr. Dave Parlour and Mr. Hans

4  Schwarz.

5    Q.   Okay.

6         MR. GRINSTEIN:  How about Exhibit PX 772.

7    Q.   (By Mr. Grinstein)  Is this exhibit another

8  example of you sending data over in 2005 to Xilinx?

9    A.   Yes, it is.

10    Q.   Did your conversations with Xilinx continue on

11  into 2006?

12    A.   They did.

13    Q.   Let me show you Plaintiff's Exhibit 367.  Tell

14  us what Plaintiff's Exhibit 367 is.

15    A.   This was a specification for our XPP III H

16  chips -- chips.

17    Q.   And what was the date of this specification?

18    A.   It was May 2006.

19    Q.   Did you provide this to Xilinx?

20    A.   We did, yes.

21    Q.   Was this containing confidential PACT

22  information?

23    A.   This was actually highly confidential

24  information.

25    Q.   Did you have more meetings with Xilinx through

1  2006?

2       A.   Yes, I recall at least one more meeting.

3       Q.   Tell us about that one meeting you recall.

4       A.   We met with Ivo Bolsens and Hans Schwarz.

5       Q.   And what happened after that meeting?

6       A.   After this meeting, Xilinx discontinued to

7  discuss with us.

8       Q.   Were you surprised?

9       A.   Very much so.  I mean, they were asking us

10  from 2005 to 2006 for information and suddenly they

11  dropped us.  It's -- it was very surprising, yes.

12      Q.   At the time you were working with Xilinx or

13  talking to Xilinx, were you also working on any other

14  transactions or deals or anything like that?

15      A.   Yes, we are working with Intel.

16      Q.   What was your project you were doing with

17  Intel?

18      A.   Intel at that time was looking for an

19  accelerator to accelerate their products in terms of

20  speed, performance, and also they were interested in

21  decreasing the power dissipation.  So this was a natural

22  fit for us.  At first we proposed to Intel a kind of

23  plug-in board which you could plug in to your PC, but it

24  was idea for us to focus on the high-end service and

25  high end -- high-end workstations.

1    So they came up with the idea -- oh, you

2  should know first, those boards have not only one

3  processor, but they have two or even four processors or

4  more on a single main board.  So you have a parallel

5  processor system in there.  And Intel's idea was to

6  remove three of their processors on that board and plug

7  our chips into -- into their sockets instead of theirs,

8  so this had been a great deal for us, yes.

9    Q.   Did Intel agree to work with PACT on this

10  particular deal?

11    A.   Yes, they agreed on providing us the so-called

12  FSB which is required to enable somebody to plug their

13  chips into their sockets so they -- they, yeah, agreed

14  to provide us this FSB and also they agreed to provide

15  us software so that our processors could communicate

16  with the Intel processor.

17    Q.   While you were having these conversations with

18  Intel, did anyone at Intel tell you that PACT's

19  technology was really bad?

20    MR. BAXTER:  Excuse me, Your Honor, calls

21  for hearsay.

22    THE COURT:  Mr. Grinstein, it sounds like

23  hearsay to me.

24    MR. GRINSTEIN:  Okay, Your Honor.

25    Q.   (By Mr. Grinstein)  Mr. Vorbach, while you

1  were dealing with Intel, did any -- there come to be a

2  point in time in which anyone at Xilinx got involved in

3  the Intel project?

4       A.   Yes.

5       Q.   How did that come to be?

6       A.   The -- the FSB was very hard to implement, and

7  we tried a lot of design effort.  Basically you were not

8  able to -- to implement it in one run, you can say, but

9  you have to do multiple silicon spins, which means you

10 had to implement multiple of those wafers which we

11 showed you before in order to get this interface

12 running.  So this would come to -- for us at a very high

13 cost in terms of design time, also in terms of wafer of

14 chip and manufacturing.

15          Now, Intel had at that point in time another

16 project ongoing with Xilinx where they were implementing

17 this FSB on an FPGA already, which meant that Intel

18 ultimately, how shall I say, told us that their

19 preferred solution would be if we interface via Xilinx

20 FPGA between their socket and our chip.

21      Q.   Did that require some level of cooperation

22 with Xilinx?

23      A.   Yes, it did.

24      Q.   Technically could you have done that project

25 without Xilinx?

1      A.   Yes, absolutely.  As I mentioned, we could

2   have implemented the FSB on our own chips, but the

3   problem would have been the design time and also the

4   cost in terms of wafer spins, which means in terms of

5   silicon implementations to figure out whether this

6   interface works or not.

7      Q.   Costs in terms of technical costs or dollar

8   costs or what do you mean?

9      A.   Both in terms of time and in terms of dollar

10  cost.

11     Q.   So did you interact with Xilinx in 2007 to try

12  to get this cooperation from them?

13     A.   Yes, we did.

14     Q.   Was this the same -- actually, was this the

15  same time that PACT was considering filing a lawsuit

16  against Xilinx?

17     A.   Yes.

18     Q.   Well, why didn't you tell Xilinx that you were

19  considering filing a lawsuit with them at the same time

20  you were interacting with them then?

21     A.   Well, from our perspective those were two

22  completely different issues.  On one side we were

23  working on a normal business project with this -- in

24  this Intel project; the other side was a patent dispute,

25  totally different issues.

1    Q.    When did PACT file this lawsuit?

2    A.    December -- December 2007.

3    Q.    So what happened to PACT's request for

4 cooperation from Xilinx after PACT filed the lawsuit?

5    A.    Xilinx declined to work together with us

6 anymore.

7    Q.    And what was the impact of that on the Intel

8 deal?

9    A.    The Intel deal was dead after that.  It didn't

10 continue --

11    Q.    How did that -- oh, sorry.  How did that

12 impact PACT?

13    A.    Well, this project would have been very

14 important to us.  I mean, if Intel implements our

15 technology in their products, this would be huge for our

16 company, it could have made the company, but -- so it

17 was a huge blow for us.

18    Q.    Mr. Vorbach, were you surprised that Xilinx

19 didn't want to cooperate with PACT after PACT sued

20 Xilinx?

21    A.    Actually, yes.  I mean, maybe I was naive, but

22 I have observed in the semiconductor industry that all

23 those big companies have patent disputes all the time,

24 and on the other side -- on the other hand, they still

25 work together.  But in our case, this did -- this did

 1  not happen.

 2      Q.   I want to turn our focus again to the '181 and

 3  the '106 patents.  By 2002 had the Patent Office

 4  completed all of its work on those patents?

 5      A.   Yes.  Yes, they had.

 6      Q.   Was that the end of the story at the Patent

 7  Office on those two patents?

 8      A.   No, it was not.

 9      Q.   What happened next?

10      A.   In 2009, Xilinx filed a re-examination

11  petition for the '181 patent.

12      Q.   Was this after PACT sued Xilinx?

13      A.   Yes, we -- we sued -- we sued them in 2007, so

14  this was about two years after.

15      Q.   Were you involved in PACT's response to the

16  re-examination petition?

17      A.   Yes, I was.

18      Q.   So based on that, what is your understanding

19  of what a re-examination petition is?

20      A.   A re-examination petition is if somebody goes

21  to the USPTO to the U.S. Patent -- Patent Office and

22  asks them to re-examine whether a patent should have

23  been issued.

24      Q.   Let me show you Defendants' Exhibit 26.

25              MR. GRINSTEIN:  And can we go to Page

1  409210.

2      Q.   (By Mr. Grinstein)  Can you tell us what this

3  is, Mr. Vorbach?

4      A.   This is Xilinx re-examination petition.

5      Q.   Are you familiar with this exhibit?

6      A.   Yes, I was back then.

7      Q.   What did Xilinx ask the Patent Office to do

8  via this petition?

9      A.   They asked them to take away our patents.

10     Q.   Both patents or one of the patents?

11     A.   This was here the '181.

12     Q.   Did Xilinx make any arguments that Xilinx had

13  invented the '181 inventions first?

14     A.   Yes, actually they did, they cited their own

15  chips and -- and manuals and literature.

16     Q.   After Xilinx filed for the re-examination on

17  the '181 patent, what did PACT do?

18     A.   We filed in 2010 a re-examination petition for

19  the '106 patent.

20     Q.   PACT filed a re-examination petition?

21     A.   Yes, we did.

22     Q.   Why on earth did you do that?

23     A.   Well, both patents belong to the same patent

24  family, so they are very similar, and we wanted to clear

25  the '106 patent from Xilinx's changes.

     Q.   So in PACT's '106 re-examination petition, did
PACT argue -- ask the Patent Office to take away PACT's
patents?

     A.   No.  No, absolutely not.  We asked the USPTO
to confirm that the '106 patent is valid.

     Q.   What did Xilinx do in response to PACT's '106
re-examination request?

     A.   They filed their own re-examination request
for the '106.

     Q.   And was Xilinx's request for re-examination
different from PACT's?

     A.   Oh, yes, absolutely.  They, again, asked to
take the patent away from us.

               MR. GRINSTEIN:  Let's take a look at DX
25, please.

     Q.   (By Mr. Grinstein)  And what is this, Mr.
Vorbach?

     A.   This is Xilinx's re-examination request.

     Q.   And in the course of this re-examination
request, did Xilinx also cite some of its own product,
literature, and things like that?

     A.   Yes, again.

     Q.   Now, we've taken a look briefly at the
re-examination petition for the '106 patent and the '181
patent.  Do those two petitions contain all of the prior

1    art that was before the Patent Office in the

2    re-examinations?

3         A.   No.  PACT cited additional prior art, which we

4    have now.

5              MR. GRINSTEIN:  Let's take a look quickly

6    at two exhibits at the same time, 774 and 776.

7         Q.   (By Mr. Grinstein)  Can you tell us what these

8    exhibits are, Mr. Vorbach?

9         A.   Those are information disclosure statements.

10   I'm not sure why it says citations here.

11        Q.   And what goes on in an information disclosure

12   citation or statement or whatever it is?

13        A.   This is when a company cites additional

14   information to the USPTO so that the examiners are aware

15   of this prior art material.

16        Q.   What happened after Xilinx filed these

17   re-examinations?

18        A.   Initially, the USPTO rejected our patents.

19        Q.   What did you do to change the Patent Office's

20   view?

21        A.   Among other things, we asked for an interview.

22        Q.   How many interviews did you end up attending

23   with the Patent Office?

24        A.   A total of two.

25        Q.   Describe for us the first interview.

1    A.    The first interview happened in 2010.  I

2  attended that interview, one of our lawyers, and three

3  examiners of the USPTO attended this meeting.

4    Q.    And describe how that meeting went.

5    A.    It lasted about an hour, and I thought it went

6  very well.

7    Q.    What happened after that?

8    A.    The USPTO rejected the patents again or the

9  patent, it was the '181.

10    Q.    Okay.  When did the second interview occur?

11    A.    This was in August 2011.

12    Q.    Describe that one for us.

13    A.    This time it was, again, me, one of our

14  lawyers, and three of their patent examiners.  This

15  lasted longer, it lasted for two hours.

16    Q.    And what happened at that meeting?

17    A.    Well, those examiners were very skilled in

18  the -- in the art.  They were specialized on FPGAs and

19  processors and they asked a lot of questions and we

20  discussed all things through.

21    Q.    How did you feel that meeting went?

22    A.    I thought it went great.

23    Q.    And what happened after that meeting?

24    A.    In September 2011, the USPTO released a note

25  to us that they -- that they want to confirm the patents

1  that they are valid.

2                  MR. GRINSTEIN:  Let's take a look at

3  Plaintiff's Exhibit 775, and maybe go a page.

4      Q.   (By Mr. Grinstein)  What is Plaintiff's

5  Exhibit 775?

6      A.   This is the notice of intent to issue ex parte

7  re-examination certificate.

8      Q.   Is this the note that you just talked about?

9      A.   Yes.

10                  MR. GRINSTEIN:  Can we go to the page

11  that's 2349?

12      Q.   (By Mr. Grinstein)  And in the middle of the

13  page, there's a however?

14      A.   Okay.

15      Q.   And it says:  However, taken as a whole, these

16  arguments show that Claim 1 is neither taught nor

17  suggested by the cited prior art.

18           What did you understand that statement to

19  mean?

20      A.   This means that the USPTO has rejected all of

21  Xilinx's invalidity argument.

22      Q.   And what was the cited prior art?

23      A.   This was the -- the prior art cited by Xilinx

24  and the prior art cited by PACT.

25      Q.   How about PX 773?  What is PX 773?

1     A.   This is the respective document for the '106

2  patent.

3     Q.   All right.

4          MR. GRINSTEIN:  And can we go to Page 301

5  of that?

6     Q.   (By Mr. Grinstein)  And in the next to last

7  paragraph, the examiner writes:  Accordingly, none of

8  the cited references appear to teach or suggest, either

9  alone or in combination, each and all of the features of

10  Claims 2 to 33.  Do you understand what that meant?

11     A.   Yes.  Again, the USPTO has rejected all of

12  Xilinx's invalidity theories.

13     Q.   And what was the cited -- what were the cited

14  references?

15     A.   Again, it was the -- the material which Xilinx

16  provided to the USPTO and in addition the material which

17  we provided to the USPTO.

18          MR. GRINSTEIN:  Let's take a look at

19  Plaintiff's Exhibit 787 and 788 together.

20     Q.   (By Mr. Grinstein)  What are these documents?

21     A.   Those are the certificates for the '181 and

22  '106 patent issued by the USPTO saying that the patents

23  are valid.

24     Q.   When did these certificates issue?

25     A.   For the '106, in November 22nd, 2011; and for

1  the '181 November 29th, 2011.

2      Q.   So at the end of the day, did Xilinx succeed

3  in getting the Patent Office to take away PACT's '181

4  and '106 patents?

5      A.   No, not at all.  The U.S. PTO has rejected all

6  their invalidity arguments.

7           MR. GRINSTEIN:  Thank you.  No further

8  questions.

9           MR. BAXTER:  May we approach just a

10 second, Your Honor?

11          THE COURT:  All right.

12          (Bench conference.)

13          MR. BAXTER:   Your Honor, I think he's

14 opened the door to the re-exam document.  Now, when he

15 asked this witness to testify they had all these

16 conversations, that he talked to these three Examiners,

17 I'll have a right to say what they put in writing about

18 what their patent was really like because there's a

19 bunch of hearsay or nebulous talk about what they said.

20          I ought to be able to put in what they

21 actually told the Examiner.  So I'm going to ask the

22 Court to reconsider his ruling on my -- on my document

23 on the re-exam.

24          THE COURT:  And what is -- if you have a

25 relevance other than the construction of the claims?

1              MR. BAXTER:  It doesn't have anything to

2    do with the construction of the claims, Your Honor.  The

3    construction of the claim is set.  It's permanent.  This

4    reconfirms that, that it's permanent and that it didn't

5    need programming, which is exactly what they have said

6    it needed to be.  I just want to see what they showed

7    the Patent Office that in the re-exam.  It's what they

8    told the patent examiners to get over rejection that it

9    was permanent and that it was fixed and that it didn't

10   need any --

11             THE COURT:  And what's -- what is the --

12   what issue or defense is that relevant to?

13             MR. BAXTER:  Willfulness, Your Honor, and

14   on -- on the issue of infringement.

15             THE COURT:  I don't see how it relates to

16   the issue of infringement.

17             MR. BAXTER:  If they -- if they say, Your

18   Honor, that their chip doesn't need to be programmed and

19   that's what we do to make our chips work, then clearly

20   they have taken themselves out of the ballgame of

21   accusing our chips of infringing.

22             THE COURT:  It's a matter of what it

23   claims.

24             MR. BAXTER:  And the claims says it's

25   permanent and that's what they told the Patent Office.

1  We're not trying to back up on the claim.  We love the

2  claim, Your Honor, that's exactly what we need it to be.

3  I just want to see -- show the Patent Office that in the

4  re-exam he once, again, said that it was permanent, that

5  he didn't need to be programmed.  Seems to me it goes to

6  the heart of infringement.

7                  THE COURT:  I think it goes to an attempt

8  to get the jury to rely on that in construing the

9  claims.

10                 MR. BAXTER:  No, Your Honor. I want --

11 well, the Court could rely on that to help construe the

12 claims.  I want to use what the Court said, that it was

13 permanent to explain and that they agree that it's

14 permanent.  I mean, it was an agreed construction.  And

15 it was agreed to because when they agreed to that, they

16 said it wasn't programmable.  That's our position and we

17 ought to be able to prove that that's what they told the

18 Patent Office.

19                 MR. GRINSTEIN:  Your Honor, I'll let Mr.

20 Baxter state his arguments, but this is heading straight

21 into 02 and straight into Markman and whether there's 50

22 documents out there that confirm the construction or

23 don't confirm the construction has nothing to do with

24 the case.  The only thing the jury should be looking at

25 are the language of the claims and the language of this

1  Court's definitions and if we're going to have some game

2  here where we go in, we look at the patent specification

3  and say, well, permanent must mean this or that because

4  of what's in the specification we're going to have a

5  Markman hearing in front of the jury.

6             THE COURT:  I have to agree with Mr.

7  Grinstein on that.  I'll -- I'll deny your request to

8  consider that door open.

9             MR. BAXTER:  Thank you, Your Honor.

10            (Bench conference concluded.)

11                    CROSS-EXAMINATION

12  BY MR. BAXTER:

13     Q.   Mr. Vorbach, my name is Sam Baxter.  I don't

14  think we've had a chance to meet, sir.  Welcome to

15  Marshall.  We're glad to have you here.

16     A.   Thank you.

17     Q.   I want to start, if I can, Mr. Vorbach, with

18  the Intel part of your testimony that you told the jury

19  about a little while ago.  And is it my understanding

20  that you needed some help from Xilinx in order to do any

21  kind of work with Intel?

22     A.   Well, to do this specific implementation,

23  which Intel has requested from us, yes.

24     Q.   Okay.  And you went and asked Xilinx if -- if

25  they would give you that help?

1       A.    Yes.

2       Q.    Did they ever tell you no?

3       A.    Yes.

4       Q.    They did?  Who told you no?

5       A.    This was my understanding what Xilinx told

6  us --

7       Q.    No, no, no.  Who told you no?

8       A.    Xilinx.

9       Q.    Who?

10      A.    I can't recall.

11      Q.    Well, did they write you a letter, send you an

12  e-mail?  What did they do?

13      A.    They discontinued to operate -- to -- to work

14  with us.

15      Q.    No, sir.  In regard to the Intel chip problem,

16  okay, you wanted some help from them; is that right?

17      A.    Yes.

18      Q.    Okay.  You asked for the help.  My question

19  is:  Did they ever say, no, we won't give you the help?

20      A.    They dis -- they discontinued to help us.

21      Q.    They discontinued what?

22      A.    To help us.

23      Q.    Okay.  Did they tell you that we're not going

24  to give you the code; is that what they said?

25      A.    It's for me the same.

1    Q.   No, sir.  Did someone write you a letter or an

2    e-mail that said we're not going to give you the code?

3    A.   No.

4    Q.   Okay.  What did they do?

5    A.   I said they discontinued to work with us.

6    Q.   Well, what really happened is you sued them,

7    right?

8    A.   This is right.

9    Q.   Okay.  And while you needed their help, did --

10   did you call them up, by the way, and said, look guys,

11   this is just business.  We need to sue you for a lot of

12   money, but just ignore that and give us some help?  Did

13   you do that?

14   A.   We sent an e-mail and said we want to keep

15   these two things separate and want to see or want to

16   figure out how to proceed, yes.

17   Q.   So your position was I'm going to sue you for

18   a lot of money, but go ahead and ignore that and help me

19   do this project, was that it?

20   A.   We didn't say to ignore it.  We said we want

21   to see how we can proceed.

22   Q.   Okay.  And what really happened is that once

23   you sued them, they told you if you will contact

24   Xilinx's lawyers, maybe we can go forward, but you need

25   to contact the lawyers because we can't talk to you

1    anymore because you've sued us; isn't that right?

2         A.   This is about our ideas.

3         Q.   Okay.  And you never ever did that, did you,

4    Mr. Vorbach?

5         A.   This may be true, yes.

6         Q.   Okay.  So just so the jury will understand,

7    you didn't tell them up front you were going to sue

8    them?  That was sort of a surprise that came in the

9    mail, right?

10        A.   My understanding is that -- that Xilinx has

11   received the notice before that e-mail.

12        Q.   Okay.  The -- the question I asked you was:

13   You didn't call them up and say, Mr. Bolsens, we're

14   going to have to sue you, sorry.  You didn't do that,

15   did you?

16        A.   We did not, no.

17        Q.   You sent them a notice in the mail or had a

18   process server drop by their offices and serve the

19   papers; is that right?

20        A.   I'm not sure how this works in the U.S.

21        Q.   Okay.  Well, assuming that's how it works,

22   that's how you did it?

23        A.   Yes.

24        Q.   Okay.  And then after you did that, you

25   requested more help and they said, well, since you've

1  sued us, contact our lawyers and we can talk about it,

2  and you never did; is that right?

3      A.   I recall this e-mail.  I -- as I'm sitting

4  here, I -- I think so.  This may be right, yes.

5      Q.   Okay.  So the ball ended up in your court and

6  you decided not to bat it back across the net?

7      A.   I wouldn't put it that way.

8      Q.   Well, would you put it that you never picked

9  up the phone and called them, never sent them an e-mail,

10  never did anything, you just dropped it?

11      A.   This thing that we have to contact -- to

12  contact the lawyers was -- was for us unclear.  No, we

13  don't want to work with you anymore.

14      Q.   No, it didn't say no at all.  It said we can't

15  talk to you under the ethics rule in the United States,

16  but if you'd like to continue the talks, call our

17  lawyers and your lawyers can talk to our lawyers; isn't

18  that what that said?

19      A.   My understanding was that this is not a lawyer

20  issue, that this is a technical and business issue which

21  we discussed.

22      Q.   But it became a lawyer issue when you sued

23  them, didn't it?

24      A.   Again, from my perspective, this lawsuit and

25  the business are two different things.

```
 1        Q.   I understand that.  But from Xilinx you
 2   realize they had certain ethical considerations that
 3   they couldn't talk to you anymore because you'd sued
 4   them, right?  You understand that?
 5        A.   I understand your position, yes.
 6        Q.   Okay.  So you don't blame them for saying,
 7   well, have your lawyers call our lawyers, did you?
 8        A.   I don't blame them for that, no.
 9        Q.   Okay.  And the -- the -- the problem then is
10   you never made contact again and asked for any more
11   help, did you?
12        A.   After that, no.
13        Q.   Okay.  Now, let me talk about your position,
14   if I can, for a moment at PACT.  My understanding is
15   that you are the -- the CTO?
16        A.   This is correct, yes.
17        Q.   And do you get paid for being the CTO?
18        A.   Yes.
19        Q.   How much is that?
20        A.   Approximately 30,000 Euros.
21        Q.   30,000 Euros a month?
22        A.   Yes.
23        Q.   30,000 Euros?
24        A.   Yes.
25        Q.   Okay.  For those of who don't do Euros, Mr.
```

1  Vorbach, and you probably can convert that to dollars,

2  about how much is that?

3       A.   I only can estimate.

4       Q.   Estimation is good.  I won't --

5       A.   It would be --

6       Q.   -- even know the difference if you don't get

7  it right.

8       A.   Maybe 16, 17.

9       Q.   60 or 70?

10       A.   16 or 17,000.

11       Q.   Okay.  It's 30,000 Euros a month?

12       A.   No.

13       Q.   No.  How many -- how many -- how much a month?

14       A.   I said -- you -- I said 13, 10 --

15       Q.   Oh, okay.  13?

16       A.   13 --

17       Q.   I'm sorry --

18       A.   -- yes.

19       Q.   -- I misquoted you.  13,000 Euros a month is

20  about 16 or 17,000 bucks?

21       A.   This is a rough estimation.  I didn't do the

22  calculation --

23       Q.   Oh, no, no --

24       A.   -- right now.

25       Q.   -- I -- that's fine.  So you're making about

1   $16,000 a month from PACT; is that right?

2       A.   Yes.

3       Q.   Okay.  And so what's the day like as a CTO at

4   PACT now?  Are you doing any -- do you have -- how many

5   employees there?

6       A.   Right now two.

7       Q.   You and?

8       A.   Mrs. Kerschensteiner.

9       Q.   And what does she do?

10      A.   She's an assistant.

11      Q.   She's your assistant?

12      A.   Yes.

13      Q.   Is it like -- like one of my assistants out

14  here, they -- she's like a paralegal or an

15  administrative assistant or something like that?

16      A.   She's an assistant.

17      Q.   Okay.  She -- she does paperwork for you or

18  does she answer the phone and do filing and that sort of

19  thing?

20      A.   What kind of filing?

21      Q.   I don't know.  What kind of filing do you

22  have?

23      A.   Okay.  I mean -- you mean filing in -- in

24  terms of paperwork?

25      Q.   Yes.

1      A.    Yes.  Yes, she does.  Yes.

2      Q.    Okay.  All right.  So it's just you and she?

3      A.    Yes.  Right now, yes.

4      Q.    Okay.  And do you go to the office every day?

5      A.    No.

6      Q.    Okay.  About how many days a week do you go to

7  the office?

8      A.    I have a home office, so I can't tell you.

9      Q.    You have a home office?

10     A.    Yes, I do.

11     Q.    Does PACT have a -- have an office in a

12  building?

13     A.    In Munich, yes.

14     Q.    How about in the United States?

15     A.    We had an office.  I think this doesn't exist

16  anymore.

17     Q.    Okay.  Is -- is your assistant in Germany or

18  in the United States?

19     A.    In Germany.

20     Q.    Okay.  So you have an employee in Germany that

21  does some sort of paperwork filing and then you here in

22  the United States in your home?

23     A.    Here in the United States and in Germany.

24     Q.    Okay.  Do you have a home in Germany as well?

25     A.    Yes.

```
 1        Q.    Okay.  I take it you don't have a lab?

 2        A.    In the building in Munich we still have a lab,

 3   yes.

 4        Q.    Okay.  Do you have any employees working in

 5   that lab?

 6        A.    Not anymore.

 7        Q.    Okay.  You don't work in the lab, do you?

 8        A.    No.

 9        Q.    Okay.  You don't have a lab in the United

10   States, do you?

11        A.    No.

12        Q.    Okay.  What sort of -- when you are working in

13   your home for PACT, what kind of work are you doing?

14        A.    You said when I -- in the -- in the past?

15        Q.    No, right now.

16        A.    Right now.

17        Q.    Last week.

18        A.    This is mainly intellectual property.

19        Q.    You're in -- you're in the lawsuit business,

20   now?

21        A.    No, this is intellectual property.  I mean,

22   any kind of intellectual property.

23        Q.    Okay.  Well, what -- what -- what do you do

24   with it?

25        A.    Well, we have this ongoing business with EADS
```

1  Astrium they use our IP design, which is --

2      Q.   Okay.

3      A.   -- intellectual property.

4      Q.   Go on.

5      A.   Then we have ongoing patent prosecutions and

6  certainly this case.

7      Q.   Okay.  Let me ask you about Astrium, okay?

8  Because counsel chided me for denigrating your -- your

9  company about no license.  Did I understand that was a

10 license in the year 2000?

11     A.   No.  This license was taken later.  It was

12 taken during the XPP II development.

13     Q.   What year was that?

14     A.   I don't know exactly.  I believe it was 2003.

15     Q.   Okay.  So they took a license in 2003?

16     A.   Yes.

17     Q.   In 2004, did you sell them a chip?

18     A.   No.

19     Q.   In 2005 or '6, did you sell them a chip?

20     A.   This was an IP license, not chips.

21     Q.   Okay.  Did you ever sell them any chip?

22     A.   No.  It was an IP license.

23     Q.   Okay.  So what they took was a license in

24 order to make your chip?

25     A.   Correct, a license on our technology.

1    Q.   Okay.  I asked it wrong, then.

2         In 2003, how much did they pay you in

3  royalties?

4    A.   If you take a license, you pay first the

5  upfront payment, the upfront fee.

6    Q.   Okay.  After that, there was -- there was a

7  royalty?

8    A.   Royalty starts as soon as chips are used.

9    Q.   Okay.  So in 2003, how much did they pay you

10  in royalty?

11    A.   They did not -- they did not use yet chips in

12  2003.

13    Q.   '4, '5, or '6?

14    A.   They did the chip design.  The chip design is

15  now about to be finished.

16    Q.   No, sir.  My question was, how much did they

17  pay you in royalty?

18    A.   None as to the design work was ongoing.

19    Q.   Okay.  And so as we stand here today, no

20  money's been paid?

21    A.   They paid the license fees.

22    Q.   Okay.  No royalty has been paid?

23    A.   We expect royalties coming in -- from this

24  year.

25    Q.   How many satellites have they launched since

1  you gave them a license to your technology?

2      A.   The first ones are, as I'm informed, to be

3  launched this year.

4      Q.   So they've never launched the satellite?

5      A.   Not yet.  They design first.

6      Q.   Okay.  So they've been in production of the

7  satellite for lo these many years, at least nine or ten

8  or twelve, and they've yet to get one in the year and

9  they've yet to pay you for a chip; is that right?

10     A.   This is not correct.  No.

11     Q.   No?  Do they have any satellites up in space?

12     A.   Not yet, but the design was not ongoing for 12

13 years.

14     Q.   Okay.  How many of your chips would they use

15 in the satellite?

16     A.   I don't know their business plan.

17     Q.   One or two?

18     A.   More.  Certainly more.

19     Q.   Ten?

20     A.   I can't talk about Astrium, but I assume --

21 and this is only an assumption -- that they would use

22 between 10 to 30 chips per satellite.

23     Q.   Okay.  And they have one satellite on the

24 launching pad, do they?

25     A.   Again, I'm -- I have no inside information

1  about Astrium.

2     Q.   Okay.  So you don't really know if they're

3  going to use your chips or launch a satellite or do

4  anything, do you?

5     A.   The last information I got was that they

6  planned to launch the first satellites this year.

7     Q.   Okay.  You don't have a clue if they're using

8  your chips?

9     A.   I can't tell more than -- the last information

10 I got was that they plan to launch them this year.

11    Q.   I understand that.  My question was slightly

12 different.

13         You don't have a clue if they're going to use

14 any of your technology, do you, because you don't know

15 what their technical plans are?

16    A.   Again, the last I heard was that they were

17 going to launch the first chip -- the first satellite

18 with our chips this year.

19    Q.   All right.  Now, I know that your lawyer asked

20 you about your -- your contract.

21         Did I understand that if you were to win this

22 case and get money that you get a part of it?

23    A.   Yes.

24    Q.   And how much is that?

25    A.   It depends on the outcome.

```
 1        Q.    Well, tell me what the parameters are.
 2        A.    As he mentioned, it's 8 percent for any kind
 3   of income above 6 million Euros.
 4        Q.    Okay.  Just about 8 million bucks, round
 5   numbers, 7 million?
 6        A.    Roughly estimated, yes.
 7        Q.    Okay.  And you get a percentage of that?
 8        A.    Yes, I do.
 9        Q.    Does the percentage go up as the numbers go
10   up?
11        A.    Yes, they do.
12        Q.    What's the top end?
13        A.    It should be around 20 percent, if the income
14   of the company is -- is above 30 million, roughly.
15        Q.    And that's a pretty good incentive for you, is
16   it not?
17        A.    Well, it reflects my ownership share in the
18   company.
19        Q.    Okay.  Now, my understanding is that when I
20   corrected Mr. Carroll the other day that you were not
21   the sole inventor, it turns out that's correct; is it
22   not?
23        A.    Yes.  Robert Munch invented together with me.
24        Q.    Okay.  And you and Mr. Munch discussed
25   everything there was to talk about the two patents at
```

1  issue here and other patents as well?

2      A.   This is 15 years ago, but I think so.  Yes.

3      Q.   Okay.  And so he would have about as much

4  knowledge about the patents as you would?

5      A.   No, actually not.

6      Q.   Was he the -- was he the software guy?

7      A.   Yes.

8      Q.   Did he come to you and say the chip is too

9  complex; we've got to dumb it down, and that's how the

10 bus got developed?

11     A.   This is not what I recall.  No.

12     Q.   He didn't do that?

13     A.   No.

14     Q.   Okay.  I noticed in Plaintiff's Exhibit 15 --

15          MR. BAXTER:  Can you get that up for me,

16 Mr. Diaz?

17     Q.   (By Mr. Baxter) That this -- this is the

18 Insider's Guide to Microprocessing Hardware, is this

19 thing still in publication?

20     A.   I don't know.

21     Q.   This was in the year 2000, is that right?

22 Plaintiff's Exhibit 15, do you see that up there?

23     A.   Yes.  This was in 2000.

24     Q.   And it says that your chip was very complex.

25 Do you see that?  Powerful and very complex?

1      A.   Yes, I see that.  Yes.

2      Q.   And that was the truth, wasn't it?  It was

3  very complex?

4      A.   It was a complex design.  Yes.

5      Q.   Okay.  All right.  And that was the problem

6  for you, was it not?

7      A.   No, not at all.

8      Q.   You had to write very complicated code, or Mr.

9  Munch did, right?

10          Is it Munch, by the way, or Munch

11  (pronounces)?

12      A.   Munch (pronounces).

13      Q.   Say it for me again.

14      A.   Munch (pronounces).

15      Q.   Now, I took German in college, Mr. Vorbach,

16  and failed it.  And the only thing I remember is dass

17  schade.  What does that mean?

18      A.   Schade?

19      Q.   Yes.  What does that mean?

20      A.   This is schade.

21      Q.   Does it mean terrible?

22      A.   No, no.  It doesn't mean terrible.  Schade

23  is -- this is -- this not so good.  I'm sorry for that,

24  something like that.

25      Q.   Well, I was sorry for the F, too.

1          In any case, your chip was, in fact, very

2  complex, wasn't it?

3      A.   It was complex design.  Yes.

4      Q.   Okay.  Now, let me get --

5          MR. BAXTER:  Mr. Diaz, would you go down

6  to the third paragraph.

7      Q.   (By Mr. Baxter) And this writer says -- did he

8  interview you for this article, by the way?

9      A.   I don't recall that, but I think not.  No.

10     Q.   Who do you think he interviewed to get this

11  information and to get these diagrams?

12     A.   My best guess would be Eberhard Schueler.

13     Q.   A PACT employee?

14     A.   Yes.

15     Q.   Now, this is the XPU 128 illustrates the

16  potential of the architecture.  Do you see that?

17  And then right below that, it says the XPU 128 is real.

18  He just highlighted it there.  Do you see that?

19     A.   Yes.  I see that, yes.

20     Q.   Then it says:  The company is testing

21  second-pass silicon that is expected to be fully

22  functional.

23          Do you see that?

24     A.   Yes.

25     Q.   Turns out that didn't work out, did it?

```
 1        A.    Well, it was fully functional.

 2        Q.    It didn't work, did it?  You abandoned it?

 3   Did you abandon the chip?

 4        A.    We abandoned the I/O, which means the --

 5        Q.    Did you ever sell any of those?

 6        A.    No.

 7        Q.    Did you make any of those?

 8        A.    No.

 9        Q.    Did you ever offer them for sale?

10        A.    No.

11        Q.    I think you told your lawyer earlier that you

12   never offered any chips for sale in the United States;

13   is that right?

14        A.    This is correct, yes.

15        Q.    Let me get you to look at -- and Mr. Diaz is

16   going to pull it up, DX 179.

17             This is an e-mail from Mr. Weber, and you're

18   copied on the e-mail.  Can you see it, Mr. Vorbach?

19                  MR. GRINSTEIN:  Your Honor, just to

20   interrupt quickly.  Can we provide a hard copy, if it's

21   a multiple-page documents to the witness, so he has the

22   context as opposed to seeing a flat screen?

23                  MR. BAXTER:  I'll be glad to give him my

24   copy.  How about that?

25                  MR. GRINSTEIN:  Okay.
```

```
 1              MR. BAXTER:  May I approach the witness,

 2   Your Honor.

 3              THE COURT:  You may.

 4     Q.   (By Mr. Baxter) Here you are, Mr. Vorbach.

 5     A.   Thank you.

 6     Q.   Yes, sir.  I'll just read it off the screen.

 7              MR. BAXTER:  You have another?

 8     Q.   (By Mr. Baxter) It says:  Hello, Hans and Ivo.

 9   Now, this is June of 2006, is it not?

10     A.   Yes, it is.

11     Q.   Okay.  And it's from Mr. Weber and Mr. Weber

12   is right back here?  Is Mr. Weber here?

13     A.   He's outside.

14     Q.   Outside.  Who is Mr. Weber?

15     A.   He's our CEO.

16     Q.   Currently?

17     A.   Currently, he's on the board.

18     Q.   On the board?

19     A.   Yes.

20     Q.   Is there a CEO right now?

21     A.   Yes.

22     Q.   Who is it?

23     A.   Mr. Hans Schwarz.

24     Q.   Okay.  Anyway, it says:  Hello, Hans and Ivo.

25   As discussed in our meeting, please find attached the
```

1    invitation package to our chip project.  Right now it is

2    my understanding that it is for your information only as

3    part of your due diligence process.

4            However, we certainly would welcome your

5    participation in our project should you so desire.  And

6    as we can support a max of five partners for this

7    project, we'd appreciate to hear from you soon.

8            Do you see that?

9        A.   I see that.  Yes.

10       Q.   Are you familiar with the chip project?

11       A.   I am, yes.

12       Q.   Okay.  As a member of this project, you have

13   the freedom to define specific I/O requirements around

14   an XPP 40.16.8 core -- and there are some more

15   numbers -- these I/O requirements will be realized as a

16   bond-out version of the XPP chip.  Participation in the

17   project costs $350,000 and includes the delivery of 10

18   samples.

19           Do you see that?

20       A.   Yes, I see that.

21       Q.   Is that an offer for sale?

22       A.   It is not an offer for sale.  It is an offer

23   to participate in a chip design, which then would become

24   a chip.

25       Q.   And if you sent them $350,000, you could get

1   10 chips back?

2        A.   I see --

3        Q.   Is that what it says?

4        A.   Yeah.

5        Q.   Did you make this in the United States?

6        A.   What?

7        Q.   This offer.

8        A.   The offer in the participation of a chip

9   design, yes.

10       Q.   Okay.  And was there a letter of intent on the

11  back?

12       A.   Yes, I see that.

13       Q.   And was there a payment schedule involved,

14  150,000 in contract, signed July 15th, 2006, 150 Golden

15  RTL 50,000 of delivery of samples.

16            Do you see that?

17       A.   I can't locate --

18       Q.   That's on Page 365, Bates stamp number, second

19  page.

20       A.   Yes.  Yes, I see it.

21       Q.   Okay.  Does it sound like an offer to sell

22  chips to you?

23       A.   No.

24       Q.   Okay.  Now, let me see if I can make it --

25  find this out?

1          MR. BAXTER:  Let me see DX 71.

2          By the way, do we have a book for Mr.

3   Vorbach?

4          I apologize, Mr. Vorbach, and we'll give

5   Mr. Grinstein one, too.

6          May I approach the witness, Your Honor?

7          THE COURT:  Yes.

8          MR. BAXTER:  I apologize for not giving

9   Mr. Vorbach the book.

10          Here you are, sir.

11          THE WITNESS:  Yes.

12          MR. BAXTER:  Got it?

13          THE WITNESS:  Yeah.

14     Q.   (By Mr. Baxter) Can I get you to go to DX 71,

15   and there are in that book, Mr. Vorbach, is a numerical

16   number, so we'll skip around a little bit.

17          You see that?  You have the documents there?

18     A.   71, yes.  Yes.

19     Q.   Okay.  And trying to use your explanation of

20   the way the date runs, I told my colleagues I didn't

21   know what month 29 was, but they said I wasn't wise in

22   the way of Europe.

23          So that's October the 29th, 2001?

24     A.   Yes.  It's a German date, again.

25     Q.   Okay.  And this is the PACT business plan?

1    A.   Yes, it is.

2    Q.   Did you help write this?

3    A.   I edit -- I edited at least part of it.  Yes.

4    Q.   Did you think it was correct?

5    A.   I think it was okay.  Yes.

6    Q.   Okay.  Let me get you to look at first -- at

7  the bottom of the first page, if I could, which actually

8  is labeled Page 3.  And it says:  PACT's Extreme

9  Processing Platform, the XPP, is that where the initials

10 came from?

11   A.   Yes.

12   Q.   Utilizes a unique combination of revolutionary

13 technologies to enable a new way of computing.

14        Is that what you said in your business plan?

15   A.   Yes, clearly.

16   Q.   And was that true?

17   A.   Yes.

18   Q.   Okay.  And if you go to the next page, Page 4,

19 it says the programmability and flexibility of XPP is

20 founded on break-through, transparent run-time

21 reconfiguration technology that dynamically controls

22 processing resources and makes instant algorithmic --

23 how do you say that word, Mr. Vorbach?

24   A.   Algorithmic.

25   Q.   Changes based on internal and external events,

 1   and is that sort of the core of what your chip was

 2   about?

 3        A.    It was one of the features.  Yes.

 4        Q.    All right.  Now, if I -- you knew about FPGAs

 5   before you started, right?

 6        A.    Yes, I did.

 7        Q.    And you knew about Xilinx?

 8        A.    Yes, I did.

 9        Q.    And you knew Xilinx was the leader in FPGA

10   technology?

11        A.    I don't know which one was the leader back

12   then, Xilinx or Altera, but I could confirm that.  Yes.

13        Q.    And you heard the story about Mr. Freeman.

14   Did you know the story about Mr. Freeman, how he

15   invented the Xilinx chips?

16        A.    Actually not, no.

17        Q.    Okay.  They didn't teach you that in college?

18        A.    No.

19        Q.    Okay.  The -- but you knew about FPGAs, right?

20        A.    Yes, I did.

21        Q.    And you were, in effect, going to make a new

22   kind of FPGA, were you not?

23        A.    Kind of enhanced FPGA.

24        Q.    Is that a yes?

25        A.    Enhanced FPGA.

 1     Q.   Okay.  It was different from the regular FPGA,

 2  was it not?

 3     A.   It was enhanced.  The technology comprised

 4  enhancements, optimizations to FPGAs.

 5     Q.   Okay.  Does that make it different?

 6     A.   I would say enhanced.

 7     Q.   Okay.

 8     A.   Optimized.

 9     Q.   Well, was it the same old thing they already

10  had?

11     A.   It was an optimized thing.

12     Q.   No, sir.  Listen to my question.  This is a

13  kind of a yes or a no.

14     A.   Okay.

15     Q.   Was it the same thing they already were

16  building and selling?

17     A.   Which year?

18     Q.   The FPGA chips.

19     A.   In which year?

20     Q.   Sir?

21     A.   In which year?

22     Q.   Well, when you wrote this document, which was

23  2001, I believe.

24     A.   From my perspective, I would say it was not

25  the same old thing.

1     Q.   All right.  Well, I mean, at the end of the

2  day, you were trying to sell them your technology,

3  right?

4     A.   Xilinx, yes.

5     Q.   And could we agree that if it were the same

6  thing, they probably wouldn't buy it?

7     A.   Yes.

8     Q.   Can we agree that you had to tell them and did

9  tell them that it was new and revolutionary?

10     A.   We certainly told them our technology is new,

11  yes.

12     Q.   Okay.  And it had to do, if I understood the

13  little portion that we read, it had to do with changes

14  based on internal or external events; is that correct?

15     A.   Sorry.  You lost me.

16     Q.   I'm sorry.  I went back to Page 4 in the

17  paragraph I read you before, the one that's highlighted

18  there, Mr. Vorbach.

19     A.   Okay.  Yes.

20     Q.   And it says that it makes instant changes, and

21  there's a word I can't pronounce in there.  You can say

22  for me again.

23     A.   Algorithmic.

24     Q.   Yes.  Based on internal or external events.

25  So it was -- so the changes were made based on either

1  something happening on the inside or something happening

2  on the outside; is that right?

3      A.   This was one aspect of the technology.

4      Q.   Okay.  But that's what primarily the

5  technology was, wasn't it?  That's what you really

6  trying to sell to Xilinx?

7      A.   I wouldn't say so.  This was one of the

8  aspects of our technology.

9      Q.   Were you trying to sell them something else?

10     A.   Our technology, yes.

11     Q.   Well, what else?  What technology were you

12  trying to sell them?

13     A.   The complete package of our technology.

14     Q.   Okay.  When you went in there the first time,

15  the second time, or the fifth time, what you talked

16  about with them was how to change their FPGA chips over

17  to your chip so that it could make instant changes based

18  on internal or external events.

19          Isn't that what the discussions really were

20  about?

21     A.   The discussion was about performance

22  improvement.

23     Q.   Okay.  This is how you were going to improve

24  performance, was it not?

25     A.   No.  Again, this is one aspect of our

1  technology.

2      Q.   Okay.  Would it be fair to say it's the main

3  thing?

4      A.   I would not know.

5      Q.   All right.  Let me get you to go to Page 16,

6  if I could, please.  Actually, let's go to 17.

7  And you see where it says C there, FPGAs?

8      A.   Yes.

9      Q.   And it says, for example, Xilinx Virtex, you

10 see that?

11     A.   Yes, I see that.

12     Q.   And you're comparing your technology to

13 theirs?  You see that?

14     A.   I see that.  Yes.

15     Q.   Okay.  Now, it says one of the negatives they

16 have is no dynamic reconfiguration, don't they?

17     A.   This is one of the aspects.  Yes.

18     Q.   Okay.  Okay.  And you wanted to change that,

19 didn't you?

20     A.   This is one aspect where we saw a difference

21 between their technology and ours.

22     Q.   Okay.  Now, let me I understand what you

23 didn't invent, please, sir.

24          You didn't invent FPGAs, did you?

25     A.   I never claimed that.

1    Q.   No, I know you didn't.  I just want the jury

2  to understand what the parameters are we're talking

3  about.

4         You didn't -- you didn't invent configurable

5  logic blocks, right, CLBs?

6    A.   This was before our time.

7    Q.   Okay.  And you didn't invent programmable

8  interconnectors, did you?

9    A.   I would say we did.

10   Q.   You did?

11   A.   Yes.

12   Q.   That's what you invented?

13   A.   We invented a kind of programmable

14 interconnector.  Yes.

15   Q.   Okay.  But you didn't invent the original one,

16 did you?

17   A.   There are many different ones out there.

18   Q.   Xilinx was already doing that?

19   A.   They had a different technology.

20   Q.   All right.  They were already doing it since

21 1984, weren't they?

22   A.   Again, in a different technology.

23   Q.   You didn't invent something called a DSP.

24 What is that?

25   A.   Data processing system.

1    Q.   Did you invent that?

2    A.   This was before our time.

3    Q.   All right.  You didn't invent buses?

4    A.   It depends.

5    Q.   Did you invent the buses?

6    A.   Our buses, yes.

7    Q.   But buses have been around since they had

8  computer chips, right?

9    A.   There are many different buses.

10   Q.   All right.  And you didn't invent the bus

11  control systems, did you?

12   A.   Again, ours, yes.  There were others around.

13   Q.   Did you invent something called a serializer

14  or a deserializer?

15   A.   Again, there were others around.  We had our

16  own technology.

17   Q.   Well, a serializer had been around since there

18  were commuter chips, hadn't they?

19   A.   I agree to that.  Yes.

20   Q.   And deserializer, the same way, right?

21   A.   Excuse me?

22   Q.   Deserializer?

23   A.   Yes.

24   Q.   Okay.  And tell the jury what a serializer is.

25   A.   A serializer gets parallel data, multiple

1   electrical signals at once, and it puts them into a

2   serial chain.  You can understand it like an SOS signal.

3   You have a character and the character is one signal,

4   but if you are sending or receiving SOS, you get these

5   long or short signals.  Serially means one after the

6   other.

7        Q.   And so you have multiple lines coming in and

8   one line coming out, like a multiplexer?

9        A.   You have in a serializer multiple lines coming

10  in and one line coming out.  Yes.

11       Q.   And a deserializer goes the other way,

12  multiple lines and one line; is that right?

13       A.   Yes.

14       Q.   Okay.  You didn't invent that?

15       A.   I said there were others around there.

16       Q.   Okay.  Now, did you understand, Mr. Vorbach,

17  that when you filed for your patent, you had to take an

18  oath that everything you said in there was true?

19       A.   Yes, absolutely.

20       Q.   On both patents?

21       A.   Yes.

22       Q.   Just like today?  Just like today?

23       A.   Like today, yes.

24       Q.   Did you take that seriously?

25       A.   Yes.  Absolutely, yes.

1      Q.   So being honest with the Patent Office was

2  real important?

3      A.   Yes.

4      Q.   And what you said in the patent was true?

5      A.   Yes.

6      Q.   Okay.  How about in business; you need sort of

7  the same standard in business, Mr. Vorbach, that what

8  you tell potential investors or customers is true?

9      A.   Yes.  I personally, yes.

10     Q.   Okay.  And that's what you've practiced?

11     A.   Yes.  I can speak only for myself, yes.

12     Q.   I understand.

13          Now, let me look at -- at one of your patents

14  just a moment.

15               MR. BAXTER:  If we can see DX 5, please,

16  Mr. Diaz.

17     Q.   (By Mr. Baxter) Now, this is the '181 patent;

18  is that right?  Can you see that?

19               MR. BAXTER:  Blow it up for him,

20  Mr. Diaz.

21     A.   Yes.  Yes, it is.

22     Q.   (By Mr. Baxter) And it's got your name and Mr.

23  Munch's name on it?

24     A.   It says et al.

25     Q.   Does it say Robert --

1    A.    Yes.  Yes, under inventors.  Yes.

2    Q.    Okay.

3          MR. BAXTER:  So if we could -- we could

4  go down, please.  Go over to the abstract.  You know,

5  I've got this on a slide, Mr. Diaz.

6          Can you go to Slide 19, I think?  It

7  might be easier to read.

8    Q.    (By Mr. Baxter) There's the '181.  Now, this

9  is the abstract and that comes right -- first at the

10 patent, does it not?

11   A.    This is on the front page.  Yes.

12   Q.    Yes.  And you understand that when the public

13 reads the patent, they get to read the whole thing?

14   A.    The whole patent?

15   Q.    Yes.

16   A.    They typically do.  Yes.

17   Q.    And so what you told the Patent Office and

18 what you told the public is that here's an abstract of

19 your invention.  It's a uniform bus system that's

20 provided which operates without any special

21 considerations by a programmer.

22          Is that what you swore to?

23   A.    Without any special consideration, yes.

24   Q.    And then it says:  The bus system control is

25 predefined; is that right?

```
 1        A.   Yes.

 2        Q.   That means fixed, permanent?

 3        A.   Permanent.

 4        Q.   Okay.  Fixed, same way?

 5        A.   Fixed is maybe too narrow.

 6        Q.   Okay.  You need it to be broader, predefined?

 7        A.   Permanent.

 8        Q.   Permanent?

 9        A.   Yeah.

10        Q.   All right.  And does not require any influence

11   by the programmer.

12             Is that what you swore to?

13        A.   This is what is here in this abstract.

14        Q.   Okay.  But that's also what you told the

15   Patent Office, right, you and Mr. Munch?

16        A.   No.  We told the Patent Office more details

17   than the abstract.

18        Q.   Well, did you tell them at least the abstract?

19        A.   We told the Patent Office the whole

20   specification.

21        Q.   Okay.  All right.  Good.

22             And this is the specification, is it not, part

23   of it?

24        A.   No.  This is the abstract.

25        Q.   All right.
```

```
 1              MR. BAXTER:  Let's go to the spec then,
 2   Mr. Diaz.  If you'll go to the next Slide, which is
 3   Slide 20, I think.
 4                  Can you go do that?
 5                  There we go.
 6       Q.   (By Mr. Baxter) Now, in the spec, you have the
 7   summary of the invention.
 8       A.   Yes.
 9       Q.   Okay.  And did you swear to this, too?
10       A.   Pardon me?
11       Q.   Did you swear to this portion of the patent?
12   Did you swear --
13       A.   Yes.  Yes.  Yes.
14       Q.   And the summary of the invention where you
15   tell the world what your invention really is, you said:
16   The present invention provides a uniform bus system
17   which operates without any special consideration by the
18   programmer, right?
19       A.   Yes.
20       Q.   And it said:  The present invention includes a
21   permanent implementation of the bus system control.
22       A.   Yes.
23       Q.   Is that -- is that what you swore to?
24       A.   Again, this is part of the specification.
25   We've sworn to the whole specification.
```

1    Q.   Did you swear to this part?

2    A.   To all parts.

3    Q.   Including this?

4    A.   Including this, yes.

5    Q.   And then it says:  The bus system control is

6  predefined and does not require any influence by the

7  programmer.

8         Is that what it says?

9    A.   This is what is written in this part.  Yes.

10    Q.   Okay.  Likewise, on the '106 --

11         MR. BAXTER:  If you go to Slide -- the

12  next slide.

13    Q.   (By Mr. Baxter) There's also an abstract for

14  the '106, and did you tell the Patent Examiner and swear

15  to it that the bus system control is predefined and does

16  not require any influence by the programmer?  Did you

17  swear to that, sir?

18    A.   Again, this is the abstract.  This is part of

19  a whole specification.  Yes.

20    Q.   Did you swear to it?

21    A.   As part of the whole specification, yes.  Yes.

22    Q.   Okay.

23         MR. BAXTER:  Then go to the next slide,

24  Mr. Diaz.

25    Q.   (By Mr. Baxter) And this is the summary, the

1 patent summary for Patent '106.  And it says:  A uniform

2 bus system operates without any special consideration by

3 a programmer.  A permanent implementation of the bus

4 system control is provided, right?

5     A.   Yes.

6     Q.   Permanent?

7     A.   Yes.

8     Q.   Okay.  And then it says:  The bus system

9 control is predefined, which you -- you've told me meant

10 permanent, right?

11     A.   It says predefined.  You're looking for

12 another word.

13     Q.   And does not require any influence by the

14 programmer.

15     Is that what you swore to?

16     A.   Yes.

17     Q.   All right.  Now, you -- you went out into the

18 marketplace, after you had your patents or even before,

19 I guess, and wanted to sell your idea; is that correct?

20     A.   Certainly.  Yes.

21     Q.   Okay.

22     MR. BAXTER:  Let me see Slide 26.

23     Q.   (By Mr. Baxter) Now, up -- up-to-date, how

24 many chips have you sold?

25     A.   I can't tell.  Maybe less -- less than 10, I

1 would say.

2      Q.   And who did you sell the 10 to?

3      A.   European telecommunication industry.

4      Q.   The what?

5      A.   The European telecommunication system.

6      Q.   Is that Siemens?

7      A.   Siemens, Talus, I don't have all the names,

8 but -- I mean...

9      Q.   Did you get money from Siemens?

10      A.   Yes, we did.

11      Q.   Okay.  Did they test your chips eventually?

12      A.   Yes, they did.

13      Q.   What year was that?

14      A.   2003.

15      Q.   Okay.  Have you sold any since that time?

16      A.   We didn't sell chips since 2003.  Maybe --

17 maybe 2004 still, but at least in this -- or in this

18 timeframe, we stopped the chip business.

19      Q.   Okay.  So would it be fair to say,

20 Mr. Vorbach, and I mean, no -- anything by it other than

21 you haven't been successful selling chips, have you?

22      A.   You can put it that way.  Yes.

23      Q.   Would it also be fair to say that you went to

24 pick somebody, you went to Sony and tried to interest

25 them in your technology for their television sets, did

1  you not?

2       A.   True, yes.

3       Q.   And they were not interested?

4       A.   They were interested to specific level, yeah.

5       Q.   And the level stopped short of you actually

6  doing anything with them?  They didn't sign any license

7  or anything?

8       A.   They did not, no.

9       Q.   Okay.  What about Kyocera, did you talk with

10  them?

11      A.   Yes.

12      Q.   Did they buy any chips?

13      A.   No.

14      Q.   Sign a license?

15      A.   No.

16      Q.   Texas Instruments is on there.  Did you talk

17  to them?

18      A.   We did.

19      Q.   They're over here in Dallas.

20      A.   We did, yes.

21      Q.   Did you sell them any chips?

22      A.   No, we did not.

23      Q.   Did you get to make a full and fair

24  presentation to all 60 companies?

25      A.   I don't know whether we made a full

1  presentation but some presentations to them.

2      Q.   Okay.  And of those 60 companies, where you

3  explained your ideas, none of them took you up, did

4  they?

5      A.   You can put it that way.  Yes.

6      Q.   Okay.  Was there any other way to put it?

7      A.   It's okay.

8      Q.   Okay.  Now, what you took to those companies

9  really was the reconfiguration portion of your

10  technology, was it not?  That's what you were the

11  proudest of?

12      A.   We took to them the concept of the XPP

13  technology.

14      Q.   Okay.  And the real concept was this being

15  able to look at internal and external events and

16  reconfigure the chip; is that right?

17      A.   Again, this is a part of our concept.

18      Q.   But that was the main part, wasn't it,

19  Mr. Vorbach?

20      A.   I wouldn't put it that way.

21      Q.   What would you say the main part was?

22      A.   The main part was enhancement and optimization

23  to FPGA technology.

24      Q.   Okay.  But of your chip, what was the main

25  part?  What was it you were really trying to sell to

1  these companies?

2      A.   I would say coarse granular enhancements to

3  FPGA technology.

4      Q.   All right.  And coarse grain is what your

5  technology was, wasn't it?

6      A.   In some major aspects, yes.

7      Q.   Okay.  Well, the major extent of external and

8  internal changes, that's coarse grain technology, is it

9  not?

10     A.   The -- sorry.  I'm not sure I got this

11  question.

12     Q.   Well, all these PAEs that you have in your

13  product, those are coarse grain, are they not?

14     A.   For example, yes.

15     Q.   Okay.  Now, the CLBs in Xilinx, those are fine

16  grain, are they not?

17     A.   I personally would -- would put it that way.

18  Yes.

19     Q.   Okay.  And so there's a big difference --

20  there's a big technology difference and a big philosophy

21  difference between having coarse grain and fine grain;

22  is that correct?

23     A.   I would say there's a difference between

24  coarse grain and fine grain.  Yes.

25     Q.   And you went coarse grain, and the traditional

1  FPGA business went fine grain; is that correct?

2      A.   I cannot agree to that.  No.

3      Q.   All right.  Now, when you contacted Xilinx, I

4  believe your first meeting was in 2002; is that correct?

5      A.   I think it was 2001.

6      Q.   Okay.  In that meeting, I believe we asked you

7  at your deposition and you said nothing really happened

8  at that meeting; you didn't exchange technology; you

9  might have gotten a Diet Coke out of it, but that was

10  about it.

11      A.   The 2001 meeting?

12      Q.   Yes.

13      A.   Yes.  I think there was no real outcome of it.

14  Yes.

15      Q.   Okay.  So the first real discussions were in

16  2002; is that correct?

17      A.   Yes.

18      Q.   Okay.  Did you tell Xilinx that you had a

19  better and different way of doing -- doing what they

20  were doing?

21      A.   I would say so, yes.

22      Q.   Okay.  But it was different from what they

23  were doing, was it not?

24      A.   It was different from our understanding what

25  they are doing.  Yes.

1    Q.   And you did have an understanding of what they

2  were doing, didn't you?

3    A.   Yes.  We had some understanding.

4    Q.   Okay.  Well, as a matter of fact, Xilinx puts

5  all of their manuals and all of their information on the

6  Internet, don't they?

7    A.   They do, yes.

8    Q.   And you can just go look at a manual and

9  figure out what they're doing, can't you?

10    A.   Yes, I can.

11    Q.   Okay.  And you did that, did you not?

12    A.   In 2001?  No, I -- I don't think I did.

13    Q.   What year did you do it?

14    A.   I think the last time I really analyzed an

15  FPGA manual was when we built those emulators.

16    Q.   Okay.  They were there, and they were there

17  not only for you, but they were there for every engineer

18  at PACT, were they not?

19    A.   That's correct.  Yes.

20    Q.   So all you had to do is get online, and you

21  know exactly what they're doing, correct?

22    A.   Yes.

23    Q.   In fact, you had been told by a member of your

24  advisory board that you were to study up on Xilinx and

25  look at their press releases and see what they were

1 doing; is that correct?

2     A.   I think I can recall in respective e-mails.

3 Yes.

4     Q.   Okay.  And you had that direction and, in

5 fact, you would have to know what they were doing, if

6 you were going to tell them what you had was new and

7 different.  Would you agree with that?

8     A.   Maybe we should, but we didn't.

9     Q.   Well, surely you didn't go in and say I've got

10 something new and different, and you didn't know what

11 they were doing.

12     A.   Well, we went in with the knowledge we had at

13 that time.

14     Q.   Okay.  Well, would it have been a good idea to

15 go look on the Internet and that's what you did?

16     A.   That's actually not what we did.  No.

17     Q.   Your engineers did it, didn't they?

18     A.   Some of our engineers were working with Xilinx

19 products.  Yes.

20     Q.   Okay.

21            MR. BAXTER:  Now, let me look at -- at DX

22 1027, if I could, please, Mr. Diaz.

23     Q.   (By Mr. Baxter) And it's in your book there,

24 Mr. Vorbach.

25          And that is in July of 2002, and that's from

1    someone named Mr. -- Mr. Zeisel.  Did I say that right?

2         A.   Yes.

3         Q.   Who was that?

4         A.   He was our German VP Sales for some time.

5         Q.   And he sent it to Mr. Bolsens over at Xilinx,

6    did he not?

7         A.   Yes, he does.

8         Q.   And he was trying to set up a meeting, was he

9    not?  Said he was coming to the United States and he

10   wanted to set up a meeting; is that right?

11        A.   I didn't find --

12        Q.   Said he could make a very attractive offer.

13   Is that what he said?

14        A.   This is what he says.  Yes.

15        Q.   Okay.  He also says:  We have a hot -- we have

16   a hot topic we address, the reconfigurable processing;

17   is that right?

18        A.   Maybe you can help me.  Where is that?  Where

19   is this?

20        Q.   Yes, right there and right there (indicates).

21        A.   Yes, I see that.

22        Q.   And it says:  Our IP approach is fitting

23   extremely well to your product roadmap.

24        A.   Yes, I see that.

25        Q.   Somebody has to know something before they

1    were so bold as to say our product fits, right?

2         A.    This was his statement.

3         Q.    Okay.  Now, look at 1030, if you would,

4    please, Mr. Vorbach.

5         A.    1030.

6         Q.    Yes.  It will be a couple of tabs over.  Now,

7    this one is in September of '03, and this one is from

8    you, is it not?

9         A.    Yes.

10        Q.    And it's to Mr. Bolsens, and he says:

11   PACT/Xilinx meeting possibilities?

12        A.    Yes.  Yes, it says this.

13        Q.    Now, had Xilinx ever contacted you and asked

14   you to come in and pitch your technology to them?

15        A.    I only have this e-mail traffic here right

16   now.  And based on that, I would say he contacted

17   Xilinx.

18        Q.    Okay.  And basically, you're telling

19   Mr. Bolsens that we met about a year ago and discussed

20   about PACT's reconfigurable XPP technology, would that

21   be the '01 meeting?

22             I'm now on a U.S. trip on September the 8th

23   and asked whether you're interested in meeting me; is

24   that right?

25        A.    Yes.  It seems right.  Yes.

1      Q.   I would be happy to discuss our actual

2  enhancements of the XPP architecture.  You see that?  It

3  offers lower cost and power dissipation; is that

4  correct?

5      A.   Yes.  Yes.

6      Q.   He's going to highlight it.

7           You see that?

8      A.   Yes, I do.

9      Q.   So I take it that when you wrote Mr. Bolsens

10  in 2003 that you already had some idea about what their

11  cost was and about what their power dissipation was,

12  since yours was going to be better.

13      A.   Is this a question?

14      Q.   Yes.  Yes.

15      A.   Well, this was based on the understanding we

16  had.

17      Q.   Okay.  So you had an understanding about their

18  cost and their power dissipation; is that right?

19      A.   This was based on my understanding.  Yes.

20      Q.   Okay.  And you had looked that up, hadn't you?

21  I mean, you just didn't make it up out of thin air?

22      A.   No, I didn't.

23      Q.   You looked it up, didn't you?

24      A.   No, I didn't.

25      Q.   You didn't look it up?

1      A.    This understanding was based on what I

2   understand on FPGAs.

3      Q.    Where?

4      A.    This understanding came back from the product

5   designs that I did in the late '90s.

6      Q.    Then it says:  Actually, we're starting a

7   project with ATMEL and HarmanBecker, a car radio

8   company, delivers for DaimlerChrysler, right?

9      A.    Yes.

10      Q.    In Germany with the purpose of developing a

11   complete platform for telemetrics, right?

12      A.    Yes.

13      Q.    Did you ever do that?

14      A.    Yes.  This platform has been delivered.

15      Q.    It doesn't have anything to do with FPGA?  Did

16   you sell any of that?

17      A.    I can't tell you what exactly was on that

18   platform.  It's too long ago.  I should have to look it

19   up.

20      Q.    Did you sell it?  Did you sell them any?

21      A.    They were boards sold in that project.

22      Q.    How many?

23      A.    I can't tell you.  This was an academic

24   project.

25      Q.    Oh, it wasn't a real project.  It wasn't a

1  commercial project?

2      A.   It was an academic project.

3      Q.   Oh, okay.  It wasn't commercial.  You

4  weren't -- you weren't going to put this in Chrysler

5  cars?

6      A.   No, again, this was academic.

7      Q.   Okay.  All right.  Now, then you tell him:

8  Let me know if you have the possibility to meet me.

9          You see that right down at the bottom?

10     A.   Yes.

11     Q.   Okay.  Let me look at 1029, if I can, please,

12  Mr. Vorbach.

13         This is assessment of '03, and it's from you

14  to Mr. Bolsens.  Do you see that?

15     A.   Yes.

16     Q.   Your -- Ivo I just want to follow up the last

17  meeting.  Have you got a chance to talk to the attendees

18  of the meeting?  Please let me know whether and how you

19  intend to proceed.  I would be glad to do additional

20  presentations at Xilinx and/or enter technical

21  discussions.  Best regards, Martin.

22         So you were pursuing Mr. Bolsens at that time,

23  were you not?

24     A.   Yes.

25     Q.   Now, let's look at DX 75, back toward the --

1   toward the front of the book.

2         And you got a response from Mr. Bolsens, did

3   you not?

4      A.   Yes.

5      Q.   And that was in October of '03, so that would

6   have been less than a month later?

7      A.   I didn't remember the previous date.

8      Q.   Well, if it was September of '03, does that

9   sound close?

10      A.   Okay.  Yes.

11      Q.   And Mr. Bolsens writes to you:  Hi, Martin.

12   You raised a lot of interest in your technology in

13   Xilinx.  However, after several internal discussions, we

14   concluded that Xilinx cannot license your technology.

15   The decision is based on continuous tradeoffs we have to

16   make with size of partner company, effort to introduce

17   new technology, availability of tools, potential

18   benefits, et cetera.

19         And so Mr. Bolsens, about a month after

20   meeting with you and hearing your presentation, said no;

21   is that right?

22      A.   Yes.

23      Q.   Did you drop it once he told you no?  Did you

24   just say, gosh, good try, sorry, and walk away?

25      A.   Yes.

1      Q.   Okay.  So that was the last contact you had

2  with Xilinx?

3      A.   No.

4      Q.   Well, did Xilinx call you back up and say get

5  back in here; we've changed our mind?

6      A.   In some way.

7      Q.   Well, was it -- was it possible that -- that,

8  in effect, you pursued them?

9      A.   In a way, I did.

10     Q.   Now, let's look at your response to his

11  e-mail, 155.  October the 14th, 2003, Mr. Vorbach, and

12  you say to Mr. Bolsens:  I understand your position.

13  Maybe PACT should come up with a solution how to

14  integrate our tool chain and allow an easy access to our

15  technology in terms of silicon as well as user interface

16  and tools for Xilinx.  We are working on different

17  scenarios internally.  Peter Weber will contact you to

18  discuss a possible cooperation when he's back in the

19  United States.

20          Does that sound like Mr. Bolsens was going to

21  get a call from Mr. Weber?

22     A.   Yes.

23     Q.   And Mr. Bolsens didn't ask for that, did he?

24     A.   He did not.  No.

25     Q.   Okay.  Now, this is 2003 and you knew already

1  that Xilinx had the RocketIO in their Virtex chip, did

2  you not?

3       A.   No.

4       Q.   You didn't know about the RocketIO?

5       A.   I don't think so.  I'm not aware of that, no.

6       Q.   They made a giant press release about it and

7  they put all their manual on the Internet, and you want

8  to tell me you didn't know about it?

9       A.   I wasn't aware of it.  No.

10       Q.   Sir?

11       A.   I was not aware of it.  No.

12       Q.   Were your engineers not monitoring the

13  Internet and looking at all the manuals?

14       A.   Some people may have.  Yes.

15       Q.   Okay.  And that was -- that was their duty,

16  was it not?

17       A.   No.

18       Q.   Well, if you were going to try to do a deal

19  with Xilinx and you needed to know what their

20  technology -- the fact they put their manuals on the

21  Internet, would be the very best thing to find out,

22  wouldn't it?

23       A.   Yes.

24       Q.   Okay.  And that's what you had engineers

25  doing?

1    A.   No, not really.

2    Q.   Oh, okay.  Let's look at Exhibit 155 -- well,

3 that was 155.  Let me look at Exhibit 162.

4         This is in 2005, and Mr. Weber did, in fact,

5 get back in contact and pursued Xilinx, did he not?

6    A.   Yes.

7    Q.   Okay.  And, in fact, Mr. Bolsens'

8 administrative assistant says:  I have you on Ivo's

9 calendar for 4:00 p.m., not 5:00 p.m.  I hope that's

10 good for you.

11         And Mr. Weber had contacted Mr. Bolsens and

12 asked for another meeting, had he not?

13    A.   Yes.

14    Q.   Okay.

15         MR. BAXTER:  In fact, we can find that

16 out by looking down at the bottom of the e-mail

17 exchange, Mr. Diaz.

18    Q.   (By Mr. Baxter) It says from Mr. Weber to Mr.

19 Bolsens:  Dear Ivo, thanks for taking the time talking

20 to us.  We'd like to discuss the following topics or

21 issues, and one of those was the general purpose imaging

22 processor, Virtex-4 plus XPP.

23         Do you see that?

24    A.   Yes.

25    Q.   And that meant that your company was trying to

1  talk Xilinx into putting the XPP on their Virtex-4 chip;

2  is that right?

3       A.   This is correct.  Yes.

4       Q.   Now, the Virtex-4 chip which had the RocketIO

5  in it, right?

6       A.   As I know as of today, yes.

7       Q.   It had the RocketIO in it, but what you really

8  wanted to do was to put your technology on top of the

9  chip; is that right?  Integrate it in the chip?

10       A.   We wanted to put our technology, merge it with

11  the FPGA device.  Yes.

12       Q.   And that's because your technology was

13  different from Xilinx's technology, wasn't it?

14       A.   Based on the misconception I had, yes.  In

15  reality, no.

16       Q.   You now want to tell the jury you didn't

17  understand how the FPGA worked?

18       A.   My understanding was based on the old FPGAs

19  end of the '90s.

20       Q.   The end of the '90s, and that's the last time

21  you looked at it.  It's setting there on the Internet

22  and you didn't look at it?

23       A.   Yes.

24       Q.   And none of your engineers did?

25       A.   Our engineers certainly did.

1    Q.   Okay.   So Mr. Weber, after talking to the

2  engineers, said it's a good idea to put the XPP on the

3  Virtex-4 because it's different, didn't he?

4    A.   I'm not sure he discussed that with the

5  engineers.

6    Q.   Well, your company wanted to put it on there

7  because it was new, innovative, and different, wasn't

8  it?

9    A.   Again, based on the misconception I had, it

10  was different.  Yes.

11    Q.   It was not a misconception.  Your engineers

12  are looking at it on the Internet.  They're reading the

13  manuals.

14        Now, how could there be a misconception about

15  that?

16    A.   This was my misconception.

17    Q.   This e-mail isn't from you.  It's from

18  Mr. Weber having talked to the engineers.  He's still

19  wanting to put your technology on a Xilinx chip, isn't

20  he?

21    A.   This was the proposal.

22    Q.   All right.  Now, the Virtex-4 chip is the chip

23  you accuse of infringement now, is it not?

24    A.   Yes.

25    Q.   Let's look at DX 169 if we can, please, the

1  next tab over.

2          This is, once again, from Mr. Weber in July of

3  '05.  You get carbon-copied on this, do you not?

4      A.   Yes.

5      Q.   Hello, Ivo.  Thanks again for the open and

6  constructive discussions we had with you yesterday.  I

7  have an additional question.  You mentioned Xilinx is

8  expecting a factor of 4 in size going from 130nm via

9  90nm to 65nm.

10          I don't know what nm's are.  What is that?

11      A.   Nanometers.

12      Q.   Okay.  Would you please comment on the

13  frequency ratio.  This would help us to more accurately

14  predict XPP performance and die size?

15          Do you see that?  Looking forward to hearing

16  from you.

17      A.   I see that.  Yes.

18      Q.   You're trying to get information out of

19  Xilinx, right?  And you're still trying to put your chip

20  on theirs, right?

21      A.   Yes.

22      Q.   Okay.  Now, let's spring forward, if we can,

23  to May of '06, and look at Exhibit No. 56.  This is,

24  once again, an e-mail from Mr. Weber that you're copied

25  on.

1          It said:  Dear Ivo, I would like to follow up

2    our recent discussions and confirm that we are very

3    interested in Xilinx as an investor in the upcoming

4    investment round.  I understand from Martin -- that's

5    you, right?

6          A.    Martin is me.  Yes.

7          Q.    That you requested a more detailed technical

8    due diligence to be held at -- at May the 26th.  Please

9    advise when additional steps are planned to move the

10   process forward.  I will call you Tuesday to further

11   discuss these steps.  I'm attaching our executive

12   summary for your review.

13          And he attaches an executive summary; is that

14   right?

15          A.    Yes.

16          Q.    Let's look at the executive summary that's

17   attached right behind that page.  And the executive

18   summary is not a technical document, right?  It's just

19   an overview of trying to raise some more money, right?

20          A.    Yes.

21          Q.    Okay.  Now, let's look at the company

22   overview.  It says:  PACT is a solution provider for

23   high-performance signal processing applications that

24   demand high bandwidth and low power.  They've developed

25   a reconfigurable and patented XPP technology that

1  provides a fully programmable and reusing standard

2  hardware platform, right?

3          And it tells you what the company overview is;

4  is that right?  Do you see that?

5      A.   This is -- yes.

6      Q.   Does the word bus ever appear in there?

7      A.   High bandwidth is clearly bus-oriented.

8      Q.   That's not a bus, is it?  High bandwidth is in

9  any portions of a chip, isn't it?

10     A.   But it's also bus -- bus-related, certainly.

11     Q.   I'll ask you another question.

12     A.   Yes.

13     Q.   Does the word bus appear in there?

14     A.   It is an overview of the architecture.

15     Q.   Okay.  Is the answer no?

16     A.   No.

17     Q.   Okay.  Now, it says on Page 4:  The Xilinx

18  meeting XPP III IP product with complete tool chain and

19  application software including integrated software

20  package will be available in Quarter 2 of 2006.

21          Do you see that?

22     A.   Yes, I see that.

23     Q.   And that wasn't true, was it?

24     A.   This was our plans back then.

25     Q.   Sir?

1    A.    This was our plans back then.

2    Q.    But that didn't happen, did it?

3    A.    No, it did not.

4    Q.    And then on Page 6 where it says -- down at

5  the bottom, it says:  Status, 1999/2001, company

6  founded, design start.  Status:  Ready to go to market.

7          Do you see that?

8    A.    Yes.

9    Q.    And that, of course, wasn't correct either,

10 was it?

11   A.    Pardon?

12   Q.    None of your stuff was ever ready to go to

13 market, was it?

14   A.    The XPP III design from my perspective,

15 clearly, yes.

16   Q.    Did you ever make any XPP III chips?

17   A.    No, we did not.

18   Q.    All right.  By the way, I noticed on Page 8 it

19 says:  Currently, PACT is actively engaged in customer

20 projects including companies such as Intel, Xilinx.

21 Were you representing to the world you were in a project

22 with Xilinx?

23   A.    This was what is written there.  Yes.

24   Q.    Which, of course, wasn't true, was it?

25   A.    Our understanding was that we had an ongoing

1 relationship with Xilinx.

2     Q.   It says a project, like you're doing business

3 with them, like you're selling them something, like

4 you're working on a chip together.

5        That's not true, is it?

6     A.   Again, for me, this is ongoing business and we

7 had ongoing business with Xilinx.  Yes.

8     Q.   Okay.  Now, let me look at 182, if I could,

9 please, sir.

10       This is in July of '06, and it's to Mr. Weber

11 and you get CC'd, do you not -- no, I'm sorry, you

12 don't.

13       Mr. Bolsens gets CC'd and it's from

14 Mr. Schwarz at Xilinx.  Do you see that?

15     A.   Yes.

16     Q.   Hello, Peter.  I appreciate your persistence

17 as Ivo and I are being pulled in many directions.

18 Fortunately, Ivo and I had a brief discussion regarding

19 your technology.  Our resulting feeling is skepticism

20 due to our perceived architecture complexity and

21 software challenges.

22       Your technology, although different, is yet

23 another new, complex, multiprocessor solution a startup

24 trying to develop.  We have seen several.  In our

25 opinion, most have implementation software challenges.

1 Although we are interested in exploring solutions

2 targeted at video space, we believe our proposed

3 solution is too risky -- your proposed solution is too

4 risky, plus the synergy with Xilinx is minimal at this

5 point.  As such, we prefer to watch from the sidelines

6 for now.

7       Is that the e-mail that finally told you don't

8 come back anymore; we're just not going to do the deal?

9     A.   I haven't seen that e-mail.  I cannot comment

10 on that.

11    Q.   All right.  Now, you had another prototype

12 board, did you not?

13             MR. BAXTER:  Can I see DX 720, Mr. Diaz?

14    Q.   (By Mr. Baxter) The one that your lawyer

15 showed today --

16             MR. BAXTER:  Go to the next page.

17 Go to the next one.

18    Q.   (By Mr. Baxter) That wasn't the only startup

19 board you had, was it?

20             MR. BAXTER:  See if you can find me the

21 picture, Mr. Diaz.

22             There you go.  Can you blow that picture

23 up?

24    Q.   (By Mr. Baxter) Now, that was an XPP system

25 development platform, right?

```
 1      A.   Right.

 2      Q.   And that's different from the one your lawyer

 3  showed today, is it not?

 4      A.   Yes.

 5      Q.   And this one has Xilinx chips in it?

 6      A.   Yes.

 7      Q.   Okay.  Do you know which Xilinx chip that is?

 8      A.   Actually, no.

 9      Q.   Okay.  But we do know this:  That the Xilinx

10  chip in order to get something on or off, you had to

11  program the bus, didn't you?

12      A.   We had to configure the Xilinx chip.  Yes.

13      Q.   Okay.  And did you have to configure that bus

14  on that chip?

15      A.   Yes.

16      Q.   And to configure the bus, you had to use the

17  CLBs, right?  CLBs, isn't that how you do it?

18      A.   I'm not sure.  It depends on what kind of FPGA

19  is on the board.

20      Q.   Well, you knew what kind of FPGA Xilinx had,

21  right?

22      A.   I knew -- I'm not sure about -- about that.

23      Q.   Well, in order to get it to work, somebody had

24  to program it using CLBs, right?

25      A.   They had to program the Xilinx device.  Yes.
```

1       Q.    Okay.

2       A.    The Xilinx device.

3       Q.    And you understand that the Xilinx device,

4  this bus control system, can implement, depending on how

5  it's programmed, all kinds of bus system protocols,

6  can't it?

7       A.    You can in a programmable solution implement

8  many different bus protocols, yes.

9       Q.    And someone did that on that chip?

10       A.    I assume so.  Yes.

11       Q.    All right.  I had told you I wanted you to

12  look at a document, and I finally found it.

13                   MR. BAXTER:  Look at 900, please,

14  Mr. Diaz.

15       Q.    (By Mr. Baxter) And this is a memo to you from

16  a board member; is that right?

17       A.    No.

18       Q.    I'm sorry.  Who is Mr. Eckardt Bihler?

19       A.    The first part, yes.

20       Q.    Okay.  Now, does he tell you that he wants you

21  to look at all things Xilinx so you'll be prepared to

22  deal with them?

23            Look at the last page.  In addition, I

24  recommend you learn about everything that Xilinx --

25  processors, memory, interfaces -- offers on the chips in

1   order to make things easier for the user.  It also makes

2   sense to have a good overview of Xilinx's tools and

3   libraries so that you can make recommendation for the

4   integration of PACT tools.  Right?

5        A.   No.  We have a misconception here.

6        Q.   Is this what he told you to do, sir?

7        A.   Eckardt Bihler, no.

8        Q.   He didn't tell you to do that?

9        A.   No.

10       Q.   Who did he tell to do that?

11       A.   This is not what Eckardt Bihler wrote.

12       Q.   Sir?

13       A.   This is not what Eckardt Bihler wrote.

14       Q.   I'm sorry.  Mr. Vorbach, who didn't write

15   that?

16       A.   Eckardt Bihler did not write this.

17       Q.   Who wrote it?

18       A.   Reiner Hartenstein.

19       Q.   Okay.  Who was he?

20       A.   He was a friend.

21       Q.   Is he on the advisory board of PACT?

22       A.   At some time.  I'm not sure he was at that

23   time.

24       Q.   Okay.  Did he give you that advice to do it?

25       A.   Yes.

1    Q.   Okay.  Now, did -- did -- did you know that

2  Xilinx had put in the DSP48 into its chips?

3    A.   At what point in time?

4    Q.   Any point in time, sir.

5    A.   At some point in time, yes.

6    Q.   Okay.  And that is a chip that you're now

7  accusing of infringement, right?

8    A.   Yes.

9    Q.   But you knew about it while you were still

10  talking to Xilinx, didn't you?

11    A.   About the DSP48, yes.

12    Q.   Yes.  As a matter of fact, you had the manual

13  for the DSP48, did you not?

14    A.   We had a manual.  Yes.

15    Q.   Sir?

16    A.   Yes.

17    Q.   And that wasn't the only one you had, was it?

18    A.   Only one crosses my mind.

19    Q.   Okay.  And you had the detailed manual, did

20  you not?

21    A.   I wouldn't say so.  No.

22         MR. BAXTER:  Can you get me DX 49,

23  Mr. Diaz.

24    Q.   (By Mr. Baxter) Look at DX 49, if you would,

25  please, Mr. Vorbach.

1          Now, you had this manual and you sent it to

2   one of your engineers for analysis, did you not?

3       A.   I don't think so.

4       Q.   Sir?

5       A.   I don't think so.

6       Q.   Did you have the manual?

7       A.   The manual was there.  Yeah.

8       Q.   Did you have it?

9       A.   It was on my computer, yes.  Yes.

10      Q.   Okay.  And you're denying you sent it to one

11  of your engineers to be examined?

12      A.   I recall it differently.

13             MR. BAXTER:  May I approach just a

14  second, Your Honor?

15             THE COURT:  All right.  Do you have a

16  document?

17             MR. BAXTER:  I do, Your Honor.

18             (Bench conference.)

19             MR. BAXTER:  This is the one that we

20  talked about, Your Honor, that the Court has --

21             THE COURT:  Well, I'll tell you what,

22  it's about time that we're going to take an afternoon

23  recess, and we'll talk about it then.

24             MR. BAXTER:  All right.  Sir.

25             (Bench conference concluded.)

1          THE COURT:  Ladies and Gentlemen, we're

2  going to take the afternoon recess now.  We'll take a

3  15-minute recess for the jury.

4          LAW CLERK:  All rise.

5          (Jury out.)

6          THE COURT:  Thank you.  Please be seated.

7  Mr. Baxter?

8          MR. BAXTER:  Could we excuse,

9  Mr. Vorbach, Your Honor?

10         THE COURT:  For what purpose?

11         MR. BAXTER:  Well, now I want to impeach

12  the witness, Your Honor.  He says he did not send this

13  manual to his engineer, and Document 720 clearly says

14  that he did, and the engineer writes back that he's read

15  the manual.

16         THE COURT:  Well, all right.  Can I see

17  the document?  Is this a document that we've previously

18  addressed?

19         MR. BAXTER:  Yes, it is.  It's the same

20  one, Judge.

21         THE COURT:  Thank you, Mr. Baxter.

22         MR. BAXTER:  Yes, sir.

23         THE COURT:  Mr. Vorbach, you can step

24  down while we do this.  You can take your break now as

25  well.

1          THE WITNESS:  Okay.

2          MR. GRINSTEIN:  Your Honor, if I may

3   address the document.

4          THE COURT:  Go ahead.

5          MR. GRINSTEIN:  Mr. Vorbach, I think the

6   Court would like you outside.

7          Is that what the Court wants, Your Honor?

8          THE COURT:  I think that's probably best.

9   Go ahead.

10         (Witness leaves the courtroom.)

11         MR. GRINSTEIN:  Your Honor, the

12  impeachment purpose is to impeach the testimony, when

13  the question was asked:  Did you send the Synplicity

14  (sic) DSP manual to one of your engineers, to which Mr.

15  Vorbach said:  That's not my understanding.

16         And they're impeaching him with an e-mail

17  from one of his engineers to him, attaching the DSP48

18  manual.  So I don't understand the impeachment.  If the

19  question had been asked:  Did one of your engineers --

20  did Markus send it to you, and he said no, then maybe

21  this could have been put in front of him to refresh his

22  recollection or something.

23         But it's not actually impeaching the

24  testimony for which they suggest it's impeachable.

25         THE COURT:  Mr. Baxter?

1     MR. BAXTER:  Here's what he said in his

2 deposition, Your Honor.  I just assume he'd say the same

3 thing again.  The Exhibit DX 49, the publication about

4 the difference in the DSP48:

5     QUESTION:  Do you have that in front of

6 you?

7     ANSWER:  Yes.

8     QUESTION:  Have you ever reviewed that

9 before?

10     ANSWER:  Obviously, I sent or I assumed

11 it is the document I sent to Markus.  Markus

12 being Mr. Weinhardt, the engineer he sent it to.

13     So I was surprised that he denied sending

14 it to him since very recently he swore that he did.

15     MR. GRINSTEIN:  We'll impeach with the

16 deposition, Your Honor.

17     THE COURT:  I would have to agree.  It

18 sounds like -- from what I'm looking at this document,

19 it appears to be running the other way.  Is there

20 anything in this document that indicates that

21 Mr. Vorbach sent this to the engineer?

22     MR. BAXTER:  Yes, sir.  I think the whole

23 document indicates that he's responding to Mr. Vorbach's

24 question about what the DSP is, and it goes to show that

25 they had knowledge of our products.  It goes to show how

1  they characterized their patented technology as XPP.

2  And, of course, it goes to show that their engineer

3  thought it didn't have anything to do with XPP.

4             THE COURT:  Well, with respect to the use

5  you want to put on it now, I'm going to sustain the

6  objection to using this to impeach his testimony.

7             You can use his deposition, but this does

8  not appear to me to -- to impeach that.

9             Is there some other use you want to make

10 of this document?

11            MR. BAXTER:  No, Your Honor, not other

12 than anything I've already said.  It shows the knowledge

13 they had of our products, which is an important issue in

14 this case, which he denied they had.

15            It shows that they felt that it was not

16 an infringing product.  And it shows how they referred

17 to their own patented technology as XPP, but it

18 certainly goes to show they had knowledge of our

19 technology, which he's now trying to run away from.

20            THE COURT:  You can use his deposition

21 answer, but otherwise sustain the objection.

22            And we've got 10 minutes left on the

23 break.

24            LAW CLERK:  All rise.

25            (Recess.)

1          LAW CLERK:  All rise.

2          (Jury in.)

3          THE COURT:  Thank you.  Please be seated.

4          Mr. Baxter, I think I interrupted you.

5   You may proceed with your examination.

6          MR. BAXTER:  Thank you, Your Honor.

7          Mr. Diaz, can you get up?

8      Q.   (By Mr. Baxter) Let me -- let me ask you this,

9   Mr. Vorbach:  Have you had a chance to think about

10  whether or not you've sent Exhibit 49 to one of your

11  engineers at PACT?

12     A.   I thought about it.  I -- I cannot recall.

13     Q.   Okay.  Let me show you your deposition that we

14  took a few months ago, Mr. Vorbach, and we asked you

15  about it and it's going to be Page 435 at Line 8.

16          QUESTION:  And I'm going to tell you that

17  Exhibit 23 that they showed you is DX 49, if you'll take

18  my word for that, which is this manual.  And with

19  Exhibit 23, the publication about the difference in the

20  DSP48, do you have that in front of you?

21          ANSWER:  Yes.

22          QUESTION:  Have you ever reviewed that

23  before?

24          ANSWER:  Obviously, I sent or I assume it

25  is the document that I sent to Marcus.

1          QUESTION:  Who is Marcus?

2          ANSWER:  Marcus was one of -- was our

3   compiler engineer.

4       Q.   (By Mr. Baxter)  Okay.

5          MR. BAXTER:   And if you'll go back now

6   to DX 49, Mr. Diaz.

7       Q.   (By Mr. Baxter)  Does that refresh your memory

8   that you had in your possession DX 49, which is the

9   DSP48 manual and that you sent it to one of your

10  engineers?

11      A.   I think this is a misconception somehow based

12  on the e-mail we have.

13      Q.   Okay.  My -- my question is, sir:  Does that

14  refresh your memory, the fact that you swore in your

15  deposition that you did send it to him that, in fact,

16  you did?

17      A.   As I said, I think this is a kind of a

18  misconception which is there.

19      Q.   Okay.  Did you send it to him or no?

20      A.   I don't know.

21      Q.   Okay.  You had it in your possession, didn't

22  you?  You said you did?

23      A.   I said I don't know.  I'm not -- I don't know

24  whether I sent it to him or he sent it to me.  I --

25  actually, I don't know.

1    Q.   Okay.  Either way it went, both you and he had

2  it at one time or another soon after it was written?

3    A.   We had it at -- at one time.  I -- I don't

4  know when it was written.

5    Q.   Okay.  Well, we know this was in -- in 2005,

6  Mr. Vorbach.  Do you remember that?

7    A.   I see it on the document, yes.

8    Q.   Okay.  So you had a chance to look and see

9  what DSP48 and so did your engineer had a chance to look

10  at it, right?

11    A.   Yes.

12    Q.   And after you did that, after you looked at it

13  and after he looked at it, did you call up Xilinx and

14  say that DSP48 you just put out, that infringes our

15  intellectual property?

16    A.   As said, I believe we had a misconception.

17    Q.   Okay.  And my question, sir, is:  Did you ever

18  call Xilinx up, send them an e-mail, write them a nasty

19  letter, do anything to put them on notice that you've

20  seen their DSP48 and it infringes your intellectual

21  property?

22    A.   No, as we had a misconception.

23    Q.   Okay.  All right.  So the answer is no?  Now,

24  I think you told me earlier that you gave Siemens some

25  chips.  Did you sell them to them or give them to them?

1      A.   To my -- I think we -- we sold them to -- to

2  Siemens, yes.

3      Q.   Okay.  And did they evaluate your chips?

4      A.   Yes, they did.

5           MR. BAXTER:  All right.  Let me look at

6  DX 87, if I can, please, Mr. Diaz.

7      Q.   (By Mr. Baxter)  And because my time is

8  running short here, Mr. Vorbach, I'm going to go to the

9  conclusion --

10          MR. BAXTER:   Which is on Page 35, Mr.

11  Diaz.

12      Q.   (By Mr. Baxter)  This is a conclusion if it --

13  if you look under the second paragraph that he's

14  highlighted there --

15          MR. BAXTER:  If you can blow that up.

16      Q.   (By Mr. Baxter)  In contrast to the first

17  theoretical power and area information, the XPP 64

18  benchmark results show not the performance as expected.

19          Do you see that?

20      A.   Yes.

21      Q.   It says:  The results may -- are mainly

22  explainable from the old based on the early '90s and the

23  inflexible technology concept.  Do you see that?

24      A.   Yes.

25      Q.   All right.  This becomes visible with the

1   attempt to use all PAE components, do you see that?

2   Skipping -- skipping the German, down to the next

3   English section it says:  Also the architecture is not

4   flexible enough to process samples with various bit

5   width.  Lack of flexibility leads to the fact that

6   instead of 24 bit, 16 bits have to be processed.  The

7   unused bit result in inefficient PAE performance.  Do

8   you see that?

9        A.   Yes.

10        Q.   And you were disappointed in the Siemens

11   rejection, were you not?

12        A.   Yes.

13        Q.   Okay.  Now, you also had it examined by an

14   outside consulting company, did you not?

15        A.   Yes, we did.

16        Q.   And that was BDTI?

17        A.   Yes.

18        Q.   And you hired them, did you not?

19        A.   Yes.

20        Q.   Okay.  And you paid them what, $80,000 to

21   examine your products?

22        A.   Actually, I don't know the numbers.

23        Q.   Okay.  Does that sound close?

24        A.   I have no idea.

25        Q.   Okay.  It was a lot of money?

1    A.   If it was the 80,000, then it was a lot of

2  money, yes.

3    Q.   Okay.  I'm going to represent to you that's

4  what the contract says.  And you signed the contract,

5  didn't you?

6    A.   Yes, I signed it.

7    Q.   Although at your deposition when we asked you,

8  you denied that you signed it, didn't you, Mr. Vorbach?

9    A.   I did not recall it.  I thought it was a board

10  memo.

11    Q.   All right.  Now, BDTI is a highly respected

12  independent testing organization, are they not?

13    A.   They are a testing company, yes.

14    Q.   Okay.  And that's why you sent your chips to

15  them; is that correct?

16    A.   I -- I don't think they had ever chips from

17  us.

18    Q.   Okay.  You sent them products to evaluate?

19    A.   I think this -- this evaluation was based on

20  technical data.

21    Q.   Okay.  And they evaluated your -- it was your

22  technical data?  It wasn't somebody else's, was it?

23    A.   As far as I know, I did not interact directly

24  with BDTI.  Maximum, I had one meeting.

25    Q.   You read the report, did you not?

1    A.   I read it, yes.

2    Q.   In fact, you tried to get it changed, did you

3  not?

4    A.   Yes.

5    Q.   Okay.

6         MR. BAXTER:  Let me go if I can, Mr.

7  Diaz, to -- to the evaluation.

8    Q.   (By Mr. Baxter)  I think we may look at it in

9  some detail later, Mr. Vorbach, but if we look at 2.5.4,

10  which is on Page 20, they -- they gave you grades, did

11  they not?

12    A.   Yes.

13    Q.   And at the end of the day, it's fair to say

14  that you didn't do very well on the grades, did you,

15  under any -- any aspect they ran your data, PACT didn't

16  do well, did it?

17    A.   I -- I think I disagree.

18    Q.   Well, it says score D minus.  I realize the

19  education systems may be different, but in Germany

20  that's not good, is it?

21    A.   I agree with you.  This particular portion is

22  not good.

23    Q.   Okay.  It says risk, D; start up cost, D;

24  flexibility, B; performance, D.  Do you see that?

25    A.   I see that, yes.

1    Q.   I've got some more of them, should I go

2 through those with you, Mr. Vorbach, too?

3              MR. BAXTER:   Let's look at 2.2.4, Mr.

4 Diaz, which would be Slide 1.

5    Q.   (By Mr. Baxter)  I had them -- had them put up

6 on a slide.  It says development, D; risk, D; start-up

7 cost, D; flexibility, B minus; performance, C.  Do you

8 see that?

9    A.   Yes.

10             MR. BAXTER:   Let me see the next one, Mr.

11 Diaz.

12    Q.   (By Mr. Baxter)  C, D, D, B minus, C, you see

13 that?

14    A.   I see it, yes.

15    Q.   Yes.

16             MR. BAXTER:   See the next one.

17    Q.   (By Mr. Baxter)  B, D, C, B minus, C, you see

18 that one?

19    A.   Yes, I do.

20    Q.   Okay.  And -- and the very last one is B, D,

21 C, B minus, C; do you see that?

22    A.   I see it, yes.

23    Q.   And in contrast say to Xilinx on that very

24 same chip it was C, A, A, A, B; do you see that?

25    A.   I see it, yes.

1    Q.   And so what they told you was that the Xilinx

2  chip and digital display image post processing

3  applications was better than your chip, did they not?

4    A.   Based on this table, yes.

5    Q.   Okay.  All right.  Now, let me look at DX 52,

6  if I can just a moment, Mr. Vorbach, and if you'll find

7  that in your notebook.  And this is a letter that you

8  wrote the board, is it not?

9    A.   It is, yes.

10    Q.   And we asked you about this at your

11  deposition, and I believe you pegged this around 2005;

12  is that correct, sir?

13    A.   This is what I believe, yes.

14    Q.   Okay.  And your job at that time was being --

15  still being CTO?

16    A.   Yes.

17    Q.   Okay.  And you said before discussing what

18  happened the time between '01 and '04, our short

19  preamble is necessary.  I managed development of the XPP

20  architecture and design of the first chips from '97 to

21  2000.  Small team, limited tools; do you see that?

22    A.   Yes.

23    Q.   And then the next paragraph says:  After the

24  former CEO, is it Kreutler --

25    A.   Kreutler.

1    Q.   -- was accused of mismanagement, the board

2    felt I was also guilty for whatever reasons.  Surely

3    I've been pushing the team extremely hard, with the

4    given success which was not acknowledged at all.

5    Formally I became an officer of the company but with no

6    responsibilities.  My sole responsibility remained on

7    patents.  I cannot withstand to say this may be the only

8    thing we did right in the time frame which may pay off.

9         Is that what you said?

10        And then you said --

11   A.   I --

12   Q.   -- down here where it says the -- the -- let

13   me go to the chip project.  We can go back to Siemens

14   later.  The chip specifications did not fit any

15   customers' requirements, not even Siemens.  It did not

16   support sequential processing.  External DPSs (sic) were

17   required -- DSPs were required, which did not even

18   interface and integrate well.  The infrastructure was

19   proprietary.  The protocols complicated and badly

20   defined.  No standard bus structure was implemented.

21   With the given specifications, the chip was absolutely

22   useless for any product, not even for prototyping.

23        Is that what you wrote, Mr. Vorbach?

24   A.   Yes, this is my opinion.

25   Q.   And that was true, wasn't it?

1    A.    This is my opinion, yes.

2    Q.    Okay.  Well, your opinion was that the chips

3 up to 2005, at least, were absolutely worthless; is that

4 right?

5    A.    No.

6    Q.    Okay.  Did you say the chip was absolutely

7 worthless for any product, not even for prototyping?

8    A.    The XPP 64, yes.

9    Q.    All right.  Accordingly, the development board

10 was far too complex.  Even Accent was unable to get the

11 chips interfaced and efficiently up and running.  And

12 additionally the board's capabilities were limited to

13 software defined radio and even worse, the Siemens

14 laboratory equipment it was useless for any other

15 customer.  It was observed to manufacture the chip was

16 with STMicro, you see that?

17    A.    Yes.

18    Q.    In the end we got less than 10 good chips out

19 of a multimillion Euro project.  And would have to spend

20 another 250,000 K Euro for another wafer run; is that

21 right?

22    A.    This is correct, yes.

23    Q.    Development boards were too unstable,

24 complicated and limited for any customers development or

25 testing purposes, right?

1      A.    Yes.

2      Q.    The project was lousily managed; is that

3 right?

4      A.    I missed the line.

5      Q.    And -- an unfortunately you wrote I was just

6 the bad guy the company; is that right?

7      A.    You lost me, sorry.

8      Q.    That's okay, Mr. Vorbach.  Your self-analysis

9 in 2005 at least was that up until that time, certainly

10 your chip project had been a failure.  Had it not?

11      A.    Yes.

12      Q.    Okay.  Now, was there ever a time when you met

13 with Xilinx, having seen their technology, that you ever

14 accused them of infringing your -- your patents?

15      A.    As said, I never have seen their technology as

16 it was.  It was -- I had a misconception then.

17      Q.    Yes.  My question was different.  Did you ever

18 accuse them, you or Mr. Weber or any engineer at PACT,

19 anybody ever accuse them after spending five years with

20 them and seeing their technology, not just having an

21 understanding, but seeing their technology, did you ever

22 accuse them of infringement?

23      A.    Again, we didn't see the technology the way it

24 was.

25      Q.    You couldn't see those manuals on the

1 internet?

2     A.   I didn't.

3     Q.   Your engineers could and did?

4     A.   Yes.

5     Q.   And none of them called you up and said,

6 Martin, they're infringing, let's go talk to them, did

7 you?

8     A.   No, they did not.

9     Q.   First notice is when you sued them?

10     A.   Yes.

11         MR. BAXTER:  Thank you, Mr. Vorbach.  I

12 appreciate your attention, sir.

13         THE WITNESS:  Thank you.

14         REDIRECT EXAMINATION

15 BY MR. GRINSTEIN:

16     Q.   I just have a few follow-up questions for you,

17 Mr. Vorbach.  During his cross examination of you, Mr.

18 Baxter, do you recall him asking you a bunch of

19 questions about the differences between your product

20 design and the Xilinx products; do you recall those

21 questions?

22     A.   Yes, I do.

23     Q.   Were you asked any questions about the

24 differences between your patent claims and the Xilinx

25 products?

1    A.    Not at all.

2    Q.    There was some discussion which I don't feel

3    like full explanation was given of about coarse grained

4    versus fine grained.  Can you explain in your

5    terminology what your understanding of fine grained and

6    coarse grained were?

7    A.    Okay.  Fine grained are small, little

8    configurable elements which can mainly do simple

9    functions.  Coarse grained are larger more complex

10   elements which can be configured to do complex functions

11   or complete, how shall I say, can be a complete part of

12   a function by themselves.

13   Q.    And what is your -- what was your

14   understanding of what Xilinx's FPGA technology was?

15   A.    I thought they are fine grained.

16   Q.    And your bus interface technology, is that

17   fine grained or coarse grained?

18   A.    Coarse grained.

19   Q.    So just to be clear, you thought Xilinx was

20   fine grained, your technology on the bus was coarse

21   grained; is that your testimony?

22   A.    Yes.

23   Q.    Let me see if there's anything you wrote that

24   confirms this.

25             MR. GRINSTEIN:  Can we look at PX 468?

1      Q.   (By Mr. Grinstein)   In the middle of PX 468,

2  there is an e-mail dated September 2003; do you see

3  that?

4      A.   Yes, I do.

5      Q.   And this is an e-mail from you to Ivo Bolsens;

6  is that right?

7      A.   Correct.

8      Q.   What do you say in the second paragraph?

9      A.   We should figure out whether a corporation on

10  any level between Xilinx and PACT would make sense.

11  PACT believes that a combined device having Xilinx's

12  fine grained structure and PACT's coarse grained array

13  could be positioned very successful at the market.

14      Q.   What was the mistake that you'd made about

15  Xilinx?

16      A.   My understanding was they are traditional fine

17  grained technology.

18      Q.   Did Mr. Bolsens or Dr. Bolsens e-mail you back

19  after this and say, whoa, you're mistaken, we're

20  actually coarse grained, too?

21      A.   No, never.

22      Q.   So what impression did that leave in your mind

23  about how Xilinx's products worked?

24      A.   I thought my impression was correct.

25      Q.   Let's take a look at another exhibit, DX 693.

 1   DX 693 is an e-mail -- what -- describe who's on these

 2   e-mails, please.

 3        A.   On this e-mail is Peter Weber, me, and

 4   Christian Schattenmann.

 5        Q.   Okay.  And what's the date of this particular

 6   e-mail?

 7        A.   It's August 3rd, 2005.

 8        Q.   Okay.  What do you say in the second

 9   paragraph?

10        A.   To process any logic operation, FPGAs require

11   a significant amount of overhead, at least approximately

12   20 to 30 times in terms of gates, which is an implicit

13   problem of all fine grained configurable architectures.

14        Q.   What do you say in the next one?

15        A.   As PACT is much more coarse grained, this

16   overhead is significantly less, less than 10.

17        Q.   So what does this e-mail say about what your

18   thinking was in 2005 about how Xilinx products operated?

19        A.   I still believe they were fine grained.

20        Q.   Were you mistaken?

21        A.   I was, yes.

22        Q.   Now, I'd like to take a look at DX 900.  This

23   is the e-mail that was put in front of you during cross

24   examination, and if we can go to the last page of DX

25   900, please.  And we were discussing, if you remember on

1  cross examination, the statement that Professor

2  Hartenstein had made to you, and said:  Do you remember

3  when we discussed in addition I recommend that you learn

4  about everything that Xilinx offers on its chips in

5  order to make things easy for the user.  Do you see

6  that?

7      A.   Yes, I see -- I see that.

8      Q.   Did you follow his advice?

9      A.   No, I did not.

10     Q.   Let's see what his advice was in the context

11  of.

12          MR. GRINSTEIN:  Can you bring it down a

13  little bit, Mr. Boles?

14     Q.   (By Mr. Grinstein)  What do you write in this

15  particular e-mail to Mr. Hartenstein?

16     A.   I say hello, Reiner.  The meeting with Ivo

17  Bolsens has been set.  We are meeting on the 24th in the

18  morning.  Thank you very much -- thanks very much.

19     Q.   Is that the September 24th, 2002 meeting that

20  you and I discussed on direct?

21     A.   Yes, it is.

22     Q.   And did I provide you a copy of the PowerPoint

23  that you gave to Xilinx during that meeting --

24     A.   You did.

25     Q.   -- during your direct?

1      A.    You did, yes.

2      Q.    Let's look at that PowerPoint, DX 1410.  Is DX

3   1410, which is in your books up there -- your book up

4   there --

5      A.    It's --

6      Q.    -- your book up there --

7      A.    -- it's okay, I can see.

8      Q.    Well, I actually want you to look at it in the

9   book, please, Mr. Vorbach, if you wouldn't mind.  It's

10  in book number two.  That is DX 1410, and so this -- is

11  this the presentation coming from the September 24th

12  meeting that you were discussing with Professor

13  Hartenstein?

14     A.    Yes, it is.

15     Q.    In that entire document, do you mention Xilinx

16  once?

17     A.    I don't think so.

18     Q.    So what does this say about whether or not you

19  followed Professor Hartenstein's September 2002 advice

20  to investigate Xilinx?

21     A.    I did not do it.

22     Q.    In fact, can we go back to that Hartenstein

23  e-mail, DX 900?

24              MR. GRINSTEIN:  And couple pages, please,

25  Mr. Boles, and I want to see what date -- one page

1  ahead.

2      Q.   (By Mr. Grinstein)   What was the date that

3  Professor Hartenstein had written you that e-mail?

4      A.   This was September 7th, 2002.

5      Q.   So a couple of weeks before the Xilinx

6  meeting?

7      A.   Yes.

8      Q.   Let's go back to DX 1410.

9      A.   Okay.

10     Q.   What is the date on the bottom of the document

11  of the second page of DX 1410?

12     A.   It is July 27th, 2002.

13     Q.   So had you updated this document between July

14  27th, 2002 and when you met with Xilinx in September

15  24th, 2002?

16     A.   No, as I would have changed the date.

17     Q.   So what does that tell you about whether or

18  not you followed his advice to investigate Xilinx's

19  products?

20     A.   I obviously did not.

21     Q.   We had a lot of conversation -- I heard a lot

22  of conversation about DX 49.

23              MR. GRINSTEIN:  Can we put that up,

24  please, Mr. Boles?

25     Q.   (By Mr. Grinstein)  And there was a

1   conversation about how you had in your hands a Xilinx

2   DSP48 manual; do you remember that?

3        A.   Yes, I do.

4        Q.   And it was about DX 49?

5        A.   Yes.

6        Q.   DX 49 is from what company?

7        A.   Synplify.

8        Q.   Is --

9        A.   Synplicity.

10       Q.   -- is Synplicity Xilinx?

11       A.   No, it is -- it is a synthesis company.

12       Q.   Is DX 49 even a Xilinx document?

13       A.   No, it is not.

14       Q.   So does DX 49 prove to -- prove that you had

15   in your hand that Xilinx DSP48 manual in any way?

16       A.   No, it does not.

17       Q.   Now I want to talk to you about the BDTi

18   report.

19              MR. GRINSTEIN:  Can we look at the BDTi

20   report, DX 47?

21       Q.   (By Mr. Grinstein)  This is that BDTi report,

22   right?

23       A.   Yes, it is.

24       Q.   Okay.  Turn with me to the third page which is

25   788603.  And in the first paragraph of the third page,

1  tell me which product or which chip design was the BDTi

2  firm investigating.

3      A.   They are obviously evaluating the XPP II

4  architecture.

5      Q.   Okay.  Let's go -- and did the BDTi report

6  constitute an evaluation of the XPP III architecture?

7      A.   There were some evaluations in it.

8      Q.   Is the whole report about the II or the III?

9  All those grades, all those grades that were shown were

10  those grades for the II or were those grades for the

11  III?

12      A.   All they were for II, only for the II.

13          MR. GRINSTEIN:  Can I see Demonstrative

14  6, Mr. Boles?

15      Q.   (By Mr. Grinstein)  And just so we're clear

16  about this, there was a first generation of a PACT

17  technology, a second generation of PACT technology and a

18  third generation of PACT technology.  Which generation

19  did the BDTi report Evaluate?

20      A.   Only the second one.

21      Q.   Okay.

22          MR. GRINSTEIN:  Now, can we also look at

23  DX 52?

24      Q.   (By Mr. Grinstein)  DX 52 is this e-mail or

25  this document that was also shown to you during cross

1  examination, right?

2      A.   Yes.

3      Q.   And it's discussing Siemens and this chip

4  project and all that sort of stuff, right?

5      A.   Yes.

6      Q.   Which generation of your technology are you

7  talking about here?

8      A.   The XPP II.

9      Q.   So in either the BDTi report or this document,

10 are you crit -- are you experiencing criticism, seeing

11 criticism of XPP III?

12     A.   No.  No, not at all.

13     Q.   Now, I want to talk to you about what you were

14 trying to promote to Xilinx.

15             MR. GRINSTEIN:   Let's take a look at DX

16 1413.

17     Q.   (By Mr. Grinstein)  DX 1413, is this a

18 presentation that PACT made to Xilinx?

19     A.   Obviously, yes.

20             MR. GRINSTEIN:   Turn to the second page.

21     Q.   (By Mr. Grinstein)  What is the date of DX

22 1413?

23     A.   It is the 1st of September 2003.

24     Q.   And what was the date of the BDTi report?

25 That's DX 47.  It's up there on the screen.

1    A.   Okay.  October 22nd, 2004.

2    Q.   So that presentation we were just talking

3 about was a year before the BDTi report?

4    A.   Yes.  Yes.

5    Q.   Let's talk about what you were promoting to

6 Xilinx a year before the BDTi report.  Turn to Page 45

7 of this report.  Page 45 of the report is a graph.  Can

8 you tell us what this graph shows?

9    A.   Yes, we are comparing here the gate count of

10 the XPP II architecture versus the gate count of the XPP

11 III.  And you can see that the XPP III architecture

12 requires much fewer gates than the XPP II which means in

13 terms of gate count, the XPP III is far superior.

14   Q.   So were you telling Xilinx in 2003 that the

15 XPP II is great and they should buy that?

16   A.   No, we'd rather tell them to buy the XPP III.

17   Q.   Let's look at another page.  Go to the next

18 page of this presentation.  This one talks about power

19 dissipation.  What does this chart, which you showed to

20 Xilinx in 2003, say about the power dissipation of your

21 two designs?

22   A.   It says that the XPP II has about three times

23 more power dissipation than the XPP III.

24   Q.   And was that a way of promoting XPP II to

25 Xilinx?

1      A.   Certainly not.

2      Q.   Would Xilinx want to buy XPP II after you just

3  told them that XPP III is a lot better?

4      A.   They would rather buy the XPP III, the better

5  product.

6      Q.   Let's look at the next page of the

7  presentation.  What does this page tell Xilinx about XPP

8  II versus XPP III?

9      A.   It says that the XPP III has about 10 times

10  better reconfiguration performance or it's 10 times

11  faster in terms of reconfiguration than the XPP II.

12     Q.   Again, is this an effort by PACT to convince

13  Xilinx to buy the XPP II?

14     A.   Certainly not, no.

15     Q.   As of the date of this document in 2003, was

16  PACT even trying to sell XPP II to Xilinx?

17     A.   No, we were clearly selling XPP III.

18     Q.   So what difference did it make to your

19  dealings with Xilinx that a year later this BDTi outfit

20  criticized a design that you weren't trying to sell to

21  Xilinx?

22     A.   It made no difference at all.

23          MR. GRINSTEIN:  No further questions.

24          MR. BAXTER:  Can I have just a few

25  questions, Your Honor, just on that topic?

1          THE COURT:  No, I think we're just going

2  to go with direct and redirect and just -- just one shot

3  at cross.  You can just know you would have had more

4  questions if you had the opportunity.  You step down,

5  Mr. Vorbach.

6          THE WITNESS:  Thank you.

7          THE COURT:  Who's your next witness, Mr.

8  Grinstein.

9          MR. GRINSTEIN:  Your Honor for our next

10  witness we call Mr. Peter Weber.

11          THE COURT:  Mr. Weber, if you'd -- Mr.

12  Weber you can come up to the witness stand up here --

13          THE WITNESS:  Yes.

14          THE COURT:  -- and be sworn.

15          (Witness sworn.)

16          MS. GODFREY:  Your Honor, may I approach?

17          THE COURT:  You may.

18      PETER WEBER, PLAINTIFF'S WITNESS, SWORN

19             DIRECT EXAMINATION

20  BY MS. GODFREY:

21    Q.   Please state your name for the jury?

22    A.   My name is Peter Weber.

23    Q.   Mr. Weber, what is your relationship with

24  PACT, the Plaintiff in this case?

25    A.   I am the Chairman of the Board of Directors of

1   PACT XPP.

2       Q.   Let's talk a little bit about your background,

3   Mr. Weber.  Where were you born?

4       A.   I was born in Frankfort, Germany.

5       Q.   And do you still live in Germany?

6       A.   No, I don't.  I spent most of my professional

7   life and career in the United States of America.

8   Actually I'm an American citizen since about 2007.

9       Q.   And do you still have a German passport?

10      A.   No.

11      Q.   Please describe your education for the jury?

12      A.   I'm a communications engineer by education.

13      Q.   And how long have you worked in the high-tech

14  industry, Mr. Weber?

15      A.   It's more than 40 years now.

16      Q.   How did you begin your high-tech career?

17      A.   I worked as a design engineer at a German

18  telecommunications company, and that followed by an

19  activity as a sales engineer for Texas Instruments in

20  Germany and then sales manager for company called

21  Signetics for Central Europe.

22      Q.   And where did you go after Texas Instruments

23  and Signetics?

24      A.   I was recruited by Intel in Europe as one of

25  their early employees in Europe.

1    Q.   And did you have any significant

2  accomplishments with Intel?

3    A.   One of my first activities was to create a

4  relationship between Siemens and Intel resulting in a

5  cooperation between the two companies and the fact that

6  Siemens became a major customer for Intel and also a

7  distributor and partner for development of

8  semiconductors.

9    Q.   And what was your next role at Intel?

10   A.   In 1983, Intel asked me to come to the U.S.

11 and take over as their director of marketing for the MOA

12 division.

13   Q.   And how long total were you at Intel?

14   A.   About 10 years.

15   Q.   And what did you do next?

16   A.   After Intel, I was recruited by a company

17 called Siliconix in California as vice president of

18 marketing.

19   Q.   And were you promoted at Siliconix?

20   A.   Yes.   In 1987 I was promoted as executive vice

21 president and became a member of the board of directors

22 of Siliconix.

23   Q.   And what did you accomplish at Siliconix?

24   A.   We focused on the power management for a group

25 of appliances and became the leading supplier for those

1  activities.

2      Q.   And what was next for you after Siliconix, Mr.

3  Weber?

4      A.   After Siliconix, I became general manager of a

5  company called Temic in Germany.

6      Q.   And what is the Temic Group?

7      A.   The Temic Group is -- was founded by -- by

8  Daimler Benz, the manufacture of the Mercedes Benz

9  automobiles, and it consolidated all of the high-tech

10 activities of Daimler Benz in one group.

11     Q.   And after the Temic Group, what did you do?

12     A.   After the Temic Group I moved back to the

13 United States and cofounded a company by the name of

14 Netro in the telecommunications area.

15     Q.   And was Netro successful?

16     A.   Netro was very successful, and we went public

17 in 1999, and we're a major player in the liberalization

18 of the telecommunication market for various

19 applications.

20     Q.   What are you doing these days, Mr. Weber?

21     A.   I'm an angel investor in the high-tech

22 industry.

23     Q.   And what is an angel investor?

24     A.   An angel investor is arranging financing and

25 support for young startup companies and guides them in

1  their activities.

2      Q.    And what young startup companies have you

3  worked with besides PACT?

4      A.    At this point in time, I'm chairman of a

5  company in San Francisco by the name of Appcentral.  I'm

6  chairman of a company named Hyperion.  I founded a

7  company named Ceentek.  And beyond that, I'm serving on

8  the board of a publicly traded company named Dialog

9  Semiconductor.

10     Q.    So is it safe to say that you have a lot of

11 experience helping startups like PACT get off the

12 ground?

13     A.    I would say so.  Yes.

14     Q.    Mr. Weber, we heard earlier from Mr. Vorbach.

15 When did you first meet Mr. Vorbach?

16     A.    I met Mr. Vorbach towards the end of 2002,

17 about October 2002.

18     Q.    And does Mr. Vorbach work with you at any of

19 those other companies you mentioned a moment ago?

20     A.    Yes.  At this point in time, we both work for

21 PACT and also for Hyperion.

22     Q.    Mr. Weber, when did you first join PACT?

23     A.    I officially joined PACT in January of 2003 as

24 a member of the Board of Directors.

25     Q.    And when did you become Chairman of the Board

1    of Directors?

2        A.   In the very same meeting in January.

3        Q.   Mr. Weber, have you had any other roles at

4    PACT?

5        A.   Yes.  In 2004, about mid-2004, I took over as

6    the acting CEO of PACT.

7        Q.   And what did it mean to be the acting CEO?

8        A.   I did not consider it a full-time job at this

9    point in time, and I didn't -- did not expect it --

10   expecting it to last forever, and so I considered myself

11   the acting CEO.

12       Q.   Please take a look at DX 914, if you would,

13   Mr. Weber.

14       A.   Yes.

15       Q.   And I'll put -- direct you to the second page.

16   Can you tell us what this is?

17       A.   It's an agreement between myself and PACT XPP.

18       Q.   And you can look at the screen, if that's

19   easier.

20       A.   Okay.  Thank you.

21       Q.   Does this agreement include a salary?

22       A.   Yes, it does.  It states a salary of 3,800

23   Euro per month for my services.

24       Q.   I'm sorry.  Did you say 3,000?  Is that what

25   the --

1      A.    Sorry.  13,800.

2      Q.    And about how much is that in U.S. dollars, if

3 you --

4      A.    About 20,000, depending on the exchange rate.

5      Q.    And did you accept that salary of 20,000 per

6 month?

7      A.    No, I did not at this point in time.  I really

8 felt -- you know, young companies are always short on

9 cash, and I did not want to become a further cash strain

10 for the company, and I had further means of income at

11 this point in time.

12      Q.    Mr. Weber, did you ever invest any of your own

13 money in PACT?

14      A.    Yes, I did.  I invested in the range of

15 400,000 U.S. dollars in the company.

16      Q.    And do you still have that investment today?

17      A.    Unfortunately not.  It was so-called washed

18 out in the refinancing of the company in 2008.

19      Q.    And what happened during that refinancing in

20 2008?

21      A.    The company needed additional funding, and the

22 investors, you know, that came in wanted to make sure

23 they had the majority in ownership of the company and

24 requested that the owners so far would basically be

25 washed out.

1    Q.    Mr. Weber, do you expect to be paid by PACT if

2    PACT becomes profitable?

3    A.    Yes, I do.

4    Q.    And how would that work?

5    A.    I have what is called a profit-sharing

6    agreement with the company, so as soon as the company

7    generates some return in profit, I would be compensated.

8    Q.    So would that agreement, that profit-sharing

9    agreement, would that apply to any damages award that

10   PACT might receive as a result of this lawsuit?

11   A.    This would be included.  Yes.

12   Q.    But as of today, Mr. Weber, have you ever

13   received a single dollar of compensation from PACT?

14   A.    No, I have not.

15   Q.    Mr. Weber, you mentioned that you yourself

16   invested a significant amount of your own finances in

17   PACT.

18        Does PACT have other investors?

19   A.    Yes.  We certainly had and have other

20   investors, and it was a total investment over the years

21   of about 45 million U.S. dollars into the company.

22   Q.    Mr. Weber, what were your responsibilities as

23   acting CEO of PACT?

24   A.    I set the strategic direction for the company.

25   I worked out the -- you know, the basic business plan

1  with the team, and I looked after the marketing

2  direction and the sales direction of the company.

3      Q.   So let's be clear, Mr. Weber, you personally

4  have a technical background, but at PACT, have you

5  served in a technical role or a business role?

6      A.   Certainly not in a technical role but as a

7  manager on the business side.

8      Q.   And has that been true for most of your

9  professional career?

10     A.   Yes.  Since I joined Texas Instruments as a

11  salesperson, my technical knowledge has been limited.

12     Q.   Mr. Weber, what markets was PACT interested in

13  when you first joined the company?

14     A.   In the multiple markets the company looked at

15  at this point in time, but it was mainly the -- the

16  mobile marketplace that developed very strongly.  And so

17  the company looked at mobile end-use systems, basically

18  mobile phones, and also at the same time at the

19  infrastructure for mobile systems.

20     Q.   So how would mobile phone companies have used

21  PACT's technology?

22     A.   They would create an implementation of the

23  PACT technology for application in their systems.

24     Q.   Mr. Weber, when PACT thought about licensing

25  out its technology, did it have specific payment terms

1  in mind?

2      A.   Oh, yeah, very much so.  And the -- basically

3  had payment terms that included an upfront license fee

4  and it included royalties.

5      Q.   And what range of upfront license fee were you

6  interested in?

7      A.   Upfront license fee, depending on the

8  complexity of the product, the size of the product,

9  we're in the range of $500,000 to about 1.5 million.

10  Royalties also, again depending on the complexity of the

11  product, the size of the product, would be in the range

12  of 3 percent to 7 percent approximately.

13      Q.   Mr. Weber, what kinds of companies was PACT

14  interested in partnering with when you first joined

15  PACT?

16      A.   At this point in time, PACT was actively

17  involved in a project with Siemens.

18      Q.   So is it safe to say that PACT was focused

19  more on the European market when you first joined?

20      A.   This was one of the problems I saw from my

21  perspective that the company was very European-centric

22  and missed out on the worldwide marketplace.

23      Q.   So you mentioned Siemens.  Tell us a little

24  bit more about PACT's relationship with Siemens when you

25  first joined.

1          A.    PACT was in a very comprehensive technology

2    evaluation with Siemens at this point in time, including

3    the design of a development board, including a chip that

4    was designed.   And Siemens actually provided this offer

5    for that.

6          Q.    And, again, where did this project take place?

7          A.    In Germany and Europe.

8          Q.    Was Xilinx involved in that project with

9    Siemens in any way?

10         A.    I -- I wouldn't call it involvement because

11   the chip used the -- the development board included one

12   or two, yes.

13         Q.    And did PACT ultimately license its designs to

14   Siemens?

15         A.    No, it did not come to that.

16         Q.    Did PACT have any other initial success

17   finding potential partners in licensing out its

18   technology?

19         A.    Well, you know, one very successful activity

20   certainly is the relationship with Astrium in Germany.

21         Q.    Can you remind us what Astrium is?

22         A.    Astrium is one of the leading satellite

23   manufacturers in the world.   They're actually only two

24   in Europe, and Astrium is in the forefront.

25         Q.    And what project, very briefly, did PACT

1  discuss with Astrium?

2      A.   We discussed the -- the use of the XPP

3  technology to enable the communication between the base

4  station and the satellites.

5      Q.   And would that have involved PACT products

6  being launched into space?

7      A.   Absolutely.

8      Q.   And, Mr. Weber, are you familiar, generally

9  speaking, with the terms of the license that PACT

10  granted to Astrium?

11      A.   Oh, yes.  Yeah.  The initial upfront license

12  fee is or was actually 1.2 million Euros or in the range

13  of about 1.7 million U.S. dollars, and a royalty per

14  chip in the range between $4,500 per chip, and later on,

15  when there was higher volume, in the range of about

16  $3,200, depending a little on the exchange rate, of

17  course.

18      Q.   And, Mr. Weber, please take a look at DX 194,

19  if you would, and I'll specifically direct you to

20  Section -- let's see -- I believe it's Section 7.2 --

21      A.   Okay.

22      Q.   -- sorry -- 7.1.

23      A.   Okay.  Where is it?

24          MS. GODFREY:  I think, Mr. Boles, if you

25  could go on to the next page.

1     A.    Okay.  7.1, yes.

2     Q.    (By Ms. Godfrey) That chart that's on the top

3  of that page, does this chart reflect the per-unit

4  royalty that you were talking about just a moment ago?

5     A.    Yes, it does.

6     Q.    And that's in Euros, correct, not --

7     A.    It is in Euros --

8     Q.    -- in U.S. dollars?

9     A.    -- yes.

10     Q.    Okay.

11     A.    So exchange rate about 1.3, an average,

12  between Euro and dollars.

13     Q.    Okay.  And, Mr. Weber, is the relationship

14  between PACT and Astrium still going on today?

15     A.    Yes, it is an ongoing relationship.  The chips

16  are developmentally designed at this point in time, and

17  we expect the first chips to go into space within about

18  12 to 15 months.

19     Q.    And when that happens, does PACT expect to

20  receive further payments from Astrium?

21     A.    Of course, yeah, outlined in the royalty

22  agreement.

23     Q.    Mr. Weber, let's talk for a moment about some

24  of the companies that showed interest in PACT's

25  technology after you joined PACT.

1  Could you name some of those companies, please?

2      A.   Sure.   They are companies like, you know,

3  Silicon Optix in Silicon Valley; people like Samsung in

4  Korea; Olympus in Japan; Intel and Xilinx.

5      Q.   Tell us about the project with Intel, if you

6  would.

7      A.   The initial project with Intel started around

8  2005 and they -- they're looking for an implementation

9  to handle multi-standard video-players.  So they looked

10  at an ability to combine HD TVs technology and Blu-ray

11  technology into one player, and they evaluate our

12  technology among others -- among actually 12 others at

13  this point in time.

14      Q.   And what was the outcome of that evaluation

15  with 12 other companies?

16      A.   We were, you know, winning the contest, so we

17  came out as number one; Intel much liked our

18  architecture.  The project, unfortunately, did not come

19  to fruition because the Intel Pentium processor at this

20  point in time could not handle some of the sequential

21  logic in the timeframe necessary for this application,

22  so the project did not materialize.

23      Q.   And did PACT get involved in the second

24  project with Intel?

25      A.   Yes, very much so.  Intel very much liked our

1  technology, and the project leader of this project

2  recommended us to his colleagues in Parsippany, New

3  Jersey, where they were looking at advanced

4  implementations for their server products.

5       Q.   And what was Intel trying to accomplish with

6  those advanced implementations for their server

7  products?

8       A.   Intel had -- or servers in general have a

9  basic problem that their utilization is very low, and

10  typically in the range of 16 to 20 percent only.  And

11  particular with the upcoming multimedia market where you

12  want to be able to have a voice, audio, video, images

13  and everything communicated, they needed to find a much

14  better solution and ultimately came to the conclusion

15  that we would be able to improve the performance by a

16  factor of 4, which means the load of 1 server to 80

17  percent.

18       Q.   So in other words, Intel believed that PACT's

19  technology could increase the efficiency of Intel's

20  servers by a factor of 4; is that correct?

21       A.   This is correct.

22       Q.   Did you and Intel discuss how PACT's

23  technology might interface with the Intel servers?

24       A.   Yes.

25            MR. ALPER:  Objection, Your Honor.  I

1  think this line of questioning is calling for some

2  hearsay testimony.

3           THE COURT:  I would admit that it sounds

4  like it might be headed there.  I don't think we're

5  there yet, but I'll -- I'll overrule the objection at

6  this point, but I will sustain it if we get that.

7           MS. GODFREY:  I'll take that under

8  advisement, Your Honor.

9           THE COURT:  All right.

10     Q.   (By Ms. Godfrey) What was your understanding

11  of how PACT's technology might interface with the Intel

12  servers?

13     A.   It would interface directly with the bus --

14  with the Intel bus structure.

15     Q.   And so did PACT ultimately create an interface

16  with the Intel bus structure?

17     A.   Initially, the problem was that the -- the

18  Intel structure was not an open bus.  It was an internal

19  activity, which was never specified in detail and which

20  was adjusted by Intel from time to time as they needed

21  it.  And so they wanted some logic in between.

22     Q.   And what was the logic that they wanted in

23  between?

24     A.   They asked us to use initially a Xilinx chip

25  as an interface between their software and our product.

1    Q.   So in other words, you needed some level of

2 cooperation from Xilinx to go forward with that Intel

3 project, correct?

4    A.   Yes, we did.

5    Q.   Let's talk about PACT's relationship with

6 Xilinx for a few minutes.  Mr. Weber, do you know

7 whether or not PACT had any face-to-face meetings with

8 Xilinx before you joined PACT?

9    A.   Yes, they did.

10    Q.   And did you yourself have any face-to-face

11 meetings with Xilinx?

12    A.   Yes.  I had my first meeting with Xilinx in

13 September of 2003.

14    Q.   And what was the purpose of that first

15 meeting?

16    A.   We were looking -- or let me start the other

17 way.  We always felt that the combination of

18 fine-grained technology and coarse-grained technology

19 would be very beneficial, and we were trying to explore

20 whether there was an ability to cooperate with Xilinx in

21 this activity.

22    Q.   And do you remember who was at that meeting

23 with Xilinx, the first one that you attended, in 2003?

24    A.   It was -- it was 2003, but I -- I -- there

25 were four -- there were, of course, two people on our

1  side, Mr. Vorbach and myself, and there were four people

2  on the Xilinx side.  There was a lady by the name of

3  Sholeh Diba.  There was Mr. Dan Gibbons.  There was a

4  Mr. Hwang and the other person -- I'm sorry; I can't

5  remember.

6      Q.   Do you know who set up that meeting on

7  Xilinx's side?

8      A.   The meeting was arranged by Dr. Bolsens, the

9  CTO.  And for some reason, he could not participate in

10  the meeting, but he arranged the meeting for us.

11      Q.   And what was the outcome of that 2003 meeting

12  that you attended?

13      A.   There was no specific outcome.  We had very

14  intense discussions.  We presented our technology and

15  our plans of our technology, and that was it.

16      Q.   Mr. Weber, did you contact Xilinx again at a

17  later date?

18      A.   We had further contacts later on.  That is

19  right.

20      Q.   And how did that come to be?

21      A.   As part of our financing activities, we were

22  talking to venture capital companies in Silicon Valley.

23  One of those venture capital companies was Intevest, and

24  the senior partner at Intevest is Mr. Phillip Gianos.

25  Mr. Phillip Gianos was also was a member of the board of

1  directors of Xilinx at this point in time.

2         And he was the one who motivated us to talk to

3  Xilinx, because he wanted to use the Xilinx experience

4  for his technical due diligence.  And he also wanted to

5  see whether there was an interest on the Xilinx side to

6  participate in this financing.

7      Q.   So as a result of that encouragement from Mr.

8  Gianos, did you, in fact, start talking with Xilinx

9  again in 2005?

10     A.   Yes, we did.

11     Q.   And did Xilinx show any interest in investing

12 in PACT?

13     A.   Yes.  We had multiple discussions.  We met

14 with members of their investment committee.  They had a

15 small investment committee of four people with the CEO,

16 Mr. Roelandts; Ivo Bolsens on the technical side as the

17 CTO; Mr. Hans Schwarz as the business development

18 person; and Mr. Kris Chellam, who was their Chief

19 Financial Officer at this point in time.

20     Q.   And did you have any meetings with Xilinx in

21 which they evaluated PACT's technology in 2005?

22     A.   Yes.  We had a multitude of meetings and very

23 intense discussions reviewing and benchmarking the

24 technology, evaluating the advantages, looking at

25 performance characteristics.  Very intense discussions.

1    Q.   And did you continue to have discussions with

2  Xilinx later in 2005?

3    A.   Yes.  Those discussions went on, and

4  eventually included also some other managers of Xilinx.

5  For example, Mr. Chris Dick, who at this point in time

6  was in charge of the digital sequence processing

7  architectures, participated in the meeting, among

8  others.

9    Q.   At some point after those meetings had been

10  going on for a while, did you approach Xilinx's CEO?

11    A.   Yes, I did.  Because I simply felt the

12  meetings were stretching out for too long, and I wanted

13  to make sure I had a direct interface with the CEO of

14  the company and understood myself how serious those

15  discussions were and whether there really was an

16  opportunity of either a corporation of any kind or some

17  kind of an investment at this point.

18    Q.   And did you make any points to the CEO about

19  PACT's technology when you contacted him?

20    A.   Well, we are both not very technical people at

21  this point in time, I must admit, but we basically

22  exchanged the data that was, you know, prepared for

23  Mr. Roelandts from his people and from -- and I

24  exchanged the data prepared from our people.

25         And the basic discussions we had was or

1  disagreement we had between the two sides was that

2  Xilinx made it the performance improvements of our

3  technology over theirs by a factor of three to four.  We

4  made it the performance improvements in the range of

5  seven to eight.  And we were at kind of an impasse, and

6  I wanted to make sure at least I had an opportunity to

7  exchange our thoughts on this level.

8       Q.   So what was the outcome of those discussions

9  with the CEO, Mr. Roelandts?

10      A.   Mr. Roelandts basically sent us back to

11 Dr. Bolsens for further discussions.

12      Q.   So did you have further discussions with

13 Dr. Bolsens at Xilinx?

14      A.   Yes.  Yes, we did have further discussions

15 with -- with Dr. Bolsens and then also including

16 Mr. Hans Schwarz.  Actually, I think we had -- I think

17 we had two more very intense discussions with those two

18 gentlemen with the target to bring the discussions to an

19 end, to come to a resolution, because it was going on

20 for a long time.

21      Q.   And then what happened?

22      A.   Well, we waited for some response, because it

23 was the outcome of the discussion that they said, okay,

24 we will have discussions and come back to you.  So we

25 waited.

1           And after some time, I was taking the

2    initiative and we contacted Mr. Schwarz, and, finally,

3    you know, got him on the phone and he told me that,

4    yeah, he finally had an opportunity to meet Dr. Bolsens

5    in the hallway, and they decided that they didn't want

6    to move forward with PACT.

7        Q.   Were you surprised by the way Xilinx

8    communicated with its decision to not move forward with

9    you?

10       A.   Surprised is probably understated.  I mean,

11   it's not the point that somebody is saying no.  It

12   happens all the time.  However, in the way it was

13   communicated after such intense, and in many ways,

14   frankly discussions, for me was absolutely unbelievable.

15   It never happened to me in my life.

16       Q.   So it wasn't typical of the way that a Silicon

17   Valley firm would typically say no then?

18       A.   Some people may have the impression that

19   Silicon Valley is a very tough environment, but it's a

20   very friendly environment simply because we know each

21   other in many ways over many years, and we treat each

22   other with courtesy.

23       Q.   So after Xilinx terminated the discussions

24   with PACT, did you have any further communications with

25   Xilinx?

1      A.   Yes.  I wrote an e-mail to Mr. Schwarz.  I

2  also wrote an e-mail to Mr. Bolsens, and ultimately also

3  wrote a letter to the president to Mr. Roelandts

4  himself.

5      Q.   Let's look at DX 183.  Mr. Weber, is this the

6  e-mail that you wrote to Mr. Schwarz?

7      A.   Yeah.  Yes.

8      Q.   And why did you write this e-mail?

9      A.   I just wanted to express my thinking, and --

10 in this contract and wanted to express my frustration at

11 this point in time, because I really felt we were

12 treated very poorly.

13     Q.   Let's look at DX 184.  Mr. Weber, is this the

14 e-mail that you wrote to Mr. Roelandts?

15     A.   It's actually a letter I wrote to

16 Mr. Roelandts at this point in time, yes.

17     Q.   And why did you write that letter?

18     A.   I wrote it to him, because Xilinx is taking

19 great pain to position themselves as a very ethical,

20 very fair, as an ideal company in Silicon Valley.  And I

21 felt the way we were treated as a company did not affect

22 that, and I wanted to make sure that the CEO at this

23 point in time understood that.

24     Q.   And at the time that you wrote this letter to

25 Mr. Roelandts and the e-mail to Mr. Schwarz, Mr. Weber,

1 were you thinking about taking legal action against

2 Xilinx?

3     A.   Not at all.

4     Q.   So around this time, were you still working

5 with Intel?

6     A.   Yes, very much so.

7     Q.   On that same project we were talking about a

8 moment ago?

9     A.   Yes.  Yes.

10     Q.   And do you recall how much longer you

11 continued working with Intel on that project?

12     A.   The project discussions went on into 2007.

13 They ultimately resulted in a license that we received

14 from Intel to allow our product to interface with the

15 front-side bus and was part of a three-party

16 relationship between -- spearheaded, of course, by Intel

17 but including PACT XPP and Xilinx.

18     Q.   Mr. Weber, in his opening statement Mr. Baxter

19 said that PACT had failed in the marketplace.

20     Do you remember hearing that?

21     A.   I heard that very well.

22     Q.   So when you were working with Intel in 2005,

23 2006, and 2007, did you feel like PACT had failed in the

24 marketplace?

25     A.   We were extremely proud that we were able to

1  convince the leading, the leading microprocessing

2  company in the world to team up with us.

3       And I would also like to point out that this

4  happened about two years after I took over as acting

5  CEO, and when you go back into the history of startup

6  companies, you will always find out that it takes

7  typically three years before a company is finding its

8  sweet spot in the marketplace.  And you have some

9  rejections before.  That is normal before you really

10 know who you are and what you are doing.

11     Q.   So during all this time, was Xilinx continuing

12 to cooperate on that Intel project?

13     A.   Yes, Xilinx cooperated.  It was a completely

14 different cooperation, I need to mention, that they

15 interface within this project.  And, yes, we had the

16 cooperation because we needed certain data from them.

17     Q.   So the people you were working with on the

18 Intel project were not the same people that you had been

19 speaking to earlier about the technology --

20     A.   Not at all.

21     Q.   Okay.

22     A.   Not at all.  Nothing to do with them.

23     Q.   So did the project with Intel come to

24 fruition?

25     A.   Well, unfortunately not, and because at some

1  point in time, Xilinx decided not to share any more

2  technical information with us.

3      Q.   And do you know why Xilinx decided not to

4  share any technical information with you?

5      A.   Xilinx decided to reduce that, because we had

6  found in the meantime that there may be infringement of

7  the Xilinx technology on our technology.

8      Q.   And so what did you do as a result of finding

9  that possibility of infringement?

10      A.   We went through a detailed evaluation of that

11  potential infringement, and then decided to file a

12  lawsuit.

13      Q.   So, Mr. Weber, let me make sure I understand.

14  It was after you filed a lawsuit against Xilinx that

15  they stopped sharing technical information with you that

16  you needed for the Intel project; is that right?

17      A.   That is right.

18      Q.   And that surprised you?

19      A.   Yes, it did, because from my point of view or

20  our point of view, the two activities are completely

21  unrelated.  On one hand, there was a potentially strong

22  business activity between Intel, Xilinx, and PACT.  And,

23  you know, on the other hand, there was a situation that

24  took place on the PACT side.

25      Q.   So is it unusual in your experience,

1   especially in Silicon Valley, Mr. Weber, that companies

2   with a business relationship might continue to maintain

3   that relationship even after one company sues the other

4   for patent infringement?

5   A.   It's -- it's virtually the standard.  We see

6   it every day, and I'm sure most people are familiar with

7   the litigation between Apple and Samsung, and at the

8   same time, you know, Samsung is the major supplier of

9   the processing unit and the display unit for Apple.  So

10  it's absolutely not unusual.

11  Q.   So what was the effect on PACT after that

12  Intel project fell through?

13  A.   It was -- of course, it was devastating.  You

14  know, we -- we had found our sweet spot.  We were

15  extremely happy and proud that we were where we wanted

16  to be and thought we really belonged, and, you know, we

17  could not continue this project.

18  Q.   Mr. Weber, did PACT ever sell any of the

19  projects that incorporated the technology reflected in

20  the patents-in-suit in the United States?

21  A.   No, we did not.

22  Q.   And did PACT ever offer for sale any such

23  products in the United States?

24  A.   No.

25  Q.   And did PACT ever import into the United

1   States any such products?

2        A.    We had no products to import.

3        Q.    Did PACT own other patents, aside from the

4   patents asserted in this lawsuit?

5        A.    PACT owns about close to 60 U.S. patents.   On

6   a worldwide basis, we have about 150, give and take, 1

7   or 2 patents.

8        Q.    And does PACT have other patent applications

9   pending?

10       A.    Yes.   We have about 45 patent applications

11  pending.

12       Q.    And, Mr. Weber, when you were in discussion

13  with companies like Intel or Siemens, did you share

14  information with them about PACT's designs?

15       A.    That was the nature of our relationship,

16  because we wanted them to take over our designs and

17  implement it in their chips.

18       Q.    And did those companies sometimes criticize

19  PACT's designs?

20       A.    Of course, depending on the application and

21  requirements, you know, it may have not be ideal for

22  certain applications.

23       Q.    And when you had conversations with those

24  companies, did you mention PACT's patents to them?

25       A.    Yeah.   We -- we really did that, because as a

1 young company, you want to build credibility and what

2 more can you show in credibility by showing your patent

3 portfolio, showing your knowledge and by showing that

4 you're innovative.

5     Q.   And did any of those companies with whom you

6 discussed PACT's patents ever criticize PACT's patents?

7     A.   No.

8     Q.   Thank you, Mr. Weber.

9           MS. GODFREY:  I pass the witness.

10           THE COURT:  Okay.

11           MR. ALPER:  Take care of a little

12 housekeeping upfront.

13           May I approach, Your Honor?

14           THE COURT:  Yes.

15           THE WITNESS:  Thank you.

16           MR. ALPER:  You bet.

17                 CROSS-EXAMINATION

18 BY MR. ALPER:

19     Q.   Good afternoon, Mr. Weber.  I think we first

20 met at your deposition in this case.

21     A.   Yes, we did.

22     Q.   And there you appeared for PACT as a corporate

23 representative; is that right?

24     A.   Yes.

25     Q.   And that meant that you were testifying in

1  your own personal capacity and you were also

2  testifying on behalf of PACT as a company, right?

3       A.   That is right.

4       Q.   Of course, you gave full, complete, and

5  accurate answers?

6       A.   Absolutely.

7       Q.   Now, there was a suggestion you saw the

8  opening statement that Mr. Grinstein made today; is that

9  correct?  You were here in the courtroom?

10       A.   Yes.  I was here for that.

11       Q.   There was a suggestion during Mr. Grinstein's

12  opening statement that Xilinx had copied PACT, but I

13  recall at your deposition, you testified to something

14  different.  And I just want to make sure that we can

15  clear this up.

16            At your deposition, you testified that you

17  weren't aware of any evidence that someone at Xilinx

18  used PACT -- PACT materials to develop any Xilinx

19  products; isn't that correct?

20       A.   That was correct at the time.  Yes.

21       Q.   Thank you.

22            You talked a little bit just a moment ago

23  about your compensation, your agreement with PACT.

24       A.   Yes.

25       Q.   And I just would like to discuss that for a

1  moment.  Your compensation is affected by the results in

2  this case; is that right?

3     A.   To a degree it is.  Yes.

4     Q.   So if PACT wins, you make money?

5     A.   I would make money.  Yes.

6     Q.   And if PACT loses, you don't get any money?

7     A.   It would stay as it is so far.

8     Q.   And, in fact, the more PACT wins, the more

9  money you get?

10     A.   This is true.

11     Q.   Okay.  Let's talk a little bit about the Intel

12  front-side bus project.

13     Now, you weren't in the room, but I took a

14  note here from Mr. Vorbach's testimony and he said -- he

15  testified that Xilinx declined to do a deal with --

16  with -- with PACT.

17     Now, isn't it true that Xilinx never refused

18  to do anything with respect to the Intel project that

19  impacted PACT's ability to make that happen?

20     A.   This is not true.

21     Q.   Okay.  Well, let's see if I can explore that a

22  little bit.

23     In order to develop the -- the XPP product

24  that PACT was working on with Intel, PACT needed a

25  license from Xilinx for a Xilinx reference design; is

1  that right?

2      A.    That is right.

3      Q.    And that license would have allowed PACT to go

4  forward with the Intel project.  That's your testimony?

5      A.    This is true.

6      Q.    And PACT -- it was your testimony that PACT

7  never -- or it's -- the import of your testimony is that

8  PACT never obtained a license for that Xilinx reference

9  design; is that right?

10     A.    This is right.

11     Q.    Now, Xilinx filed this lawsuit in late 2007,

12  right?  Is that correct?

13     A.    PACT filed the lawsuit in 2007.

14     Q.    I'm sorry.  Thank you for correcting me.

15  And prior to that filing of this lawsuit, Xilinx had

16  never refused PACT with respect to its reference

17  designs; isn't that right?

18     A.    No.  We cooperated.

19     Q.    They never said, no, you can't have a license;

20  you can't have the reference design; nothing like that?

21     A.    No.

22     Q.    Fully cooperative?

23     A.    Yes.

24     Q.    Okay.  Now, after PACT filed the lawsuit, PACT

25  never requested from Xilinx a license to the Xilinx

1  technology in order to finish the project; isn't that

2  right?

3       A.   No.

4       Q.   Is that incorrect?

5       A.   Yes.

6       Q.   Well, at some point after PACT filed this

7  lawsuit -- withdrawn.

8            It's your testimony that after filing this

9  lawsuit, PACT never requested from Xilinx a license to

10 Xilinx's technology in order to allow PACT to finish its

11 project with Intel?

12      A.   No.

13      Q.   So after filing this lawsuit, PACT never

14 requested from Xilinx a license to the Xilinx technology

15 to allow PACT to finish its project with Intel; isn't

16 that correct?

17      A.   We requested an ongoing relationship and

18 information.  Absolutely.

19      Q.   But you didn't answer my question.

20           After filing this lawsuit, PACT never

21 requested from Xilinx a license to the technology so

22 that it can complete its project with Intel; isn't that

23 correct?

24      A.   It's not correct.

25                 MR. ALPER:  Can you please play Clip 150?

```
 1                    (Video clip playing.)

 2                    QUESTION:  After filing this lawsuit, did

 3   PACT ever request from Xilinx a license to the Xilinx

 4   technology to allow PACT to finish its contract with

 5   Intel -- or finish the project with Intel?

 6                    ANSWER:  No.

 7                    (End of video clip.)

 8        Q.   (By Mr. Alper) Now, at some point after PACT

 9   filed this lawsuit, you attempted to contact Xilinx to

10   attain a license to the Xilinx technology for the Intel

11   project, but you were told, since the lawsuit had

12   already been filed, you had to go through the lawyers?

13        A.   The -- yes.

14        Q.   And -- and, of course, that makes sense,

15   because once a lawsuit is filed in the United States,

16   there are ethical rules that prohibit parties from

17   talking to each other directly, right?

18        A.   I'm not a lawyer, but it's probably right.

19        Q.   Right.  And so PACT's counsel would have had

20   to call Xilinx's counsel in order to try to make that

21   deal happen, once this lawsuit was filed; isn't that

22   correct?

23        A.   Again, I'm not a lawyer, so I cannot really

24   comment on that, but I assume it's correct.

25        Q.   Right.  It only makes sense, right?
```

1  And PACT's counsel has never attempted to contact Xilinx

2  to obtain a license from Xilinx in order to allow PACT

3  to finish that project; isn't that correct?

4       A.   This is true.

5       Q.   Let's turn to some of the communications

6  between PACT and Xilinx.  Now, one thing that seems to

7  be pretty clear is that PACT was pursuing Xilinx over

8  the two -- in the 2000s; isn't that correct?

9       A.   I made my statement earlier; it's not correct.

10      Q.   Well, okay.

11           When PACT first met with Xilinx, it was

12  because PACT reached out to Xilinx, right?

13      A.   Yes.

14      Q.   Xilinx didn't ask for that meeting.  It was

15  PACT who proposed the meetings, right?

16      A.   That is true.

17      Q.   And the first meetings came about, because

18  PACT was investigating potential customers for its XPP

19  technology; isn't that right?

20      A.   Yes.

21      Q.   And it decided that Xilinx could be a

22  potential customer?

23      A.   A customer and a partner.

24      Q.   Now, PACT reached out to Xilinx in around

25  the -- had some meetings in the 2002 timeframe; isn't

1  that correct?

2       A.   Yes.

3       Q.   And your -- well, let me withdraw that.

4  Mr. Vorbach was involved in some of those initial

5  meetings?

6       A.   Yes.

7       Q.   And those meetings kind of went through the

8  2002 timeframe into 2003, right?

9       A.   Yes.

10      Q.   But towards the fall of 2003, Xilinx declined

11  to adopt the PACT technology; isn't that right?

12      A.   The discussion just stalled, then ended.  Yes.

13           MR. ALPER:  Let's take a look at DX 1, if

14  we could pull that up, Mr. Diaz, and zoom in in the

15  lower half of the e-mail.

16      Q.   (By Mr. Alper) So if we look down at the

17  bottom, this is an e-mail from October 2003.  That's the

18  end of this first period, which I want to talk about

19  between you and Xilinx.

20           And it's an e-mail from Dr. Bolsens.  He's at

21  Xilinx, right?

22      A.   Right.

23      Q.   And it's to Mr. Vorbach, and what Mr. --

24  Dr. Bolsens says is:  After several internal

25  discussions, we concluded that Xilinx cannot license

1  your technology; isn't that right?

2      A.   Yes.

3      Q.   And he gives reasons for this.  He says:  This

4  decision is based on a continuous tradeoff we have with

5  respect to size of partner -- of the partner company,

6  effort to introduce the new technology, availability of

7  tools, potential benefit, et cetera, right?

8      A.   Right.

9      Q.   Now -- now, you'd agree that reasons like

10 that, like effort to introduce new technology

11 availability of tools, potential benefit, et cetera,

12 those are perfectly legitimate business reasons to

13 decide not to adopt someone's technology?

14     A.   Sure.

15     Q.   And PACT understood that at the time; isn't

16 that right?

17     A.   Yes.

18     Q.   If we go up to the top of the e-mail, we see

19 what Mr. Vorbach responded with, and he said, when he

20 responded to Dr. Bolsens:  I understand your position,

21 right?

22     A.   Yes.

23     Q.   And he copies you here?

24     A.   He does.

25     Q.   Because at this point, you've now joined the

1  company and you're coming online to all this stuff?

2      A.   Yes.

3      Q.   All right.  So at that point, Xilinx had

4  declined to license PACT's technology, right?

5      A.   Yes.

6      Q.   And they were kind of saying, respectfully, we

7  have legitimate business reasons that we'd like to go in

8  another direction, right?

9      A.   Yes.

10     Q.   But that's not the end of the story, right?

11     A.   It's not, no.

12     Q.   PACT came back for more, right?

13     A.   We were prompted to come back for more.

14     Q.   I see.

15          MR. ALPER:  Well, let's take a look at DX

16  162, please, Mr. Diaz, if you can display that.

17          And take a look at the bottom half of

18  this e-mail.

19     Q.   (By Mr. Alper) So this is now April 2005.  So

20  we've flashforwarded by about two years, and now you've

21  taken over at this point the primary role of

22  corresponding with Xilinx; is that right?

23     A.   Part of the communication, yes.

24     Q.   And here you're writing an e-mail now to

25  Dr. Bolsens and the subject is our meeting, Thursday at

1  5:00 p.m.; is that right?

2      A.   Yes.

3      Q.   Now, the -- the first line in this e-mail is:

4  Thanks for taking the time for talking to us, right?

5      A.   Yes.

6      Q.   It's PACT thanking Xilinx for taking time to

7  talk to PACT, right?

8      A.   I'm a polite person.

9      Q.   Yes.  But it's not Xilinx thanking PACT for

10  making time out of PACT's schedule to come to Xilinx; is

11  that right?

12      A.   It was my e-mail, so...

13      Q.   Well, I will admit that was a polite way to

14  start the e-mail.  Let's go on and see what you say down

15  below:  We would like to discuss the following topics

16  and issues.  And then you have a bullet point list for

17  kind of the agenda for the meeting, right?

18      A.   Yes.

19      Q.   And one of the items is potential cooperation

20  between Xilinx and PACT, right?

21      A.   Right.

22      Q.   You refer to Virtex-4, a general purpose

23  imaging processor, which you call Virtex-4 plus XPP,

24  right?

25      A.   Yes.

1    Q.    Now, Virtex-4, that's one of the chips that's
2    accused of infringement in this case, right?
3    A.    Yes.
4    Q.    And you're aware that what PACT is accusing in
5    this case isn't just the whole chip, the whole Virtex-4,
6    but it's specific features on the Virtex-4, right?
7    A.    Yes.
8    Q.    And the features like RocketIO, right?
9    A.    Yes.
10   Q.    And DSP48, you're familiar with that term;
11   that's another one of the features that PACT is
12   accusing?
13   A.    I've heard the term.  Yes.
14   Q.    And these are features that are on the accused
15   chips like the Virtex-4, right?
16   And isn't it the case -- so we go back to this
17   and what you're proposing here was you have a chip with
18   the Virtex-4 features, plus the features of XPP; isn't
19   that right?
20   A.    Yes.
21   Q.    And you kind of kept pitching this over the
22   coming months; isn't that right?  This kind of
23   combination of Virtex-4 plus PACT; is that right?
24   A.    Yes.  As mentioned before, the office felt
25   fine grain and coarse grain would cause --

1     Q.   Let's take a look at DX 165.  And here's

2 another e-mail from you to Dr. Bolsens, and this is now

3 in June 2005.  So this is a month or two later, right?

4     A.   Okay.

5     Q.   And here you're talking about another meeting

6 coming Monday, right?  And, again, you politely open the

7 meeting saying -- open the e-mail saying:  Thanks for

8 taking the time for meeting with Martin and me coming

9 Monday, right?

10     A.   Yes.

11     Q.   Martin refers to Mr. Vorbach?

12     A.   Mr. Vorbach, yes.

13     Q.   And this was a meeting you requested, right?

14     A.   Yes.

15     Q.   And if we look at the bottom of the e-mail,

16 you say -- one of the things you want to talk about is

17 you'd appreciate to talk to you and see what your

18 thinking is regarding the positions -- positioning of

19 our technology within Xilinx, right?

20     A.   Yes.

21     Q.   Now, in this second round of discussions,

22 Xilinx listened to you obviously, because you had a

23 number of meetings, but, once again, declined to adopt

24 the PACT technology; isn't that right?

25     A.   This is true.

1    Q.   I'm sorry?

2    A.   Yes, that's right.

3    Q.   Okay.  If we take a look at DX 171, please,

4  and let's look at the bottom half again, because this is

5  a double -- another one of these double e-mails.

6         So now we're in August 2005, right?  This is

7  another month or so later?

8    A.   Uh-huh.

9    Q.   And this is -- you're writing an e-mail to Wim

10  Roelandts.  Do you know who Mr. Roelandts is?

11    A.   Yes.  He is the CEO and President of Xilinx.

12    Q.   Okay.

13    A.   He was at this point in time.

14    Q.   That's right.  At this point in time,

15  Mr. Roelandts was the CEO of Xilinx.  And what you do

16  here is you're talking about an opportunity to further

17  discuss performance ratios between the Xilinx FPGAs and

18  the PACT XPP, right?

19    A.   Yes.

20    Q.   And that's because you're comparing the two to

21  show Xilinx that you thought yours matched up, right?

22    A.   We're actually better, not matched up.

23    Q.   Thought yours were better.  I'm sorry.  I

24  stand corrected.

25         And if we go to the top of this e-mail, here

1  we have for a second time Xilinx politely declining

2  PACT's invitation to combine their technology with

3  Xilinx; isn't that right?

4       A.   Yes.

5       Q.   And what Mr. Roelandts says is:  Thank you for

6  your persistence in analyzing the advantages of PACT --

7  PACT's XPP and Xilinx FPGAs, right?

8       A.   Yeah.

9       Q.   That's what he says?

10      A.   Yeah.

11      Q.   And he goes on to say:  Considering all your

12  feedback, I still believe that PACT XPP -- and here I

13  think there's a typo here, so I'm going to read it as it

14  is actually written, and I'm going to ask you how you

15  understood it.

16           He says:  Considering all your feedback, I

17  still believe that PACT XPP, given enough of an

18  advantage to consider it to be adopted by Xilinx.

19  Did you understand Mr. Roelandts to mean I still believe

20  that PACT's XPP does not give enough advantage to

21  consider it to be adopted by Xilinx?  Is that the import

22  of his e-mail?

23      A.   He didn't think the advantage was big enough

24  to justify an activity.

25      Q.   That's right.

1            And what he goes on to say is -- if you kind

2   of look down the line a little bit, he says:  Unless Ivo

3   becomes convinced, I am not going to change my mind on

4   this; is that right?

5       A.    This is right.

6       Q.    And when he talks about Ivo, he's talking

7   about Dr. Bolsens?

8       A.    Yes.

9       Q.    And what he means is, unless Dr. Bolsens

10  becomes convinced that Xilinx should adopt the PACT

11  technology, he's not going to change his mind; is that

12  right?

13      A.    Yes.

14      Q.    And at this point in time, Dr. Bolsens didn't

15  think the performance advantage that XPP provided was

16  enough to warrant adopting it into PACT's technologies

17  at Xilinx; is that right?

18      A.    Yes.

19      Q.    All right.  Now, that there, in August 2005,

20  that still wasn't the end of the story with -- between

21  Xilinx and PACT, right?

22      A.    Yes.

23      Q.    There was another round of meetings and

24  discussions that -- discussions that occurred after that

25  time that Xilinx declined to adopt PACT's technology; is

1  that right?

2       A.   Yes.

3                 MR. ALPER:  Let's take a look at DX 56.

4       A.   Please say it again.  DX 56?

5       Q.   (By Mr. Alper) DX 56, yes.  I apologize.

6       A.   Okay.

7       Q.   And this time around, PACT, in addition to

8  other things, was seeking investment from -- seeking

9  to -- was asking Xilinx to be an investor in PACT; am I

10 right?

11      A.   Give me just a minute to read the e-mail,

12 please.

13      Q.   Sure.  Well, I'll read it with you.  This is

14 an e-mail from yourself to Dr. Bolsens.  Now we're in

15 May 2006, so we've jumped about eight or nine months

16 ahead.

17      A.   Right.

18      Q.   And here you say:  I would like to follow up

19 on our recent discussions and confirm that we are very

20 interested in Xilinx as an investor in our upcoming

21 investment round, right?

22      A.   This is true.

23      Q.   So at this point, you're asking Xilinx -- you

24 need more money from them to invest in PACT?

25      A.   Yes.

1    Q.   Okay.  And the fact is, though, that Xilinx

2 still didn't see a fit; isn't that correct?

3    A.   Yes.

4    Q.   Okay.

5    A.   That was the outcome.

6    Q.   If we look at DX 182, once again -- now for a

7 third time, Xilinx politely declines PACT's offers to --

8 to have a relationship with Xilinx; isn't that right?

9    A.   Yes.

10    Q.   So here we see -- and this is now from Hans

11 Schwarz.  Who is Mr. Schwarz?

12    A.   Mr. Schwarz was the Director of Business

13 Development at Xilinx at this point in time.

14    Q.   Okay.  And this is an e-mail to you, copying

15 Dr. Bolsens, right?

16    A.   Yes.

17    Q.   And now we're in July 2006, right?  And what

18 he says is:  Your technology, although different, is yet

19 another new, complex multiprocessor solution a startup

20 is trying to develop.  We have seen several, right?

21    A.   That's what he's saying.  Yes.

22    Q.   And then if we go down below.  He says:  We

23 believe your proposed solution is too risky, plus the

24 synergy with Xilinx is minimal at this point.  As such,

25 we prefer to watch from the sidelines for now; is that

1  right?

2      A.   That's right.

3      Q.   Now, you followed up with Xilinx after this

4  third rejection; isn't that right?

5      A.   Yes, I did.

6      Q.   And if we could -- you sent actually a couple

7  different e-mails.  The first one we just saw.  You were

8  discussing in your direct testimony --

9              MR. ALPER:  Let's put it up.  It's

10 DX 183, and let's zoom in about the top half.

11             Yeah, that's good.

12     Q.   (By Mr. Alper) This is an e-mail that you sent

13 to Mr. Schwarz, responding to him.  Now we're in August

14 of 2006, right?

15     A.   Yes.

16     Q.   And if we look at the second paragraph, it

17 starts off, it says -- the second sentence says:  As you

18 may know, we have been working with Ivo's group over the

19 last 12 months, trying to build a good understanding on

20 both sides how XPP positions against FPGAs; is that

21 right?

22     A.   That's what it's saying.  Yes.

23     Q.   That was a true statement when you made it?

24     A.   Sure.

25     Q.   Let's go look at the other one of these

1 letters that you wrote around the same timeframe.  It's

2 going to be DX 124, and this is now a -- a letter that

3 you wrote to Mr. Roelandts, the CEO of Xilinx?

4     A.   Yes.

5     Q.   And this is just a couple days later on August

6 4th, 2006; is that correct?

7     A.   Yes.

8     Q.   And that's your signature down at the bottom,

9 right?

10     A.   It is.

11     Q.   And what you say here is:  You may recall our

12 meeting at your offices in early August last year.

13 Following these discussions, we have continued to

14 work -- so this is a year ago August 2005, right?

15          Following those discussions in August 2005, we

16 have continued to work with your organization, trying to

17 establish the advantages of our XPP technology in

18 comparison to FPGAs.

19          You mean the Xilinx FPGAs, right?

20     A.   Yes.

21     Q.   The ease of programming and the factor of

22 merit, right?

23     A.   Yes.

24     Q.   At this point in time, you've spent the last

25 12 months working with Xilinx, trying to establish a

1   comparison between XPP and Xilinx's FPGAs at that time?

2       A.   Yes.

3       Q.   And that included some of the FPGAs that are

4   accused of infringement in this case, right?

5       A.   Yes.

6       Q.   And that included the features, the specific

7   features that Xilinx -- or PACT is accusing of

8   infringement in this matter?

9       A.   This statement is getting too technical for

10  me.  I'm sorry.  I cannot comment.

11      Q.   You don't know the answer to whether -- you

12  don't know whether the FPGAs that you're accusing of

13  infringement have the features that PACT is saying

14  infringes patents?

15      A.   They do, I think.

16      Q.   Okay.  Now, if we go down a little bit lower

17  in this e-mail, you say:  We were very disappointed by

18  the recent e-mail from your Mr. Hans Schwarz, right?

19      A.   Yes.

20      Q.   That was true.

21           You go on to say:  We certainly do not

22  challenge your decision, which we respect and

23  understand, right?

24      A.   Yes.

25      Q.   And if we go down just a little bit further,

1  you say:  Again, I'm not writing to complain about this

2  decision.  I'm sure it was derived in a fair and

3  competitive manner.

4       A.   Yes.

5       Q.   Okay.  And that was August 2006; is that

6  right?

7       A.   Yes.

8       Q.   Okay.

9            MR. ALPER:  Actually put that letter up

10  once more.

11       Q.   (By Mr. Alper) Now, here in August 2006, in

12  this letter to Xilinx's CEO, you didn't say anything

13  about Xilinx using PACT's inventions, right?

14       A.   I had no suspicion.  Of course, I didn't say

15  anything.

16       Q.   Right.  And you didn't say anything about

17  infringement here, right?

18       A.   Of course not.

19       Q.   Okay.

20            MR. ALPER:  Your Honor, how -- should

21  I -- I'm about to switch.

22            THE COURT:  Go ahead.

23            MR. ALPER:  Keep going?

24            THE COURT:  Yes.

25            MR. ALPER:  You got it.

1       Q.    (By Mr. Alper) Let's talk a little bit about

2   what PACT knew about Xilinx's products at this time.

3            Now, prior to meeting with potential customers

4   like Xilinx, you'd educate yourself on their industry

5   and their products, right?

6       A.    Yes, we do.

7       Q.    You'd read about their product offerings; is

8   that right?

9       A.    We look into get an understanding.  Yes.

10       Q.    You look at public market information

11   concerning their products, right?

12       A.    Yes.

13       Q.    And, for instance, you'd look at press

14   releases, right?

15       A.    Maybe, maybe not.  I cannot comment on that.

16       Q.    Well --

17               MR. ALPER:  Can you play Clip 11, please.

18               MS. GODFREY:  Your Honor, I'd ask the

19   Defendants to give us a citation for the depositions.

20               MR. ALPER:  You bet.  109, 4 through 11.

21               MS. GODFREY:  Thank you.

22               (Video clip playing.)

23               QUESTION:  What details would you

24   typically look at before you'd go out to and talk with a

25   customer?

1              ANSWER:  I would look at their end-use

2    products.

3              QUESTION:  How would you do that?

4              ANSWER:  Market data, market information,

5    public information.

6              QUESTION:  So, like, press releases?

7              ANSWER:  For example.

8              (End of video clip.)

9        Q.   (By Mr. Alper) Let's take a look at a Xilinx

10   press release.

11             MR. ALPER:  Can you give me the ELMO?

12        Q.   (By Mr. Alper) I've got one right here, so let

13   me zoom this in here.

14             This is a press release.  You can see it's

15   dated March 4th, 2002, right?

16        A.   Yes.

17        Q.   And it's a Xilinx press release, right?

18        A.   Yes.

19        Q.   And it's entitled:  Xilinx Introduces

20   Breakthrough Virtex-2 Pro FPGA to Enable New Era of

21   Programmable System Design, right?

22        A.   Yes.

23        Q.   If we look down below, we see this is where

24   Xilinx is introducing to the public Virtex-2 Pro FPGA

25   with that RocketIO technology that we're talking about

1   in this case, right?

2       A.   That's what it says.  Yes.

3       Q.   And this is, of course, a public document,

4   right?

5       A.   Sure.

6       Q.   And you know that Xilinx had other sorts of

7   documents that were available to the public, right?

8       A.   Yes.

9       Q.   Like their user manuals that had technical

10  details about their products, right?

11      A.   Yes.

12      Q.   And when we say user manuals, this isn't like

13  user manuals that you get when, for instance, you buy a

14  calculator or something like that.  These are user

15  manuals for engineers who are going to program the

16  Xilinx FPGAs, right?

17      A.   I don't get those user manuals.  I cannot

18  comment.

19      Q.   Right.  These are pretty technical things that

20  wouldn't be in your area, right?

21      A.   Yes.

22      Q.   But they're publicly available by Xilinx on

23  their web, available for anyone to have, right?

24      A.   I assume so.  Yes.

25      Q.   Now, when you first started at PACT in 2003,

1 PACT had these prototype products that actually had

2 Xilinx chips on them, right?

3     A.   Yes.

4     Q.   And obviously, PACT had to know a thing or two

5 about Xilinx chips from that, right?

6     A.   For these application, yes.

7     Q.   But just learning about Xilinx through public

8 means, that's not the only way that PACT had in order

9 to -- or that -- the only way that you, rather, learned

10 about Xilinx's products; isn't that correct?

11     You had a relationship with Xilinx where you

12 exchanged information, right?

13     A.   We exchanged information with them.  Yes.

14     Q.   And, in fact, between 2001 and 2006, PACT made

15 periodic but continued efforts to convince Xilinx to

16 adopt its technology.  We saw that when we were kind of

17 walking through that timeline a minute ago, right?

18     A.   This is right.

19     Q.   There were quite a few meetings during that

20 timeframe leading all the way up to August 2006 with

21 that last e-mail that we looked at; is that right?

22     A.   This is right.

23     Q.   Right.  And during those -- that timeframe,

24 there's quite a bit of interfacing between the technical

25 folks at PACT and the engineers at Xilinx, right?

1      A.    The engineer management at Xilinx, yes.

2      Q.    When you say the engineering management, you

3  mean like Dr. Bolsens?

4      A.    Like Dr. Bolsens, yes.

5      Q.    Like the Chief Technical Officer at Xilinx?

6      A.    Yes.

7      Q.    Right.  And other people at Xilinx, who were

8  interfacing with folks at PACT, right?

9      A.    There was a limited interface, but there

10  certainly was an interface.  Yes.

11      Q.    And that occurred on again and off again from

12  2001 all the way to 2006, right?

13      A.    Yes.

14      Q.    And we saw -- in fact, we just saw that you

15  put in your letter to -- or your e-mail rather in August

16  2006 to PACT that from August 2005 all the way to August

17  2006, you made persistent and continued efforts to learn

18  about the Xilinx FPGA so you can have an accurate

19  comparison of XPP with Xilinx FPGAs; isn't that right?

20      A.    I cannot completely agree with this statement.

21  No.

22      Q.    Right.  Well, you did over that 12-month

23  period attempt to learn about the Xilinx FPGAs so you

24  could compare the XPP technology to the then current

25  Xilinx FPGA; isn't that right?

1     A.   We presented our technology and the benchmarks

2 based on our technology, and Xilinx presented their

3 benchmarks based on their technology.

4     Q.   Well, let's be clear about this.  This wasn't

5 just PACT telling Xilinx about its technology, right?

6 This was PACT learning about Xilinx's technology, right?

7     A.   In a very limited way, yes.

8     Q.   Well, in fact, isn't it true that PACT -- PACT

9 was internally comparing Xilinx's technologies with

10 PACT's technologies, right?

11     A.   In a certain way, yes.

12     Q.   Yeah.  You were compare -- you were performing

13 quite a bit of benchmark comparison testing, when you

14 were internally comparing Xilinx's technologies with

15 PACT's technologies, right?

16     A.   You are getting too technical for me.  I'm

17 really sorry.

18     Q.   Okay.  Can you please --

19          MR. ALPER:  I'm going to direct you to

20 653, 15 through 20.

21          MS. GODFREY:  Thank you.

22          MR. ALPER:  Give me Clip 38, please.

23          (Video clip playing.)

24          QUESTION:  And as you discussed

25 yesterday, there was quite a bit of benchmark comparison

1  testing that was done by PACT, you know, comparing when

2  it -- internally was comparing Xilinx's technologies

3  with PACT's technologies; is that right?

4                    ANSWER:  Yes.

5                    (End of video clip.)

6      Q.   (By Mr. Alper) At your deposition, your answer

7  to that question was yes, wasn't it, sir?

8      A.   That was my answer.  Yes.

9      Q.   And, in fact, we -- we know that -- well,

10 you'd agree that in order to compare -- I mean, this is

11 a common sense question.  You'd agree that in order to

12 compare PACT XPP with Xilinx's then current FPGAs, the

13 accused FPGAs, you'd need to know what you're comparing

14 with, right?  It's only common sense.

15     A.   I need to repeat -- I apologize.

16     Q.   Sure.

17     A.   We looked -- we looked at our data and

18 created -- let me start different.

19          We agreed on certain benchmarks we looked at,

20 and then we did our benchmarks, and Xilinx did their

21 benchmarks and then we compared the data.

22     Q.   Okay.

23     A.   That was the procedure.

24     Q.   You'd agree this is just a common sense

25 question I'm asking you.  It's a very simple question.

 1  You'd agree that in order to do -- you're trying to

 2  compare PACT's -- the PACT XPP technology with the

 3  Xilinx then current FPGAs, which are the accused FPGAs

 4  in this case, you'd need to know something about the

 5  Xilinx FPGAs in order to do that?

 6      A.   You'd need to have some understanding.  Yes.

 7      Q.   Okay.  And these comparison tests, they led

 8  right up to August 2006; isn't that right?

 9      A.   Yes.

10      Q.   And, in fact, you know -- you know that PACT

11  was in possession of the manual on the DSP48, one of the

12  accused features in this case, prior to that time, that

13  August 2006 time?

14      A.   I would assume we had it.  Yes.

15      Q.   You would assume you had it.  You know you had

16  it; isn't that right?

17      A.   I -- I can't recall right now.  Sorry.

18      Q.   Let me show it to you.

19          MR. ALPER:  Let me put this on the ELMO.

20      Q.   (By Mr. Alper) This manual here, it says:

21  Using Virtex-4, Virtex-4 is an accused FPGA in this

22  case, right?

23      A.   Yes.

24

25      Q.   And it goes on and says DSP48 components;

1 those are accused components in this case, right?

2     A.   Yes.

3     Q.   Okay.  And those are things that PACT says.

4 PACT says that the DSP48 is an embodiment of PACT's

5 inventions, right?

6     A.   Just went away.  Sorry.  Yeah.

7     Q.   Okay.  And there's a suggestion a little bit

8 ago that this document wasn't really about the Virtex-4

9 DSP48s, but I just want to take a look at it for a

10 second.  It says right up here -- it starts off:  The

11 Virtex-4 FPGA architecture from Xilinx includes a new

12 DSP-oriented component called the DSP48.

13        Do see that?

14     A.   Yes, I see that.

15     Q.   It's the very first line of this document that

16 talks about a Virtex-4, an accused FPGA in this case,

17 right?

18     A.   Yes.

19     Q.   And the DSP48, an accused component in this

20 case, right?

21     A.   Yes.

22     Q.   And if we actually go down, we see -- I'm not

23 an engineer either, but this looks like a pretty

24 technical -- technical figure there about the DSP48

25 component.

```
 1              Wouldn't you agree with that?
 2         A.    That's what it looks like.  Yes.
 3         Q.    All right.  And actually, if I go to the end
 4  of this, I see the last document here -- the last page
 5  is -- let me show you this, Page 16.  This is a 16-page
 6  document on one single component, one single component
 7  in the Xilinx FPGA; isn't that right?
 8         A.    That's what it shows.  Yes.
 9         Q.    And if we were to flip through this document,
10  we'd see quite a bit of detail about the DSP48.
11              Starting on the second page, this is the
12  friendly introduction part of this.
13              It says:  What is the DSP48, right?  And then
14  it goes on from there, right?  And I'm not going to take
15  up all your time going through all these pages, but
16  anyone can kind of see, this looks like stuff for
17  engineers, right?
18         A.    It does.
19         Q.    Okay.  And one other thing that I wanted to
20  point out -- ask you about is this paragraph here.  It
21  says:  One more basic control of the DSP48 is the OPMODE
22  of the DSP48.
23              Do you know what an OPMODE is?
24         A.    No, I don't.
25         Q.    Do you have an understanding that that's the
```

key part of the DSP48 that PACT is saying is the source

of infringement?

A.   I'm sorry.  This is a question for

Mr. Vorbach, not for me.

Q.   Okay.  Now, isn't it correct -- let's go into

this timeframe.  Let's go back to that August 2006

correspondence that you have with Xilinx.

A.   Okay.

Q.   And isn't it correct, sir, that during all

this time, 2001 to 2006, all of those meetings that you

had with Xilinx and their engineers, the internal

comparisons that you did between the PACT XPP and the

Xilinx technology, considering all of that -- isn't it

correct that nobody at PACT ever told anyone at Xilinx

that PACT believed that any of Xilinx's products

infringed any of PACT's patents?

A.   This is correct.  Yes.

Q.   And if I understand your -- your testimony,

it's because you're saying PACT just didn't know?

A.   They did not know.

Q.   And so what you're saying is despite all of

these meetings with the engineers, all of this

comparison testing, the fact that you had the manual in

your possession and that all the other manuals are

publicly available, you're sitting here telling us that

1  PACT did not know enough about Xilinx's FPGAs to even

2  recognize its own inventions in them?

3       A.   We were never suspicious.

4       Q.   And you remember -- you were here for the

5  opening, right?

6       A.   Yes.

7       Q.   And you remember this slide?

8            MR. ALPER:  Can we pop this up?

9       Q.   (By Mr. Alper) This is a slide your counsel

10  put up, because he was making the point that Xilinx has

11  touted the RocketIO to the public, touted it as a

12  significant feature on their chips, right?

13       A.   Right.

14       Q.   And you're telling us that -- and this was --

15  we saw that press release that was released in 2002,

16  right?

17            MR. ALPER:  Let me kill this.

18       Q.   (By Mr. Alper) Is that right?

19       A.   Yes.

20       Q.   And you're telling us, despite the fact that

21  the accused features have been public for years, that

22  Xilinx intentionally was attempting to make these

23  features public by putting them in press releases and

24  putting technical manuals available on the web for

25  anyone to download, somehow they seemed to keep these

1  things so hidden from PACT that it had no clue that they

2  were on Xilinx's chips?

3          Is that what your story is?

4      A.   This is true.  Absolutely.

5      Q.   And you're telling us that you're trying to

6  get Xilinx to adopt PACT's technologies for five years;

7  five years you were trying to get PACT to adopt Xilinx's

8  technologies, and during that time, no one bothers to go

9  onto the Internet and download one of those publicly

10  available documents about Xilinx's FPGAs; is that right?

11      A.   This is right.

12              MR. ALPER:  Should I keep on going, Your

13  Honor?

14              THE COURT:  Only until you're done.

15              MR. ALPER:  Okay.  Thank you.

16      Q.   (By Mr. Alper) Okay.  Now, Xilinx wasn't the

17  only FPGA company that PACT attempted to get to adopt

18  its technology; isn't that right?

19      A.   This is right.  Yes.

20      Q.   PACT also approached Altera, right?

21      A.   Yes, we did.

22      Q.   And Altera and Xilinx are the two major

23  players in the FPGA marketplace, right?

24      A.   Yes.

25      Q.   And PACT's approach to Altera was very similar

1  to its approach to Xilinx, right?

2      A.   We never had such a close relationship.  No.

3      Q.   Okay.  Well, in 2005, PACT attempted to sell

4  its XPP technology to Altera, right?

5      A.   Yes.

6      Q.   And Altera evaluated PACT's technology at the

7  time, right?

8      A.   Yes.

9      Q.   And Altera was evaluating to see kind of the

10  same thing that you were talking to Xilinx about.

11  Altera was evaluating PACT's technology to see if it

12  would fit into their FPGAs, right?

13      A.   Yes.

14      Q.   And those technologies, PACT had meetings --

15  well, PACT had meetings with Altera and presented its

16  technologies to Altera similar to the things that we've

17  been seeing with Xilinx; isn't that right?

18      A.   Yes.

19      Q.   And when PACT was making presentations to

20  Altera, those presentations included the patented

21  technologies at issue in this lawsuit, like this bus

22  technology and the dynamic reconfiguration technology;

23  isn't that right?

24      A.   It included all of our technology.  Yes.

25      Q.   And ultimately, Altera chose not to purchase

1  or adopt PACT's XPP technology; am I right?

2       A.   Yes.

3            MR. ALPER:   Let's take a look at DX 100,

4  if we could, and let's go down to the bottom.

5       Q.   (By Mr. Alper) Now, you're the CEO of the

6  company during this timeframe of 2005/2006 timeframe;

7  isn't that right?

8       A.   Yes.

9       Q.   And this is an e-mail from Francis Chow of

10 Altera to Mr. Vorbach; isn't that right?

11      A.   Yes.

12      Q.   And this is Altera saying to PACT:  I'm afraid

13 there is not a good match of interest that would benefit

14 both parties.

15           Did I read that correctly?

16      A.   This is what it says.  Yes.

17      Q.   If we go up to the top -- excuse me -- if we

18 go to the top of the e-mail, we see, again, Mr. Chow

19 from Altera writing to Mr. Vorbach, and now it's October

20 2006, right?

21      A.   Yes.

22      Q.   And what he says is:  Our original idea was to

23 see how well your implementation would fit into Altera's

24 FPGAs, right?

25      A.   Yes.

```
 1        Q.    What he says is:  From what we have seen, it
 2   probably would require a lot of optimization on your
 3   side to be on par with that implementation.
 4             Here's the key part:  We feel that it is
 5   unlikely a direction that would bear great fruit for
 6   both companies.
 7             Do you see that?
 8        A.    That's what it says.  Yes.
 9        Q.    Here we are fall of 2006, right?  And you've
10   got the two major players in the FPGA space that have
11   been around for decades, right?
12             You've got Xilinx and Altera, right?  Are you
13   with me?
14        A.    Yes.  Yes.
15        Q.    And both of them had an opportunity -- an
16   opportunity to have you come and present them with
17   PACT's technology, right?
18        A.    Right.
19        Q.    And they both decided to go in a different
20   direction, right?
21        A.    Yes.
22        Q.    Because they didn't see a good fit?
23        A.    Yes.
24        Q.    Now, Altera wasn't the only company to decline
25   to go in PACT's direction; isn't that right?
```

1      A.    That is right.

2      Q.    In fact, between 2001 and 2010, PACT had

3  discussions about this technology with about 75

4  companies, right?

5      A.    I never counted the number, so I cannot -- but

6  many, many companies.  Yes.

7                  MR. ALPER:  457.

8                  Clip 62, please.

9                  (Video clip playing.)

10                  QUESTION:  Between 2001 and 2010, how

11  many companies did PACT have discussions with concerning

12  PACT's technology?

13                  ANSWER:  Many.

14                  QUESTION:  Okay.  Can you give me a

15  number?  And feel free to count, if you would like.

16                  ANSWER:  About 75.

17                  (End of video clip.)

18      Q.    (By Mr. Alper) Okay.  What I'm going to show

19  you is -- let me throw this on the ELMO.

20           This is -- in this case, the parties had a

21  chance to ask each other written questions, and then you

22  give written answers as part of the discovery process.

23  And these are going to be PACT's answers to Xilinx's

24  questions.  They're called interrogatories.

25           Do you see this document?

1      A.   I do.

2      Q.   And I'm going to turn to Page 16 here, and

3  what we see is --

4           MS. GODFREY:  Pardon, Your Honor.  Which

5  exhibit is this?

6           MR. ALPER:  I'm sorry.  This is Exhibit

7  1417, DX 1417.

8           MS. GODFREY:  Thank you.

9      A.   14 --

10     Q.   (By Mr. Alper) -- 17.

11     A.   1417.

12     Q.   And it should be in your binder.

13     A.   Okay.

14     Q.   Okay.  And so what we see in this -- we see in

15  addition, between 2001 and 2010, PACT had discussions

16  relating to PACT's patented technology with the

17  following companies.  And there's a pretty big, long

18  list of companies here, right?

19     A.   Right.

20     Q.   And there's some pretty big companies, like

21  Apple, right?  IBM, Intel, Microsoft, Toshiba, Texas

22  Instruments, Toyota, U.S. Army.  The list goes on and

23  on, right?

24          Now, of the 75 companies that PACT had

25  discussions with between 2001 and 2010 concerning its

1  technologies, from what I can tell, PACT made sales

2  outside the development context to one of them.  That's

3  Astrium; is that right?

4      A.   This is right.

5      Q.   Okay.  And besides Astrium, PACT never

6  received any revenue from any company or entity with

7  respect to PACT's technologies, other than for

8  evaluation purposes; am I right?

9      A.   This is right.

10     Q.   Now, let's talk about Astrium for a minute.

11  Astrium is a German company, right?

12     A.   Yes, it is.

13     Q.   And they've never sold any PACT chips to any

14  customers; isn't that right?

15     A.   Not so far, yes.

16     Q.   Now, I think you talked about in your direct

17  testimony how you have an arrangement with Astrium that

18  if they actually sell the chips with the PACT technology

19  on them or use them, then you're going to get a royalty

20  payment; isn't that true?

21     A.   That's true.

22     Q.   And there haven't been any royalty payments?

23     A.   Not so far.

24     Q.   Just Astrium saying they expect to use the

25  technology at some point in the future, right?

1    A.   They are using the technology.

2    Q.   Right.  Well, if they were using the

3 technology, they'd have to pay you, right?

4    A.   Well, they paid the license agreement.

5    Q.   Well -- oh, I see.  So there was an upfront

6 payment at the very beginning, right, to kind of kick

7 off the relationship, right?

8    A.   Yes.

9    Q.   I'm sorry.  I wasn't being clear.

10        And then after that, if Astrium actually uses

11 the technology in actual chips, they owe you a royalty

12 payment, right?

13    A.   They do.

14    Q.   And there haven't been any royalty -- there

15 haven't been any royalty payments, right?

16    A.   Not so far.

17    Q.   You just have the understanding that at some

18 point in the future, PACT's technology is going to be

19 used in some Astrium satellite at some point?

20    A.   Yes.

21    Q.   Now, I heard -- I wrote this down also,

22 because I found it interesting.  Mr. Vorbach testified

23 that PACT has an ongoing business relationship with

24 Astrium.

25    A.   That's true.

1    Q.   But isn't it true that at your deposition, you

2   testified that you weren't aware of any deliverables by

3   PACT on the Astrium project?

4    A.   At this point in time, there have been no

5   further deliverables.

6    Q.   Right.  So although you're saying that there's

7   an ongoing relationship, there's nothing going on in the

8   relationship at this point, right?

9    A.   They had all the information and material that

10   they needed.

11    Q.   Right.  So maybe it's a definitional thing in

12   terms of what an ongoing relationship means.  You don't

13   mean to say that you're actually exchanging anything

14   with Astrium.  You gave some of them something a number

15   of years ago, and that's it, correct?

16    A.   There's a contractual relationship between the

17   companies.

18    Q.   Right.  If they were to use your technology in

19   one of their satellites, then they'd owe you a payment;

20   isn't that correct?

21    A.   Yes.

22    Q.   And that hasn't happened so far?

23    A.   Not yet.

24          MR. ALPER:  Let's pop this back up on the

25   ELMO for a second.

1    Q.   (By Mr. Alper) One of these companies here

2  that you guys contacted, a company called Siemens?

3    A.   Yes.

4    Q.   And you're familiar with Siemens.  I think you

5  testified that you had been responsible for interfacing

6  with them, but when you were at Intel?

7    A.   I certainly know the company.

8    Q.   And Siemens, you -- when you're at PACT, what

9  you guys did was you put together a development board or

10  a demonstration board in order to try to get Siemens to

11  purchase your chips, right?

12    A.   It was a joint evaluation of the technology

13  between Siemens and PACT.  Yes.

14    Q.   Right.  And it was for something that Siemens

15  called its software design radio project, right?

16    A.   Software defined radio, if I may correct you.

17    Q.   Software defined radio project.  And Siemens,

18  they did a whole report on -- they did a whole

19  evaluation of the XPP technology; isn't that correct?

20    A.   Yes.

21    Q.   And at the end of that evaluation, they put

22  out a report; isn't that correct?

23    A.   Yes.

24         MR. ALPER:  Can you turn to DX 188 in

25  your -- your binder?  Let's -- I'm going to throw this

1  on the ELMO in a second.

2       Q.   (By Mr. Alper) But there's the first page

3  right there.  This is, what, roughly a 30-page report on

4  the PACT XPP technology, 33 pages, something like that?

5       A.   Yes.

6       Q.   And at the end of the report, there's

7  something on conclusions, right?

8            MR. ALPER:  Let's just zoom that in and

9  save some time.

10      Q.   (By Mr. Alper) Do you see that?

11      A.   No. 7, yes, I see that.

12      Q.   And the conclusions that Siemens made about

13  the PACT technology were not good, were they?

14      A.   They didn't like it as much as we would have

15  liked.

16      Q.   They say the XPP 64 benchmark results show not

17  the performance as expected; isn't that right?

18      A.   Yes.

19      Q.   And they said that lack of performance was due

20  to what they called an inflexible technology concept.

21      A.   True.

22      Q.   Inflexible.  And they go on to say:  The usage

23  of the XPP array is not optimal and shows a bad relation

24  between processing performance and silicon size, right?

25      A.   Yes.

1    Q.   And they came back to that concept of lack of

2 flexibility.  They say:  Also the architecture is not

3 flexible enough to process samples with various bit

4 widths.  This lack of flexibility leads to the fact that

5 if instead of 24 bits, 16 bits had to be processed, the

6 unused bits result in an inefficient PAE performance,

7 right?

8         And then if we go to the last paragraph of the

9 conclusion, we see they sum up by saying:  The current

10 version of the XPP is not the state-of-the-art solution

11 for multimedia applications; isn't that right?

12    A.   Yes.

13    Q.   Okay.  Now, Siemens wasn't the only one to

14 evaluate the PACT technology; isn't that correct?

15    A.   Yes.

16    Q.   There was a point in time when you hired a

17 third party to come out and analyze the PACT technology

18 in order to kind of give you an independent evaluation

19 of it, right?

20    A.   Yes.

21    Q.   And that was a company called Berkeley Design

22 Technology, Inc.?

23    A.   Yes.

24    Q.   If you abbreviate that BDTi, right?

25    A.   Yes.

1    Q.   And BDTi is recognized, of course, for being

2    an expert in doing these sort of technical evaluations,

3    right?

4    A.   Yes.

5    Q.   And the reason that PACT -- what timeframe?

6    2004?

7    A.   I think it was 2004.  Yes.

8    Q.   Okay.  And the reason that PACT hired BDTi is

9    one of the -- the investors at this point in time,

10   especially after receiving that Siemens reports, wanted

11   some feedback of a neutral party as to how good this

12   technology is; isn't that right?

13   A.   That's right.

14   Q.   And so PACT took this BDTi analysis very

15   seriously, right?

16   A.   It was analysis we had to take into

17   consideration.

18   Q.   And you paid a substantial amount of money to

19   BDTi to engage in a very thorough analysis; isn't that

20   right?

21   A.   We paid a lot of money for this.

22   Q.   $80,000, right?

23   A.   Yes.

24   Q.   Now, there was a suggestion a little bit

25   earlier that BDTi was looking at the wrong technology

1  when it was doing its analysis in 2004.  They weren't

2  looking at the wrong technology, were they?

3      A.    I wouldn't call it wrong.  They looked at

4  early implementation of the technology.

5      Q.    Okay.  But you wouldn't pay them $80,000 to

6  look at the wrong technology, would you?

7      A.    Of course not.  That's why we asked them to

8  look at the new implementation of the technology.

9      Q.    Right.  Of course.  Of course, you wanted

10 them -- at this point in 2004, you've got an investor.

11 Investors are very important, right?

12     A.    Yes, they are.

13     Q.    They're the ones you have to please, right?

14 You know, startups; you have to please the investors.

15     A.    Absolutely.

16     Q.    Common sense.

17           And they're taking this very seriously and so

18 are you, so you're going to point BDTi exact right

19 technology you've paid $80,000 for, right?

20     A.    Yes.

21     Q.    Okay.  And BDTi provided a report reflecting

22 its evaluation of the PACT technology, right?

23     A.    Yes.

24     Q.    And creating this report, BDTi didn't have any

25 reason to not be objective, right?

1          A.    I don't think so.

2          Q.    So let's call up the report, and I believe

3    it's DX 47.  It should be in your binder.

4               This is the cover page.  We just saw this.  So

5    we see it's from Berkeley Design Technology, BDTI, and

6    it's an evaluation of the PACT technologies XPP II,

7    right?

8          A.    Yes.

9          Q.    It's dated October 2004.  That's when they

10   issued their final report?

11         A.    Uh-huh.

12         Q.    But actually, it's a revised final report.

13   Why does it say revised?

14         A.    Because we believed that the initial report

15   had shortcomings.

16         Q.    Okay.  So this version of the report that

17   we're going to look through, this was a second final

18   version of the report that came after you had an

19   opportunity to review the report and give your feedback

20   to it?

21         A.    Yes.

22         Q.    So this version we're going to look at

23   includes PACT's chance to kind of edit it and put its

24   comments in?

25         A.    Edit it, but provide further technical

1   information.

2       Q.    Okay.  Now, if we go to Page 3 of the

3   document -- I just want to walk through this real

4   briefly -- we're going to see a section called

5   Evaluation, and here it's going to lay out these four

6   categories that BDTI was evaluating PACT's technology

7   in.

8           Do you see that?

9       A.    Yes, I do.

10      Q.    And the technologies have to do with cameras

11  and PDAs, digital TV recorders, digital displays,

12  wireless infrastructure, that kind of thing?

13      A.    Yes.

14      Q.    And let's go see how we did there.  If we go

15  to Page -- going to Section 2.2.4 and that's on Page 8,

16  this is the section on still and video cameras, right?

17  And let's just take a look at this table here.  What we

18  see down on the left are five criteria that -- in this

19  particular technology area BDTI was analyzing on?

20      A.    Yes.

21      Q.    And across the columns, we see PACT in one

22  column, but then we have competitive technologies in the

23  other columns, right?

24      A.    Yes.

25      Q.    So not only was BDTI analyzing for PACT's

1  technology in its own right, but it was comparing it to

2  other competitive technologies out there in the world,

3  right?

4       A.   Yes.

5       Q.   Okay.  And in -- in this technology area,

6  you'd agree that PACT's technology did -- did worse than

7  any other competitors?

8       A.   In some of the categories, yes.

9       Q.   Right.  You see three Ds, a B minus, and a C,

10  correct?

11      A.   Yes.

12      Q.   Let's go to Page 13.

13           This is going to be digital television

14  recorders, DVRs.  And what they're talking about there

15  is they're testing how PACT -- they're talking about how

16  PACT would do in a DVR, if you stuck the PACT chip in a

17  DVR as compared to some of these other technologies,

18  right?

19      A.   Uh-huh.

20      Q.   And here, PACT didn't do very well either;

21  isn't that right?

22      A.   Yes.

23      Q.   If we go down to Page 16, this is now going to

24  be digital display image post-processing applications.

25  It's kind of a mouthful.

1          Here, PACT's performance, you'd agree, was not

2    very impressive, right?

3         A.    It's getting better.

4         Q.    Getting better but still -- getting a little

5    better but still not very impressive?

6         A.    Yes.

7         Q.    Okay.  And let's go to that fourth category on

8    Page -- see if you can find it -- found it for me --

9    there you go.  2.5.4.  And that is at, what, Page 20?

10   And here we have the category of wireless infrastructure

11   applications, right?  And I seem to recall in your

12   direct testimony you saying that wireless was a

13   particular area of importance for PACT?

14        A.    At this point in time, yes.

15        Q.    Right.  So this -- of all the categories,

16   wireless would have been the one that was most important

17   in terms of what PACT's business was -- business plan,

18   right?

19        A.    That was my understanding.  Yes.

20        Q.    Okay.  And here, PACT did very poorly;

21   wouldn't you agree?

22        A.    Yes.

23        Q.    You have in the most important category, D

24   minus, three Ds, and a B; isn't that right?

25        A.    Yes.

1    Q.   And what we see as one of the competitor

2  technologies is Xilinx Virtex-2, right?

3    A.   Yes.

4    Q.   And you'd agree that as compared to the Xilinx

5  Virtex-2, PACT did much worse?

6    A.    In their ratings, yes.

7    Q.   Let's go to Page 26.

8         MR. ALPER:   And if we go one page back

9  and zoom in on that.

10    Q.   (By Mr. Alper) BDTi had an overall summary at

11  the end of their report that they provided to you,

12  right?

13    A.   Yes.

14    Q.   And -- and here, they go through a number of

15  kind of sum-up bullet points in what they found overall

16  with respect to the PACT XPP technology; is that

17  correct?

18    A.   Yes.

19    Q.   And we see they say:   XPP II is not

20  competitive for ASSP and ASIC designs for cellular

21  telephones, PDAs, still and video cameras, and digital

22  video-recorders, right?

23    A.   Yes.

24    Q.   And then they say below:   XPP II is clearly

25  less competitive than FPGAs, right?

1      A.    Oh, yeah, down there, that's what they're

2  saying.  Yes.

3      Q.    If we go to the next page up at the top.

4      A.    Yes.

5      Q.    They go on to say:  XPP II is not competitive

6  in wireless infrastructure applications, right?

7      A.    Yes.

8      Q.    They go on to say:  In all of the applications

9  examined, the challenges and risks associated with XPP

10  II software development is a significant disadvantage,

11  right?

12      A.    Yes.

13      Q.    And then they go on to say:  In all the

14  applications examined, the business risks associated

15  with PACT as a supplier is a significant disadvantage;

16  isn't that correct?

17      A.    Yes, it is.

18      Q.    Now, after you received this BDTi report in

19  October 2004, you contacted Xilinx for another round of

20  discussions in terms of Xilinx's adopting PACT's

21  technology; isn't that right?

22      A.    Yes, prompted by a board member of Xilinx.

23      Q.    Right.  I understand.  I understand, but you

24  got in touch with PACT -- I mean, Xilinx, right?

25      A.    Yes.

1          MR. ALPER:  If we can put up DX 76,

2  please.

3     Q.   (By Mr. Alper) Now, this is an e-mail from

4  yourself in March 2005 to Omid Tahernian at Xilinx,

5  right?

6     A.   Yes.

7     Q.   And you copy Mr. Vorbach and also Dr. Bolsens,

8  right?

9     A.   Yes.

10    Q.   And this is March 2005, so this is, what,

11  about four months and some change after you received the

12  BDTi report at the end of October 2004, right?

13    A.   Yes.

14    Q.   And what you say here is:  We are out

15  performing hardware -- hard-wired solutions in terms of

16  cost, flexibility, and time to market while reaching

17  similar performance levels.

18         Did I read that correctly?

19    A.   Yes.

20    Q.   So you're telling Xilinx that you are

21  outperforming other solutions?

22    A.   Yes.

23    Q.   But meanwhile in reality, you knew from the

24  BDTi report that you had done much worse than Xilinx,

25  right?

1      A.   Yes.

2      Q.   And you didn't attach the BDTi report here.

3      A.   We're living in a dynamic world.   Things are

4  moving forward.

5      Q.   I see.   But you didn't attach the BDTi report?

6      A.   We had no reason to.

7      Q.   Right.   And you didn't give it to -- you

8  didn't give that to Xilinx, right?

9      A.   This was an internal report.

10      Q.   And isn't it correct that what you told Xilinx

11  here, when you were trying to get them to adopt your

12  technology, was the exact opposite from what Siemens and

13  BDTi had told you just months before?

14      A.   Yes.

15      Q.   Mr. Vorbach at -- in 2004/2005 timeframe,

16  after receiving the Siemens report and the BDTi report,

17  he expressed some frustration to the board of PACT with

18  respect to the PACT technology; isn't that right?

19      A.   Yes, I think so.

20          MR. ALPER:   Let's call up -- actually,

21  I'm going to throw this on the ELMO.   DX 52.

22      Q.   (By Mr. Alper) This is -- I'll show you -- you

23  have it -- if you have it in your binder.

24      A.   It's DX 52?

25      Q.   52?

1     A.    Thank you.

2     Q.    This is Mr. Vorbach's letter to the board in

3 around the 2004/2005 timeframe; is that right?

4     A.    Yes.  Yeah.

5     Q.    And what you see here is Mr. Vorbach says --

6 he's talking about the XPP and he says:  The chip

7 specification did not fit any customer requirements,

8 right?  Is that right?

9     A.    Yes.

10     Q.    He said:  The protocols are complicated and

11 badly defined, right?

12     A.    Yes.

13     Q.    And he says:  The chip was absolutely useless

14 for any product?

15     A.    He was talking about specific chip

16 implementation.  Yes.

17     Q.    I read that correctly, though.  He said the

18 chip was absolutely useless for any product?

19     A.    Yes.

20     Q.    And now you also expressed doubts about the

21 PACT technology, right?

22     A.    It was an ongoing discussion.  Yes.

23     Q.    And, in fact, you wrote to the investors of

24 PACT about your questions that you had about the PACT

25 technology; isn't that right?

1    A.   Yes.

2              MR. ALPER:  If we could look at DX 190,

3    please.

4    Q.   (By Mr. Alper) This is a -- your letter to the

5    investors of PACT?

6              MR. ALPER:  Zoom in on that top half.

7    Q.   (By Mr. Alper) This is your letter when you

8    were the Chairman -- you're currently the Chairman.  You

9    were then the acting CEO, right?

10   A.   Yes.

11   Q.   And your letter to the investors of PACT --

12   and this is in September 2007, right?

13   A.   Yes.

14   Q.   And in here you say:  First, I must say that I

15   understand very well your displeasure and disappointment

16   over the status of PACT; isn't that right?

17   A.   Yes.

18   Q.   And what you said here was that you questioned

19   the possibility of the successful implementation of the

20   PACT architecture; isn't that right?

21   A.   Yes.

22   Q.   Now, you had done the deal with Astrium at

23   this point, right?

24   A.   Yes.

25   Q.   And it seemed to me that -- and I might be

1   wrong about this, but you were talking about Astrium

2   like it was a success, right?

3        A.   It certainly is.  Yes.

4        Q.   Right.  But in -- after that, in 2007,

5   notwithstanding Astrium, you questioned the possibility

6   of the successful implementation of the PACT

7   architecture, right?

8        A.   Yes.

9        Q.   And you're talking about the technical

10  architecture, right?  Not anything else, right?

11       A.   Yes.

12       Q.   Okay.  Now, what I'd like to do is I'd like to

13  go back to DX 184.  This is your letter --

14            MR. ALPER:  Zoom in on the top.

15       Q.   (By Mr. Alper) This is your letter in August

16  of 2006, right?  We looked at that just a few minutes

17  ago.

18       A.   Uh-huh.

19       Q.   This was your kind of -- this was the final

20  communication to Xilinx after a long history of

21  communications and meeting with Xilinx where you were

22  trying to get them to adopt your technology, right?

23       A.   Yes.

24       Q.   All right.

25            MR. ALPER:  We can take that down.

1    Q.   (By Mr. Alper) If we go back to that

2 timeframe, at that point in time, Xilinx had informed

3 PACT that it was not interested in PACT's technology,

4 right?

5    A.   Yes.

6    Q.   And you understood that Xilinx was an

7 independent company, and as an independent company, it

8 was up to Xilinx to decide whether it wanted to use

9 PACT's technology or not, right?

10    A.   Right.

11    Q.   And this sort of thing where a company decides

12 to go into a different -- in a different direction, that

13 happens all the time, right?

14    A.   Yes, it does.

15    Q.   You're an experienced CEO.  You've been in

16 this business for a long time, right?

17    A.   Yes.

18    Q.   And you've worked at startup companies.  I

19 believe you testified about that in your direct

20 testimony, right?

21    A.   Yes.

22    Q.   And you've had situations, many situations

23 where you've pitched technologies at startup companies

24 and the potential customers or the folks you're pitching

25 to decide to go in a different direction, right?

1    A.    It happens.  Yes.

2    Q.    Happens all the time, right?

3    A.    Yes.

4    Q.    And you understood what was going on with

5  Xilinx when they declined to pursue the PACT XPP

6  technology; isn't that correct?

7    A.    Yes.

8    Q.    Now, let's take stock of where we are.  At

9  this point, it's August of 2006, you've had the Siemens

10  report.  You've had the BDTi report, right?  You've had

11  extensive meetings with Xilinx.  You've had Xilinx

12  technical documents floating among the engineers inside

13  of PACT, right, going back and forth and looking at them

14  and commenting on them.  And you've had comparison

15  testing with Xilinx, right?

16        And isn't it correct that everything that

17  you'd seen to that point in time, August 2006, made you

18  believe that Xilinx's decision to go in a different

19  direction was derived in a fair and competitive manner?

20    A.    Yes.  That's what I said.

21    Q.    All right.

22        MR. ALPER:  Thank you, Your Honor.

23        THE COURT:  All right.  Thank you.  How

24  much do you think you have, Ms. Godfrey?

25        MS. GODFREY:  Your Honor, I have at least

1   15 minutes or 20.

2                   THE COURT:  Well, we'll go ahead and save

3   that for tomorrow.

4                   Ladies and Gentlemen, we'll come back at

5   9:00 o'clock in the morning, and we'll be in recess

6   until that time.

7                   LAW CLERK:  All rise.

8                   (Jury out.)

9                   THE COURT:  Thank you.  We're adjourned.

10                  (Court adjourned.)

11                  * * * * * * * * * * * * * * * * * * * * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____          _____
SHELLY HOLMES, CSR                        Date
Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/12


/s/_____        _____
SUSAN SIMMONS, CSR                Date
Official Court Reporter
State of Texas No.:  267
Expiration Date  12/31/12