```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   PACT XXP TECHNOLOGIES, AG   *    Civil Docket No.
                                 *    2:07-CV-563
 4   VS.                         *    Marshall, Texas
                                 *
 5                               *    May 18, 2012
     XILINX, INC. & AVNET, INC. *    8:55 A.M.

 6
                        TRANSCRIPT OF JURY TRIAL
 7          BEFORE THE HONORABLE JUDGE ROY S. PAYNE
                UNITED STATES MAGISTRATE JUDGE
 8   APPEARANCES:

 9   FOR THE PLAINTIFFS:        MR. JOSEPH S. GRINSTEIN
                                MR. JOHN P. LAHAD
10                              Susman Godfrey
                                1000 Louisiana Street
11                              Suite 5100
                                Houston, TX   77002
12
                                MS. LINDSEY N. GODFREY
13                              Susman Godfrey
                                1201 Third Avenue
14                              Suite 3800
                                Seattle, WA   98101
15
                                MR. MICHAEL F. HEIM
16                              MR. LESLIE V. PAYNE
                                MR. RUSSELL A. CHORUSH
17                              MR. ERIC J. ENGER
                                MR. NATHAN J. DAVIS
18                              Heim Payne & Chorush
                                600 Travis Street
19                              Suite 6710
                                Houston, TX   77002
20
     APPEARANCES CONTINUED ON NEXT PAGE:
21

22   COURT REPORTERS:          MS. SUSAN SIMMONS, CSR
                               MS. SHELLY HOLMES, CSR
23                             Official Court Reporters
                               100 East Houston, Suite 125
24                             Marshall, TX   75670
                               903/935-3868
25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE PLAINTIFFS:          MR. OTIS W. CARROLL
                             MR. COLLIN M. MALONEY
                             Ireland Carroll & Kelley
                             6101 South Broadway
                             Suite 500
                             Tyler, TX    75703

                             MR. ROBERT M. PARKER
                             MR. CHRISTOPHER BUNT
                             MR. CHARLES AINSWORTH
                             Parker Bunt & Ainsworth
                             100 East Ferguson
                             Suite 1114
                             Tyler, TX    75702

FOR THE DEFENDANTS:          MR. SAMUEL F. BAXTER
                             McKool Smith
                             104 East Houston
                             Suite 300
                             Marshall, TX    75670

                             MR. JASON CASSADY
                             MS. ADA BROWN
                             McKool Smith
                             300 Crescent Court
                             Suite 1500
                             Dallas, TX    75201

                             MR. GREGORY S. AROVAS
                             Kirkland & Ellis
                             601 Lexington Avenue
                             New York, New York    10022

                             MR. MARC H. COHEN
                             Kirkland & Ellis
                             950 Page Mill Road
                             Palo Alto, CA    94304

                             MR. ADAM R. ALPER
                             Kirkland & Ellis
                             555 California Street
                             27th Floor
                             San Francisco, CA    94104

<u>P R O C E E D I N G S</u>

1
2
3          (Jury out.)

4          LAW CLERK:  All rise.

5          THE COURT:  Good morning.  Please be

6  seated.

7          I understand that there's something that

8  either side -- one side wants to take up before we

9  start.

10         Yes, sir?

11         MR. CASSADY:  Yes, Your Honor.  Jason

12 Cassady again for the Defendant.

13         We -- this morning I thought maybe we'd

14 have an issue with some of the damages numbers that were

15 put out with Ms. Woodford's testimony.  I asked counsel

16 if they were planning to use the 79.4 -- I think the

17 79.7 million dollar number in front of this jury and ask

18 for that number.

19         It sounds like the answer is yes, and so

20 I wanted to bring that to the Court's attention and

21 object to that number as being outside the scope of any

22 disclosure in the case, not supported by any expert

23 testimony.

24         Ms. Woodford simply testified to a

25 calculated number as we all know, and I think it's a

1    similar situation where if that number is presented to a

2    jury, it's just like presenting invalidity contention or

3    invalidity art to the jury for prior art purposes that

4    weren't disclosed.

5                    THE COURT:  All right.  Mr. Grinstein?

6                    MR. GRINSTEIN:  Your Honor, to be clear,

7    I'm going to put the jury verdict form on the ELMO, and

8    the number I'm going to write in on the damages section

9    is 30.8 million.  I am going to mention 79.5 million --

10                   THE COURT:  All right.

11                   MR. GRINSTEIN:  -- because I think that

12   supports our number.

13                   THE COURT:  All right.  Mr. Cassady, as

14   long as they proceed in the manner that he's just

15   indicated, I don't see a problem with it.

16                   MR. CASSADY:  Your Honor, I mean, I was

17   just saying that we'd object.  I think it's prejudicial

18   and I think it's confusing to a jury to hear that

19   number, and it's just a calculation.  It wasn't a number

20   that actually had any supported opinion.

21                   THE COURT:  All right.  I note your

22   objection.  They've already heard the number, however,

23   so I think it's something that can be talked about by

24   either side.

25                   Just so both sides will know the way

1  we're going to proceed, it should take me about 40

2  minutes or so to give these instructions to the jury.

3  They're each going to have a copy of them.

4           I'm going to break after I read them the

5  jury verdict form.  And by that, I mean we're going to

6  take a break, a 10-minute recess or so.  So that they'll

7  be fresh when you get them on the closing arguments.

8           We'll go through the closing argument

9  arguments all the way, and then I'll -- I have some just

10 final instructions to give them about how to deliberate

11 and -- and the like.

12          Mr. Grinstein, does Plaintiff want a

13 warning at a particular point in time, or have you got

14 that covered?

15          MR. GRINSTEIN:  I think we've got that

16 covered.  I do intend to go -- I think yesterday we

17 might have said 25/15.  I think I intend to go 30/10.

18          THE COURT:  All right.  So I'm going to

19 let you go until you sit down.

20          MR. GRINSTEIN:  When I hit 41 minutes, I

21 have to sit down, I guess.

22          THE COURT:  Well, no, you won't hit 41

23 minutes.

24          MR. GRINSTEIN:  I understand.

25          THE COURT:  All right.  And what about on

1  the Defense side; do you want a warning at a particular

2  time?

3              MR. BAXTER:  We're going to split 25/15,

4  Your Honor.  I think Mr. Arovas and myself, he can read

5  a stopwatch and I cannot, so if you will let me know

6  when there's five minutes, Your Honor, out of my time, I

7  would appreciate it.

8              THE COURT:  And which is yours?

9              MR. BAXTER:  I've got the 15, Your Honor.

10             THE COURT:  Are you going to go first

11 or...

12             MR. BAXTER:  No, sir.  He's going to go

13 first.

14             THE COURT:  So Mr. Arovas, I'm just going

15 to let you go until you're done; is that right?

16             MR. AROVAS:  Yeah.  Thank you, Your

17 Honor.

18             THE COURT:  Okay.  And then what I'll do,

19 Mr. Baxter, is let you know when you have how much left?

20             MR. BAXTER:  Five, Your Honor.

21             THE COURT:  Five minutes left.

22             MR. BAXTER:  Yes.

23             THE COURT:  So that will at 35 minutes

24 overall.

25             MR. BAXTER:  Yes, sir.

```
 1                    THE COURT:  I'll tell you you've got five
 2  minutes left.
 3                    MR. BAXTER:  I will note, Your Honor,
 4  I've been in this position before where the co-counsel,
 5  in order to keep me from the podium, took all the time.
 6  Perhaps he'll leave me some.
 7                    THE COURT:  That will be between you and
 8  Mr. Arovas.
 9                    MR. AROVAS:  But what Mr. Baxter didn't
10  put on the record is how he dealt with that.
11                    THE COURT:  I understand.
12                    And, Mr. Grinstein, do you want at the
13  very end a particular warning or --
14                    MR. GRINSTEIN:  Two-minute warning.
15                    THE COURT:  -- just thank you?
16                    MR. GRINSTEIN:  A two-minute warning
17  would be appreciated.
18                    THE COURT:  Two-minute warning.
19                    MR. GRINSTEIN:  Yeah, my rebuttal.
20                    THE COURT:  All right.  I'll do that.
21  I'll do that.
22                    All right.  Well then, I think we're
23  ready.  We'll bring in the jury.
24                    LAW CLERK:  All rise.
25                    (Jury in.)
```

1                    THE COURT:  Good morning.  Please be

2    seated.

3                    Ladies and Gentlemen of the Jury, I have

4    observed over the last week that you've been listening

5    carefully and taking notes.  I don't want you to have to

6    take notes during these instructions, so I'm going to

7    ask the clerk to pass out to each of you a copy of the

8    instructions and the verdict form.

9                    You are welcome to read along as I give

10   you these instructions, or you can just listen.  You

11   will have a complete copy of everything that I'm telling

12   you that you can take back to the jury room with you.

13                   So you -- either way, you want to do is

14   just fine by me.

15                   Also, so that you'll know, after I finish

16   giving you these instructions, we're going to take the

17   morning recess so that you can be fresh and give your

18   full attention to the lawyers during their closing

19   arguments.  Each side has 40 minutes to present their

20   arguments to you.

21                   Members of the Jury, you have heard the

22   evidence in this case.  I will now instruct you on the

23   law that you must apply.  It is your duty to follow the

24   law as I give it to you.  On the other hand, you, the

25   jury, are the judges of the facts.  Do not consider any

statement that I have made during the trial or make in

these instructions as an indication that I have any

opinion about the facts of this case.

The attorneys will soon make their

closing arguments.  Statements and arguments of the

attorneys are not evidence and are not instructions on

the law.  They are intended only to assist you in

understanding the evidence and the parties' contentions.

In determining whether any fact has been

proved in this case, you may, unless otherwise

instructed, consider the testimony of all witnesses,

regardless of who may have called them, and all exhibits

received in evidence, regardless of who may have

produced them.  You may also consider any stipulations

received in evidence.

By the Court allowing testimony or other

evidence to be introduced over the objection of an

attorney, the Court did not indicate any opinion as to

the weight or effect of such evidence.  As stated

before, you are the sole judges of the credibility of

all the witnesses and the weight and effect of all

evidence.

When the Court sustained an objection to

a question addressed to a witness, you must disregard

that question entirely and may draw no reference from

its wording or speculate about what the witness would

have said, if he or she had been permitted to answer.

At times during the trial, it was

necessary for the Court to talk with the lawyers here at

the bench out of your hearing or by calling a recess.

We met because often during a trial something comes up

that does not involve the jury.  You should not

speculate on what was said during such discussions.

Certain testimony in this case has been

presented to you through depositions.  A deposition is

the sworn, recorded questions asked a witness in advance

of trial.  Under some circumstances, if a witness cannot

be present to testify from the witness stand, the

witness' testimony may be presented under oath in the

form of a deposition.

Some time before this trial, attorneys

representing the parties in this case questioned this

witness under oath.  A court reporter was present and

recorded the testimony.  This deposition testimony is

entitled to the same consideration as testimony given by

a witness from the witness stand.  That is to say, you

should judge the credibility of and weigh the importance

of deposition testimony to the best of your ability as

if the witness had testified in court.

While you should consider only the

evidence in the case, you are permitted to draw such

reasonable inferences from the testimony and exhibits as

you feel are justified in the light of common

experience.  In other words, you may make deductions and

reach conclusions that reason and common sense lead you

to draw from the facts that have been established by the

testimony and evidence in the case.

The testimony of a single witness may be

sufficient to prove any fact, even if a greater number

of witnesses have testified to the contrary, if after

considering all the other evidence, you believe that

single witness.

There are two types of evidence that you

may consider in properly finding the truth as to the

facts in the case.  One is direct evidence, such as the

testimony of an eyewitness.  The other is indirect or

circumstantial evidence, the proof of a chain of

circumstances that indicates the existence or

non-existence of other facts.

As a general rule, the law makes no

distinction between direct and circumstantial evidence,

but simply requires that you find the facts based on the

evidence, both direct and circumstantial.

When knowledge of a technical subject

matter may be helpful to the jury, a person who has

1  special training or experience in that technical field,

2  called an expert witness, is permitted to state his or

3  her opinion on those technical matters.  However, you

4  are not required to accept that opinion.  As with any

5  other witness, it is up to you to decide whether to rely

6  upon it.

7  Preponderance of the evidence means

8  evidence that persuades you that a claim is more likely

9  true than not true.  In determining whether any fact has

10  been proved by a preponderance of the evidence, you may,

11  unless otherwise instructed, consider the stipulations,

12  the testimony of all witnesses, regardless of who may

13  have called them, and all exhibits received in evidence,

14  regardless of who may have produced them.

15  Clear and convincing evidence means

16  evidence that produces in your mind a firm belief or

17  conviction as to the matter at issue.  When a party has

18  the burden of proving any claim or defense by clear and

19  convincing evidence, it means the evidence has persuaded

20  you that the claim or defense is highly probable.

21  In determining whether any fact has been

22  proved by clear and convincing evidence, you may, unless

23  otherwise instructed, consider the stipulations, the

24  testimony of all witnesses, regardless of who may have

25  called them, and all exhibits received in evidence,

regardless of who may have produced them.

Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree that is necessary for the preponderance of the evidence standard.  If the proof establishes in your mind a firm belief or conviction, then the standard has been met.

As I did at the start of the case, I will give you a summary of each side's contentions in this case.  I will then provide you with detailed instructions on what each side must prove to win on each of its contentions.

As I previously told you, PACT seeks money damages from Xilinx and Avnet for allegedly infringing the '181 patent and the '106 patent by making, using, selling, and offering for sale products that PACT argues are covered by Claims 1, 3, 17, and 30 of the '181 patent and Claim 8 of the '106 patent. These are the asserted claims.

PACT also argues that Xilinx and Avnet have actively induced infringement of these claims by others.  The products that are alleged to infringe are the Virtex-I Pro, Virtex-II Pro X, Virtex-4, Virtex-5, and Virtex-6 families of FPGAs.

Xilinx and Avnet deny that they have

infringed the asserted claims of the '181 patent and the

'106 patent and argue that, in addition, the asserted

claims are invalid.  Xilinx and Avnet also deny that

they have actively induced others to infringe the

asserted claims of the '181 patent and the '106 patent.

Your job is to decide whether Xilinx and

Avnet have infringed the asserted claims of the '181

patent or the '106 patent and whether any of the

asserted claims of the '181 patent or the '106 patent

are invalid.

If you decide that any claim of the '181

patent or the '106 patent has been infringed and is not

invalid, you will then need to consider whether PACT has

an obligation to notify Xilinx and Avnet of the alleged

infringement and decide any money damages to be awarded

to PACT to compensate it for the infringement.

You will also need to make a finding as

to whether the infringement was willful.  If you decide

that any infringement was willful, that decision should

not affect any damages award you make.  I will take

willfulness into account later.


Before you can decide many of the issues

in this case, you will need to understand the role of

patent claims.  The patent claims are the numbered

sentences at the end of each patent.  The claims are

important, because it is the words of the claims that

define what a patent covers.  The figures and text in

the rest of the patent provide a description and/or

examples of the invention and provide a context for the

claims, but it is the claims that define the breadth of

the patent's coverage.

Each claim is effectively treated as if

it were a separate patent, and each claim may cover more

or less than another claim.  Therefore, what a patent

covers depends, in turn, on what each of its claims

covers.

You'll first need to understand what each

claim covers in order to decide whether or not there is

infringement of the claim and to decide whether the

claim is invalid.  The law says that it is my role to

define the terms of the claims, and it is your role to

apply my definitions to the issues that you're asked to

decide in the case.

Therefore, as I explained to you at the

start of the case, I have determined the meaning of the

claims, and I've provided you my definitions of certain

claims in your binder.  You must accept my definition of

these words in the claims as being correct.  It is your

job to take these definitions and apply them to the

1  issues that you're deciding, including the issues of

2  infringement and validity.

3            I will now explain how a claim defines

4  what it covers.

5            The claim sets forth in words a set of

6  requirements.  Each claim sets forth its requirements in

7  a single sentence.  If a device satisfies each of these

8  requirements, then it is covered by the claim.

9            There can be several claims in a patent.

10 Each claim may be narrower or broader than another claim

11 by setting out more or fewer requirements.  The coverage

12 of a patent is assessed claim-by-claim.

13           In patent law, the requirements of a

14 claim are often referred to as claim elements or claim

15 limitations.  When a product meets all the requirements

16 of a claim, the claim is said to cover that product, and

17 that product is said to fall within the scope of that

18 claim.  In other words, a claim covers a product where

19 each of the claim elements or limitations is present in

20 that product.  If a product is missing even one

21 limitation of a claim, the product is not covered by the

22 claim.

23           The beginning portion or preamble of a

24 claim often uses the word comprising.  The word

25 comprising as used in the preamble means including or

containing.  When comprising is used in the preamble, a

device that includes all the limitations of the claim,

as well as additional elements, is covered by the claim.

A claim requirement may describe a certain functionality

or capability that the device must possess.  In such

cases, a device satisfies the requirement, if it is

reasonably capable of operating in the recited manner.

Sometimes the words in a patent claim are

difficult to understand, and, therefore, it is difficult

to understand what requirements these words impose.

It's my job to explain to you the meaning

of the words in the claims and the requirements that

these words impose.

As I just instructed you, there are

certain specific terms that I have defined, and you are

to apply the definitions that I provide to you.

By understanding the meaning of the words

in a claim and by understanding that the words in a

claim set forth the requirements that a product must

meet in order to be covered by that claim, you'll be

able to understand the scope of coverage for each claim.

Once you understand what each claim

covers, then you're prepared to decide the issues you

will be asked to decide, such as infringement and

invalidity.

1            I'll now explain to you the meaning of

2   some of the words of the claims in this case.  In doing

3   so, I'll explain some of the requirements of the claims.

4            As I've previously instructed you, you

5   must accept my definition of these words in the claims

6   as correct.

7            For any words in the claim for which I've

8   not provided you with the definition, you should apply

9   their common meaning.  You should not take my definition

10  of the language of the claims as an indication that I

11  have a view regarding how you should decide the issues

12  that you've been asked to decide, such as infringement

13  and invalidity.  These issues are yours to decide.

14  I have defined the following claim terms for you:

15            The term bundled means combined.

16            The term bus system means a system used

17  to communicate information according to a bus protocol.

18            The term cells means configurable

19  elements.

20            The term communication means exchange of

21  information.

22            The term configurable elements means a

23  component of a logic unit which can be set for a special

24  function by a configuration string or word.

25            The term configuration string means a

series of bits of any length that represents a valid

setting for the element to be configured so that an

operable unit is obtained.

The term configuration means the function

and interconnection of a logic unit, an FPGA cell, logic

cell, or a PAE.

The term configured means having the set

function and interconnection of a logic unit, an FPGA

cell, logic cell, or a PAE.

The term configuring means setting the

function and interconnection of a logic unit, an FPGA

cell, or a PAE.

The term DFP means data flow processor

according to German Patent DE 44 16 881.

The term DPGA means dynamically

programmable gate array.

The term dynamically reconfigurable cells

means a cell that can be halted and reset with a new

configuration, while any remaining cells continue with

the same function.

The term FPGA means field-programmable

gate array.

The term interface or interface unit

means unit providing implementation of a bus system

control for communicating information across a shared

1 boundary.

2          The term multidimensional programmable

3 cell architecture means a pattern of programmable cells

4 disposed such that each cell has connections in at least

5 two dimensions.

6          The term primary logic unit means unit

7 for configuring and reconfiguring a PAE or logic cell

8 embodied by a microcontroller specifically designed for

9 this purpose.

10          The term reconfiguring means resetting

11 any number of logic units, FPGA cells, logic cells, or

12 PAEs with a new configuration, while any remaining logic

13 units, FPGA cells, logic cells, or PAEs continue with

14 the same function.

15          The term state machine means logic which

16 can assume miscellaneous states.  The transitions

17 between states depend on various input parameters.

18          These machines are used to control

19 complex functions.

20          The term state machine for controlling

21 the at least one interface unit means permanent,

22 predefined state machine for controlling the interface

23 unit.

24          I'll now instruct you on how to decide

25 whether or not Xilinx and Avnet have infringed the '181

patent or the '106 patent.  Infringement is assessed on a claim-by-claim basis.  Therefore, there may be infringement as to one claim but no infringement as to another.

In this case, there are two possible ways that a claim may be infringed.  The two types of infringement are called direct infringement and active inducement.  Active inducement is referred to as indirect infringement.  There cannot be indirect infringement without someone else engaging in direct infringement.

To prove indirect infringement, PACT must also prove that Xilinx's indirect infringement and Avnet's indirect infringement caused some direct infringement.

In this case, PACT has alleged that Xilinx and Avnet directly infringe the '181 patent and the '106 patent.  In addition, PACT has alleged that Xilinx and Avnet's customers directly infringe the '181 patent and the '106 patent, and Xilinx and Avnet are liable for actively inducing that direct infringement by its customers.

In order to prove infringement, PACT must prove that the requirements for one or more of these types of infringement are met by a preponderance of the

1  evidence; that is, more likely than not that all of the

2  requirements of one or more of these types of

3  infringement have been proved.

4           I will now explain these two types of

5  infringement in more detail.

6           In order to prove direct infringement,

7  PACT must also prove by a preponderance of the evidence,

8  i.e., that it is more likely than not that Xilinx and

9  Avnet have made, used, sold, or offered for sale within

10 the United States a product that meets all of the

11 requirements of a claim.

12          You must compare the product with each

13 and every one of the requirements of a claim to

14 determine whether all of the requirements of that claim

15 are met.  If you find that the accused product includes

16 each element of the claim, then that product directly

17 infringes the claim even if such product contains

18 additional elements that are not recited in the claim.

19          If you find, however, that the accused

20 product is missing even one element of the claim, that

21 product does not directly infringe the claim.

22          A patent can be directly infringed even

23 if the alleged infringer did not have knowledge of the

24 patent.  A patent may also be directly infringed even

25 though the accused infringer believes in good faith that

what it is doing is not an infringement of the patent.

You may have heard evidence and argument in this case about Xilinx's own patents relating to certain of its products.  However, owning a patent is not a defense to infringement of another patent.  A party can infringe someone else's patents, even though it may have patents of its own.

You must determine, separately for each asserted claim, whether or not there is infringement. PACT alleges that Xilinx and Avnet are liable for infringement by actively inducing their customers to directly infringe the '181 patent and the '106 patent.

As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

Xilinx and Avnet are liable for active inducement of infringement of a claim only if PACT proves by a preponderance of the evidence that the acts are actually carried out by Xilinx and Avnet's customers and directly infringe that claim.

Xilinx and Avnet took action during the time the '181 patent and the '106 patent were in force intending to cause the directly infringing acts by Xilinx and Avnet's customers.

And Xilinx and Avnet were aware of the

'181 patent and the '106 patent and knew that the acts,
if taken, would constitute direct infringement of that
patent, or Xilinx and Avnet believed that there was a
high probability that the acts, if taken, would
constitute infringement of the '181 patent or the '181
patent but deliberately avoided confirming that belief.

In order to establish active inducement
of infringement, it is not sufficient by itself that
Xilinx and Avnet's customers directly infringe the
claim, nor is it sufficient by itself that Xilinx and
Avnet were aware of the acts by their customers that
allegedly constitute direct infringement.

Rather, you must find that Xilinx and
Avnet specifically intended their customers to infringe
the '181 patent and the '106 patent or that Xilinx and
Avnet believed there was a high probability that its
customers would infringe but remained willfully blind to
the infringing nature of its customers' acts.

In this case, PACT argues that Xilinx
infringed, and further that Xilinx infringed willfully.

If you have decided that Xilinx has
infringed, you must go on and address the additional
issue of whether or not this infringement was willful.

Willfulness requires you to determine by
clear and convincing evidence that Xilinx acted

recklessly.  To prove that Xilinx acted recklessly, PACT

must prove two things by clear and convincing evidence:

The first part of the test is objective.

PACT must persuade you that Xilinx acted despite a high

likelihood that Xilinx's actions infringed a valid and

enforceable patent.  In making this determination, you

may not consider Xilinx's state of mind.  Legitimate or

credible defenses to inducement -- to infringement, even

if not ultimately successful, demonstrate a lack of

recklessness.

Only if you conclude that Xilinx's

conduct was reckless do you need to consider the second

part of the test.  The second part of the test does

depend on the state of mind of Xilinx.  The patent

holder must persuade you that Xilinx actually knew or

should have known that its actions constituted an

unjustifiably high risk of infringement of a valid and

enforceable patent.

To determine whether Xilinx had this

state of mind, consider all facts which may include but

are not limited to whether or not Xilinx acted in

accordance with the standards of commerce for its

industry.

Whether or not Xilinx intentionally

copied a product of PACT that is covered by the '181 or

1  '106 patent.

2           Whether or not there is a reasonable

3  basis to believe that Xilinx did not infringe or had a

4  reasonable defense to infringement.

5           Whether or not Xilinx made a good-faith

6  effort to avoid infringing the '181 patent or the '106

7  patent.  For example, whether Xilinx attempted to design

8  around the '181 patent and the '106 patent.

9           And finally, whether or not Xilinx tried

10 to cover up its infringement.

11          I will now instruct you on the rules you

12 must follow in deciding whether or not Xilinx and Avnet

13 have proven that -- that Claims 1, 3, 17, and 30 of the

14 '181 patent and Claim 8 of the '106 patent are valid.

15          An issued patent is accorded a

16 presumption of validity based on the presumption that

17 the United States Patent Office acted correctly in

18 issuing the patent.  Because of this presumption, in

19 order to prove that any claim of a patent is invalid,

20 Xilinx and Avnet must persuade you by clear and

21 convincing evidence, that is, you must be left with a

22 clear conviction that the claim is invalid.

23          Prior art may include items that were

24 publicly known or used, offered for sale, or sold in the

25 United States, or publications or patents that disclose

the claimed invention or elements of the claimed invention.

To be prior art, the item or reference must have been publicly used or known in the United States or published or patented before the invention at issue was made or patented or published or publicly used, sold, or offered for sale in the United States more than one year before the filing date of the patent application at issue.

The parties have agreed that the following is a complete list of the prior art at issue in this case:  U.S. Patent No. 6,052,773, issued to DeHon, the DeHon '773 patent.

Second, Hartenstein, Reiner W., et al., a new FPGA Architecture For Word-Oriented Datapaths, Lecture Notes in Computer Science, Volume 849, 1994.

Third, PCI Special Interest Group, PCI Local Bus Specification, Production Version, Revision 2.1, June 1995.

And finally, Xilinx, Inc., The Programmable Logic Data Book, 1996.

In order for someone to be entitled to a patent, the invention must actually be new.  In general, inventions are new when the identical product has not been made, used or disclosed before.  Anticipation must

1  be determined on a claim-by-claim basis.

2  For the claim to be invalid because it is

3  not new, Xilinx and Avnet must show by clear and

4  convincing evidence that all of the requirements of that

5  claim were present in a single previous item that was

6  known of, used, or described in a single previous

7  printed publication or patent.  We call these things

8  anticipating prior art.

9  To anticipate the invention, the

10  prior art does not have to use the same words as

11  the claim, but all of the requirements of the

12  claim must have been disclosed, either expressly

13  or inherently, to a person having ordinary skill

14  in the art in the technology of the invention, so

15  that looking at that one reference, that person

16  could make and use the claimed invention.

17  Anticipating prior art must also

18  disclose the claim requirements arranged and

19  combined in the same way as recited in the claim.

20  Something is inherent in an item of prior art if it

21  is always present in the prior art item or always

22  results from the practice of the prior art item, and

23  if a person ordinarily skilled in the art would

24  understand that to be the case.  Inherency may not be

25  established by mere probabilities or possibilities.

1  Xilinx and Avnet claim -- or contend that Claims 1, 3,

2  17, and 30 of the '181 patent and Claim 8 of the '106

3  patent are invalid because the claimed inventions are

4  anticipated.  Xilinx and Avnet must convince you of this

5  by clear and convincing evidence; that is, that the

6  evidence highly probably demonstrates that the claims

7  are invalid.

8          Here is a list of ways that Xilinx and

9  Avnet can show that a patent claim was not new or that

10  the patentee lost the right to patent the claims:

11          An invention is not new if it was known

12  to or used by others in the United States before

13  December 20, 1996.  An invention is known when the

14  information about it was reasonably accessible to the

15  public on that date.

16          An invention is not new if it was already

17  patented or described in a printed publication anywhere

18  in the world before December 20, 1996.

19          PACT has lost its rights if the claimed

20  invention was already patented or described in a printed

21  publication anywhere in the world by PACT or anyone else

22  before October 8, 1996.  An invention was patented by

23  another if the other patent describes the same invention

24  claimed by PACT to a person having ordinary skill in the

25  technology.

1       PACT has lost its rights to the claimed

2   invention or if the claimed invention was publicly used,

3   sold, or offered for sale in the United States before

4   October 6 (sic) 1996.  An invention was publicly used

5   when it was either accessible to the public or

6   commercially exploited.

7       An invention was sold or offered for sale

8   when it was offered commercially and what was offered

9   was ready to be patented; that is, a description to one

10  having ordinary skill in the field of the technology

11  could have made and used the claimed invention, even if

12  it was not yet reduced to practice.

13      Finally, an invention is not new if the

14  claimed invention was described in a patent granted on

15  an application for patent by another filed in the United

16  States and the application was filed before December 20,

17  1996.

18      Even though an invention may not have

19  been identically disclosed or described in a single

20  prior art reference before it was made by an inventor,

21  in order to be patentable, the invention must also not

22  have been obvious to a person of ordinary skill in the

23  field of technology of the patent at the time the

24  invention was made.

25      Xilinx and Avnet may establish that a

patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention as a whole would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of input/output and bus systems for programmable logic devices.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of input/output and bus systems for programmable logic devices that someone would have had at the time the claimed invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art. In considering whether a claimed invention is obvious, you should consider whether at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field of input/output and bus systems for programmable logic devices to combine the known elements in a way the claimed invention does, taking into account such factors

as:

Whether the claimed invention was merely the predictable result of using prior art elements according to their known functions.

Whether the claimed invention provides an obvious solution to a known problem in the relevant field.

Whether the prior art teaches or suggests the desirability of combining elements claimed in the invention.

Whether the prior art teaches away from combining elements in the claimed invention.

Whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified predictable solutions.

And finally, whether the change resulted more from design incentives or other market forces.

To find it rendered the invention obvious, you must find that the prior art provided a reasonable expectation of success.  Obvious to try is not sufficient in unpredictable technologies.

In determining whether the claimed invention was obvious, consider each claim separately.

Do not use hindsight; that is, consider only what was known at the time of the invention without having read PACT's patents.  In other words, you should not consider what a person of ordinary skill in the art would know at the present time or after reading PACT's patents.

In making these assessments, you should not take -- or you should take into account any objective evidence, sometimes called secondary considerations -- all right.  That was not for particular dramatic effect.

In making these assessments you should take into account any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention and afterwards that may shed light on the obviousness or not of the claimed invention, such as:

Whether the invention was commercially successful as a result of the merits of the claimed invention, rather than the results of design needs or market pressure, advertising or similar activities.

Whether the invention satisfied a long-felt need.

Whether others had tried and failed to make the invention.

Whether others treated the invention --

1  or I'm sorry, whether others invented the invention at

2  roughly the same time.

3              Whether others copied the invention.

4              Whether there were changes or related

5  technologies or market needs contemporaneous with the

6  invention.

7              Whether the invention achieved (sic)

8  expected results.

9              Whether others in the field praised the

10 invention.

11             Whether persons having ordinary skill in

12 the art of the invention expressed surprise or disbelief

13 regarding the invention.

14             Whether others sought or obtained rights

15 to the patent from the patentholder.

16             And whether the inventor proceeded

17 contrary to accepted wisdom in the field.

18             In deciding what the level of ordinary

19 skill in the field of input/output or bus systems for

20 programmable logic devices is, you should consider all

21 the evidence introduced at trial, including but not

22 limited to:

23             The levels of education and experience of

24 the inventor and other persons actively working in the

25 field.

1              The types of problems encountered in the

2    field.

3              Prior art solutions to those problems.

4              Rapidity with which innovations are made.

5              And the sophistication of the technology.

6              In considering whether the claimed

7    invention was obvious at the time it was made, you

8    should consider the scope and content of the prior art

9    that I previously identified.

10             When a party attacking the validity of a

11   patent relies on prior art which was specifically

12   considered by the Examiner during the prosecution of the

13   application leading to the issuance of the patent, that

14   party bears the burden of overcoming the deference due a

15   qualified government agency official presumed to have

16   performed his or her job.

17             If you find that Xilinx and Avnet

18   infringed any valid claim of the '181 patent or the '106

19   patent, you must then consider what amount of damages to

20   award PACT.

21             I will now instruct you about the measure

22   of damages.  By instructing you on damages, I am not

23   suggesting which party should win this case on any

24   issue.

25             The damages you award must be adequate to

compensate PACT for the infringement.  They are not
meant to punish an infringer.

PACT has the burden to establish the
amount of its damages by a preponderance of the
evidence.  While the patent owner is not required to
prove damages with mathematical precision, it must prove
them with reasonable certainty.  In other words, you
should award only those damages that PACT establishes
that it more likely than not suffered.

In this case, PACT seeks a reasonable
royalty.  A reasonable royalty is defined as the money
amount PACT and Xilinx would have agreed upon as a fee
for the use of the invention at the time prior to when
the infringement began.  A reasonable royalty may only
be applied to infringement that occurred in the United
States.

I will give more detailed instructions
regarding damages shortly.  Note, however, that PACT is
entitled to recover no less than a reasonable royalty
for the infringement.

A royalty is a payment made to a
patentholder in exchange for the right to make, use, or
sell the claimed invention.  A reasonable royalty is the
amount of any -- is the amount of royalty payment that a
patentholder and the infringer would have agreed to in

the hypothetical negotiation taking place at a time prior to when the infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patentholder and the infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.  In determining this, you must assume that both parties believed the patent was valid and infringed and that the patentholder and infringer were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, not simply a royalty either party would have preferred.

Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.  Although evidence of the actual profits an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

1            In determining the reasonable royalty,

2  you should consider all the facts known and available to

3  the parties at the time the infringement began.  Some of

4  the kinds of factors you may consider in making your

5  determination are:

6            The royalties received by the patentee

7  for licensing of the patent-in-suit, proving or tending

8  to prove an established royalty.

9            The rates paid by the licensee for the

10  use of other patents comparable to the patent-in-suit.

11  The nature and scope of the license as exclusive or

12  nonexclusive or as restricted or nonrestricted in terms

13  of territory or with respect to whom the manufactured

14  product may be sold.

15            The licensor's established policy and

16  marketing program to maintain his or her patent monopoly

17  by not licensing to others to use the invention or by

18  granting licenses under special conditions designed to

19  preserve that monopoly.

20            The commercial relationship between the

21  licensor and licensee, such as whether they are

22  competitors in the same territory in the same line of

23  business, or whether they are inventor and promoter.

24            The effect of selling the patented

25  specialty in promoting sales of other products of the

licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales.

The duration of the patent and the term of the license.

The established profitability of the product made under the patents, its commercial success, and its current popularity.

The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions.

The portion of the realizable profits that should be credited to the invention as

distinguished from non-patented elements, the

manufacturing process, business risks, or significant

features or improvements added by the infringer.

The opinion and testimony of qualified

experts.

The amount that a licensor, such as the

patentee, and a licensee, such as the infringer, would

have agreed upon, at the time the infringement began, if

both had been reasonably and voluntarily trying to reach

an agreement; that is, the amount which a prudent

licensee -- who desired, as a business proposition, to

obtain a license to manufacture and sell a particular

article embodying the patented invention -- would have

been willing to pay as a royalty and yet be able to make

a reasonable profit and which amount would have been

acceptable by a prudent patentee who was willing to

grant a license.

No one factor is dispositive and you can

and should consider the evidence that has been presented

to you in this case on each of these factors.  You may

also consider any other factors which in your mind would

have increased or decreased the royalty the infringer

would have been willing to pay and the patentholder

would have been willing to accept, acting as normally

prudent business people.

The final factor establishes the framework which you should use in determining a reasonable royalty, that is, the payment which would have resulted from a negotiation between the patentholder and the infringer taking place at a time prior to when the induce -- the infringement began.

In determining the amount of damages, you must determine when the damages began.  To do so, you may need to consider whether PACT was obligated to notify Xilinx and Avnet of its alleged infringement and, if it was, whether it properly did so.

If a patent owner offers products covered by its patent for sale in the United States or imports such products into the United States, it is required to mark those products.  Marking is placing either the word patent or the abbreviation P-A-T, period, with the patent's number on substantially all of the products that include the patented invention.  You must determine whether PACT offered for sale or imported into the United States a product that includes the claimed invention.

An offer for sale occurs when the terms of the offer are sufficiently detailed that a person could make a binding contract simply by accepting the offer.  An offer is sufficient if it identifies the

product and provides a quantity to be purchased or sold.

Advertising a product is not sufficient to constitute an offer for sale if it does not indicate that the advertising party is willing to be bound to sell the product for the terms identified in the advertisement without further discussion.

If you find that PACT offered for sale in the United States or imported into the United States a patented product, damages after such time begin when Xilinx received actual notice of the alleged infringement.  However, any damages that arose before that time are not affected.

You must determine the date that Xilinx and Avnet received actual notice of the '181 patent and the '106 patent and the specific product alleged to infringe.  Actual notice means that PACT communicated to Xilinx and Avnet a specific charge of infringement of the '181 patent and the '106 patent by a specific accused product or device.

The filing of the complaint in this case qualified as actual notice, so the damages period begins no later than the date the complaint was filed on December 12, 2007.

If you find that PACT did not offer for sale in the United States or import into the United

States a patented product, damages begin without the

requirement for actual notice of the alleged

infringement.  If you find this, damages should be

calculated as of the date you determine that the

infringement began.

You must perform your duties as jurors

without bias or prejudice to any party.  The law does

not permit you to be controlled by sympathy, prejudice,

or public opinion.

All parties expect that you will

carefully and impartially consider all of the evidence,

follow the law as it is now being given to you, and

reach a just verdict regardless of the consequences.

Answer each question from the facts as you find them.

Do not decide who you think should win and then answer

the questions accordingly.  Your answers and your

verdict must be unanimous.

Ladies and Gentlemen, I ask you now to

turn to the verdict form which is the three-page

document that you were given last.  I want to review

that verdict form with you, and then I'll come back to

the remainder of the instructions.

As you'll see on the first page of the

verdict form, it directs you in answering these

questions; you're to follow all of the instructions I've

1  given you.

2              The first question is, did PACT prove by

3  a preponderance of the evidence that Xilinx or Avnet

4  infringed the claims of the '181 and '106 patents listed

5  below?  Answer yes or no for each patent claim.  If you

6  find the claim infringed, answer yes; otherwise, answer

7  no.

8              And you'll see you have a chart below

9  which lists the five claims at issue and has a box for

10  Xilinx infringed.  And you would answer yes or no for

11  each claim as to Xilinx.  And the separate box for

12  Avnet, and you would answer yes or no as to Avnet.

13              The second question on the next page is,

14  did Xilinx or Avnet prove by clear and convincing

15  evidence that any of the following claims are invalid in

16  view of the prior art, and you would answer yes or no

17  for each claim.  If you find the claim invalid, answer

18  yes; otherwise, answer no.

19              And you see a chart, and it lists the

20  five claims and has a box for invalid as anticipated,

21  and you would answer yes or no.  And a separate box as

22  for invalid as obvious, and you would answer yes or no.

23              Then you see that you should answer

24  Claims 3 -- questions 3 through 6 only if you found at

25  least one claim both infringed and not invalid.

1          And those questions are No. 3:  Did PACT

2    prove by clear and convincing evidence that Xilinx

3    willfully infringed the '181 or '106 patents?  You would

4    write in your answer, either yes or no.

5          No. 4:  Did PACT offer to sell in the

6    United States or import into the United States a

7    patented product?  You would answer yes or no.

8          No. 5:  If you answered yes to Question

9    4, when did the earliest offer to sell or importation

10   occur?  And you would fill in a date.

11         And finally, Question 6 on the third page

12   is:  What sum of money do you find from a preponderance

13   of the evidence would fairly and reasonably compensate

14   PACT for the patent infringement you found?  And you

15   would fill in a dollar amendment.

16         The person you elect as your Foreperson

17   would sign and date the form and advise the bailiff that

18   you were ready to return your verdict.

19         Now, Ladies and Gentlemen, we will now

20   with that take the morning recess.  We'll take 15

21   minutes, and then return, and the lawyers will present

22   their closing arguments.  So with that, we'll adjourn.

23         LAW CLERK:  All rise.

24         (Jury out.)

25         THE COURT:  Is there anything we need to

```
 1  put on the record before the break?
 2              MR. GRINSTEIN:  Not from the Plaintiff,
 3  no.
 4              MR. COHEN:  Probably should to have the
 5  record clear that in one of the definitions you left out
 6  the word permanent.
 7              THE COURT:  I did?
 8              MR. COHEN:  I believe.
 9              THE COURT:  Where is it?
10              MR. COHEN:  It was the definition of
11  interface unit.
12              THE COURT:  Are you -- are you saying
13  that the written --
14              MR. COHEN:  No, the written is fine.
15  I -- I --
16              THE COURT:  I -- in my reading of it I
17  left it out?
18              MR. COHEN:  Yeah, I believe so, Your
19  Honor.  That would be Page 5, the term interface or
20  interface unit means.
21              THE COURT:  Does anyone -- is that a
22  consensus?  Did anyone else notice that?
23              MR. GRINSTEIN:  Possible to check the
24  transcript or too soon?
25              THE COURT:  Let me see.
```

```
 1                    MR. COHEN:   Your Honor, I just want to

 2   make sure the record was clear.

 3                    THE COURT:   Okay.  Well, I -- you -- are

 4   you requesting that some action be taking -- taken about

 5   that?  I mean, the jurors do have a copy in their

 6   notebooks that they've had and there's a -- they have a

 7   copy of the printed instructions.  I am sure I did

 8   occasionally change a word here or there in the course

 9   of the 15 pages, but --

10                    MR. AROVAS:   Your Honor, we would

11   actually request, just in case any of the jurors took

12   notes or were recording that, that is obviously of all

13   the words in the case probably the single most

14   significant one and one that we're going to be talking

15   about a lot in closing.

16                    Now, you know, from our side, I don't

17   think any of the rest of us or that the transcript can

18   say for sure.  I mean, Mr. Cohen was the one designated

19   to try to track as the -- the portions of the charge was

20   being read, so just in case --

21                    MR. GRINSTEIN:  Mr. Cohen.

22                    MR. AROVAS:   -- yeah, an enviable job,

23   but just because it is such a central word, we would

24   request that that piece just be reread to the jury.

25                    MR. GRINSTEIN:  I don't have a problem,
```

```
 1  of course, rereading it if it wasn't in the transcript.

 2  I understand that maybe we can see the transcript and

 3  then --

 4                 THE COURT:  All right.

 5                 MR. AROVAS:   Of course, obviously, if

 6  it's in the transcript --

 7                 THE COURT:  All right.

 8                 MR. AROVAS:   -- we have no issue.

 9                 THE COURT:  We'll check on that during

10  the break, and we're in recess.  Thank you.

11                 MR. AROVAS:  Thank you, Your Honor.

12                 (Recess.)

13                 LAW CLERK:  All rise.

14                 THE COURT:  Before we bring in the jury,

15  I will note that I am going to reread the claim

16  construction on interface.  It just -- so there will be

17  no issue about that, I'll simply reread that.  You can

18  tell them it's because I may have misspoken, and then

19  I'll turn it over for closing argument.

20                 MR. BAXTER:  Thank you, Your Honor.

21                 MR. GRINSTEIN:  Thank you.

22                 THE COURT:  Thank you.  Bring in the

23  jury.

24                 (Jury in.)

25                 THE COURT:  Thank you.  Please be seated.
```

```
 1              Ladies and Gentlemen, it has been pointed
 2  out to me that I may have misspoken during my reading of
 3  one of the claim constructions to you, and I'll say
 4  generally, if at any point I misspoke in giving you
 5  these instructions, the printed instructions that you
 6  have are -- are what we have carefully put together.
 7  But I do want to give you, again, the claim construction
 8  for interface or interface unit.
 9              The term interface or interface unit
10  means unit providing permanent implementation of a bus
11  system control for communicating information across a
12  shared boundary.
13              And if I said anything different during
14  my earlier instructions, you should disregard that.
15              And with that, I would ask you to give
16  your attention at this time to the lawyers for their
17  closing arguments, and we'll start with the Plaintiff.
18              MR. GRINSTEIN:  Good morning, Ladies and
19  Gentlemen of the Jury.
20              Let me be the first person to thank
21  you-all for your time and attention during this long
22  week and for your jury service.  I know this trial has
23  caused you-all to be away from your families, from your
24  homes, from your jobs, all to help us resolve this
25  dispute.
```

1          And I also know I can speak on behalf of

2   both sides to tell you that we very, very much

3   appreciate your jury service.

4          Out of the box, that is a phrase we've

5   heard a lot during this trial.  In fact, I had one of my

6   colleagues count it up.  It's been said 47 different

7   times during this trial.  It's kind of catchy.  It's

8   easy to remember.  And as a description of PACT's

9   patented inventions, it is utterly and completely wrong.

10          In fact, if we want to talk about boxes,

11   their real issue in this case is that Xilinx is boxed

12   in.  Xilinx is boxed in by the language of the claims of

13   these patents.  Xilinx is boxed in by the Court's

14   definition of those claims.  And Xilinx is boxed in by

15   all of those bad documents you've seen during this case.

16   Maybe that's why Xilinx wants to talk about out of the

17   box so much, because Xilinx wants you, Ladies and

18   Gentlemen of the Jury, to let it out of that box.

19          But I don't think you-all should.  I

20   don't think you should let Xilinx out of that box.  And

21   that phrase out of the box certainly has nothing to do

22   whatsoever with the patented inventions in this case.

23          Before I get to those patented

24   inventions, I want to spend a few minutes talking about

25   some of the sideshows we've heard about in this case.

One of the sideshows we heard about in this case was that PACT was a bad business and PACT had a bad chip.  You heard that over and over and over again from the Defendants.

And you know what, as an initial matter, we disagree with that.  We think PACT has had quite a few successes for a small startup company.  60 patents granted in the United States, a deal to put its chips on satellites going into space, praise from folks like Lawrence Livermore National Laboratory, technology collaboration with Intel.

But at the end of the day, all of that really doesn't matter anyway.  It's a sideshow.

Think about it this way:  If you have a piece of property and you wanted to drill for oil on your land and, you know what, you hit a dry hole, does that give Exxon the right to come on your land and drill its own well on your land just because you couldn't drill a successful well yourself?

Of course not.  If Exxon came on your land and started drilling your land and taking your oil, they would owe you a royalty, because that property is not Exxon's property.

And it's the same thing here.  Whether or not PACT had a good business or whether or not PACT had

1 good or bad chips makes absolutely no difference,

2 because it doesn't give Xilinx the right to come on to

3 PACT's intellectual property and take it without paying.

4           And even more importantly, whether or not

5 PACT had a good business and whether or not PACT had a

6 good or a bad chip says absolutely nothing about the

7 value of its patents.  And you don't have to take that

8 from me.  You can take that from the patent grab e-mail

9 where Mr. Parlour says very clearly just the fact that a

10 business doesn't do well commercially doesn't mean it

11 has bad technology.

12           You can take that from the testimony of

13 Dr. Bolsens, who said, you know what, just because a

14 company doesn't do well out in the marketplace has

15 nothing to do with whether or not it's got good patents.

16           In fact, you don't have to take this from

17 me; you don't have to take this from Xilinx.  You can

18 take it from the Court, because the Court told you in

19 its instructions that a patent owner is entitled, under

20 the United States Constitution, to come into this Court

21 and defend its intellectual property rights.

22           And it doesn't matter how big they are;

23 it doesn't matter who owns them; it doesn't matter what

24 kind of a business they are.  They all have the same

25 right to protect their intellectual property.  So that

1 is a sideshow.

2                    Another sideshow we heard about in this

3 case was this whole argument of PACT must have

4 investigated Xilinx.  And I have to confess, I had a

5 hard time following this argument.  It was a complicated

6 contraption of an argument, but as I basically

7 understand it, the argument went:

8                    PACT knew it had to investigate folks who

9 it does business with.  One of those folks was Xilinx.

10 Xilinx's information was on the internet.  PACT,

11 therefore, must have gone on the Internet and researched

12 Xilinx.  PACT did not accuse Xilinx of infringement

13 years ago.  Xilinx rejected a business deal with PACT in

14 2006, and so, therefore, PACT sued Xilinx in 2007

15 because of sour grapes.

16                    That argument was a mouthful.  And it's

17 also based completely on speculation and guesswork and

18 not a single real document out of PACT's files, and it

19 makes not one whit of sense.

20                    Because as you've heard the testimony,

21 which Xilinx loved to tell you about, PACT had gone out

22 and tried to do business deals with 75 different

23 companies.  But did it file 75 different lawsuits?

24 No.  The only company it's filed suit against is Xilinx,

25 because in 2007, Xilinx -- PACT discovered Xilinx was

taking PACT's intellectual property.  So this whole business about PACT must have investigated Xilinx is a sideshow.

Another sideshow in this case, Robert Munch, the co-inventor.  I bet you-all thought it was interesting that Xilinx was calling on its behalf one of the co-inventors of the patents, but what did we really learn from Mr. Munch?

We learned that Xilinx had paid him $80,000 to fly all the way over here from Zurich, Switzerland, and testify opposite Mr. Vorbach, despite the fact that he says:  I don't actually mind PACT.  I had a good experience with them.  I made my way forward there.

And all of that should make you think. Why do you suppose someone would come all that way to testify against his former employer, unless there was an ulterior motive?  So it's up to you-all to judge the credibility of Mr. Munch, and it's up to you-all to decide who really is the best person to be describing how PACT's inventions came to be.

So those are the sideshows I wanted to get out of the way.

What I want to focus on right now are the real issues in this case.  And there are three big,

1  significant issues in every patent case.  Those issues

2  are infringement, validity, and damages.

3            Although I should tell you that this case

4  was kind of strange, because Xilinx treated those last

5  two, validity and damages, kind of like an afterthought

6  as I'm going to describe to you in just a few minutes.

7  But let's talk about infringement first.  Infringement

8  is the biggest issue in this trial, and that is where

9  PACT tried to keep its focus.  The first thing I should

10  say is I probably don't have to remind you that there

11  was a lot of technical information that was presented to

12  you during the course of this trial.

13            And one way for you-all to resolve all of

14  that technical information is to consider the parties'

15  expert witnesses.  Consider which of them was the best

16  qualified to testify about what they were saying and

17  which of them appeared to be towing the company line.

18            On the one hand, you had Dr. Tredennick.

19  Dr. Tredennick has a Ph.D. in electrical engineering,

20  has a boatload of prestigious engineering awards.  He

21  was the chief scientific officer at Altera, the number

22  two FPGA company.  He holds FPGA patents.  He's written

23  FPGA articles.  He was the keynote speaker at FPGA

24  conferences.  And even Xilinx issued a press release

25  calling him an industry pioneer.  And they even tried to

1    hire him to be their chief scientist.

2                I don't think you could possibly imagine

3    a better qualified, a more qualified FPGA expert than

4    Dr. Tredennick, which is why we submitted him to the

5    Court, and Xilinx didn't object, as an expert in FPGAs.

6    Who was Xilinx's expert?

7                Xilinx's expert was Mr. McAlexander.  And

8    I don't mean to be critical of him personally.  He

9    seemed to be a very nice man to me.  That being said, he

10   cannot hold a candle to Dr. Tredennick in terms of FPGA

11   qualifications.

12               Mr. McAlexander has no prestigious

13   engineering awards.  He's never worked at an FPGA

14   company.  He holds no FPGA patents.  He's written no

15   FPGA articles.  He's given no keynote speeches at FPGA

16   conferences.  He hasn't even attended any FPGA

17   conferences.  And there's certainly no press releases

18   from Xilinx praising him as a visionary.

19               In fact, Xilinx didn't even offer up

20   Mr. McAlexander as an expert in FPGAs.

21               Don't you think that was odd?  Don't you

22   think that it was odd that Xilinx, the world's largest

23   FPGA-maker, tried to argue to you-all that it didn't

24   need an expert in FPGAs on its side in this case?

25               We spent this entire trial talking about

1  Xilinx's FPGAs, but Xilinx tried to suggest to you we

2  don't need an FPGA expert.

3                    At the end of the day, Mr. McAlexander's

4  chief qualifications appear to be that he knows a lot of

5  stuff about electronics generally and that he is a very

6  practiced professional witness.  How practiced and

7  professional?

8                    Well, we showed you how practiced and

9  professional Mr. McAlexander is.  Very practiced and

10 professional.

11                   And that -- that should raise a question

12 in you-all's mind about Xilinx's non-infringement

13 position in this case.  Because if you asked Xilinx,

14 they will tell you that they are world-renowned.  They

15 are the leader of the FPGA industry.  Everyone who's got

16 an FPGA or is thinking about an FPGA knows and respects

17 Xilinx.

18                   So why isn't -- why isn't it that Xilinx

19 couldn't have opened up its Rolodex and found one of its

20 colleagues in the FPGA industry to come in here and

21 testify on its behalf in this trial?

22                   The reason is, because no one with any

23 real FPGA industry experience would dispute that

24 Xilinx's products have a permanent bus interface

25 pursuant to the way that is used in the claims of the

1    patent.

2              No one in the FPGA industry would ever

3    argue that, because Xilinx's products are designed to be

4    bus interfaces.  They're always used as bus interfaces,

5    and they can't be reconfigured to be anything but bus

6    interfaces.

7              So maybe the reason why Xilinx ended up

8    hiring a practiced professional witness in this case is

9    because Xilinx's non-infringement arguments are less

10   about the technical issues and are more about word games

11   that practiced professional witnesses are very good at

12   playing.  That's something I think you-all should

13   consider.

14             So let's talk about the infringement

15   issues in this trial.  And remember what I told you

16   in -- in the opening statement.  The claims are the name

17   of the game for infringement.  In fact, the Court just

18   told you the same thing.  You must focus on the claims.

19   And remember how I also told you in opening that Xilinx

20   was going to do its best to divert your attention away

21   from the claims.  They want to spend their whole time

22   looking for places other than the claims to define the

23   inventions, like the rest of the patent, like

24   co-inventors they flew in from Zurich, Switzerland.

25             But as the Court told you, the place

where you define the invention, the place that tells you what the invention is are the claims of the patent. Nowhere else.

Now, to be fair to Xilinx, they did play lip service to the claims.  Like Mr. McAlexander, he told you, oh, yes, yes, yes; the claims define the invention.  But virtually in the next breath, he says, oh, wait a minute; the patent specification, this is the invention.

And that was Xilinx's tactic during this trial, was to try to go find other places to define PACT's inventions, other than the claims, and then come back to the claims and say our definition is consistent with the claims.  That's what Xilinx did.

But the Court told you you should start and stop with the claims, and the Court's definition of the claims.  Those are the inventions.

So let's take a look at the word in the claims that Xilinx does not like.  That word is permanent.  You can see where it appears in the claims right there.  And you heard Dr. Tredennick testify to you that permanent means not built out of those configurable logic blocks.

In simple terms, that means if a piece of logic is a bus interface, it's always going to be a bus

1  interface.  It can't be changed to be something else.

2  It's like a permanent translator that speaks a variety

3  of languages.  That translator is always going to be a

4  translator, but you can program it and tell it, hey,

5  please talk another language to me.

6           And at this point, I've gotten to my

7  favorite part of this argument, because I get to play

8  LEGOS with you-all.  And I bought the three-year-old

9  version of LEGOs, A, because they're bigger and easier

10 to see; and, B, because my LEGO-building skills are

11 about the level of a three-year-old.

12          Remember when I told you in opening

13 argument that you could liken the word permanent to a

14 prebuilt LEGO roof piece.  This thing is a roof.  It's

15 always going to be a roof.  I could toss it in the air.

16 I could drop it on the ground.  That thing is still a

17 roof.

18          Now, it may be when I'm building my

19 LEGOs, I connect my roof up to some other pieces so that

20 my roof can be configured to be into a building of some

21 sort, but that doesn't change the fact that the roof is

22 still the roof.  It is still permanent.

23          Another thing I did was build a roof out

24 of individual LEGO pieces, and trust me, this was

25 supposed to be a roof.  Is this thing permanent?

```
 1                     I don't think so, because, look, that's

 2    not permanent (demonstrates).  Now I've got individual

 3    LEGO pieces, and I can go and use these LEGO pieces to

 4    build something else.  That's what permanent and not

 5    permanent means in the language of the claims.

 6                     And so there is no doubt that Xilinx's

 7    products have a permanent interface, and that that

 8    Xilinx interface includes a permanent implementation of

 9    a bus control system.  You heard Mr. Menon testify, I

10    agree, you know what, the RocketIOs, they're not made

11    out of LEGOs; the EMACs, they're not made out of LEGOs;

12    the PCIe, that's not made out of LEGOs either.

13                     And as we further showed to you, all of

14    those particular instrumentalities have a permanent

15    implementation of a bus control system.  For the Es and

16    the Ps, it's this thing called flow control.  It's right

17    there.  It's permanent.  That's not made out of LEGO

18    blocks.

19                     In fact, there wasn't even any dispute in

20    this case that flow control is a bus control.  It's got

21    the word control in its name.  And even Mr. McAlexander

22    didn't come up and dispute that.

23                     And for the RocketIO, the permanent bus

24    system control is this serializer/deserializer.  Those

25    are permanent parts of the RocketIO.  They're not going
```

1  anywhere.  If you drop them on the ground, they would

2  still be there.

3              And the serializer controls the

4  serialization of data coming -- going off the chip via

5  the bus system, and the deserializer controls the

6  deserialization of data coming on to the chip via the

7  bus system.  That's what Dr. Tredennick told you.

8              So because the right way to use the words

9  in the claims is so simple and because infringement is

10 so clear, Xilinx hates the word permanent.  And that's

11 why they spent this whole case trying to redefine the

12 word.  That's why they've spent this whole case trying

13 to convince you that permanent means without any

14 programming, or permanent means out of the box.

15             But you can -- you're going to have in

16 front of you all the claims in this case, and you're

17 going to have in front of you all the Court's claim

18 constructions.  And you can review those words for

19 yourself.  And nowhere in there are you going to see

20 anything that says permanent means without any

21 programming.

22             You won't see without any programming in

23 any of that.  You won't see out of the box in any of

24 that.  Xilinx is making those words up and trying to

25 insert them into the claims, because it's otherwise

```
1   boxed in by those claims.
2              At the end of the day, all the
3   programming that Xilinx is referring to is connecting
4   these LEGO blocks up to other LEGO blocks in order to
5   build some sort of a further structure.  But the fact
6   that you have to connect a LEGO block up to the roof
7   doesn't change the fact that the roof is permanent.
8              Each of Xilinx's bus interfaces are
9   permanent interfaces in the same way.  They have to have
10  pieces added to them, but that doesn't change the fact
11  that they themselves are permanent.
12             Now, another key piece of the
13  infringement case in this particular case is all of
14  those documents that you saw where Xilinx was talking
15  about how much it wanted PACT's patents and how it
16  wanted to fetch them out of bankruptcy.  And that's
17  really interesting.
18             Why was Xilinx so interested in PACT's
19  patents?
20             I mean, do you remember Dr. Trimberger's
21  testimony?  He told you that Xilinx is basically a
22  patent machine.  I mean, if you go down the lunch -- go
23  down the hall to go eat lunch at Xilinx, you pass by
24  2,000 patents.  I kind of got the impression that if a
25  Xilinx engineer sneezes, a patent comes out.  I mean, it
```

1  is all about patents there.

2            So why were they so interested in our

3  patents?  It's not like they needed to add to their

4  collection, unless, of course, there was something

5  special about our patents; unless, of course, Xilinx

6  knew that it was infringing them.

7            The next thing I want to talk to you

8  about is validity.  And as you've heard from the Court,

9  every patent is presumed to be valid, and in order to

10  overcome that presumption, Xilinx has to present to you

11  clear and convincing evidence of invalidity.  It's a

12  huge burden.

13            And I bet when you heard the Court's

14  preliminary instructions in this case on Monday, you

15  probably thought validity was going to be a big deal in

16  this case, because the Court spent like five minutes

17  telling you all about invalidity defenses.

18            And yet when Mr. Baxter got up to deliver

19  Xilinx's opening, the word invalidity didn't come out of

20  his mouth.  In fact, in this entire trial, I counted it

21  up; Xilinx spent about 20 minutes talking about

22  invalidity.  20 minutes.

23            And the reason why Xilinx doesn't want to

24  talk about invalidity is because Xilinx is embarrassed

25  by the issue.  Because as we told you, in 2009, Xilinx

1 ran to the Patent Office and tried to get the Patent

2 Office to take away PACT's patents in re-exam.

3           But that didn't work, and now Xilinx has

4 got egg on its face, and it doesn't like mentioning

5 invalidity, because when it mentions invalidity, we

6 mention the re-exams.  And when we mention the re-exams,

7 you're reminded about all of Xilinx's efforts over the

8 years to avoid this day in Court and to avoid doing the

9 right thing.

10           All that being said, Xilinx couldn't help

11 itself, so it had to come up with some invalidity theory

12 in this case, and the invalidity theory it chose was

13 this DeHon patent.  And, frankly, we were quite

14 surprised when Xilinx rolled out the DeHon patent,

15 because the DeHon patent is a patent that Xilinx put in

16 front of the Office -- the Patent Office in the

17 re-examinations, in the '181 and the '106 patents.

18           It submitted it to the Patent Office, and

19 the Patent Office said no way.  The Patent Office said

20 DeHon does not invalidate PACT's patents.  And, in fact,

21 DeHon was in front of the Patent Office in the original

22 '106 patent.  So the Patent Office has looked at

23 Xilinx's smoking gun invalidity evidence three times,

24 and each of those three times the Patent Office has said

25 that does not invalid PACT's claims.

1              So I certainly don't think Xilinx has

2  come even close to clear and convincing evidence of

3  invalidity.  Although there's probably another reason

4  why Xilinx doesn't want to talk about invalidity in this

5  case, because when Xilinx brings up invalidity, we bring

6  up the re-exams.

7              And when we bring up the re-exams,

8  you-all might start to ask yourselves a question, and

9  that question is:  If Xilinx is so sure that it doesn't

10  infringe these patents, if it's so clear that PACT's

11  permanent bus system is nothing like their permanent bus

12  system, then why did they spend all that time and effort

13  and money going to the Patent Office trying to

14  short-circuit this trial and prevent this day in Court

15  by getting the Patent Office to take away PACT's

16  patents?

17              Why did they need to do that, if it's so

18  clear that they didn't infringe?

19              Why did they need to throw that Hail Mary

20  pass to the Patent Office, if there's no question that

21  they trust you, the jury, to find non-infringement?

22              It's a question you-all should ask

23  yourselves.

24              The last issue in any patent case is

25  damages, and usually in a patent case, this particular

1    issue is hotly disputed, except this was an unusual

2    patent case, because it really wasn't.  We put before

3    you the testimony of Mr. Jim Nawrocki, who ran through a

4    very reasoned, calculated basis for awarding PACT

5    damages of $30.8 million.

6                    And as we've seen in PX 318, Xilinx's

7    sales of all these infringing chips have been ramping up

8    year after year after year, willfully infringing PACT's

9    patents.  And Mr. Nawrocki put in front of you all the

10   various Xilinx documents which showed just how important

11   all of these features were to Xilinx and why they're

12   worth that much money to PACT.

13                   In response, the Defendants put up the

14   testimony of Ms. Woodford, and Ms. Woodford's damages

15   model actually agreed with PACT on almost every factor.

16   The only difference between her model and PACT's model

17   was her final conclusion, her final number, $4 million.

18                   But as you remember on cross-examination

19   yesterday, the only way that Ms. Woodford got to $4

20   million was by cherry-picking out all the bad numbers

21   that hurt her model, and she cherry-picked out those

22   numbers to keep the damages low.

23                   If you actually used all the data like we

24   showed you yesterday, under her model, the damages would

25   be $79.5 million.  All that just goes to show how

1 reasonable PACT's 30.8-million-dollar damage number

2 really was.

3                  Now, at this stage, what I'd like to do

4 is talk to you a little bit about the jury verdict form.

5 Mr. Diaz, would you mind -- thank you very much.

6                  You will get a verdict form in this case.

7 And the first question you're going to be asked is:

8                  Does Xilinx infringe Claim 1 of the '181

9 patent?

10                  Relying upon Dr. Tredennick's testimony,

11 the answer to that question would be yes.  To save

12 everybody time, I'll just write in Ys on the rest of

13 these questions.

14                  So the first question, infringement, just

15 based on the differences between Dr. Tredennick and Mr.

16 McAlexander, you can write in yeses, not to mention the

17 mountain of technical information which we provided to

18 you to proving that up.

19                  Now, as to Avnet, I should add there

20 hasn't been much discussion of Avnet in this case.  The

21 only discussion of Avnet, in fact, was Dr. Tredennick,

22 who proved up that Avnet sells Xilinx's infringing

23 products.  That's enough for infringement.  That's why

24 there's a yes on Avnet.

25                  On invalidity, as I previously said, they

1  don't even get close on invalidity.  Therefore, when

2  you're asked the question:  Are the claims invalid, you

3  write in, please, no, no, no, no, no.  They're not

4  obvious either:  No, no, no, no, no.

5              The next question asks you as to

6  willfulness.  I think we've more than proven up to you,

7  Ladies and Gentlemen of the Jury, that Xilinx has been

8  willfully infringing PACT's patents.  Just think back

9  upon all the documents.  Think back upon the e-mails.

10  Think about Dr. Bolsens' testimony on the stand.  The

11  answer to that question is yes.

12              Question No. 4:  Did PACT offer to sell

13  in the United States or import into the United States a

14  patented product?

15              You heard testimony after testimony after

16  testimony that PACT never sold a product in the United

17  States.  They never brought one in that was ready for

18  sale.  I mean, Xilinx wants to talk about this 2006

19  offer for a chip that was made to Xilinx, but there

20  actually wasn't any chip product that existed at that

21  time.  It hadn't yet been made.

22              So the answer to this question, did PACT

23  offer to sell in the United States or import into the

24  United States a patented product, the answer to that

25  question is no.  And if you answer that question no, you

1   don't have to answer Question 5.

2                 Then the final question you're going to

3   be asked is:  What's the fair damages in this case?

4   As I just mentioned to you, Mr. Nawrocki more than

5   easily proved up $30.8 million as fair compensation for

6   PACT in this case.  So the answer to this question is

7   $30.8 million.

8                 Ladies and Gentlemen of the Jury, I

9   get -- I'm sitting down now, and I get to stand back up

10  after the Defendants close to give you a few further

11  thoughts.  But I do want to leave you with something

12  before I sit down.

13                Like I said to you in opening, this case

14  is about something more than simple trespassing.  This

15  case is about doing the right thing.  And I think we

16  have more than proven up to you in this case that Xilinx

17  has not done the right thing.

18                Xilinx tried and plotted for years to

19  extract confidential information out of PACT.  And, in

20  fact, yesterday on the stand it admitted it breached a

21  non-disclosure agreement in doing that.  Xilinx plotted

22  for years to put PACT into bankruptcy so it could get

23  PACT's patents on the cheap.  And Xilinx tried to take

24  away those patents in re-exam, rather than face its day

25  in Court here.

```
 1                   So I think, Ladies and Gentlemen of the
 2   Jury, it's time for you to make Xilinx do the right
 3   thing.  It's time for you to show Xilinx it's time to do
 4   the right thing.
 5                   Thank you.
 6                   THE COURT:  Thank you, Mr. Grinstein.
 7   Mr. Arovas.
 8                   MR. AROVAS:  And, Your Honor, before I
 9   start, may I just put up one board that was used with
10   Mr. McAlexander?
11                   I'm going to put it over here next to the
12   lectern, because we can't --
13                   THE COURT:  That's fine.
14                   MR. AROVAS:  -- obviously block the
15   screen.
16                   THE COURT:  That's fine.
17                   MR. AROVAS:  May it please the Court.
18                   Ladies and Gentlemen of the Jury, thank
19   you for your time and attention.  I actually want to
20   join Mr. Grinstein in thanking you for your service.
21   I know this is a long trial.  I know the information was
22   technical.
23                   And I can bet that two weeks ago, before
24   you were impaneled on this jury, learning about FPGAs
25   probably wasn't high on your to-do list.  But you did
```

1  get to learn a little bit, and I hope some of it was

2  interesting and some of it may be even entertaining.

3              Now, what I'd like to do is start from

4  the very beginning, and from the very beginning of this

5  case, from the opening statement that Mr. Baxter gave,

6  he said this case is about non-infringement.  Actually,

7  that's something that Mr. Grinstein mentioned, and we

8  strongly agree with that.

9              And we told you that the Xilinx products

10 are different.  We told you the Xilinx products uses a

11 fundamentally different approach.  Now, that was the

12 beginning, and we were telling you what we intended to

13 show you.

14             And think about what we did over the last

15 week.  We brought to you two of the absolute most senior

16 technical scientists and engineers from Xilinx to tell

17 you about how the products worked and how they were

18 different.  And I want you to try to think back to

19 that -- that part of the trial.

20             How many questions did -- did PACT's

21 lawyers actually ask Mr. Menon and Dr. Trimberger, who's

22 sitting right over here, about the details of how those

23 products worked?

24             Those cross examinations lasted minutes.

25 Why did they do that?  They had the people on the stand

under oath.  They could have asked them every question
they wanted to, and they didn't.  Ask yourself why they
conducted the trial that way.

                    We're going to talk later about
Dr. Tredennick.  You heard opinions from Mr. McAlexander
about issues of infringement and validity.  And, of
course, Dr. Tredennick has the right to get up and
respond to those.  Where was Dr. Tredennick at the end
of the case?

                    He's sitting right here in the back.  We
can see him over there in the front.  In fact, he was
here the last day of trial where they could have put him
up on the stand.  They could have said Mr. McAlexander
is wrong.  They could have gone through and said look
what Mr. McAlexander said.  We've got a transcript here.
They could have showed you exactly what Mr. McAlexander
said and tried to prove to you they were wrong.

                    Why do you think the chair stayed empty?

                    Because they didn't have a response.  He
was here.  We had the time, but he didn't take the
witness stand.  So think about the evidence that you
actually saw in this case.

                    Dr. Trimberger, one of the visionaries in
the field of FPGAs, 190 patents, a Xilinx fellow, an
IEEE fellow.  He got up to you and he talked about the

1  architecture, how the architecture works and why it

2  works that way.

3              Mr. Menon.  We brought you the senior

4  most engineer who was in charge of the chips and the

5  blocks that you have to make a decision on in this case,

6  the guy who did it hands-on.

7              What were the questions from PACT about

8  how that worked?

9              It didn't happen.

10             And Mr. McAlexander -- and this I find

11 really interesting.  Mr. Grinstein wants to say he's not

12 taking anything away from Mr. McAlexander.

13             Mr. McAlexander happens to be one of the

14 world's foremost experts in buses and interface

15 technology starting at Texas Instruments, and he's been

16 doing this for 40 years.

17             Now, you remember that chart that

18 Mr. Grinstein showed you, where he compared the two

19 experts?

20             It sounded like what the expertise would

21 need to be in this case is on FPGAs, right?  And so we

22 would expect to see that in the Court's jury

23 instructions.  But what's interesting -- if we could

24 have the ELMO.

25             And let's take a look at exactly when the

1  Court talked about the field of somebody of ordinary

2  skill in the art, what is it?  In the field of

3  input/output and bus systems for programmable logic

4  devices.  This is in the jury instructions.  You'll see

5  it on Page 9.  You can read it yourself.

6               Go to the next paragraph.  Level of

7  ordinary skill in the field of input/output and bus

8  systems for programmable logic devices.  This is the

9  relevant field and skill in the art.  In this case, it's

10 for determining validity.

11              Relevant field for the patent, right?  It

12 doesn't say FPGAs.  Now, of course, Mr. McAlexander has

13 designed with FPGAs.  He's destructively tested FPGAs,

14 and he talked about that as well as numerous other

15 programmable logic devices.  But the issue in this case,

16 the issue we've been talking about in the whole case is

17 this, right?  The permanent implementation of a bus

18 system control.  And that's what this case is about.

19              Now, because the main issue is the issue

20 of infringement, and I agree with Mr. Grinstein that

21 there are quite a few of sideshows.  Mr. Baxter and I

22 have decided to divide up the closing argument.  I'm

23 going to address the issue of infringement.  And when

24 we're done, hopefully, you'll see that should be the end

25 of this case.

```
 1              Mr. Baxter is going to address some of
 2  these other issues, issues that I believe PACT is
 3  focusing on, because more than anything, they don't want
 4  the focus on the problems with their infringement case.
 5              So let's start with what happen matters
 6  in a patent case.  As I said, a patent case is about
 7  patent claims.  And here we have one and we know we have
 8  five in the case.  Now, we have to decide, and it's a
 9  process, and the jury instructions say, you take those
10  claims and you compare it against the product, and you
11  have to see if each and every word of those claims in
12  the product.
13              Now, the Court helped us, and the Court
14  gave us some definitions that we can use for purposes of
15  this.  And now, Mr. Grinstein was up here telling you
16  just minutes ago how we don't want to look at the claims
17  and the claim construction.  I don't even think we're at
18  the same trial.
19              Mr. McAlexander was up on the stand for
20  over three hours.  Do you remember that board that was
21  setting over there on the easel?  That's this board
22  right over here (indicates).
23              And one of the things it has on it, it
24  has the claim and it has the claim constructions that
25  are applicable.  In fact, that is the key issue.  When
```

1  you saw the presentation from Mr. Grinstein, you didn't

2  see that focused on.

3                  In fact, he called using the word

4  permanent, which is used by the Court in the claim

5  construction, a word game.  And so what I want to do is

6  I want to actually take a close look at what we have to

7  work with, what is it -- what's the right answer here,

8  when we look at the claim construction and look at the

9  evidence.

10                 And let's focus very closely on this

11 definition of interface unit, and that's one of the

12 terms that's in the claims.  It's in all of the claims.

13 And what it says is a permanent implementation of a bus

14 system control for communicating information.

15                 What Mr. Grinstein wants to do is just

16 focus on the word permanent.  You heard Mr. McAlexander

17 tell you, all the circuits on the chip are permanent.

18 They're always permanent.  The question is, what are

19 they doing?

20                 And the construction tells us what it

21 needs to do.  A unit providing a permanent

22 implementation of a bus system control.  So we're not

23 looking for a permanent circuit.  The CLBs that

24 everybody agrees in this case are completely and totally

25 programmable, is as permanent as any other circuit.

```
 1                 But what it isn't, it doesn't have
 2  permanent functionality, a permanent bus system control
 3  baked into it.  And what is -- when we look at this
 4  phrase, what is being controlled?  A bus system.
 5                 And guess what, we have a definition of
 6  bus system.  It's used to communicate information
 7  according to a bus protocol.
 8                 So PACT wants to and, in fact, needs to
 9  run from these claim constructions as the only way it
10  can make its case.
11                 Now, I brought this up with
12  Dr. Tredennick, and I don't know if you remember, but he
13  had that shopping cart example or analogy that he used.
14                 And I asked him, I said:  Well, if I
15  asked your wife -- if your wife asked you to go to the
16  store and said buy me a loaf of bread and you came back
17  with just an itty-bitty slice of bread, what would the
18  reaction be?
19                 The reaction would be:  What did you just
20  do?  You brought me a slice of bread.  I told you to get
21  me a loaf.
22                 And if we look at the claim construction,
23  I asked him about that.  And this is actually a
24  demonstrative exhibit.  This is what I put on the
25  screen.  The claim construction I asked Dr. Tredennick
```

1   how he was actually applying that claim construction.

2   And we see here it's the same words we saw from the

3   Court's construction:  A unit providing a permanent

4   implementation of a bus system control.  And he wants to

5   read in -- it's a little faint -- an aspect of bus

6   system control.  That is not in the Court's

7   construction.  If they wanted, they could have asked the

8   Court to put it in there.  They didn't.

9            It says a bus system control.  We have to

10  use the Court's constructions as they exist

11  word-for-word.  And just think about it with a loaf of

12  bread.  If I said a permanent implementation of a loaf

13  of bread.  It's not a slice.  Its' not an aspect of.

14  It's the loaf.

15           And we know what this loaf is supposed to

16  do because the Court told us.  You have control of a bus

17  system, so it's bus system control, so you're

18  controlling a bus system.  You don't have to have more

19  than one protocol.  You can, but you have to have at

20  least a protocol, because bus system is used to

21  communicate information according to a bus protocol.

22           So think a little bit as you deliberate

23  who is actually running from the claim constructions,

24  who is changing the claim constructions.  And we didn't

25  hear from Dr. Tredennick to get back up on that stand

1   and explain to us why any of that is wrong.

2                    And why is it that they needed to run

3   from the claim construction?  And we finally, after a

4   long time with Dr. Tredennick, got to it.

5                    The issue is, Dr. Tredennick admits

6   there's no infringement, unless he can read an aspect of

7   it into that claim construction.  I asked him that, and

8   I said:  Let's say the jury were to conclude that it

9   doesn't just have to be an aspect of bus system control,

10  but what you actually have to find is actually control

11  of the entire bus system.  A bus system.  The bus

12  protocol as defined.

13                   There would be no infringement, correct?

14  Yes, I believe that's true.

15                   They don't only run from the claim

16  construction, they run from the entire patent.  I have

17  to tell you -- and I am not saying that this changes the

18  claim construction.  I'm saying it's consistent with the

19  claim construction.  It doesn't change it, but all I do

20  in patent cases.  In my entire career, I have yet to see

21  until this case a patent case where the Plaintiff and

22  the patent owner doesn't take the jury through the

23  patent and say what was the problem I was solving?

24                   What was my solution?

25                   How did I describe it in 1996?  Before I

1    had the Xilinx products in front of me, and I knew what

2    I wanted to do to try to get a reasonable royalty, what

3    did you say in 1996 before the lawsuit existed?

4              That's what's in the patent.  And in

5    every case I've ever seen, the Plaintiff, the patentee,

6    they're proud of it.  They go through it.  That's what

7    Mr. Munch did, right?  Who, by the way, has no stake in

8    this lawsuit and was subpoenaed for testimony by

9    Xilinx -- I mean, by PACT for his deposition, and then

10   brought to this trial by Xilinx.

11             And so they want to run from the patent.

12   They don't look at anything else, don't even for

13   context.  Why?

14             Because they don't like the fact that the

15   inventors, both of them, by the way, explained what they

16   thought.  The bus system control is predefined and does

17   not require any influence by the programmer.

18             Now, of course, that's context, right?

19   No influence or without any influence by the programmer

20   is context.  It's background.  This (indicates) is what

21   we applied for coming to the ultimate decision.

22             But why don't they want to talk about it?

23   Why do they want to say ignore the patents?

24             It's because they're ignoring the claims.

25   They're trying to ignore the patents.  They're trying to

1 change their invention that they made in 1996 to cover

2 something that is very different.

3                And so I told you about the standard for

4 infringement, and the Judge has already instructed you.

5 If a product is missing even one limitation of the

6 claim, the product is not covered by the claim.

7                Mr. McAlexander focused on the most

8 salient, the clearest differences.  It is the permanent

9 bus system control and the requirement for being able to

10 provide that communication.

11               And there's a second instruction that

12 you're going to see that you should pay attention to.

13 This one relates to the issue of capability and

14 functionality.  And what the jury instruction will say a

15 claim requirement may describe a certain functionality

16 or capability that the device must possess.

17               In such cases, a device satisfies the

18 requirement if it is reasonably capable of operating in

19 the recited manner.

20               And now, I want you to focus on some

21 language that's in the actual claims and the claim

22 construction, because it's interesting to see how that

23 lines up with this additional instruction from the

24 Court.

25               If we look -- it's a little small.  The

1  '181 patent, Claim 1, it says that this interface unit,

2  it's combined with lines and everything like that and it

3  has to -- providing communication between a processing

4  unit and at least one additional unit, a memory device,

5  or a peripheral device.

6            That's right down over here (indicates)

7  providing.  So there's a requirement of actually having

8  the circuits and structure to provide information.  We

9  see it in the definition of bus system.  It's a system

10 used to communicate.  We see it in the interface unit.

11 It's for communicating information.

12            And then think back to how the FPGAs

13 work.  They're flexible.  That's the whole point.

14 They're building blocks.  When they're sold, they can't

15 communicate.  They have to be programmed; the building

16 blocks have to be put together.

17            And when they are put together, you will

18 see every single witness in this case.  All of the

19 evidence is that you cannot make a bus system.  You

20 cannot put a bus protocol -- not one, not one single

21 example of the hundreds of options that are out there

22 can be done without programming CLBs, the very

23 programmable devices that cannot permanently contain

24 information, because when the power goes off, they lose

25 everything.

1           And so now let's talk about the Xilinx

2   products.  I told you the whole history.  You heard it

3   from Dr. Trimberger.  The whole history from the first

4   day with the Freeman patent in 1984, the architecture,

5   the focus, the philosophy has been this flexible

6   approach to always give the customers that option, but

7   the consequence of that, you always, in the chip, have

8   to use those programmable resources, the CLBs, to

9   actually make bus system control.

10           And that is, by the way, the opposite of

11  what's required by the Court's construction.

12           Every witness in this case testified,

13  even the PACT witnesses, that the way the Xilinx chips

14  are designed, you must program CLBs for bus system

15  control.  Dr. Trimberger, Suresh Menon, Mr. McAlexander,

16  Dr. Tredennick, and even Mr. Vorbach.

17           Let's look at some of the quotes.  What

18  did Dr. Trimberger say?  That this feature is a

19  fundamental philosophy to give programmability to our

20  customers.

21           What did we see about whether it even

22  works?  Can you get data on and off the chip without

23  using CLBs and I/O blocks?

24           No.  And that goes all the way back to

25  the first chip.

 1                  What did Mr. Menon say?  He's asked about

 2   RocketIO, EMAC, and PCIe; those are the three blocks in

 3   this case.  Can any of them be implemented without

 4   programming CLBs?

 5                  No.

 6                  Why?

 7                  Because we provided the customer a

 8   flexible tool.

 9                  Mr. McAlexander, what types of bus

10   communication abilities does an FPGA have just out of

11   the box?

12                  None.  There's no protocol.  Circuits are

13   not told or controlled how to operate or how to

14   cooperate.

15                  And even Dr. Tredennick, although he

16   didn't come back to explain his response, if any, we do

17   know from the cross examination what he said:  Until

18   this chip is programmed with CLBs, none of these blocks,

19   not the PCIe, not the ethernet, not the RocketIO is

20   going to communicate with any outside chips, according

21   to the bus protocol, right?

22                  Then we go through a few questions

23   talking about that it's actually sending any information

24   or data, and he says yes.

25                  And the fact is, it's undisputed all of

1  the evidence that the capability to actually communicate

2  information as required by the claim constructions, as

3  we've seen here, as we've seen in the providing language

4  in the claim, does not exist in the chip, because it's

5  building blocks.

6          And when you put the building blocks

7  together, there is one and only one way to do it.  You

8  have to program the CLBs, and that's not permanent.  So

9  it doesn't matter whether you're in the box, whether

10  you're out of the box, whether you're after programming,

11  the bottom line is these claims cannot be satisfied.

12          If there is even one element missing,

13  there is non-infringement, and here, there are many

14  missing.

15          Now -- and even Mr. Vorbach said it when

16  he used Xilinx's chips, he had to program the bus.

17          Now, let's look at the documents.  What

18  are the documents, and this is the testimony you saw.

19  How about the historical, technical documents that are

20  used by engineers to understand what these products do

21  and what these products don't do.

22          Well, the user guide for the RocketIO

23  said it's tightly integrated with the programmable logic

24  resources.  Those are the CLBs.  That's what we've been

25  talking about, and I'll show you more about that later.

1   We went through -- I don't know if you remember -- both

2   when I cross-examined Dr. Tredennick and with Mr.

3   McAlexander, the data sheets that say, well, for all of

4   these protocols, what resources are needed?

5               And these are a selection of many, many

6   different protocols, but we see the same thing over and

7   over again.  The mode, those are the different

8   protocols, and what does it say?  Hundreds of CLBs

9   required for RocketIO, hundreds of CLBs required for

10  Ethernet MAC, hundreds of -- up to 2,850 required for

11  PCI Express.

12              That is the only way these products work,

13  and there's not a shred of evidence saying they can work

14  without using those configurable blocks to do bus system

15  control.

16              Now, let's go a level deeper, right?  We

17  heard about the RocketIO and we saw some pictures from

18  Mr. Grinstein about that.  So let's got a level deeper

19  and let's look at the RocketIO itself.  And I don't know

20  if you remember during the cross examination of

21  Dr. Tredennick or the -- direct of Mr. McAlexander, I

22  put up this block diagram of the RocketIO.

23              That's the functional block diagram that

24  shows us the inputs and outputs.  And I pointed out over

25  here where it says FPGA fabric and down over here, it

1 says FPGA fabric (indicates), and then I colored in

2 yellow all the lines going in and out of that block.

3 What does that show us?

4            Virtually everything in the RocketIO,

5 including the serializers and deserializers pointed to

6 by Dr. Tredennick, are all connected up to control

7 signals that are coming from the fabric.  The fabric is

8 the CLBs, those programmable blocks that we've been

9 talking about that have to be used.  This thing does not

10 work without programming the CLBs.  Cannot work.

11 And guess what?

12            I asked Mr. McAlexander about it.  He

13 says, yeah, those are all connected to the CLBs, to the

14 fabric.  That's the programmability.  That's the

15 opposite of being permanent.

16            You take the power off, the programming,

17 the bus system control, right?  The circuit doesn't go

18 away, but keep in mind, it's the bus system control that

19 has to be permanent.  That doesn't stay when you turn

20 the power off.

21            And the RocketIO can't do anything

22 without that programming of the CLBs.

23            What did Mr. -- Dr. Tredennick say?  I

24 asked him, you're going to have to program the CLBs, all

25 those wires that are going to send those signals in and

1   out, right?  And he said that's correct.

2              So even Dr. Tredennick admits CLBs are

3   required for the RocketIO to do anything.  Without the

4   control signals, it does nothing.

5              So what does Dr. Tredennick do?  He keeps

6   retreating back and back to smaller and smaller pieces.

7   And think about this.  This case is about the evidence,

8   and let's look at it.  He retreats and his position and

9   what he wants to tell you to do, he's going to say they

10  have a serializer and a deserializer, and those two

11  little blocks in that RocketIO in that larger chip

12  that's filled with all those CLBs -- and all these parts

13  don't work without the CLBs -- he wants to say that is

14  the permanent implementation of a bus system control,

15  those two little blocks.

16             But even that doesn't make any sense.

17  And why?

18             Well, I asked.  That's -- I asked

19  Mr. McAlexander.  I said, you know what, I want you to

20  put your own opinions out of your mind.  I want you to

21  think about this and say, I'm going to, with blinders,

22  focus just on that serializer and deserializer, and

23  would it work?

24             And he (sic) said:  Is it even possible

25  that the serializer and deserializer could satisfy the

1  requirements of the claims?

2                No.

3                Why?

4                It requires control from the fabric in

5  order to operate.  Even those two little boxes are

6  entirely dependent on programming the CLBs to do

7  anything.  When the power goes off, that programming is

8  gone.  It's not permanent as we see required by the

9  claims and the claim construction.

10                And guess who else said it.

11  Dr. Tredennick, I asked him, too.  Control signals from

12  the FPGA fabric that have to be programmed with CLBs for

13  the serializer to even work?

14                That's correct.

15                That's why PACT so much wants to focus

16  just on the word permanent, because they want to say the

17  RocketIO block is permanent.  Of course, it's permanent.

18  The CLB blocks are permanent.  The memory blocks are

19  permanent.  The clock blocks are permanent.

20                What none of those things are is a

21  permanent bus system control.  They don't have that

22  language in there that allows you to do anything.  That

23  requires the CLBs, and that is, by design, not

24  permanent.

25                Now, you may wonder -- you say with all

1  this focus on serializers and deserializers, is that the

2  invention?  Is that even mentioned in the PACT patents?

3  You can go through the PACT patents and you won't see

4  serializer and deserializer mentioned.  And guess what,

5  that couldn't be their invention anyway.  You know why?

6  Serializers and deserializers, Mr. Menon was asked about

7  that.  They existed in Xilinx products in '95, before

8  the PACT patents.  Now, I don't want to suggest Xilinx

9  invented the serializer/deserializer, because they

10  didn't either.

11            In fact, Mr. Vorbach agreed the

12  serializer had been around since there were computer

13  chips.  This is a very, very old circuit.

14            Mr. Munch was asked, did you invent

15  serializers and deserializers?

16            No.

17            And, in fact, I showed Mr. McAlexander a

18  piece of prior art.  This is an article from 1994, years

19  before the 1996 PACT patent.  It's on a new FPGA

20  architecture.  And by the way, the new part is not the

21  serializer.  But what does it say?  Parallel-to-serial

22  converter, serial-to-parallel converter with a serial

23  link in between.  That's a serializer and a

24  deserializer.

25            There's nothing new about it.  Xilinx was

1    using serializers and deserializers in its chips before

2    PACT.  And by the way, it has nothing to do with

3    infringement, because even that little block needs CLBs

4    to work.

5                    Now, why is it that there is such a big

6    mismatch between the PACT patents and the Xilinx

7    products?

8                    And this really comes down largely to Dr.

9    Trimberger's testimony where he told you about the

10   fundamental approach.  Xilinx is about allowing their

11   customers to do whatever bus system control they want.

12   To do that, they have to keep that level of

13   programmability.  Mr. Menon also explained that they

14   couldn't, in fact, bake it all in and make it all

15   permanent.  And that's our idea.

16                   And by the way, there's a cost to doing

17   that.  There's a cost in terms of cost in the chip.

18   There's a cost in real estate.  There's a cost in

19   design, but that provides their customers the benefits

20   their customers want.

21                   Now, the PACT approach which was

22   described by Mr. Munch, he told us about the goal.  And

23   I'm not saying that the goal overrides the claim.  What

24   I'm saying is that's a background in understanding the

25   approach that was being used by PACT, the problem that

they were trying to solve.  And we can contrast that
with what Xilinx was doing to understand the context of
this dispute, right?

And he was asked, right, would it have
achieved your goals if you only had one aspect of the
bus system control that was permanent?

The goal is only achieved if the bus
system control implements the complete protocol, not
half done.

Right?  And he was even asked, and this
was under oath:  Was it your invention to use a
combination of configuration logic blocks with I/O
blocks to implement bus system control?

No.  It's the approach used by FPGA
chips -- to us -- so it was known how -- to us how this
was done, and our goal was exactly the opposite.

That was on Page 35 of the slides.

So what do we know?

There's the FPGA approach, the
building-block approach that maintains flexibility,
programmability, non-permanent bus system control.
That's the way the Xilinx products work, and every
single witness who's testified about that functionality
has confirmed that.  That is the opposite of what PACT
was trying to achieve.

1          Now, let me talk just for a couple

2  minutes about validity.  I find this very interesting.

3  I didn't realize I was embarrassed about this, so I just

4  learned that for the first time in Mr. Grinstein's

5  closing argument.

6          We actually spent a substantial amount of

7  time in a very short-time trial going through each and

8  every one of the elements of the claims.  And what Mr.

9  Grinstein would like you to do is he would like you to

10  just say, well, because there was a re-examination,

11  forget it.  It's all done.  You don't have to do

12  anything with validity.

13          And I want you to just think back a

14  little bit.  Do you remember that patent video that you

15  saw at the beginning of this case, the video that was

16  played?

17          And that patent video told you that it's

18  commonplace, right, the patents go through the Patent

19  Office, but the ultimate decision on patent validity is

20  with the jury.  That was in the patent video played to

21  you by the Judge; right?

22          And what does Mr. Grinstein want you to

23  do?

24          He said don't pay attention to it.  Don't

25  think about it.  You don't need to.  Somebody else

1  already made the decision for you.

2            Okay.  Now, you have to make your

3  independent decision, and you have to look at the

4  evidence and you come to the decision of what you

5  believe is right and wrong.  But I can tell you one

6  thing that's definitely wrong is that the Patent Office

7  took the decision away from you, and that's what

8  Mr. Grinstein would like you to believe.

9            And you'd think, after all of that, where

10 was Dr. Tredennick to talk about it?

11            You heard Mr. McAlexander go through

12 element-by-element and say where it all was.  Where was

13 Dr. Tredennick?

14            Sitting back there, not answering any

15 questions, when he could have been on the witness stand

16 and told you if PACT really believed that there was a

17 problem with that analysis.

18            Now, what PACT did instead is they tried

19 to confuse the issues.  They said, well, remember that

20 cross examination, shouldn't the DeHon patent not be on

21 the flexible side; it should be on the permanent side.

22            Where is it on the timeline?

23            I don't know if anybody remembers that.

24 And they kept going back and forth between different

25 things that DeHon said.  And Mr. McAlexander explained

1   very clearly, he said, no, you're missing the point.

2   DeHon, and the reason I picked DeHon, is because he's

3   tailoring it to the arguments in this case, the relevant

4   in evidence this case.

5               And DeHon has both fixed and

6   reconfigurable and it says it right there, Figure 3C and

7   if you'll look at Column 16, Lines 32 to 41, fixed bus

8   structure and reconfigurable logic depending on whether

9   it was a high-end or a low-end product.

10              DeHon certainly considered, Mr.

11  McAlexander told you, but look at everything else that

12  was considered.  What Mr. McAlexander did also tell you,

13  and this is another reason why DeHon was the one

14  presented.  He went through the evidence, and what did

15  he find, DeHon reference was considered by the Patent

16  Office.  I've read those and my opinion is, some of

17  those technical submissions were not technically

18  accurate.

19              And that's why, Ladies and Gentlemen,

20  these issues do come to juries because that's where

21  these ultimate decisions of validity are made, just like

22  you saw in the patent video.

23              What is the response to all this from

24  PACT?  Not lawyer argument.  The Judge just told you a

25  lawyer argument is not evidence.  What was their

response?  Nothing.  They never came back after Xilinx's

case and said anything.  These patents are not infringed

and they are disclosed and invalidated by DeHon.

            And thank you.  With that, I'm going to

turn it over to Mr. Baxter.

            MR. BAXTER:  May it please the Court.

            Ladies and Gentlemen, let me, too, thank

you for your service.  I know it's been a long week and

we've had long days.

            This is incredibly important because this

is a case in which a company that has been the leader in

technology has been accused of stealing someone else's

property and it is not true, and therefore, we have had

to take up a lot of your time with technical issues that

is very important to Xilinx.

            But I want to talk to you about what they

call the sideshows, a sideshow that they invented.

And -- and let's start right at the beginning, and that

is did PACT know about the Xilinx technology?

            Here's the question, they're in our

offices for five years, saying we have new technology.

We have a new way of doing it.  We want you to give us

some money and buy our products.  And here's the

problem, they now claim they didn't know what our

product was.  After five years they claim, oh, we had no

1    earthly idea.

2                    Well, look at Slide 42 for me, Mr. Diaz.

3                    And we asked Mr. Weber on cross

4    examination.  Now, prior to meeting with potential

5    customers like Xilinx, you educate yourself on their

6    industry and their products, right?

7                    Yes, we do.

8                    And then if we go to Slide 45, we had Mr.

9    Bolsens in here, the man that talked to them the most

10   and we asked him:  Did you talk about the RocketIO and

11   the DSP48?

12                   He said, of course we did.  That's what

13   the discussions were about.

14                   It's simply untrue they didn't know what

15   our product was.  The problem is now they never accused

16   us of infringement.  They knew exactly about the

17   RocketIO.  They knew about the DSP48 and they never said

18   a word.

19                   Now, they want to say oh, you infringe.

20   Well, their excuse was, well, we didn't know if you

21   coarse-grain and we're not.  Those arrays are fine-

22   grained arrays and if that weren't true, you would have

23   heard from Dr. Tredennick who backed up Mr. Vorbach on

24   that and not a word.  I read the transcript last night.

25   The words never fell from his mouth.  That's something

1  they just made up because they needed an excuse.

2                    Well, then we had -- look at Slide 46 for

3  me, Mr. Diaz.

4                    We had these issues.  And this is the

5  sideshow that they brought up.  First thing they did,

6  they said, oh, well you copied us.

7                    Let's go to the next slide.

8                    It's going to be real hard and I'll be

9  real interested in their closing argument how they

10  explain this.  The RocketIO, you copied the RocketIO

11  from us.  The problem was that we began working on the

12  RocketIO in February of 2000, two years before PACT even

13  shows up.  We released the product before they even show

14  up.  So how we copied it from their materials or what

15  they told us is sort of a mystery to me.  Maybe they'll

16  tell you about that.

17                    And then we go to the issue -- excuse me,

18  and -- and go if you would to 48, if you would, Mr.

19  Diaz.

20                    And we asked the man that designed the

21  RocketIO, had you even heard of PACT?  Have you ever

22  seen any documents?  He said no.  They didn't ask him

23  one single question about that, not one.  If they had

24  any evidence, they'd have drug it out then.  Absolutely

25  nothing.

1            And then we go to the issue of, what I'm

2    going to call, because they called it this and they

3    wanted to keep calling it this because they thought it

4    might prejudice you against Virtex Xilinx the patent

5    grab.  And -- and if there was a patent grab, then it

6    had to do with Altera.  They're the ones out buying

7    patents.  We were buying patents on technology we wanted

8    to use, but we certainly weren't going to go buy patents

9    that we didn't want to use.

10            And we said at the time, these companies

11   are not much of a threat to us, but we're interested in

12   this technology in case that's the future.

13            And go to the next slide.

14            We look and see exactly what we said.  It

15   says they're well positioned from a patent point of

16   view.  If you believe that coarse-grain arrays will

17   prevail in the future, then we ought to take a look at

18   it.  It turns out we decided not to go that route.  Not

19   only did we decide not to go that route, nobody in the

20   industry, none of the 75 companies went that route

21   either.  They said, oh, well, you can't look at that,

22   but look and see where the industries went.

23            They kept doing it the way that Xilinx

24   does it.  They didn't go this route.  But we were

25   interested only, only if that's what the future was

1  going to be, and it turns out that wasn't it.

2                    Go to Slide 51.

3                    THE COURT:  Five minutes, Mr. Baxter.

4                    MR. BAXTER:  Thank you, Your Honor.

5                    Then they said, well, look, you were

6  trying to extract information.  Get Plaintiff's Exhibit

7  118 in the jury room, send for it.  And here's what it

8  says:  According to Ivo, they have some interesting

9  patents and IP, but the rest of the technology doesn't

10 fit.

11                    Kees Vissers, who is a Xilink employee,

12 knows Peter Feist, the former CEO of PACT and maybe he

13 could reconnect and get some financial information.

14                    There was no technical information we

15 were trying to extract.  They just didn't tell you the

16 truth about that e-mail.

17                    And then we heard about the Intel deal.

18 Here's the deal about the Intel deal.

19                    Go to 55 if you would, please, Mr. Diaz.

20                    Here's -- here's the deal on Intel, if

21 your neighbor came to you and he's been living next to

22 you for five years and he said, you know, I'd like to

23 get an easement for free across your property for a

24 water well and you're thinking about it and you're

25 discussing it with your wife and the very next day he

1   sues you and says, oh, by the way, you stole 30 percent

2   of my property and I'm suing you.

3                   So when he comes back on Wednesday saying

4   how about that free water well easement, I don't know

5   what your answer is, but my answer is, gosh, I just

6   don't think that's right.  And maybe we shouldn't do

7   that.

8                   And I think what Xilinx did was much more

9   generous than that.  They said, have your lawyers call

10  our lawyers because we're not going to get into some

11  ethical violation and they just never picked up the

12  phone.

13                  Let me talk to you about the jury verdict

14  just a moment.

15                  If you'll bring the first page up, Mr.

16  Diaz.

17                  The Judge asked you if we infringed on

18  any of these claims, either us or Avnet and Avnet we are

19  together.  And the answer is no on each one of those.

20  And for all the reasons that Mr. Arovas talked to you

21  about, the answer is absolutely no.  They wanted to have

22  a slice of bread.  Their expert told you it was only a

23  slice of bread.  And if nothing else, you know that

24  slice of bread had to be programmed by the CLBs.  It

25  wasn't permanent.  But more importantly the claim, the

1  claim calls for a bus system control, the whole thing,

2  and it didn't call for a slice of bread.

3            The answer is no on each one of those.

4            Number two, is it invalid?  And the

5  answer is yes.  Not a word of rebuttal from PACT about

6  Mr. McAlexander's going through the DeHon patent and

7  explaining how actually that invalidated their patent.

8  They did not want to ask him a question about it and

9  they wouldn't put their expert back up here and the

10 answer is yes on each one of those.

11            Frankly, I don't even think you get to

12 these next questions, but on willful, they didn't even

13 think we were violating their patents.  How could we

14 even think they were?  The Judge told you it had to be

15 reckless and for five years they're in our offices

16 looking at our technology and telling us theirs is

17 different and we happened to believe them and they say

18 we willfully infringed, the answer is no.

19            How about this importation issue, did

20 they import it in the United States?  Absolutely.

21            Go to Slide 62.

22            And Mr. Vorbach said he imported the chip

23 in to San Jose, California in 2000.  And so the answer

24 is yes and the date you ought to put down is October of

25 2000.

 1          Let me talk about damages in the two

 2 minutes I've got left.

 3          You heard Mrs. Woodford say that what you

 4 do is you look at a product with it and without it.

 5 Just like you'd look at the price of a car, with

 6 automatic transmission and without, and that's exactly

 7 what she did.  And when you do that, the very most you

 8 could ever come up with is 4 million dollars.  But you

 9 need not answer that question because once you find that

10 we do not infringe, you get to skip that.  That simply

11 isn't a question you're ever going to get to.

12          But to think that you're going to get 30

13 million dollars for technology that didn't have anything

14 to do with our chips is preposterous.

15          Now, Ladies and Gentlemen, there's been a

16 lot to absorb, but it all boils down to this, it all

17 boils down to something that they have run from -- from

18 throughout this trial.  They don't even want you to read

19 the whole patent.  Get those patents in the jury room

20 and look at the summary of the invention and see if they

21 said it takes no programmer intervention, that that was

22 their invention.  That's exactly what Mr. Vorbach had to

23 admit to and what Mr. Munch said that was their idea.

24 That's what they wanted to do.

25          Look and see, look at that chart with the

serializer and deserializer that's well known in the art

that Xilinx has had in their -- in their product since

1995, well before PACT using them exactly the same way,

and see if those lines don't have to be programmed by

the CLBs.

THE COURT:  Thank you, Mr. Baxter.

MR. BAXTER:  And if you do, Ladies and

Gentlemen, the answer is no infringement.

Thank you, Judge.

THE COURT:  Thank you.

MR. GRINSTEIN:  Ladies and Gentlemen of

the Jury I will just try to run right through all of

those arguments in something of the order that you heard

them, time permitting.

First question we heard was -- first

argument we heard is why didn't PACT ask more questions

of Xilinx's witnesses.  Well, the reason why PACT didn't

ask more questions of Xilinx's witnesses is because

Xilinx's witnesses were talking about a completely

different invention.  They weren't talking about our

invention and we could prove up the infringement of our

invention in three questions of Mr. Menon, the three

questions of Mr. Menon that I showed you in direct -- in

my opening -- closing argument.  The three questions

that said their interface, it's not made out of LEGOS.

1  That's all we needed.

2             Now, I heard extensive criticism of PACT,

3  which was frankly shocking, that we didn't waste your

4  time and keep you here longer yesterday or longer today

5  by calling up Dr. Tredennick to rebut the invalidity

6  arguments that they phoned in.

7             I mean, if their invalidity arguments

8  were so good, why didn't they even mention them in their

9  opening statement?  In fact, why didn't they even

10 mention them when they introduced this case to you two

11 weeks ago in jury selection.  The reason why is because

12 they don't have anywhere close to clear and convincing

13 evidence of invalidity, an evidentiary standard which

14 not once came out of their mouths talking about

15 invalidity in their closing statement.

16            The Patent Office had looked at that

17 DeHon reference three times, rejected it three times,

18 and now they're asking you to second guess the Patent

19 Office after three rejections of that and 15 minutes of

20 testimony in this trial, 20 minutes, if I'm being

21 generous to them, about the DeHon reference.  There's a

22 good reason why we didn't call Dr. Tredennick because it

23 would have been a waste of everyone's time.

24            Also, did Xilinx's lawyers really just

25 argue to you that they didn't need an FPGA expert in

this case?  We've spent this whole case talking about

Xilinx's FPGA products, this whole case discussing

whether their FPGA products do the same thing as our

patents.  It was FPGA, FPGA, FPGA.  But they couldn't

find an FPGA expert who would sponsor their technical

arguments.

In their huge Xilinx rolodex of FPGA

friends in the industry, no one stepped forward to say

what Xilinx wanted them to say.  That's why they had to

hire a professional expert witness, and that's why

they're trying to backfill now and claim that he had the

necessary expertise to tell you all about Xilinx's

FPGAs, which is exactly what he did.

I want to talk to you a few seconds about

some of their noninfringement arguments that they made.

May I have the ELMO, please, Mr. Diaz?

You heard this long discussion in the

closing arguments about how PACT had redefined the word

a in the claims to mean any aspect of.  That is a little

bit stretching of an argument because the whole reason

that Dr. Tredennick was arguing any aspect of was to

rebut their position that the word a in the claim means

every.  That is their position that every bus system

control in their system has to be controlled by the

interface unit.  That is what they were saying and he

1   was just saying any aspect of to rebut their attempts to

2   reread the claims, to rewrite the claims.

3             That's why Dr. Tredennick says they read

4   it as being all bus systems control or every bus system

5   control and it really just requires one.  And he has

6   said -- again said it in his redirect examination.  You

7   know what, all these arguments about any aspect of, they

8   have absolutely nothing to do with my read on

9   infringement because I am faithfully applying the word

10  a.

11            We also heard quite a bit of additional

12  conversation about this whole programmable/

13  nonprogrammable business.  And again, Xilinx's lawyers,

14  without the benefit of any actual claim language,

15  without the benefit of any actual definitions from the

16  Court, continue to argue to you that permanent means

17  without programming.  That's all they want to say all

18  day long.

19            You know what, I've got right here a

20  thermostat.  And what kind of thermostat is it?  It's a

21  programmable thermostat.  And this thermostat, this

22  thing's permanent.  I can't take apart these parts and

23  go build something else with it.  This is always going

24  to be a thermostat, nothing else.  But look, it's still

25  programmable.

1        I mean, Xilinx's argument continues to

2   be, and yet they still won't address what we're saying

3   about it, yes, when you have your permanent bus

4   interface you are going to connect it up to some

5   surrounding LEGOS.  You are going to do that on the

6   chip.

7        But what on earth does that have to do

8   with the fact that this thing is not still permanent.

9   It is.  You can connect it to all the CLBs you'd ever

10  want to and that thing is not changing its shape.  That

11  thing is still permanent.  I didn't hear any response to

12  that from Xilinx's lawyers.

13       I also heard an argument that, you know,

14  the serializer and deserializer were around at Xilinx

15  since time in memorial and therefore we didn't invent

16  anything new.

17       Ladies and Gentlemen of the Jury, we're

18  accusing an FPGA product.  We're not saying we invented

19  the FPGA either.  What we're saying is we invented a

20  much larger claim, a much larger context of the claim

21  which includes many parts, one of which was their

22  implementation of a permanent serializer, deserializer.

23  It's one part of a larger claim.

24       You can't just pick out one thing and say

25  you know what, that was known back in 1985, therefore

1  PACT didn't invent anything new.  That's absolutely not

2  the right way to proceed on that.

3           I heard a straw man argument that was

4  raised that says we never proved up copying it, that,

5  you know, RocketIO came from before our time of our

6  patents and therefore we never proved up Xilinx's

7  copying, which is kind of funny because we never argued

8  that Xilinx copied.

9           Do you remember from my opening statement

10  when I told you that what Xilinx had done was come on to

11  our land and then see our no trespassing sign.  Xilinx

12  developed the RocketIO, but then it found our patents

13  and when it found our patents instead of stopping

14  infringing those patents like it should have, it stayed

15  on our land and continued to infringe.  That's exactly

16  what I told you in the opening statement.

17           So the whole notion that we failed to

18  prove up copying, it -- it's easy to set up an argument

19  that we're going to lose if it's not an argument we're

20  making.

21           Again, we heard more discussion of this

22  complex contraption of an argument that, you know, PACT

23  must have known that Xilinx was infringing.  But where

24  were the documents that they showed you?  Where were the

25  internal documents from PACT that showed that PACT knew

about this RocketIO and knew how it worked or knew about

embedded EMAC and knew how it worked or knew about PCI

Express and knew how it worked.  They had plenty of

internal PACT documents.  Why couldn't they find the one

that said, oh, we know how PACT -- how Xilinx works and

we don't think it infringes those particular elements,

the RocketIO, the embedded EMAC, the PCI endpoint?

There are no so such documents.

                    And, you know, this whole who told who

what, ask yourselves why all those times when PACT was

going to Xilinx telling Xilinx about PACT's technology,

why didn't Xilinx tell PACT, you know what, we're doing

what's in your patents.  Think about that.  Why didn't

they do that?

                    And I want to close by discussing some of

the things we didn't hear a response to in the

Defendants' closing argument.  We didn't hear a response

to why they filed that re-exam.  Why did they run to the

Patent Office to take away our patents if it really was

so clear that they don't infringe, like they just

represented to you in closing argument?  Did you get an

answer to that question from them?  Because I didn't

hear it.

                    THE COURT:  Two minutes.

                    MR. GRINSTEIN:  Why didn't they hire a

real FPGA expert?  They know everybody in the industry.
It would have been so simple for them to come and
present somebody with credentials almost as good as Dr.
Tredennick's.  But they didn't.  What's the answer to
that?  What was the answer to why they couldn't find
somebody who would come in with real industry experience
and really tell you why Xilinx didn't infringe?  I
didn't hear that answer.

What was the answer to why they continued
to go to other parts of the patent to try to define the
claims?  It was almost the last thing that Mr. Baxter
said.  He said go look at the summary of the invention
and figure out what the claims mean from that.  Why do
they continue to do that?

Did you hear an explanation for that?
Because the Court sure didn't tell you, go to the
summary of the invention or try to figure out what
PACT's inventions is by cobbling together parts of the
specification or people's testimony.  The Court told you
to go to the claims of the patent and stop right there.

And finally, why didn't we hear answer to
the fundamental and simple question of why was Xilinx so
interested in PACT's patents?  Xilinx is overfilled with
patents.  It's overloaded with patents.  I don't think
they have any more room on that wall on the way to the

1   lunchroom.  There is no more room there.  So they aren't

2   just in the habit of collecting random patents.  They

3   aren't just in the habit of, nah, let's pick up a couple

4   patents because maybe 15 years from now we'll need them.

5            There is a reason why Xilinx was so

6   interested in our patents.  The reason was because

7   Xilinx knew it infringed them.  Xilinx knew it needed to

8   use our patents.  And this whole case comes down to the

9   fact that Xilinx has never wanted to pay fair

10  compensation for them.

11           THE COURT:  Thank you, Mr. Grinstein.

12           MR. GRINSTEIN:  Thank you, Your Honor.

13           THE COURT:  Ladies and Gentlemen, if you

14  would turn back to Page 14 where we left off on the

15  instructions, I'll pick up with those.

16           You should consider and decide this case

17  as a dispute between persons of equal standing in the

18  community, of equal worth and holding the same or

19  similar stations in life.  This is true in patent cases

20  between corporations, partnerships or individuals.

21           A patent owner is entitled to protect its

22  patent rights under the United States Constitution.

23           This includes bringing suit in the United

24  States District Court for money damages for

25  infringement.  The law recognizes no distinction among

 1   types of parties.  All corporations, partnerships, and

 2   other organizations stand equal before the law,

 3   regardless of size or who owns them and are to be

 4   treated as equals.

 5              When you retire to the jury room to

 6   deliberate on your verdict, you may take this charge

 7   with you, as well as exhibits which the Court has

 8   admitted into evidence.  Because there are so many of

 9   them, we're not going to send them all back, but if you

10   want to see any exhibit, simply describe it in the best

11   manner you can and put it in a written note and pass it

12   up and we'll try to get that exhibit back to you to

13   consider.

14              Select your Foreperson and conduct your

15   deliberations.  If you recess during your deliberations,

16   follow all of the instructions that the Court has given

17   you about your conduct during the trial.

18              After you've reached your verdict, your

19   Foreperson is to fill in on the form your answers to the

20   questions.  Do not reveal your answers until such time

21   as you are discharged, unless otherwise directed by me.

22              You must never disclose to anyone, not

23   even to me, your numerical division on any question

24   that's before you before you return your verdict.

25              Any notes that you've taken during this

1  trial are only aids to your memory.  If -- if your

2  memory should differ from your notes, then you should

3  rely on your memory and not on the notes.  The notes are

4  not evidence.  A juror who has not taken notes should

5  rely on his or her independent recollection of the

6  evidence and should not be unduly influenced by the

7  notes of other jurors.  Notes are not entitled any

8  greater weight than the recollection or impression of

9  each juror about the testimony.

10               If you want to communicate with me at any

11  time, please give a written message or question to the

12  court security officer who will bring it to me.  I'll

13  then respond as promptly as possible, either in writing

14  or by having you brought into the courtroom so that I

15  can address you here orally.  I will always first

16  disclose to the attorneys your question and my response

17  before I answer your question.

18               After you have reached a verdict, you are

19  not required to talk with anyone about the case unless

20  the Court directs otherwise.

21               And with that, you may now retire to the

22  jury room to deliberate.

23               LAW CLERK:  All rise.

24               (Jury out.)

25               THE COURT:  Is there anything we need to

1  put on the record at this time by either side?

2             MR. GRINSTEIN:  Not from the Plaintiff,

3  Your Honor.

4             THE COURT:  All right.

5             MR. BAXTER:  Nothing from the Defendants,

6  Your Honor.

7             THE COURT:  All right.  The jury is being

8  provided with lunch.  I think that everyone is safe in

9  doing the same.  I would ask you, however, if you're not

10  going to leave somebody here in the courtroom, to please

11  let Mr. Ponder know how to get in touch with whoever you

12  want to be notified in the event there's a question, and

13  we'll -- we'll notify you before we respond.

14             And with that, we're adjourned.  Thank

15  you.

16             (Recess.)

17             * * * * * * * * * * * * * * * * * * * * * * * *

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATION</u>

2

3             I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes

5    of the proceedings in the above-entitled matter to the

6    best of my ability.

7

8

9

10   /s/_____                    _____
     SHELLY HOLMES, CSR                              Date
11   Official Court Reporter
     State of Texas No.:  7804
12   Expiration Date  12/31/12

13

14   /s/_____                  _____
     SUSAN SIMMONS, CSR                             Date
15   Official Court Reporter
     State of Texas No.:  267
16   Expiration Date  12/31/12

17

18

19

20

21

22

23

24

25