**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| PACT XPP TECHNOLOGIES, AG | § | |
| | § | |
| v. | § | Case No. 2:07-CV-563-RSP |
| | § | |
| XILINX, INC., et al. | § | |

**MEMORANDUM ORDER**

Before the Court is PACT XPP Technologies, AG's Motion for Enhanced Damages (Dkt. No. 402, filed June 27, 2012). The jury found that Xilinx willfully infringed claims 1, 3, 17, and 30 of U.S. Patent No. 6,119,181, and claim 8 of U.S. Patent No. 6,338,108. (Verdict, Dkt. No. 370.) The jury awarded $15,399,900 as a reasonable royalty. (*Id.*) The Court has denied Xilinx's Renewed Motion for Judgment as a Matter of Law of No-Willfulness, and in the Alternative, for a New Trial. (*See* Mem. Order, Dkt. No. 442.)

**APPLICABLE LAW**

After a jury awards damages for infringement, the court "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. The award of enhanced damages is a two-step process. *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996) "First, the fact-finder must determine whether an infringer is guilty of conduct upon which increased damages may be based." *Id.* A finding of willful infringement meets this requirement. *Id.* Second, "the court then determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances." *Id.* (citing *Read Corp. v. Portec, Inc.*, 970 F.3d 816, 826-27 (Fed. Cir. 1992)).

The Federal Circuit set out nine factors to be considered in *Read Corp v. Portec, Inc:* (1) whether the defendant deliberately copied the ideas or design of another; (2) whether the

defendant, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the defendant's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. 970 F.3d at 826-27.

## DISCUSSION

### 1. Whether the defendant deliberately copied the ideas of another.

There is no allegation of copying, therefore this factor is neutral.

### 2. Whether the defendant, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed.

There is overwhelming evidence in the record that Xilinx knew of PACT's patent protection. (*See* Mem. Order at 9-11, Dkt. No. 442.) Xilinx first had knowledge of PACT's patent protection around the beginning of its business discussions with PACT in 2002, and no later than 2003.

Despite having knowledge of PACT's patent protection, Xilinx has failed to present any evidence that it investigated the scope of PACT's asserted patents and formed a good-faith belief that the patents are invalid or not infringed. Xilinx's clearly expressed interest in acquiring PACT's patents suggests, at a minimum, that Xilinx did not have substantial concerns that the asserted patents are invalid.

With respect to infringement, Xilinx has argued that the documentary evidence shows that Xilinx subjectively believed that it was not infringing. To reach that conclusion, one would have to draw inferences from the evidence in Xilinx's favor, which the jury apparently did not do. The Court has seen the very same evidence and finds that the documentary evidence does

not establish that Xilinx had a good faith belief that it did not infringe.  At trial, Xilinx primarily relied on the argument that it did not believe it infringed because PACT never accused Xilinx of infringement during its business discussions.  However, as explained in the Court's ruling on Xilinx's motion for judgment as a matter of law, Xilinx knew that PACT misunderstood the design of Xilinx's infringing products, and therefore did not appreciate at the time that Xilinx's products infringed the asserted patents.  (*See* Mem. Order at 10-11, Dkt. No. 442.)

Xilinx argues that the evidence shows that Xilinx employees believed that technology like PACT's could represent "the future of computation," and contends that such statements prove that those employees did not believe Xilinx was using that technology.  The Court disagrees.  That very statement may have been made by an employee at the first car maker to introduce an automatic transmission – yet that technology certainly became the future for automobiles, even if it was a niche feature at first.  The Court finds that this factor weighs strongly in favor of enhanced damages.

**3. The defendant's behavior as a party to the litigation.**

There is no allegation that Xilinx acted inappropriately during litigation, therefore this factor is neutral.

**4. The defendant's size and financial condition.**

Xilinx is the world's largest FPGA company.  Sales of infringing products totaled $1.461 billion, and yielded a total profit of $372.6 million.  Xilinx's revenue and profits were not considered by the jury.  Xilinx has $800 million in cash, and over $1.1 billion in short-term investments.  The Court finds that Xilinx's size and financial condition weigh in favor of enhanced damages.

**5. The closeness of the case.**

This was not a close case.  Xilinx's non-infringement and invalidity positions were not reasonable.  (*See* Mem. Order at 3-9, Dkt. No. 442.)  Xilinx's non-infringement defense primarily rested on trying to convince the jury to further narrow the parties' agreed construction for the terms "interface" and "interface unit" by arguing that the patentee disclaimed claim scope during prosecution.  Had the dispute over the agreed construction been presented to the Court before trial, the Court would have rejected those arguments.  As to invalidity, Xilinx offered less than an hour of testimony that was both conclusory and unpersuasive.  The fact that PACT dropped patents over the course of this case does not diminish the strength of its case.  The record clearly reflects that PACT dropped patents as the case progressed at the insistence of Defendants that this case be made more manageable for trial.  This factor weighs in favor of enhanced damages.

**6. The duration of the defendant's misconduct.**

Xilinx willfully infringed the asserted patents at least since 2003.  Xilinx has continued to sell infringing products without modification, and even introduced new infringing products after being sued in 2007.  This factor weighs in favor of enhanced damages.

**7. Remedial action by the defendant.**

There is no evidence that Xilinx took remedial action before suit, during suit, or even after the jury's verdict.  The lack of remedial action warrants enhanced damages.

**8. The defendant's motivation for willfully infringing.**

PACT and Xilinx held meetings on ten different occasions over the time period of 2002 to 2007.  One of the inventors of the asserted patents, Martin Vorbach, attended meetings on behalf of PACT.  Xilinx was represented by 10-15 different employees, including Dr. Ivo Bolsens, Xilinx's chief technology officer.  PACT believed that Xilinx's infringing products had

a "fine-grained" design, and that the performance of Xilinx's products could be improved by incorporating PACT's implementation of its "coarse-grained" technology.  PACT sought to convince Xilinx to license the designs for PACT's implementation of its patented technology. PACT presented its patented technology, and disclosed confidential technical information related to PACT's implementation to Xilinx, subject to a non-disclosure agreement between the parties.

At around the same time that PACT and Xilinx began having discussions, Xilinx became concerned that its main competitor in the FPGA industry, Altera, was building up a patent portfolio in the area of coarse-grained array technology, such as PACT's.  Altera was building its portfolio by purchasing failed companies that had desirable patent portfolios.  Xilinx became concerned that it may miss out on the "patent grab" in a developing area that could be the "future of computation."  Xilinx identified small, innovative companies with patents related to this area of technology.  Xilinx surmised that these companies would likely fail for commercial reasons unrelated to their merits of their technology, and that their failure may present an opportunity to acquire valuable patent rights.  PACT was one of the companies identified as a potential target, and Xilinx noted that it appeared that PACT had a strong portfolio.

Xilinx was aware that Mr. Vorbach and PACT believed that Xilinx's FGPAs did not have coarse-grained elements.  However, Xilinx knew that position was false because it had already designed and incorporated the infringing RocketIO units into the infringing products.  Xilinx did not reveal this fact to Mr. Vorbach or PACT.

At trial, Xilinx admitted that it was impressed by Mr. Vorbach's technical knowledge and abilities.  Nonetheless, Xilinx chose to not partner with PACT.  Xilinx informed PACT that it was not interested in licensing PACT's designs because it did not want to go to the expense of

putting PACT's implementation on its FPGAs, and that it did not think that PACT's implementation would sufficiently improve upon the existing performance of its FPGAs.

However, the evidence suggests that the real reason for its decision to not license PACT's designs was that Xilinx already had its own superior implementation of PACT's patented technology, and was not worried that PACT, a much smaller company, would pose much of a risk to Xilinx.  Xilinx believed that PACT was running out of money, and that there might be an opportunity to acquire PACT's patents at a discount if the company failed.  Xilinx hoped that by not engaging with PACT, that it would hasten PACT's descent into bankruptcy.  Moreover, Xilinx discouraged a venture capitalist from investing in PACT.  The foregoing evidence weighs strongly in favor of enhanced damages.

At trial, there was evidence that Xilinx disregarded its obligations under the non-disclosure agreement by failing to destroy or return the confidential technical information that it received from PACT.  Xilinx also admitted that it continued to engage in discussions with PACT well after it had already reached an internal consensus that it would not enter into a business relationship with PACT.  Xilinx's mishandling of PACT's confidential information and desire to obtain as much confidential information from PACT before cutting ties shows that Xilinx was motivated to willfully infringe by its belief that it did not need to worry about a smaller competitor and its intellectual property rights.

**9.  Whether the defendant attempted to conceal its infringement.**

As recounted above, the evidence shows that PACT and Xilinx were purportedly engaged in good-faith business discussions.  During these discussions, Xilinx knew that PACT believed that Xilinx products used a non-infringing "fine-grained" design.  Xilinx intentionally did not correct PACT's misunderstanding in order to conceal its infringement.

## CONCLUSION

After considering all of the evidence and the parties' arguments, the Court finds that enhanced damages in the amount of $23,099,850 are appropriate.  This is not simply a case where the jury found willful infringement.  Throughout the trial, the Court was impressed with the strength of the evidence that Xilinx carried out a knowing and calculated plan to acquire PACT's patented technology without compensation.  Accordingly, PACT's Motion for Enhanced Damages (Dkt. No. 402) is **GRANTED**.

**SIGNED this 30th day of August, 2013.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE